IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LATHAM QUALITY, INC., on behalf of itself and others similarly situated, | ) ) | |
| | ) | Case No.: |
| Plaintiff, | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| BAYER AKTIENGESELLSCHAFT | ) | |
| Serve via Hague Convention | ) | **FILED UNDER SEAL** |
| | ) | |
| BAYER CROPSCIENCE LLC | ) | |
| Registered agent: | ) | |
| St Louis County Registered Agents Corp. | ) | |
| 12213 Big Bend Rd | ) | |
| Saint Louis, MO 63122-6837 | ) | |
| | ) | Rule 23 Class Action |
| | ) | |
| BAYER CROPSCIENCE LP, | ) | |
| Registered agent: | ) | |
| St Louis County Registered Agents Corp. | ) | |
| 12213 Big Bend Rd | ) | |
| Saint Louis, MO 63122-6837 | ) | |
| | ) | |
| | ) | |
| MONSANTO COMPANY, | ) | |
| Registered agent: | ) | |
| St Louis County Registered Agents Corp. | ) | |
| 12213 Big Bend Rd | ) | |
| Saint Louis, MO 63122-6837 | ) | |
| | ) | |
| CHANNEL BIO LLC | ) | |
| Registered Agent: | ) | |
| CSC-Lawyers Incorporating Service Co. | ) | |
| 221 Bolivar Street | ) | |
| Jefferson City, MO 65101 | ) | |
| | ) | |
| Defendants. | ) | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff Latham Quality, Inc. ("Plaintiff" or "Latham"), individually and as representative of all others similarly situated, by and through its attorneys, files this Class Action Complaint against Bayer CropScience LLC, Bayer CropScience LP, Bayer Aktiengesellschaft ("Bayer AG"), Channel Bio LLC ("Channel"), and Monsanto Company (collectively "Defendants" or "Bayer").

<u>**NATURE OF THE ACTION**</u>

1.      Latham is a family-owned independent seed company that produced hybrid corn and soybean seeds for sale and distribution to corn and soybean growers in the United States. For nearly 75 years, Latham bred and sold seed, building its brand and its business through sacrifice, hard work, and perseverance and providing quality products and service to growers and dealers across the country. After decades of prosperity, however, Latham became the latest victim of foreign monopolization in United States agriculture. Exercising unlawfully maintained monopoly power, and engaging in anti-competitive, discriminatory, and retaliatory conduct, Bayer cost Latham and other independent seed companies hundreds of millions—if not billions—of dollars. Bayer's illegal conduct suppresses competition in a vital sector of the United States economy, irrevocably damaged Latham and dozens, if not hundreds, of other independent seed companies, and hurts American farmers. Bayer's actions were designed to root out and drive away competition in the seed markets so that Bayer could maintain its monopoly and continue to reap unearned, supra-competitive prices.

2.      Bayer is a German company. Its conduct threatens and harms Latham and all other independent seed companies, as well as corn and soybean growers throughout the United States. In addition, it is a threat to the United States of America's "national and economic security."

2

3. On December 6, 2025, President Trump issued an executive order directing the Attorney General and the Chairman of the Federal Trade Commission to "take all necessary and appropriate actions to … determine whether anti-competitive behavior exists in food supply chains in the United States, as well as whether control of food-related industries by foreign entities is increasing the cost of food products in the United States or creating a national or economic security threat to Americans." https://www.whitehouse.gov/presidential-actions/2025/12/addressing-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain ("Dec. 6, 2025 Executive Order")

4. In a statement accompanying the Dec. 6, 2025 Executive Order, the White House explained that the purpose of the order was **"STOPPING PRICE FIXING AND FOREIGN CONTROL"** of the agricultural supply chain, including in the "seed" sector, which "may be vulnerable to anti-competitive manipulation that result in higher prices for farmers and consumers." https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addresses-security-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain. "Foreign-controlled companies are increasingly involved in key segments, potentially creating national security risks and driving up the cost of food for American families—issues the Task Forces are specifically directed to investigate." *Id*. "Without aggressive enforcement, price fixing and anti-competitive behavior will continue to inflate grocery bills and weaken America's food independence." *Id*.

5. As this Complaint details, for years, Bayer has engaged in precisely the conduct condemned by President Trump and the White House. Through acquisitions, mergers, and consolidation within the seed market, as well as a web of restrictive license agreements, Bayer acquired market power across hybrid corn seed containing genetically engineered ("GE") traits or

events. Although that monopoly may have originated, in part, from patents granted to, or acquired by, Bayer through the aforementioned acquisitions or mergers, Bayer's anti-competitive conduct has illegally extended and expanded its monopoly in the Relevant Markets (defined *infra*), resulting in supra-competitive prices, reduced competition, and lower output.

6. Bayer's market power, and indeed its monopoly, stems from its control over the most widely adopted GE event in hybrid corn seed. That event is known as NK603, which confers a trait in corn seed that allows growers to spray their corn fields with glyphosate, killing weeds without harming the crop. NK603 and glyphosate, which Bayer sold under its brand name Roundup, became the foundational herbicide mode of action for hybrid corn grown in the United States. Over 90% of all commercial corn planted in the United States contains the NK603 GE event.

7. For over a decade, Latham licensed from Bayer, or its predecessor Monsanto, the right to include NK603 in corn seed Latham produced and distributed downstream to growers. Bayer, and its predecessor reaped many billions of dollars in profits while NK603 was under United States patent protection. But Bayer's last United States patent on NK603 expired in November 2022.

8. As the foundation of modern agronomic weed control in the GE corn market, demand for corn seed containing NK603 remains high; so, upon expiration of the last patent, there should have been entry of generic manufacturers to compete with Bayer. Competition by generics would have injected pricing pressure on Bayer, resulting in lower costs to Latham and others to produce NK603 corn seed and, in turn, lower prices to farmers. But the opposite has occurred: Bayer increased its prices post-patent, and it has maintained its monopoly at the expense of American farmers.

9. Bayer, through its market power, foreclosed immediate competition using anti-competitive means. Through an agreement with its largest competitor, Corteva AgriScience ("Corteva"), Bayer has delayed Corteva's entry into the generic market for NK603 for years. As a result, even after the last United States patent on NK603 expired, Bayer remained the only viable source from which independent seed companies like Latham could obtain NK603.

10. But for this illegal agreement, the price of licensing and selling hybrid corn seed containing NK603 would have fallen; certainly, Bayer would not have been able to *increase* prices charged to independent seed companies, including Latham. Such increases have dramatically lowered their profit margins and, at times, rendered them unprofitable and incapable of competing with Bayer's own seed dealers, such as Channel Bio LLC ("Channel"). As a result, dozens, if not over a hundred, independent seed companies have been forced out of business or to sell their seed brands to larger seed companies that Bayer locks into long-term contracts. Bayer and Corteva's agreement not to compete on price alone foreclosed substantial competition, allowing Bayer to not only maintain, but increase, its supracompetitive prices for NK603.

11. Using its monopoly power over the market, and secure in the knowledge that its largest competitor was foreclosed from competing for years, Bayer undertook additional anticompetitive acts that made it difficult, if not impossible, for other, generic competition to emerge. As a practical matter, to grow and sell hybrid corn seed containing NK603, a seed company needs parental inbred seed that contains the NK603 event. But Bayer has maintained strict, and anticompetitive, controls of this seed line.

12. After years of searching, Latham eventually identified and obtained viable NK603-traited parental seed that was not subject to Bayer's contractual use restrictions. Latham intended to breed it into its proprietary, and superior, corn genetics to produce a generic NK603 corn seed

that would directly compete with Bayer's products after NK603's patent expiration. Bayer learned of Latham's development program, and it swiftly retaliated to prevent competition, using Latham's non-public customer and sales information, provided to Bayer under its licensing agreement, to allow Channel and Bayer itself (under its DEKALB seed brand) to steal millions of dollars of Latham's seed business in a two-week period, leaving Latham with produced but unsold corn seed inventory, putting Latham on the verge of bankruptcy and ultimately leading to the sale of its 75-year-old, family-owned seed business.

13. Bayer uses a web of restrictive, anticompetitive license agreements to further restrict the entry of generic competition. These agreements exist solely, or predominantly, to foreclose competition, and raise potential rivals' costs to compete after Bayer's patent rights expire, effectively allowing Bayer to extend its monopoly.

14. The form agreement imposed on independent seed companies, like Latham, is a prime example. For years, Latham received parent seed containing NK603 subject to the license agreement but Bayer prohibits the independent seed company from using that seed to breed or develop a competing generic NK603-traited corn product *even after the patent on NK603 expired*. And it requires the companies, including Latham, to pay royalties on seed grown from that parent, *even after the patent on NK603 expired.*

15. Bayer imposes similar restrictions on the corn growers, which produce corn from hybrid corn seed containing NK603. These form license agreements imposed on the grower prevent the grower from providing anyone, or using, the seed containing NK603, *even after the patent on NK603 expired.*

16. On information and belief, Bayer imposes similar post-patent restrictions on <u>all</u> parties to which it provides seed containing NK603, including breeders and other third-party

6

suppliers of GE hybrid corn genetics (parent seed). As a result, Bayer has effectively foreclosed all, or most, of the market from obtaining the material necessary to produce seed containing generic NK603, which would compete with Bayer, despite expiration of its United States patent rights.

17. Bayer was only able to obtain these restrictions by using its market power. It conditions access to any of its patented traits, including NK603, on agreement to abide by these post-patent limitations, which have no legitimate, pro-competitive purpose except to prevent post-patent competition. These restrictions exist solely to prevent, and raise barriers to entry, of generic competition, which has contributed to Bayer's maintenance of supracompetitive prices.

18. As its patent rights were set to expire, Bayer simultaneously began significantly weakening independent seed companies, which, on information and belief, it viewed as potential avenues of emergent generic competition, all while publicly and privately referring to them as important "partners" in the seed business.

19. In 2018-2019, Bayer revised the terms of Monsanto's "loyalty" program, called the Premier Performance Program or "PPP", with independent seed companies, including Latham, to condition their ability to earn any profit on the near-exclusive, year-over-year sourcing of seed traits from Bayer, as opposed to one of Bayer's competitors. This was intended to, and did, "lock-in" seed companies to Bayer products, raising barriers to entry for any potential, generic competitors providing seed with NK603. It also contributed to Bayer's ability to continue charging post-patent, supracompetitive royalties.

20. During the same period, and until 2025, Bayer illegally used its monopoly in corn seed to require independent seed companies to also license Bayer's GE soybean traits, which increased costs and reduced profit margins for companies like Latham.

21. Bayer also engaged in price discrimination, both between independent seed

companies with and without long-term incentive agreements and between independent seed companies and Bayer's direct-sales arms, including its subsidiary Channel. Bayer's increase in licensing fees, including for NK603, drove up costs for companies like Latham, making it difficult, and in some cases impossible, for them to compete. Bayer's direct sales arm and companies with long-term incentive agreements benefited, reducing competition. As a result, many independent seed companies left the market, were forced to sell, or went bankrupt. Bayer's conduct not only constitutes unlawful price discrimination but was designed to consolidate the market, giving Bayer greater control as its patents expired.

22. Furthermore, absent enforcement of the antitrust laws, Bayer intends to continue its monopolistic conduct. Recently, it announced that it would remove two hybrid corn seed products from the market, beginning in 2026 and 2027. The name of the products are VT Double Pro ("VT2 PRO") and SmartStax, which include NK603 and insect-resistant GE traits. These announced exit dates coincide with the expiration of its United States patent rights on the GE traits contained in each product. These products are still very popular with significant sales. Rather than offer these products at lower prices, reflecting the expiration of the patents, Bayer intends to withdraw them from the market, forcing ISCs to purchase licenses for still-patented seed technologies that many growers do not need or want. Bayer, thus, intends to use its existing monopoly to transition the buyers to patented technology so that it can ostensibly justify its supracompetitive prices, despite the fact that many growers do not desire those products.

23. Bayer's plan to thwart generic entrants in the GE corn seed markets to maintain its illegal monopoly is reflected in each of its Annual Reports since it acquired Monsanto. For example, in its 2024 Annual Report, Bayer states: "In the Crop Science Division, we could face stronger competition in the seed and crop protection industry...[N]ew competitors entering the

market and aggressive marketing and pricing strategies – not only for generic products – could have a largely negative impact on our profitability and market position." Bayer 2024 Annual Report at 87. Near identical statements were made in each Bayer Annual Report since it acquired Monsanto. *See, e.g.,* Bayer 2019 Annual Report at 93; Bayer 2020 Annual Report at 106; Bayer 2021 Annual Report at 105; Bayer 2022 Annual Report at 119; Bayer 2023 Annual Report at 107; Bayer 2025 Annual Report at 90.

24. In its 2025 Annual Report, Bayer celebrated that its "global seed and crop protection market recorded currency-adjusted growth of approximately 2% in 2025, largely driven by an increase in planted area for corn in the United States(.)" But it recognized "competitive pressure from generics again causing headwinds" in crop protection (herbicides). Bayer 2025 Annual Report at 64. Bayer's illegal conduct blocking entry of a generic NK603 corn seed was designed to avoid the generic pricing pressure that eroded its monopoly in the glyphosate herbicide market. For Bayer, its anticompetitive conduct in the corn seed market has been a huge success. For Latham and other independent seed companies, it has been devastating.

25. Bayer's conduct, both that summarized above and that detailed below, has caused immense harm to Plaintiff, to independent seed companies, to U.S. farmers, and to the security of the United States. Bayer's continued charging of patent royalties on NK603, even after its United States patents have expired, violate the contract between Bayer and independent seed companies like Plaintiff, is illegal under U.S. patent and/or antitrust law, and results in the unjust enrichment of Bayer at the expense of Plaintiff and other independent seed companies. Only through the unlawful exercise of its monopoly power has Bayer been so successful in maintaining supracompetitive prices on technology that belongs to the public. Bayer has reaped, at least, hundreds of millions, if not billions, of ill-gotten dollars.

26.     Bayer's anti-competitive conduct has directly contributed to high agricultural costs and reduced genetic diversity that threaten the U.S. food supply. It is past time to restore competition to U.S. farming and to free it of foreign influence.

27.     This action arises from damages sustained by Latham and other similarly situated independent seed companies as a result of Defendants' unlawful conduct in violation of 15 U.S.C. §§ 1-7 (the "Sherman Act"), 15 U.S.C. §§ 12-27 (the "Clayton Act"), and as amended by 15 U.S.C. § 13 (the "Robinson-Patman Act") ("Federal Antitrust Claims"), and in violation of Missouri statutes and common law ("State Law Claims").

28.     Latham also pursues individual claims for damages arising from Defendants' tortious interference, breach of covenant of good faith and fair dealing, breach of contract, promissory estoppel, negligent misrepresentation, and violation of the Missouri Uniform Trade Secrets Act.

29.     Latham on behalf of itself and others similarly situated also seeks injunctive relief, pursuant to 15 U.S.C. § 26 of the Clayton Act and Section 416.071 of the Missouri Antitrust Law, in the form of this Court's order prohibiting Defendants from engaging in any of the anticompetitive acts discussed herein and from engaging in any other practices with the same purpose and effect as the challenged practices as well as an-y other preliminary or permanent relief necessary and appropriate to restore fair and competitive conditions in the markets affected by Defendants' unlawful conduct, including but not limited to an injunction prohibiting Bayer from charging any royalties related to NK603 in the United States and requiring Bayer to provide its non-patented technology to potential generic manufacturers.

30.     Prior to filing this lawsuit, Plaintiff requested to meet and confer with Bayer to discuss the potential resolution of these claims. Bayer declined to participate in any meeting and

did not even respond to Plaintiff's request.

**PARTIES**

*Plaintiff Latham Quality, Inc.*

31.     Plaintiff Latham Quality, Inc., formerly Latham Hi-Tech Hybrids, Inc., ("Latham") is a third-generation, family-owned seed company, dating back to 1947. Throughout its history, the Latham family seed business has evolved and grown, including undergoing corporate organizational changes, but it has always maintained its rich family history and high standards for producing seed for farmers.

32.     Latham Seed Farm (later called Latham Seed Company) was founded in 1947 by Willard and Evelyn Latham (first generation), in Alexander, Iowa. It was subsequently acquired and run by their sons, Bill, Don, and Tom Latham (second generation). Latham Seed Company grew and sold soybean seeds, and its related entity, Latham Hybrids, LLC, formed in 2004, grew and sold hybrid corn seeds.

33.     In 2009, John, Shannon, and Chris Latham (third generation) bought the family business from Bill, Don, and Tom Latham. Latham Hybrids, LLC was renamed Latham Hi-Tech Hybrids, Inc., and it acquired the assets of Latham Seed Company.  Latham Hi-Tech Hybrids, Inc. sold seed under the Latham Hi-Tech retail brand.

34.     Latham, under the direction of John, Chris, and Shannon Latham, supplied seed to growers in seven states throughout the Midwest, including approximately 250 dealer-customers who, in turn, sold the seed to growers.

35.     At all relevant times, Latham produced hybrid corn seed containing certain GE traits, pursuant to a license agreement with Monsanto (now Bayer), which maintains control over the patent rights for those traits. Monsanto charged, and Latham paid, royalty fees for each unit of

11

GE corn seed sold.

36. Latham grew its sales every year from 2009 until approximately 2021, after Bayer AG acquired Monsanto and began, or expanded, the unlawful conduct detailed in this Complaint and giving rise to these claims

37. In August 2024, after suffering millions of dollars in damages due to Bayer's unlawful conduct, the Latham family was forced to make the difficult decision to sell its retail seed brand to MS Technologies, LLC ("MS Tech"). Latham Hi-Tech Hybrids, Inc. changed its name to Latham Quality, Inc., and it continues to condition, package, and deliver Latham Hi-Tech Seeds pursuant to an agreement with MS Tech.

38. As part of the sale, Latham Quality, Inc. maintained the rights to bring the claims alleged here.

39. After the sale, Latham Quality, Inc. continues to be damaged by Bayer's unlawful conduct detailed in this Complaint, including but not limited to Bayer's anticompetitive conduct and illegal charge of post-patent royalties for NK603, all of which directly cause concrete and particularized injury to Latham Quality, Inc. in the form of increased cost to produce GE corn seed and reduced net profits.

40. Latham Quality, Inc. is incorporated under the laws of the State of Iowa and has its principal office at 131 180th Street, Alexander, Iowa 50420.

***Bayer Defendants***

41. Bayer Aktiengesellschaft ("Bayer AG") is a foreign corporation with overall headquarters in Leverkusen, Germany and will be served under the Hague Convention.

42. The Bayer enterprise "is operated as a life science company consisting of three divisions," one of which is the Crop Science division. Bayer 2024 Annual Report at 105.

43. The Crop Science division is responsible for crop protection, agricultural seed products and technology, and other activities within the agricultural sector. *Id*. at 106.

44. Bayer AG, and the Bayer-wide enterprise, is governed by a Board of Management, which reports to and is overseen by a Board of Supervisors. *See* Bayer 2025 Annual Report at 13-22, 28; Bayer 2024 Annual Report at 12-22.

45. The Bayer AG Board of Management has been called "the executive organ of the Bayer Group" as a whole. https://www.bayer.com/en/board-of-management (last updated March 2, 2026).

46. Through its Board of Management, Bayer AG "performs the principal management functions for the entire enterprise." Bayer 2020 Annual Report at 27.

47. This control includes not just policy and strategic direction but direct day-to-day "management of the Group-wide operational business of the Crop Science" division. *Id*.; Bayer 2021 Annual Report at 27 (same); Bayer 2022 Annual Report at 30 (same); Bayer 2023 Annual Report at 27 (same); Bayer 2024 Annual Report at 28 (same); Bayer 2025 Annual Report at 28 (same); *see also* Bayer 2018 Annual Report at 27 ("Management functions of Bayer AG" Bayer AG "performs the principal management functions for the entire company" including "operational business of the segments").

48. In addition to operational management, "[t]he financial management of the Bayer Group is conducted centrally. Capital is a global resource, generally procured centrally and distributed within the Bayer Group." Bayer 2025 Annual Report at 74.

49. The Board of Management "as the chief operating decision maker[,] allocates resources to the operating segments [such as Crop Science] and assesses their performance." Bayer 2025 Annual Report at 288; Bayer 2024 Annual Report at 279.

50. The Board of Managers also formulates the business plan from which planning and steering are conducted for the enterprise and its divisions, including Crop Science. *See* Bayer 2024 Annual Report at 36; *see also* Bayer 2025 Annual Report at 36 ("Economic planning and steering are conducted in line with the strategic business plan formulated by the Board of Management, which contains the strategic frameworks for the Group and the divisions and how they translate into specific targets. The planning and steering process is complemented by the continuous monitoring of business developments, with key financial and nonfinancial management and performance indicators being updated regularly.").

51. Bayer AG's management and control over its divisions and affiliates also includes, without limitation, product production, procurement and supplier management, licensing, sales, marketing, research and development, product stewardship, patent protection, risk management and compliance, public affairs, human resources, and personnel, which includes enterprise-wide policies and procedures regarding communications, training, health, leave, and wages. *See* Bayer Annual Reports 2018-2025.

52. Corporate functions and support services operate enterprise-wide across entities. *See*, *e.g*., Bayer 2018 Annual Report at § 1.1 ("corporate functions and Business Services operate as Group-wide competence centers in which business support services are bundled"); Bayer 2025 Annual Report at 28 ("enabling functions support the operational business").

53. "Enabling functions" include, for example, Finance, Human Resources, and Information Technology, which "serve as Group-wide competence centers and bundle business support processes and services for the divisions." *Id.* at 29.

54. Bayer's legal and patent departments also serve the entire organization in collaboration with respective operating units. *See*, *e.g*., Bayer 2025 Annual Report at 92.

14

55. Monsanto Company is a corporation organized and existing under the laws of the State of Delaware with its headquarters and principal place of business at 800 North Lindbergh Blvd., St. Louis, MO 63167.

56. Bayer AG made an offer to acquire Monsanto Company (and affiliates) ("Monsanto") in May 2016 and signed a merger agreement in September 2016.

57. In 2018, Bayer AG acquired Monsanto, which was integrated into and operates as part of Bayer's Crop Science division.

58. From the beginning, Bayer AG intended to and did integrate and control Monsanto and its operations. As of June 2018, the Monsanto integration process was expected to begin within two months. Liam Condon, a member of Bayer's Board of Management, was tasked to "lead the combined Crop Science Division when the integration commences." Bayer Press Release (June 7, 2018) (https://www.bayer.com/media/en-us/bayer-closes-monsanto-acquisition/).

59. As part of the acquisition, Bayer was required to divest certain lines of business to BASF. In a press release dated August 22, 2018, Bayer stated that "Bayer and Monsanto [will] remain separate companies and continue to operate separately until completion of these divestments," at which point "integration of Monsanto into the Bayer Group" would begin. Bayer Press Release (8/22/18) (https://www.bayer.com/en/id/bayer-conditions-for-beginning-monsanto-integration-fulfilled).

60. Projects within the Crop Science division such as expansion of a research and development facility in Chesterfield, Missouri were the responsibility of Monsanto until after acquisition closing, at which point they were taken over by Bayer. *See* Bayer 2018 Annual Report at § 2.2.4.

61. By the time its 2018 Annual Report was published, "[t]he integration [of Monsanto]

15

[was] off to a very good start and advancing rapidly." Bayer 2018 Annual Report, Chairman's Letter; *see also id*. at "Changes to the corporate structure" (closing of transactions related to acquisition "led to the hold separate order being lifted and enabled the integration of Monsanto into the Bayer Group to begin").

62. As of that time, "integration of Monsanto's personnel and functions ha[d] been concluded such that cross-functional management [was] ensured by Bayer's Board of Management. Further integration measures such as the systems and process integration [were] either being planned or implemented, and … scheduled for completion in the coming years." *Id*. at About this Report.

63. Monsanto employees became subject to Bayer's human resources department, overseen by the Board of Management, the "primary decision-making body of Bayer's HR function, which set[s] binding policies and define priorities for all regions and organizational units." *Id*. at § 1.4.1.

64. Also, "[f]ollowing the acquisition of Monsanto, compliance responsibilities for the acquired agriculture business now lie with Bayer and its Law, Patents & Compliance function." *Id.* at § 4.2. The same was true of other activities including public affairs. *See id*. at § 4.2 (Lobbying) ("Following the acquisition of Monsanto, responsibility for the public affairs activities of the acquired business transferred to the corresponding corporate function at Bayer.").

65. Further organizational and systems integration was made a priority. Board of Management members were given targets and compensation objectives that included "integration of Monsanto" and creating growth opportunities "by active portfolio management." *Id.* at § 4.4. Part of that portfolio is crop protection, seeds and traits. *See also* Bayer 2019 Annual Report at 112-13.

66. Going forward, "[t]he main focus of restructuring activities in the Crop Science segment was on organizational adjustments following the integration of Monsanto." Bayer 2019 Annual Report at 196.

67. With Monsanto's acquisition, Bayer's Crop Science division became "the world's leading agriculture enterprise … with businesses in crop protection and seeds." Bayer 2018 Annual Report at §1.1.

68. One of the most profitable segments of Bayer's Crop Science portfolio is corn traits and seed. *See* Bayer 2025 Annual Report at 65; Bayer 2024 Annual Report at 282.

69. After the acquisition, the former Monsanto campus in St. Louis County, Missouri remained the global headquarters for the combined company's seeds and traits. As of September 2025, Bayer stated that its Global Seeds and Traits Headquarters for the Crop Science division was 800 N. Lindbergh Blvd., St. Louis, MO 63167.

70. Bayer CropScience LP is the division of Bayer AG responsible for carrying out agricultural business in North America. At Bayer AG's direction, it, and/or Monsanto, licenses seed trait technology, including the trait conferring resistance to glyphosate.

71. Bayer Crop Science LP is a Delaware limited partnership that until December 29, 2025 had its principal place of business at 800 North Lindbergh Blvd., St. Louis, MO 63167.

72. On December 29, 2025, Bayer Crop Science LP filed a cancellation of registration with the Missouri Secretary of State stating that its "[b]usiness classification is being changed from a LP to an LLC."

73. At the same time, Bayer Crop Science LLC filed for registration in Missouri as a foreign limited liability company formed under Delaware law in 1999. Bayer Crop Science LLC listed its principal place of business as 251 Little Falls, Drive Wilmington, DE 19808. This address

is without relevant operational significance. It is the address of Corporation Service Company, a general corporate services provider (among other things, receipt of mail).

74. Bayer's Crop Science operations continue at the Missouri campus in Creve Coeur (St. Louis County). As of mid-2024, Bayer AG announced that it was investing over $100 million to upgrade infrastructure at that campus. According to Brian Naber, President of Bayer Crop Science North America, Australia and New Zealand, Bayer was and is making long-term infrastructure investments to, among other things, upgrade conferencing capabilities, work spaces and meeting rooms, as well as "important technology updates for the Creve Coeur campus." Bayer Press Release (last updated Aug. 21, 2024) (https://www.bayer.com/en/us/news-stories/st-louis-campuses). Further: "We remain committed to the St. Louis region, as the North America headquarters of Bayer's Crop Science division, and we look forward to being part of the business community for many years to come." *Id*. By February 2026, permits showed that over $15 million in work was underway.

75. In a February 2026 planning document, the City of Creve Coeur updated details regarding the site. Bayer has or will sell certain portions of the property, but "is retaining the northwest portion of [the East campus] to continue in person operations for the Bayer Crop Science Corporate Headquarters." Bayer East Campus Comprehensive Plan Update for the City of Creve Coeur, Missouri (Draft Feb. 2026) (https://www.crevecoeurmo.gov/DocumentCenter/View/13562/DRAFT-Comprehensive-Plan-Update---Public-Hearing---Feb-4-2026Reduced?bidId=) at 2. Future land use recommendations include uses "compatible with Bayer Crop Science's headquarters operations," including restaurants and retail outlets. Retention of the existing Bayer conference center also was recommended as the existing center "sees regular use by Bayer" which expressed interest in continued use through lease-back or rental arrangement. *Id*. at 46-47.

76. As of year-end 2025, Bayer had spent approximately €20 million in capital expenditures "to consolidate the Creve Coeur campus and transition operational activities to the Chesterfield campus in St. Louis." Bayer 2025 Annual Report at 76.

77. Bayer Crop Science LLC and Bayer CropScience LP (together, "Bayer Crop Science") are operating divisions of and owned and controlled by Bayer AG.

78. Channel Bio LLC ("Channel") is a Delaware limited liability company registered to do business in Missouri and engaged in the sale and marketing of GE seed, including hybrid corn and soybean seed, in Missouri and elsewhere

79. Channel's sole member is American Seeds, LLC. American Seeds, LLC, a limited liability company whose sole member is Monsanto.

80. After the Monsanto acquisition, and according to Bayer: "Based in St. Louis, Channel is a division of Bayer." Bayer Press Release (September 3, 2024). https://www.cropscience.bayer.us/news-press/channel-joins-bayer-plus-2025

81. Channel is a direct competitor of independent seed companies like Latham and an instrument of anti-competitive activity as further described herein

82. Together, Defendants are engaged in developing, producing, marketing and selling crop seeds and plants, including GE seed and crop protection products including herbicides sprayed on plants grown from that seed.

83. At all times relevant to this action, there has existed, and presently exists, a unity of interest among Bayer AG, Bayer Crop Science LP, Bayer Crop Science LLC, Monsanto, and Channel, all of which comprise a single business enterprise to achieve common business purposes. According to annual reports and other published materials, these entities operate as part of a unified business group, which as to conduct giving rise to this action, fall under a crop science umbrella,

managed and controlled by Bayer AG and carried out by it and through the other defendants. These Defendants are either alter-egos or agents of one another. Alternatively, they have engaged in a joint venture, joint enterprise, or conspiracy with respect to activities giving rise to the claims asserted herein.

**JURISDICTION AND VENUE**

84. This Court has subject matter jurisdiction over Federal Antitrust Claims pursuant to 28 U.S.C. § 1337 (commerce and antitrust regulation) and 28 U.S.C. § 1331 (federal question), as this action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), Sections 2, 4, and 16 of the Clayton Act (15 U.S.C. §§ 13, 15(a), and 26). The Court further has federal question jurisdiction over claims asserted under the Federal Defend Trade Secrets Act (18 U.S.C. § 1836).

85. This Court has supplemental jurisdiction over the related State Law Claims, which form part of the same case or controversy, pursuant to 28 U.S.C. § 1367(a). Moreover, pursuant to the "Choice of Law; Submission to Jurisdiction" provision in Defendants' Corn Product License Agreement, Missouri law governs claims regarding the Parties' respective rights and liabilities under the license agreement or in any other respect.

86. This Court has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000.00, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one class member is domiciled in different states.

87. This Court also has personal jurisdiction over each Bayer entity because they are located in, transact substantial business in, have one or more agents in, entered into contracts in, and/or engaged in wrongful conduct in Missouri giving rise to the claims asserted in this case.

20

88. In addition, the principal place of business of Monsanto, and Bayer's Crop Science headquarters, is St. Louis County, Missouri.

89. In addition, Monsanto consented to the personal jurisdiction of this Court pursuant to the "Choice of Law; Submission to Jurisdiction" provision in the Corn Product License Agreement with Latham and similarly situated Independent Seed Companies.

90. Bayer AG manages, operates, controls and transacts business in this district itself and/or through its wholly owned affiliates including Monsanto and Bayer CropScience, which are agents of and/or part of a single enterprise with Bayer AG, including carrying out the unlawful acts giving rise to the claims asserted in this case.

91. This Court also has personal jurisdiction over Bayer AG and Bayer CropScience because, upon information and belief, Monsanto's rights and obligations under the Corn Product License Agreement were assigned to Bayer AG and/or its wholly owned and controlled affiliates, including Bayer CropScience, in connection with Bayer AG's acquisition of Monsanto. Pursuant to the Corn Product License Agreement, as assignees, Bayer AG and Bayer CropScience are bound by all the terms of the Corn Product License Agreement, which includes the "Choice of Law; Submission to Jurisdiction" provision, consenting to this Court's jurisdiction and venue to decide these claims.

92. Venue is proper in this district, pursuant to 15 U.S.C. § 22 and RSMo § 416.131 because Defendants may be found in and transact business in this district. Bayer AG also transacts business in this district through its control of affiliates and agents, including Bayer CropScience and Monsanto Company, making venue proper under 15 U.S.C. § 22 and RSMo § 416.131.

93. Venue is also proper in this district pursuant to the Corn Product License Agreement, which identifies this district as the proper venue and deems waived all objections to

21

this forum's convenience.

94.     Defendants are engaged in, and their activities substantially affect, interstate commerce. Defendants sell agricultural products, including seed and crop protection products, throughout the United States and the world.

**FACTUAL BACKGROUND**

**I.      The United States Corn and GE Trait Markets.**

      **A.      U.S. Corn Market**

            **1.      Consolidation inside the U.S. corn market and Bayer's promise not to raise prices.**

95.     For decades, corn has been the leading cash crop in the United States, with an annual value of over $60 billion. In 2024, corn farmers produced 14.9 billion bushels of corn in the United States.

96.     Most of that corn has been genetically modified.

97.     The biotechnology market has been the subject of intense consolidation over the past decade.

98.     Since "the early 1990s, when the first genetically engineered traits were introduced to the seed market, over 200 companies selling commodity seeds were either acquired or went out of business." https://www.ams.usda.gov/sites/default/files/media/SeedsReport.pdf. Even before Bayer's acquisition of Monsanto, four companies controlled 82% of the U.S. corn seed market. *Id.* at 42.

99.     With the acquisition by Bayer of Monsanto (now Bayer) and the merger of Dow and DuPont (now Corteva) after 2016 this consolidation intensified. Prior to the mergers, these "top two companies held around 80% of all patents and PVP rights for maize and soybean

22

varieties." *Id*. "Today, the top four (Bayer, Corteva, ChemChina and BASF) own … 95% of corn … IP. Bayer owns the highest percentage of utility patents, including 71% of corn patents, while Corteva owns the highest percentage of PVP certificates, including 53% of corn PVPs." *Id*.



**Figure 1 (*id*. at p.44)**

100. When Bayer sought to acquire Monsanto, significant concerns were raised about the impact that the acquisition would have on U.S. agriculture. Farmers feared that the "merger is going to hurt the farmer" and the "more consolidation we have on our inputs, the worse it gets." https://www.nytimes.com/2016/09/15/business/dealbook/monsanto-bayer-deal.html.

101. Liam Condon, head of Bayer's CropScience division, attempted to dissuade such concerns, telling the NEW YORK TIMES that "the company would not raise prices without providing more value to farmers." *Id.* According to Condon, "This is a highly competitive industry, and just increasing prices without having any additional advantage or benefit for growers won't go anywhere[.]" *Id*.

102. As explained below, the concerns were justified and Condon's explanation was false. Bayer has, in fact, raised prices without any added value, and it did so because the industry

lacked competition due to Bayer's anti-competitive conduct.

**2.      Distribution of corn seed in the U.S. corn market.**

103.    In the United States, corn is planted on a highly seasonal and time-sensitive basis. Growers select and purchase corn seed typically during the winter and early spring based on expected agronomic conditions, pest and weed pressures, and anticipated crop management practices. Planting generally occurs once soil temperatures and moisture conditions are suitable, most commonly between April and May, although timing varies by region and weather.

104.    Corn is typically grown from hybrid seed, which is seed produced by cross-pollinating two different inbred (purebred) parent lines to create a superior offspring, optimized for high yields, disease resistance, and rapid growth (hybrid vigor). Growers must purchase hybrid corn seed each year prior to planting. They must, thus, commit to a particular seed product before planting begins. Once planted, the crop grows through the spring and summer, with harvest typically occurring in the fall. The timing and structure of this planting cycle make seed selection decisions discrete, annual events that cannot readily be altered once the growing season is underway.

105.    Hybrid corn seed and herbicides are among the largest variable costs for growers. To grow corn, growers must purchase seed (including trait and genetic licenses, as discussed below), chemicals, fertilizers, insurance, and equipment, lease or own land, and hire or utilize their own labor. Seed and herbicides are among the most significant costs for growing corn. For example, an Iowa study conducted in 2006 found that, on average, growers paid $876.11 per acre to harvest 174 bushels of corn per acre. Variable costs represented about $484.09 per acre. Of that amount, seed costs were about 22% and herbicides were about 12%, collectively representing 34% of variable costs and a significant portion of the total cost of corn production.

https://www.extension.iastate.edu/agdm/crops/html/a1-20.html.

106. In the United States, corn seed is sold through multiple channels of distribution. Seed manufacturers, like Bayer, are vertically integrated companies that sell to growers, including through exclusive dealers. These sales from the top three seed manufacturers (Bayer, Corteva, and Syngenta) represent most corn seed sales in the United States corn market.

107. Bayer's direct sales channels have been consolidated into two brands: DEKALB and Channel, which market hybrid corn seed in the United States. DEKALB is part of and controlled by Bayer and is Bayer's flagship brand sold through Bayer-controlled representatives and exclusive DEKALB seed professionals. Channel is a subsidiary of and also controlled by Bayer. It represents a consolidation of multiple, regional brands and was explicitly designed for a company-direct, go-to-market model, using Bayer-trained salespeople.

108. Corteva also sells directly to growers through its Pioneer brand which is sold by company-employed or exclusive sales representatives.

109. The third largest seed manufacturer is Syngenta Seeds Co. ("Syngenta"), but its direct sales make up no more than 5% of overall corn seed sales in the United States.

110. The remainder of the U.S. corn seed market is served by independent seed companies and dealers, and they sell and market slightly less than one-third of corn seed.

111. Independent seed companies ("ISCs") depend upon contractual relationships with one or more of the three major seed manufacturers, such as Bayer. They purchase from them the right to corn genetics and traits, including the physical parent seed ("Parental Inbred Seed"), and specialize in multiplication, production, and conditioning of hybrid seed grown from the Parental Inbred Seed and marketing and sale of that seed for resale. Generally, to obtain the Parental Inbred Seed, ISCs must purchase and license the rights to seed genetics and biotechnology traits from one

or more of the major seed manufacturers, typically Bayer or Corteva.

112. As a result, ISCs both: (1) compete horizontally with Bayer's direct-sales channels (DEKALB and Channel) in the sale of seed to dealers and growers, and (2) are customers of Bayer through Bayer's licensing and sale of Parental Inbred Seed and GE traits.

113. ISCs purchase from Bayer, or its designee or agent, Parental Inbred Seed that contains both these licensed genetics and biotechnology traits. Pursuant to their accompanying licensing requirements, the ISCs then multiply that seed according to strict genetic, purity and stewardship requirements, and then they harvest, process, and condition the seed for use in commercial hybrid production. Once packaged, typically under the ISC's own brand name, they sell and deliver seed to dealers who sell it to dealers and growers for planting.

114. ISCs thus operate within an intermediate level of the seed supply chain. They purchase the Parental Inbred Seed and the rights to biotechnology traits and genetics, produce the seed, and then supply that seed to dealers which supply it to growers. They are a direct purchaser of seed genetics (discussed below) and biotechnology traits (discussed below), including from Bayer.

115. ISCs set the price of their hybrid corn seed, but their pricing decisions are constrained by upstream input costs, primarily trait and genetic licensing fees and Parental Inbred Seed fees, paid to companies such as Bayer.

116. ISCs serve an important role in the hybrid corn seed market. They can offer services and seed to dealers, and growers, through their regional-sales presence. But restrictions on their access to biotechnology traits, and limits on how they may produce and supply seed, materially affect the cost, volume, and availability of seed in the downstream market.

117. By constraining ISCs' ability to produce seed at competitive cost and scale,

restraints imposed by Bayer, Bayer reduces competitive pricing pressure on its own vertically integrated seed companies. When ISCs can freely access traits and supply growers with competing corn seed options, they can scale output and exert downward pressure on prices, including by competing directly with Bayer's branded seed businesses. When ISCs are artificially restrained by trait and genetic owners such as Bayer, however, their inability to expand production blunts this competitive constraint, resulting in higher prices, lower quality, and lesser output. ISCs therefore play an important competitive role in disciplining corn seed prices, a role that Bayer has suppressed through its unlawful acts.

118. As explained below, Bayer's anticompetitive conduct, as it relates specifically to ISCs, has harmed competition in the U.S. corn seed market. Its exercise of market power via one or more anticompetitive restraints has reduced competitive pricing pressure in upstream (input) and downstream hybrid corn seed markets. As a result, ISCs have paid higher prices for corn seed inputs and related licensing provided by Bayer, and growers, in turn, have paid higher prices for corn seed than they would have paid in a market where ISCs could supply rival technology or off-patent trait technology without artificial restrictions, and where competition on price, innovation, and output is not foreclosed.

### B. Glyphosate and Roundup Ready Crops

119. Corn growers use herbicides to control weeds. In the United States, 96% of planted acres were treated with herbicides in 2021. According to a study of the 2021 corn market, the cost of herbicides alone was around $35.61 per acre, totaling $3.2 billion in sales.

120. The predominate herbicide is glyphosate, a non-selective, chemical compound that controls weeds by inhibiting an enzyme called EPSPS (5-enolpyruvylshikimate-3-phospate synthase). When glyphosate is sprayed over a plant and binds to EPSPS, the enzyme stops

working. Without EPSPS activity, the plant dies.

121. Discovered by a Monsanto scientist, glyphosate was brought to market by Monsanto in the mid-1970s under the trade name Roundup.

122. Glyphosate became an effective and massively profitable weed killer. Among other things, it has broad-spectrum control (*i.e.,* unlike most herbicides, it inhibits the growth of a wide range of broadleaf weeds and grasses).

123. Monsanto, now Bayer, did and does heavily promote Roundup and its necessity to farmers. Even today, according to Bayer: "Farmers wage a daily battle, not just against pests or weather, but against an unseen enemy that threatens to choke their crops and livelihoods: weeds. Weeds compete with crops for sunlight, nutrients, and water, often outpacing the plants we rely on for food and can disrupt the balance of our global food supply." https://www.bayer.com/en/truth-about-glyphosate. Bayer represents that uncontrolled weeds can lower yields by 50% or more, causing growers significant financial loss. *See* https://www.bayer.com/en/what-is-glyphosate ("crop yields could fall by 50%-90% without glyphosate").

124. While effective against weeds, glyphosate will also kill desirable plants and crops unless they are genetically engineered to resist it.

125. Biotechnology allows researchers to copy a gene for a desired trait from one plant or organism and use it in another plant, producing a genetically modified organism ("GMO"). This occurs by inserting into the germplasm of the desired plant a transgenic "event" that will produce the desired "traits." A trait is the agricultural characteristic conferred, such as herbicide tolerance. An event is the specific genetic insertion that produces that trait and is separately patented, regulated, and licensed while still under patent.

126. During its first two decades on the market, Roundup had relatively limited utility

because it could only be used for burn-down or other applications that did not bring it into contact with desirable growing plants.

127. This changed in the 1990s when Monsanto developed genetically engineered ("GE") seed, sold under the brand name Roundup Ready ("RR"), that would grow crops, including corn, tolerant to glyphosate.

128. When commercialized in 1996 for soybean and two years later for corn, Roundup-tolerant seed, together with Roundup herbicide, became a blockbuster combination and Monsanto's flagship product.

129. For the first time, farmers could spray Roundup over the top ("OTT") of growing plants, killing the weeds but not the crop.

130. Glyphosate, the active ingredient in Roundup, is relatively simple to use. When sprayed OTT of the crop, it avoids the costly and time-consuming need to till the land. It can be applied at various times during the growing season, which reduces variability and production costs compared to other weed-control systems. And, because of its broad-spectrum efficacy, it reduces or eliminates the need to apply other herbicides. According to Bayer, it is "one of the most important tools for weed management." https://www.bayer.com/en/what-is-glyphosate.

131. The Roundup weed-control system (*i.e.,* the combination of the Roundup herbicide and GE seed containing the glyphosate-tolerant trait) was quickly and widely adopted, revolutionizing U.S. farming practices.

132. "The development and marketing of GE, Roundup Ready crops fundamentally changed how crop farmers could apply glyphosate. Before RR technology, farmers could spray glyphosate prior to crop emergence, for early-season weed control, or after harvest to clean up late-season weeds. But with RR crops, glyphosate could also be sprayed 1–3 times or more after

29

the crop had emerged, leaving the crop unharmed but controlling all actively growing weeds. This historically significant technological advance set the stage for unprecedented and rapid growth in the area planted to RR crops and sprayed with glyphosate (from usually less than 10% of cotton, maize, and soybean acres pre-1996, to 90% or more today)." Benbrook, Trends in glyphosate herbicide use in the United States and globally. *Environ Sci Eur* Vol. 28, art. 3 (Feb. 2, 2016).

133. With the introduction of RR seed, "agricultural applications of glyphosate in the U.S. rose rapidly, reaching … 79 million pounds … by 2000" and accounting for 80% of total national use. By 2010, this had risen to 90%. From 1974–2014, use rose 300-fold, and some 3 billion pounds of glyphosate was applied in the U.S. agricultural sector. *Id*.

134. Roundup became "the most widely and heavily applied weed-killer in the history of chemical agriculture in both the U.S. and globally." Environmental Working Group, *Study: Monsanto's Glyphosate Most Heavily Used Weed-Killer in History* (Feb. 2, 2016) (https://www.ewg.org/news-insights/news-release/study-monsantos-glyphosate-most-heavily-used-weed-killer-history).

135. In 2001, Roundup represented half of Monsanto's total revenue.

136. Farmers became dependent on the RR weed-control system, and Monsanto, later Bayer, made aggressive use of patent laws and licensing agreements to monetize this system to the tune of many billions of dollars.

137. Patents provide an inventor, or its assignee, an exclusive right to practice the invention. Under Article I, Clause 8 of the United States Constitution, however, patent protection is only available for a "limited [t]ime[]." Under current law, a patent expires 20 years from the date of the earliest filing for a patent.

138. During the period of patent protection, Bayer required all entities utilizing its

technology to execute contractual license agreements that, as explained below, exceed the rights provided under U.S. patent law.

139. Every farmer, agribusiness company, seed dealer, and seed grower wanting to use a Monsanto (or Bayer) trait, including the RR technology, was and is required to execute a license agreement. Bayer uses these agreements to strictly control access to and use of its GE traits and its genetics both before and after patent protection expires.

140. Monsanto's patent protection over glyphosate expired in 2000. It successfully held onto or expanded market share, however, "by bundling purchase of higher-price, Monsanto brand, Roundup herbicides with the purchase of Monsanto herbicide-tolerant seeds." Benbrook, Trends in glyphosate herbicide use in the United States and globally. *Environ Sci Eur* Vol. 28, art. 3 (Feb. 2, 2016).

141. Nonetheless, when the patent expired, numerous other manufacturers entered the market with generic formulations of Roundup, containing the same active ingredient, glyphosate. Competition fueled price competition, and the price of glyphosate herbicides fell in response to the entry of generic manufacturers.

142. Lower-cost generic glyphosate further expanded glyphosate use, increasing the demand for glyphosate-tolerant seed. Even after the patent on glyphosate expired, use of it OTT of growing plants still required Monsanto's glyphosate-tolerant trait, which was still patent protected and required a license from Monsanto.

143. "[A]lmost all corn acres planted to glyphosate-tolerant seeds since 2000 have been sprayed with glyphosate one or more times, and at incrementally higher rates of application. As a result, glyphosate use on corn in the U.S. rose from 5 million pounds in 2000 to 88 million pounds … in 2016. This 17.6-fold increase was essentially all brought about by the planting of glyphosate-

tolerant seeds. In 2022 … 75.9 million pounds of glyphosate were used on corn, with 80% of corn acres treated." Benbrook, Herbicide-Tolerant Corn in the U.S. is Heavily Treated with Glyphosate (July 10, 2024) at 1-2.

144. Reliance on glyphosate has been so extensive that some weeds developed natural resistance to it. Farmers were encouraged by Bayer to increase glyphosate application rates and spray more often to compensate for this resistance.

145. There are few alternatives to glyphosate as applied OTT of corn, and as discussed below, those alternatives have not displaced glyphosate in the agricultural sector, including corn, as the predominant herbicide.

146. Bayer continues to issue dire warnings: "The loss of glyphosate as an agricultural tool would have significant economic … repercussions." https://www.bayer.com/en/what-is-glyphosate (Last Updated: Friday, July 25, 2025). Further, it says, alternatives to glyphosate could increase "herbicide input costs by two to two-and-a-half times per acre." https://www.bayer.com/en/what-is-glyphosate.

147. Even 50 years after it was invented, Bayer still describes glyphosate as the "cornerstone in the fight against these relentless invaders," weeds. https://www.bayer.com/en/truth-about-glyphosate. Without glyphosate to combat weeds in the corn fields, according to Bayer, "Farm yields could plummet, farmer costs would go up, and food prices would rise, affecting consumers worldwide. The ripple effect would be felt across the entire food supply chain, from the fields to your dinner table." There is no practical alternative. https://www.bayer.com/en/truth-about-glyphosate.

**C. Predominance of the NK603 Roundup Ready 2 Corn Trait.**

148. Two transgenic events exist that can be inserted into corn seed to create the

glyphosate tolerance necessary to spray glyphosate OTT of corn: NK603 and GA21. Although similar, NK603 is recognized as superior and is now vastly preferred by growers.

149. GA21 expresses a mutated version of the native corn EPSPS (mEPSPS) enzyme. The modified enzyme is plant derived. Glyphosate tolerance is achieved by reducing glyphosate binding, not by inserting a naturally glyphosate-tolerant enzyme into the corn seed.

150. NK603 expresses CP4 EPSPS, a Class II EPSPS enzyme derived from *Agrobacterium* strain CP4. This enzyme is naturally insensitive to glyphosate and NK603 contains two copies of the CP4 EPSPS gene, leading to robust expression.

151. GA21's effectiveness is narrower than NK603 and is more sensitive to higher glyphosate rates and later application timing with a smaller post-emergence window. In contrast, NK603 has strong tolerance across a wide range of glyphosate-application rates, supports later-season post-emergence application, and shows greater margin of crop safety at labeled rates.

152. As a result, and through Monsanto's heavy marketing of NK603 under its "Roundup Ready 2" weed-control system ("RR2") and placement as its flagship product for glyphosate tolerance, NK603 became the backbone of the hybrid corn seed market.

153. NK603 is the foundational event in stacked-trait corn seeds, which are corn seeds containing more than one GE event that express more than one trait.

154. The vast majority of GE corn seed planted in the United States contains NK603, not GA21. Monsanto withdrew support for GA21 years ago, centering NK603 as the primary platform for glyphosate tolerance. Although GA21 is commercially available from Syngenta in its Agrisure line of corn seed, Syngenta possesses no more than 5% of the entire hybrid corn seed market in the United States, evidencing the importance, and dominance, of NK603.

155. After regulatory approval of NK603 in 2001, NK603 replaced the GA21

technology and Monsanto launched its RR2 weed-control system. NK603 officially succeeded GA21 as the predominant form of glyphosate tolerance.

156. By 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were grown from RR2 seeds.

157. As of December 2025, according to the USDA's Economic Research Service approximately 92% of domestic corn acres are produced with herbicide-tolerant seed. NK603 is present in not only most, but almost all, of that seed, which has been sold or licensed exclusively, or nearly exclusively, by Bayer.

158. RR2 corn seed and glyphosate have been immensely profitable for Monsanto/Bayer. Any investment in research and development has reaped massive returns—many times over. According to some estimates, Monsanto/Bayer has made tens of billions of dollars on Roundup herbicide and RR2 seed, which on information and belief vastly exceeds its research and development investment in the technologies.

159. The percentage of corn acres planted with the glyphosate tolerant trait "rose from less than 10% in the early 2000s, to 70% in 2010, and 90% in 2018. It has hovered around 90% since." Benbrook, Herbicide-Tolerant Corn in the U.S. is Heavily Treated with Glyphosate (July 10, 2024) at 3-4.

160. Even as some weeds have developed resistance to glyphosate, its predominant use as the foundational herbicide remains consistent. Glyphosate tolerance is now found in nearly all the foundational corn breeding lines.

**D.      Hybrids and stacking traits.**

161. "Hybrid" corn seed is seed produced by crossing two distinct parent lines to create a hybrid plant with improved performance. Breeding two plants to produce hybrid seed has been

commonly used in corn for centuries. Through natural breeding, hybrid corn seed can contain characteristics for drought tolerance, stronger roots, wind resistance, and other characteristics that improve quality and yield under various conditions.

162. "Germplasm" or "corn genetics" is the genetic material that contains a plant variety's characteristics inherited from the two parent lines crossed together during breeding. An inbred corn line developed through years of self-pollination will all contain the same or virtually identical germplasm. The inbred line (or parent line) is cross-bred with another inbred line to produce a hybrid seed variety. The seed resulting from cross-pollination inherits its genetic make-up from the parent lines. The resulting varieties, known as "hybrids," will typically exhibit greater vigor ("hybrid vigor") than the parent lines on which they are based, resulting, for example, in plants with higher yields or better stress resistance. The same controlled cross-pollination must be repeated each time the seed of those varieties is produced. Germplasm within the hybrid plant variety determines key agronomic characteristics such as (1) yield potential, (2) disease resistance, (3) maturity, and (4) adaptability to regional environments. Seed companies, like Bayer, develop germplasm through breeding programs, which are licensed to ISCs and included in the hybrid corn seed sold via their direct-sales channels.

163. Biotechnology gives seed manufacturers opportunities not available through natural breeding. Biotechnology events are patentable and can provide 20 years of legal monopolization over the use of the new technology.

164. The vast majority of commercialized genetically engineered ("GE") crops include traits falling into two categories: (1) herbicide tolerant and (2) insect resistant ("*Bt*"). As discussed above, seed with an herbicide-tolerant trait permits a grower to spray an herbicide, such as glyphosate, OTT of the corn plants to kill weeds without killing the corn plant. An insect-resistant

35

trait provides protection for the corn plant from certain insects.

165.    A glyphosate-tolerant trait was a necessary component in making glyphosate herbicide the "cornerstone" of weed control. Monsanto, and now Bayer, have been enormously successful in creating an environment in which there is no practical alternative to a glyphosate-tolerant trait in the U.S. corn market.

166.    Currently, approximately 92% of domestic corn acres are produced from seed containing one or more GE events that make the crop herbicide tolerant. All, or nearly all, of that corn contains a specific event that renders them glyphosate tolerant, which is NK603.

167.    An insect-resistant event is inserted into a corn seed that renders the crop resistant to damage by certain insects (or other pests).  In corn, the first two insect-resistant events, which made corn resistant to European corn borer ("ECB") and corn rootworm ("CRW"), were created by insertion of the gene for Bacillus thuringiensis (*Bt*). Today, according to the USDA, at least 87% of corn acres contain insect-resistant (*Bt*) traits. *See* https://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-united-states/recent-trends-in-ge-adoption ("Domestic Bt corn acreage grew from approximately 8 percent in 1997 to 19 percent in 2000, before climbing to 87 percent in 2025.").

168.    Because elite germplasm in corn alone does not produce a broad, natural resistance to any common herbicides, the combination of herbicide-tolerant GE traits and OTT herbicide spraying is a unique mode of action to protect against weeds.

169.    One of the ways Bayer maintains market dominance is by "stacking" traits into a single seed. Herbicide-tolerance traits and *Bt* traits are commonly "stacked" (or added) into a single seed, providing both herbicide tolerance and insect resistance.

170.    According to the USDA, stacked traits are the most common form of corn seed

planted in the United States today.

171. "Although other GE traits have been developed (such as virus and fungus resistance, drought resistance, and enhanced protein, oil, or vitamin content), herbicide-tolerance and Bt traits are the most commonly used traits in U.S. crop production." https://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-united-states/recent-trends-in-ge-adoption.

172. Between 2022 and 2025, over 90% of corn grown in the United States contains one or more GE traits. GE corn seed provides advantages to growers that non-GE corn seed does not, and which most growers now expect in their corn seed, which may include labor and expense savings, increased yields, and reduced soil erosion due to the elimination of tilling. These seeds provide farmers with considerable savings in labor and expense, increased yields, and reduced soil erosion by eliminating the need for tilling fields. Accordingly, farmers do not view conventional (non-GE) seeds as a reasonable or even practical substitute for GE corn.

173. Although once innovative, glyphosate herbicide and the glyphosate-tolerant events have been around for decades and have become common in commercial agriculture. Patent laws in the United States do not countenance a perpetual monopoly over an invention. Indeed, the United States Constitution only permits Congress to provide patents for "limited [t]times" and Congress has limited patent protection to 20 years. At the end of the statutory patent period, the invention belongs to the public.

174. Once the patent has expired, competition, often through generic versions of the product sold by competing suppliers, is anticipated, which should lower prices to a competitive level.

175. Monsanto's last commercially relevant United States patent on glyphosate

(Roundup) expired more than twenty years ago. It has reaped tens of billions in profits, more than compensating for its initial invention.

176.    Monsanto's, and now Bayer's, last remaining United States patent covering the glyphosate-resistant (RR2) GE corn event (*i.e.,* NK603), U.S. Patent No. 9,701,980 ("the '980 patent'"), titled "Methods for producing glyphosate tolerant plants comprising corn event PV-ZMGT32(nk603)," expired in November 2022. Again, the successful adoption of NK603 corn seed has delivered tens of billions in revenue and profits to Monsanto, now Bayer.

177.    Despite its historic returns on investment, Bayer continues to extract the value of these technologies, at supra-competitive prices, which have not eroded since they entered the public domain and became public goods.

178.    Bayer acknowledges that corn containing the RR2 technology, even post patent, has independent value to growers:

> Roundup Ready Corn 2 Technology continues to be an important tool within the Bayer portfolio for farmers. While offering a number of advantages over conventional corn, Roundup Ready Corn 2 Technology is also trusted by farmers needing a reliable refuge product and those who may not require corn with traits for insect protection.

https://www.cropscience.bayer.us/traits/corn/roundup-ready-corn-2 (last visited Feb. 26, 2026).

179.    Despite expiration of the patents, which eliminated any lawful monopoly over the NK603 event, Bayer has maintained a monopoly in the supply of NK603, which confers upon it a monopoly over the entire GE hybrid corn seed market in the United States.

180.    NK603 is a critical input to almost all GE hybrid corn seed, including stacked traits.

181.    It is included in: (a) GE hybrid corn seed sold directly by Bayer through its direct-sales channels; (b) multiple hybrid corn seed products sold by Corteva, pursuant to a licensing agreement by which Corteva pays royalties to Bayer, including as explained below, post-patent

royalties; (c) as a component of Parental Inbred Seed sold to and licensed to ISCs like Latham for inclusion in GE hybrid corn seed grown and sold by ISCs; and/or (d) on information and belief, to other seed manufacturers for sale inside and outside the United States.

182. Most hybrid GE corn seed sold in the United States contains NK603. It is the foundational herbicide-resistant trait. It is a key and necessary input to producing GE hybrid corn seed. As a result, based on its control of this critical input, Bayer has obtained monopoly power over the GE hybrid corn seed market.

183. Bayer has maintained this monopoly through anticompetitive means. It has also used its monopoly in the indispensable need for NK603, which is now a public good, to restrict the availability of other GE traits and increase Bayer's market share in those traits, foreclosing competition from competing seed companies and existing and emergent generic GE seed companies.

184. Bayer's actions to maintain and expand its monopoly through illegal means has harmed competition in the United States GE hybrid corn seed market, and in the Relevant Markets described below, harming ISCs, growers, and the public through increased supercompetitive prices, reduced quality and genetic diversity in plant varieties, and reduced output.

II. Bayer's Corn Seed Licensing and Restrictive Agreements

A. The "Corn Product License Agreement" with ISCs.

185. ISCs may license genetics and GE traits from Bayer pursuant to Bayer's Corn Product License Agreement with ISCs ("CPLA"), including the one by and between Monsanto and Latham, the terms of which are substantially similar for all ISCs.

186. The CPLA was drafted by Monsanto or its attorneys/agents.

187. The term of the CPLA runs until the last-to-expire Licensed Product Addendum,

which Bayer has the unilateral ability to control.

188. Trait Licensees (e.g. ISCs like Latham) may not draft or alter the terms of the CPLA.

189. Attempts to negotiate terms are rejected by Bayer.

190. Pursuant to the CPLA, Bayer gives Trait Licensees a limited license to produce and sell certain corn seed containing Bayer's GE traits. ISCs cannot produce or sell seed containing a Bayer GE trait without a license agreement.

191. Each year, Bayer issues Licensed Product Addenda and a product schedule listing the licensed corn seed products and the royalty fees for each product.

192. The CPLA does not permit Bayer to charge royalties for use and practice of expired patents.

193. The CPLA defines "Monsanto's Rights," which are the subject of the CPLA, as "any valid and unexpired:

(a) patent claims contained in any patent in the Territory owned by Monsanto or its Affiliates that Cover a Licensed Product and are posted by Monsanto on www.corn-states.com for that Licensed Product (as may be amended by Monsanto from time to time); and

(b) Plant Breeder Rights in the Territory owned by Monsanto that Cover a Licensed Product or a Parental Inbred Seed and are posted on www.corn-states.com for that Licensed Product (as may be amended by Monsanto from time to time)."

194. The CPLA defines "Licensed Rights," which are the subject of the CPLA, as including "valid and unexpired":

(a) patent claims contained in any patent owned or controlled by a Third Party in the

40

Territory that are licensed by Monsanto with the right to sublicense, or where applicable by an Involved Third Party Co-Licensor, that Cover a Licensed Product, and are posted on [www.corn-states.com](http://www.corn-states.com) for the Licensed Product or Licensed Event (as may be amended by Monsanto from time to time); and

(b) Plant Breeder Rights owned or controlled by a Third Party in the Territory that are licensed by Monsanto with the right to sublicense, or where applicable licensed by an Involved Third Party Co-Licensor with the right to sublicense, that Cover a Licensed Product or Corn inbred line and are posted on [www.corn-states.com](http://www.corn-states.com) for the Licensed Product or a Corn inbred line listed in a Licensed Product Addendum (as may be amended by Monsanto from time to time)."

195. In exchange for the Monsanto Rights and Licensed Rights to produce and sell Bayer's patented GE corn seed products, the CPLA requires Latham and similarly situated ISCs to pay a "Product Royalty" for every unit of Licensed Product sold or transferred and not returned.

196. Each year, Bayer unilaterally sets the per-unit Product Royalty fee it will charge for each GE corn seed product, and it lists the royalty rates on a schedule given to ISCs with that year's Licensed Product Addenda.

197. Even though Bayer's last patent covering NK603 expired in November 2022, Bayer has continued to charge and require payment of royalties for NK603 after that date, in violation of the CPLA.

198. Prior to the expiration of the last patent on NK603, Bayer would break out the Product Royalty by trait. Bayer now identifies a single royalty fee for each product. But its product schedule still identifies the portion of the Product Royalty attributable to the royalty on NK603, which is often 50% or more of the total Product Royalty.

199. For example, in 2025, the portion of the Product Royalty attributable to NK603 was ██████ per unit. By contrast, the Product Royalty for Bayer's stacked VT Double Pro which contains both NK603 and MON89034, a *Bt* trait that controls for rootworm, is approximately ██████. The Product Royalty for Bayer's most expensive stack in 2025, SmartStax Pro, which contains six GE traits (NK603, three other Bayer GE events, and two Corteva GE events licensed by Bayer) is no more than ██████ per unit, making the royalty on NK603 over 50% of the total royalty package covering six different traits. This reflects that Bayer's royalty on NK603 alone exceeds the royalty on five other GE traits, including Bayer's and Corteva's newer and allegedly more advanced GE traits.

200. Since the patents on NK603 expired, Bayer has *only* increased the portion of the Product Royalty attributable to it. ISCs pay ██████ to license this expired patent trait, which is approximately 32% *more* than they paid prior to the patent's expiration.

| Year | Roundup Ready 2 Royalty (Per Unit) |
|---|---|
| 2021 | ██████ |
| 2022 | |
| *Patent Expires* | |
| 2023 | ██████ |
| 2024 | |
| 2025 | |
| 2026 | |

**Table 1**

201. The CPLA also prohibits ISCs from using that Parental Inbred Seed to breed or produce royalty-free seed containing NK603 post patent ("generic NK603"). For example, the CPLA prohibits ISCs from transferring that Parental Inbred Seed to any third party, except as expressly authorized. CPLA § 3.02(a). ISCs are further expressly restricted from "conduct[ing] any breeding activities with any Parental Inbred Seed or Licensed Product." CPLA § 3.02(e). Nor

can ISCs "produce any Parental Inbred Seed" from the materials provided by Bayer. CPLA § 3.04(a). These restrictions persist even after expiration of the patents covering that seed.

202. Even if ISCs developed their own traits, events, or germplasm from Parental Inbred Seed, Bayer has taken for itself an option to require ISCs to provide a world-wide, non-exclusive, royalty-bearing license for any patent rights owned or controlled by ISCs and a royalty-free license for any propriety rights developed by the ISC. CPLA § 6.05.

203. For corn seed produced from Parental Inbred Seed, ISCs may only sell that seed to growers, or to dealers, that are also licensed and approved by Bayer. CPLA § 3.03. Bayer only licenses and approves dealers that agree to similar restrictions as those stated above.

204. If an ISC, dealer, or a grower violates Bayer's terms, or assists anyone else in doing so, Bayer may terminate its existing agreements and licenses. This would preclude the ISC, the dealer, and the grower from being able to use any of Bayer's seed products, including those still under patent. These restrictions are perpetual and continue after the CPLA is terminated. CPLA § 8.03.

205. Bayer regularly enforces its rights under the CPLA and the Technology Stewardship Agreement, suing farmers who allegedly violate these rights.

**B.      Bayer-Corteva Roundup Ready (NK603) Corn License Agreement**

206. Prior to the expiration of its last patent, Bayer also licensed NK603 to competitors. In exchange for the right to include NK603 into their own corn seed and sell it to growers, these competitors also paid royalties to Bayer. As a result, competitors had less incentive to innovate and develop events that would compete with NK603. And Bayer was able to promote and expand the use of NK603, and its corresponding market power, making NK603 the foundational herbicide-resistant GE event in hybrid corn seed.

207. In September 2002, Monsanto and Agrigenetics, a predecessor to Corteva, entered into the "Roundup Ready (NK603) Corn License Agreement" (hereinafter, "Bayer-Corteva NK603 Agreement"). The agreement was subsequently amended several times but, on information and belief, not in any respect material to the allegations herein.

208. Under the Bayer-Corteva NK603 Agreement, Bayer granted Corteva a non-exclusive license "of certain patent rights and propriety technology … for use in producing Corn plants that are tolerant to Glyphosate herbicide." Essential to the license was the right to practice patents covering NK603. Corteva thus received the right to "develop, produce, have produced, and sell Licensed Corn Products to Corn growers licensed by Monsanto[.]" In other words, Corteva could include the NK603 event in its proprietary corn seed products, provided Corteva sold those products to entities that agreed to Monsanto's licensing terms and restrictions, which were consistent with the Technology Stewardship Agreement, discussed below.

209. Monsanto did not initially grant Corteva a license to stack NK603 in seed containing Corteva's own GE traits, including its Bt traits, which competed directly with Monsanto's *Bt* traits. As part of litigation brought by Corteva, however, Monsanto and Corteva entered into an amended licensing agreement that permitted Corteva to stack NK603 with its own GE traits. Corteva continued to pay per-unit royalties, and Bayer continued to set and receive those royalties on any corn seed sold containing NK603.

210. On information and belief, Bayer set these confidential royalty rates to be paid by Corteva based on the NK603 trait royalties it established for ISCs and the royalties it charged dealers or growers through its direct-sales channels. Bayer, thus, effectively controlled pricing for all GE hybrid corn sold containing NK603, whether by Corteva, ISCs, Bayer, or others licensed by Bayer. This gave Bayer control over the most important, and uniformly demanded, pricing input

44

in all GE corn across all channels of distribution.

211. The Bayer-Corteva NK603 Agreement effectively eliminated the incentive for Corteva to develop its own glyphosate-tolerant event comparable in efficacy to NK603.

212. The Bayer-Corteva NK603 Agreement, both initially and as amended above, contained another serious and material limitation: Corteva was *not* permitted to sublicense NK603 to other seed companies, such as ISCs. As a result, while Corteva could stack and sell corn seed containing the NK603 event to dealers or growers, it could not license its own GE traits to ISCs in a stack containing NK603, which restriction effectively precluded Corteva from competing with Bayer in the ISC market.

213. As a result, ISCs could *only* obtain licenses for NK603 from Bayer and to do so, ISC's had to take Bayer's insect-resistance (and/or other) GE events. In effect, competition with ISCs between Bayer and Corteva, the leading seed companies, was foreclosed to a substantial portion of the upstream Relevant Market by their agreement and the critical need for NK603. This allowed Bayer to maintain 100% control of the NK603-traited corn seed market, foreclosed competitive price pressure, and blocked any alternatives for ISCs to access, grow, and sell NK603-traited corn seed.

214. As explained below, the Bayer-Corteva NK603 Agreement also effectively and unlawfully extended Bayer's monopoly over NK603 beyond the expiration of its last United States patent, effectively fixing the minimum, post-patent price of hybrid corn seed containing NK603.

215. According to Bayer, the Bayer-Corteva NK603 Agreement required Corteva to continue paying the royalties set by Bayer on any corn seed containing the NK603 event even after expiration of the last United States patent.

216. As a practical matter, this prevented Corteva from competing with Bayer by

offering growers or ISCs generic NK603, either without a royalty or at a royalty below Bayer's post-patent, supra-competitive royalty. The royalties paid by Corteva were an input cost that increased Corteva's marginal cost to compete. This ensured Bayer could continue to collect its monopoly profit post patent, and it ensured Corteva could not compete with Bayer on price.

217. On information and belief, Corteva also could not sub-license NK603 to ISCs, even after the last United States patent expired.

218. As a result of these restrictions, the Bayer-Corteva NK603 Agreement effectively extended Bayer's monopoly beyond the United States patent period and foreclosed ISCs' ability to engage in competitive price bargaining between Bayer and Corteva.

219. In addition, by setting the key input price of its competitor, Corteva, Bayer's agreement with Corteva fixed the minimum prices at which Corteva could sell corn seed containing NK603 even after any lawful monopoly Bayer had obtained via its patents in the United States had expired.

C.    **Technology Stewardship Agreements with Growers.**

220. License agreements (called "Technology Stewardship Agreements") with corn growers (the farmers who would purchase seed and grow crops for resale), once executed, remain in effect until terminated. "That agreement permits a grower to plant the purchased seeds in one (and only one) season. He can then consume the resulting crop or sell it as a commodity, usually to a grain elevator or agricultural processor. But under the agreement, the farmer may not save any of the harvested [crop] for replanting, nor may he supply them to anyone else for that purpose." *Bowman v. Monsanto Co.*, 569 U.S. 278, 281 (2013) (internal citation omitted). The agreement "forc[es] him instead to buy from Monsanto each season." *Id*.

221. Seed dealers are required to obtain an executed Technology Stewardship

Agreement from each grower prior to use of the seed. Without a license, the grower is subject to a claim of patent infringement for planting and reproducing seed containing patented GE material, until the patent expires. *Id.* Bayer collects data on all growers, monitors compliance and has enforced contract provisions through litigation. It also has the ability to unilaterally terminate licenses for non-compliance.

**III.    The Relevant Antitrust Market Definition**

222.    To the extent a market definition is required, *relevant antitrust markets include (1) an upstream input market for genetically modified ("GE") corn seed traits that are glyphosate tolerant (NK603 or its close substitutes), for use in commercial hybrid corn seed, and (2) the downstream market for hybrid GE corn seed that include NK603 or its close substitutes ("Relevant Markets").*

223.    These two Relevant Markets are vertically related.

224.    In the **upstream market**, Bayer has been and is the sole, or near-sole, supplier of an essential GE trait (NK603) that confers glyphosate tolerance, which is functionally required for seed companies to compete in the downstream commercial GE hybrid corn seed market. As explained below: GE traits that confer herbicide tolerance are a critical, non-substitutable input of commercial hybrid corn seed in the United States, and among herbicide-tolerant traits there is no adequate economic substitute for a glyphosate-tolerant trait, and among glyphosate-tolerant traits there is no adequate economic substitute for NK603.

225.    In the **downstream market,** conventional (non-GE) corn seed is not reasonably interchangeable with GE corn seed due to grower demand, including demand for herbicide tolerance, production-risk considerations, and the necessity of GE traits to meet prevailing agronomic and weed-management practices. In addition to supplying GE traits as inputs for this

market, Bayer participates directly through its vertically integrated seed brands and dealer channels (Channel and DEKALB). Nearly all commercially viable GE hybrid corn seed is either embedded with NK603 or competitively constrained by Bayer's control over NK603 as a necessary upstream input. As a result, there is no economically reasonable substitute for GE corn seed incorporating NK603.

226. By controlling a critical input—NK603—and conditioning access to that input on various use limitations described herein, Bayer has the ability to, and did, raise prices, restrict output, and foreclose competition in the Relevant Markets.

227. In the alternative, and in the event the Relevant Markets are deemed too narrow, upon the facts alleged herein, Bayer has market power to raise prices, restrict output, and foreclose competition in broader Relevant Markets that include: upstream and downstream commercial corn seed markets for all GE traits, herbicide-tolerant traits, glyphosate-tolerant traits, and/or stacked traits in the United States.

### A. The United States is the Relevant Geographic Market

228. Seed manufacturers like Bayer both market and sell GE hybrid corn seed, and market and sell the GE traits, along with related licensing, across all corn-producing states of the United States. They license genetics and GE traits or events and sell Parent Inbred Seed to ISCs or competing seed manufacturers, like Corteva, which produce and sell GE corn seed to growers directly or through dealers for the production of commodity corn. They also sell seed containing those genetics, GE traits or events, and produced from that Parent Inbred Seed, directly to growers through their direct sales channels. These transactions occur in all corn producing states, making the entire United States a proper geographic market for measuring competition.

229. Demand for certain foundational GE traits, such as herbicide-tolerant traits,

including the NK603 event, is not geographically specific.

230. Bayer's royalty for the NK603 trait in the United States does not vary by geography.

231. Each seed manufacturer, like Bayer, sets its prices and competes on a nationwide basis.

**B. GE-Corn and Non-GE-Corn Seed are Not Interchangeable.**

232. In both the downstream and upstream Relevant Markets, GE hybrid corn seed is a distinct area of effective competition in which seed manufacturers allegedly compete for market share. In contrast, non-GE hybrid corn seed is not a substitute for, and is not interchangeable with, GE hybrid corn seed, even in response to price differences because growers demand the agronomic differences provided by GE traits. They are distinct and different markets because non-GE hybrid corn seed does not offer the traits demanded by growers that GE corn seed can provide. This is true in both the inputs (upstream) market (there is no non-GE alternative to the glyphosate-tolerance conferred by a GE event such as NK603) and in the (downstream) finished seeds market (without a GE trait, there is no mechanism for conferring herbicide tolerance).

233. Differences in agronomic function (e.g., herbicide tolerance and insect resistance), economic performance (greater yields, cost structure, risk), regulatory and contractual restraints, and grower demand result in a low cross-elasticity of demand between GE and non-GE seed. In practice, growers do not meaningfully switch from GE to non-GE corn seed in response to changes in GE pricing, and seed manufacturers cannot meaningfully compete at scale without offering hybrid GE products.

234. GE corn seed is not functionally interchangeable with non-GE corn seed. GE corn contains traits that fundamentally alter how the crop is grown, including herbicide tolerance which allows the grower to spray herbicides OTT to control weeds that impair yield, insect resistance

49

which controls insects that eat crops, and stacked combinations that do both. Growers cannot reasonably substitute non-GE corn seed in response to a price increase on GE corn seed because doing so would require fundamental changes in farming practices, including increasing chemical, application, and labor costs and reducing yield.

235. Real-world behavior confirms the absence of functional interchangeability. GE corn seed has carried, and continues to carry, significant licensing costs—often, as described above, these royalties run $100-200 per unit, or more. Despite these costs, the share of corn acres planted with GE corn seed has only increased. The market did not shift to non-GE corn seed in response to the significant price differences. Today, despite these prices, GE corn seed represents over 90% of commercial hybrid corn grown in the United States.

236. Conventional hybrid corn, without GE traits, has become a specialty market for non-mainstream growers such as organic growers and identity-preserved and specialty-contract growers producing corn for non-GE food ingredients, export markets with GE restrictions, and certain specialty feed uses or supply chains. These growers serve buyers that require non-GE corn and who will pay a premium for that product. All or most growers planting non-GE seed do so because certain downstream buyers require it and will pay more for it. It, thus, represents a distinct market with a distinct level of demand, and is not a competitive substitute for GE corn seed.

237. Most—the vast majority of—commercial row crop growers use GE corn seed, including commodity corn producers, large-acreage operations, and farmers selling to ethanol manufacturers, feedlots, export channels, and industrial processors. Non-GE corn is sold in different markets and commands higher prices than commodity corn.

238. The price of non-GE corn seed does not constrain the price of GE corn seed because they serve fundamentally different markets. Likewise, there is no interchangeable substitute for

50

GE traits in the input market for GE corn seed.

239. Growers would face significant barriers to switch from GE to non-GE corn seed, including different equipment, increased labor (to till the land for weeds without herbicide-tolerant corn), and costs of compliance with rules applicable to organic and specialty farming. They would incur more risk from insects. And they would suffer lower and less consistent yields.

240. Non-GE corn seed is not part of the Relevant Markets.

### C. The Relevant Market is Appropriately Limited to GE Corn Seed Containing NK603 or Its Close Substitutes.

241. Because NK603 is a foundational input and competitively mandatory in commercial GE corn seed, markets defined by herbicide-tolerant traits, glyphosate-tolerant traits, or stacked traits are economically co-extensive for antitrust purposes. Each relies on NK603 as a core input, and no alternative product constrains Bayer's ability to exercise market power.

#### 1. Herbicide-tolerant hybrid corn seed.

242. Corn growers demand herbicide tolerance, which can only be delivered by GE events. Modern farming has come to depend upon the ability to spray herbicides OTT to control weeds, reduce costs, and increase yields. Without an herbicide-tolerant seed, that would not be possible.



**Figure 2**

243. Without herbicide-tolerant corn seed, growers must rely on mechanical cultivation (tillage, rotary hoeing inter-row cultivation). This requires multiple passes through the field, precise row spacing, specialized cultivation equipment, increased fuel costs, skilled labor, and dry soil conditions. It is less effective on late-emerging weeds, can damage corn root systems, and increases erosion risks. It increases equipment and labor costs and reduces yield.

244. With herbicide-tolerant corn seed, growers can delay application of any herbicide until, and if, weeds emerge or adjust applications based on weather and weed pressure. Without it, growers must apply any herbicide before planting or before the crop emerges, which necessarily controls for fewer weed spectrums (*i.e.,* those that emerge after the corn crop is planted or emerges), carry greater risk of injuring the crop, and require more precise timing and herbicide mixes.

245. A grower purchasing herbicide-tolerant seed is not simply buying "corn genetics," but the ability to farm using a specific, modern weed-control system. Herbicide-tolerant corn seed is not reasonably substitutable with non-herbicide-tolerant corn seed. It would require a grower to change how they farm. There is a low cross-elasticity of demand between the two seeds because of the non-transitory, material costs associated with changing farming practices. A material price

increase on herbicide-tolerant corn seed would not cause growers to shift to non-herbicide-tolerant corn seed.

246. Real-world pricing behavior confirms the absence of substitutability. As discussed above, Bayer has imposed substantial and sustained increases in the price of herbicide-tolerant corn seed and the licensing fees for NK603 over time. Despite these increases, growers did not materially substitute non-herbicide-tolerant corn seed. Instead, herbicide-tolerant corn seed—and seed containing NK603—remains the predominant type of seed sold in the United States. Its share of the market has remained substantially the same or has grown over that period.

### 2. Glyphosate-tolerant hybrid corn seed.

247. Among herbicide-tolerant hybrid corn seed, there is no economically reasonable substitute for a seed with glyphosate tolerance. Thus, glyphosate-tolerance, both as an input and as part of the downstream market for GE corn seed, is a relevant antitrust market or sub-market.

248. Glyphosate-tolerant corn seed is the predominant type of herbicide-tolerant corn seed sold in the United States. The corn acres planted with glyphosate-tolerant varieties increased from approximately 7% of total corn acres in 2000 to approximately 89% in 2016. In 2022 and to the present approximately 90% or more of acres were planted with glyphosate-tolerant varieties.

249. As explained above, according to Bayer, the loss of glyphosate would have significant economic repercussions to U.S. farmers and is the cornerstone in the fight against weeds.

250. Glyphosate tolerance is a trait included in virtually all foundational corn breeding lines sold by all major seed companies. Essentially all GE corn varieties are engineered to tolerate glyphosate.

251. Most growers, over 80% of those that plant glyphosate-tolerant seed, also spray

glyphosate. Only a small percentage of corn acres planted with glyphosate-tolerant seed is by growers that do not apply glyphosate.

252. The market for GE seed that is also not glyphosate-tolerant is so small that neither seed manufacturers nor ISCs could market or sell hybrid GE corn seed at scale without a glyphosate-tolerant trait.

253. There is no, or little, economically reasonable demand-side substitute for glyphosate-tolerant traits in corn seed. Growers, and ISCs, or new market entrants, would face significant barriers to entry in any attempt to replace glyphosate as the predominant herbicide. Growers' entire herbicide program would have to be replaced, with attendant costs.

254. Price increases, even large ones, in glyphosate-tolerant traits would not cause growers to reasonably switch to non-glyphosate-tolerant seed at scale. Nor would it cause ISCs to reasonably transition to non-glyphosate-tolerant traits as an input in corn seed sold by them.

255. Other herbicide-tolerant traits, as explained below, are imperfect complements, not substitutes, to glyphosate tolerance. Growers may use these herbicides in conjunction with glyphosate but not in place of it.

256. ISCs cannot readily switch to non-glyphosate-tolerant hybrids for several reasons. Demand is insufficient. Distribution channels expect glyphosate tolerance as a baseline. Seed portfolios without glyphosate tolerance are commercially nonviable, and practically unavailable due to stacking.

257. Real-world evidence supports that glyphosate-tolerant traits have been, and remain, indispensable. The industry recognizes that glyphosate tolerance is treated as a must-have baseline trait.

258. Observable market data shows a low cross-elasticity of demand between

glyphosate-tolerant traits and non-glyphosate-tolerant traits both as an input and in the downstream GE corn seed market.

259. There are three other herbicides for which GE tolerant events exist: glufosinate, 2,4-D, and Dicamba. None are economic or practical substitutes for glyphosate-tolerance.

### a. *Glufosinate*

260. Glufosinate is an herbicide. An event is available that confers tolerance to glufosinate, which is marketed under the brand name "Liberty Link." The last patent on that event expired in 2023. Yet, Liberty Link has not obtained significant market share. Its sales, as an input or in the finished corn seed product did not experience meaningful, if any, market-share growth following patent expiration or increases in NK603 pricing.

261. One reason that glufosinate is not a substitute for glyphosate is its mode of action. Glyphosate inhibits the EPSPS enzyme, effectively starving weeds. Glufosinate inhibits glutamine synthetase which causes toxic ammonia accumulation. As a result, glyphosate is absorbed on contact through the plant's leaves and is translocated to its roots and growing points, while glufosinate only kills the tissue it touches. To completely kill a weed, glufosinate requires complete spray coverage, and it often fails to kill roots or regrowth in perennials. It is also not as reliable on big weeds. To substitute glufosinate for glyphosate, growers would have to modify their herbicide application practices, and even then, they would likely suffer lower yields and more weed problems.

262. Glufosinate is, thus, not a substitute for glyphosate, and glufosinate-resistance is not a substitute for glyphosate-resistance when inserted into corn seed.

263. The observable market also does not view glufosinate tolerance as a substitute for glyphosate tolerance. As alleged above, Bayer's primary competitor, Corteva, entered into an

55

agreement to pay Bayer per-unit royalties to include NK603, which provides glyphosate-tolerance, in its proprietary corn seeds. And Corteva does so even when its stacks included other herbicide-tolerant traits, such as glufosinate tolerance. As a result, the market recognizes herbicide-tolerant traits, such as glufosinate-tolerance, as mere complements, but not substitutes, for glyphosate tolerance.

264. Several barriers to entry exist that make it extremely difficult for anyone to develop a new technology that might replace glyphosate-tolerance as the dominant form of herbicide tolerance in GE corn. The development and approval of new GE events is both very expensive and time consuming.

265. GE traits require extensive research and investment, must pass numerous regulatory hurdles, and take years to develop. It can take 16-17 years from initial discovery to launch a commercial trait. It costs over $100 million to develop a new GE event and millions more to market and promote it. Even then, the efficacy, efficiency, and cost of the specific herbicide matters significantly in whether growers would view it as a substitute for glyphosate, given its decades-long hold on the market.

266. Even after NK603 patents expired in the United States and Bayer maintained or increased licensing prices, Bayer did not lose market share in either the inputs or the downstream seed market to any non-glyphosate-tolerant corn seed or event.

### b. 2,4-D

267. A GE event that confers tolerance to 2,4-D, another herbicide, is also not economic or functional substitute for glyphosate tolerance. 2,4-D is routinely used in combination with, not a substitute for, glyphosate tolerance in stacked trait packages. It can provide some supplemental weed control, particularly to weeds that have naturally developed glyphosate tolerance, but

glyphosate remains the foundational herbicide in corn weed control programs even where other herbicides are applied. As a result, there is not a substitute for glyphosate tolerance seed.

268. 2,4-D controls a fundamentally different subset of weeds, lacks grass control, requires stacking with other herbicides, imposes tighter application constraints, and cannot replicate glyphosate's role as a single-pass, broad-spectrum backbone of modern corn weed-control systems.

269. Application of 2,4-D alone may leave up to half the weed problem unsolved. As a result, it can be a supplement, but not a substitute.

### c. *Dicamba*

270. Dicamba is another herbicide with a corresponding GE event that confers tolerance. Monsanto, now Bayer, owns the patent rights to the Dicamba weed treatment system. But it has its own unique set of limitations that makes it an illegitimate substitute for glyphosate tolerance, as supported by Bayer's own public statements that glyphosate and glyphosate-tolerant GE events remain the cornerstone of weed control without which there would be serious economic harm.

271. Until recently, Dicamba lacked regulatory approval for application in the United States. That approval itself has been the subject of litigation, making long-term regulatory approval uncertain. Without such certainty, Dicamba cannot be considered a legitimate and reliable substitute for glyphosate.

272. Dicamba also has serious practical limitations when compared to glyphosate. It is highly prone to volatilization and drift, making it likely to move off target when sprayed (*e.g.,* onto neighboring farms) and kill crops of neighboring farmers that have not planted seed containing a Dicamba-tolerant event either because they did not plan to spray for Dicamba or they planted crops for which no such event exists. As a result, there is a serious risk of liability to a grower that relies

on Dicamba as its herbicide treatment.

273. On top of these limitations, like 2,4-D, Dicamba only controls broadleaf weeds, and provides no grass control, which is why it is only used as a supplement in stacked systems. It also has narrower application windows and is subject to wind-speed, time and temperature, restrictions not applicable to glyphosate.

274. Because corn seed containing a glyphosate-tolerant event has no reasonable substitutes, it represents a distinct antitrust market, or at minimum a sub-market, with no economically reasonable substitutes. This is true in both the inputs market and the downstream seed market. Control over access to glyphosate-tolerant traits therefore confers substantial market power, including the power to exclude or discipline downstream competitors.

275. ISCs without access to glyphosate-tolerant traits to include in their GE corn seed cannot effectively compete at scale in the commercial hybrid corn seed market, and denial or conditioning of access forecloses a substantial share of downstream competition.

### 3. NK603 is a critical input into GE hybrid corn seed with no close substitute

276. Among glyphosate-tolerant corn seeds, NK603 is the dominant, de facto standard event and the only commercially viable option at scale. There is no economically viable substitute among glyphosate- or herbicide-tolerant traits.

277. Although a technically distinct glyphosate-tolerant event (GA21) exists, as alleged below, it does not constrain pricing or competitive behavior and is not a reasonable substitute in the marketplace. Bayer and Corteva produce and sell over 70% of all corn seed in the United States (and an even larger share of GE corn seed). In addition, they also license GE traits for corn seed sold through the ISC channel of distribution, so the vast majority of all U.S. hybrid corn seed

contains GE traits from Bayer or Corteva. As a result, nearly all seed sold by Bayer, Corteva or ISCs contains NK603, which is the vast majority of GE corn seed planted in the United States.

278. On information and belief, only GE corn seed sold by Syngenta, which reflects approximately 5% of entire corn seed market, lacks NK603, and includes only GA21, meaning that NK603 is present in nearly all GE hybrid corn seed sold in the United States.

279. Growers do not view GA21 as a reasonable substitute for NK603, even in response to price increases, as reflected in Syngenta's very small share of the corn seed market, which has now materially increased since Bayer increased the price of NK603.

280. GA21 has failed to obtain appreciable market share because, as discussed, it is not an adequate product substitute for NK603. GA21 uses an inferior mode of action for obtaining glyphosate tolerance in United States corn, and it fails to provide growers with the flexibility demanded by their farming practices, as discussed above.

281. After the last U.S. patent covering NK603 expired, Bayer maintained or increased the price of obtaining NK603 through continued licensing fees. But this did not result in an increase in GA21 market share.

282. In addition, developing a new glyphosate-tolerant trait is impractical for the reasons stated above. The cost exceeds $100 million and takes over a decade of trials and regulatory approvals. There are few seed manufacturers with the resources to undertake this endeavor. And the two largest, Bayer and Corteva, entered into a licensing agreement to allow Corteva to include NK603 into its corn seed products.

283. Substituting GA21 for NK603 is also constrained by stacked-trait portfolios which are built around NK603, as the foundational herbicide-tolerant event.

### 4. Stacked GE traits.

284. Most hybrid corn seed sold in the United States contains multiple GE events, including (at least) one event providing herbicide-tolerance (e.g., NK603) and (at least) one event that provides insect (e.g., Bt) resistance. Many growers demand both. To be viable, ISCs must be able to source and make available corn seed containing stacked traits.

285. Both as an input, and as part of the finished downstream product, it is necessary to be able to sell stacked traits to compete at scale. The market for licensing stacked traits includes the right to combine these multiple events in commercial corn hybrids for sale in the United States. These are not mere packaging choices, but a distinct product category demanded by many growers and ISCs as recognized by the industry.

286. Growers face simultaneous weed and insect pressure during the same growing season. Thus, there is a strong market for GE corn seed that can address both problems. Absent a "stacked" trait containing both a herbicide-tolerant and a Bt trait, growers would have to choose between controlling one problem or the other. There is a significant demand for a product that addresses both problems. Growers value the combination of GE traits but prices reflect the market value of each trait. Seed manufacturers, including Bayer, design, price, and market stacks separately. Bayer, however, discloses to ISCs the cost of licensing certain GE traits separate from a stacked trait. This reflects that each GE trait is an independent cost and has independent value in the stack.

287. Since 2007, most U.S. corn acres are planted with hybrid seeds containing stacked traits, including an herbicide-tolerant and insect-resistant event.

288. In 2018, the USDA reported that approximately 80% of corn acres were planted with stacked traits.



**Figure 3**

289. In 2025, the USDA reported that 92% of corn acres are herbicide tolerant and 87% are insect resistant, which means between 79% and 87% of corn acres contain both traits. This suggests that the stacked traits have, if anything, only become more common since 2018.

290. As part of the input (upstream) market for GE hybrid corn seed, Bayer possesses a dominant share of the licensing market for stacked GE traits, and therefore also of the downstream finished GE hybrid corn seed market. It may have acquired this market power based on its patents in NK603 (expired Nov. 2022), MON810 (expired 2022), and MON863 (expires in 2023), but it has expanded this market power—functionally and temporally post-patent—through its licensing agreement with Corteva, and licensing agreements with dealers, ISCs, breeders, and growers. As discussed, through its control over NK603 pricing alone, Bayer controls over 90% of the GE hybrid corn seed market and has the ability to set prices, foreclose rivals, and raise rivals' costs.

291. Bayer's monopoly power over the market spans distribution channels: it has a

dominant share of traits licensed to ISCs and it has a monopoly over hybrid corn seed sold containing NK603 or its close substitutes through its control of NK603 as an input. On information and belief, via NK603, Bayer supplies the dominant and foundational input for as much as 90-95% of all GE hybrid corn seed, which allows Bayer to set minimum prices across the market.

292.  Bayer has a monopoly over the Relevant Markets, and the alternative markets, defined above.

293.  Bayer may have obtained that monopoly in the United States via its patent rights in NK603 but Bayer has maintained that monopoly since, at least, November 2022 through the illegal exercise of that market power.

294.  In at least one lawsuit, filed in 2006, Bayer (then Monsanto) was accused by Syngenta Seeds, Inc. of obtaining a monopoly unlawfully through *inter alia* exclusive dealing seed licenses with ISCs and its bundled incentive programs. *See* Third Am. Compl., *Syngenta Seeds Inc. v. Monsanto Co. et al.*, Case No. 04-305-SLR (Nov. 14, 2006) ("Syngenta Lawsuit"). After discovery in the Syngenta Lawsuit, the court denied Monsanto's motion for summary judgment. The case was set for trial. Prior to that trial, in 2008, Monsanto settled the lawsuit, granting Syngenta a royalty-free license to Monsanto's GA21 glyphosate-tolerant corn event and to *Bt11* insect-resistant (European corn borer-resistant) corn technology. In turn, Syngenta granted Monsanto a royalty-bearing license to certain Syngenta technologies, including enabling technology for Monsanto's next-generation herbicide tolerance, which became Dicamba.

295.  As detailed below, Bayer has employed, or continued to employ, anti-competitive tactics, including some of those described in the Syngenta Lawsuit, to maintain or expand its monopoly in the Relevant Markets.

296.  The Relevant Markets are proper antitrust markets, or sub-markets, that reflect

cross-elasticity of demand, price sensitivity, and practical realities.

**IV.     Bayer Uses its Monopoly Power to Foreclose, or Delay, Entry of Generic NK603.**

297.    In a competitive market, the input price of NK603, and of selling hybrid corn seed containing NK603, would have fallen following the expiration of Bayer's last United States patent in November 2022.

298.    NK603 demand remains significant. Bayer charged and continues to charge a significant premium for it, even after patent expiration. These are conditions that, in a competitive market, should have resulted in the emergence of generic competition simultaneously with the patent's expiration. That competition should have grown in each year thereafter. In contrast, even four years later, no viable competition to Bayer has emerged. This is the direct result of Bayer's anti-competitive conduct to maintain its monopoly.

299.    Bayer has used its market (monopoly) power to foreclose, or block, the emergence of generically available NK603 and to effectively extend its monopoly over NK603 post-patent, which secures its monopoly over the Relevant Markets, and its continued extraction of supracompetitive prices.

**A.     Bayer Used Anticompetitive Agreements with the Major Seed Manufacturers to Delay or Foreclose Entry of NK603 Competition.**

300.    After its last U.S. patent expired, Bayer had no legal right to block, or to charge royalties for, use of NK603 in GE hybrid corn seed sold in the United States. Despite this, Bayer did both: (1) blocked entry of generic NK603 and (2) not only continued charging but increased royalties for it.

301.    Corteva directly competes with Bayer in both GE trait licensing and GE corn seed sales. Approximately 30%-35% of all hybrid corn seed is sold by Corteva, and an even larger share

contains its GE traits. In an unrestrained and competitive market, Corteva would have immediately been able to offer and engage in price competition with Bayer in the Relevant Markets by licensing stacked GE traits containing NK603 to ISCs and by selling GE hybrid corn seed containing NK603 to dealers and growers. Such competition would have caused the price of NK603, as an input, to fall across the Relevant Markets toward marginal cost, which in the post-patent world would be at or near zero.

302. There was no rational, practical, or economic reason keeping Corteva from the market. Rather, Corteva was restrained solely by Bayer's anti-competitive conduct.

303. As discussed above, Bayer's predecessor, Monsanto, and Corteva entered into a Bayer-Corteva NK603 Agreement, which imposed restrictions and required Corteva, according to Bayer, to pay Bayer royalties on all seed that Corteva sold containing NK603, even post-expiration of the last United States patent.

304. As a result, until no earlier than February 2026 and perhaps later, Corteva has been foreclosed from competing with Bayer based on their horizontal, anti-competitive agreement. Corteva cannot offer generic NK603 because it was required to pay post-patent royalties to Bayer. This allowed Bayer to continue charging supra-competitive prices market-wide.

305. Bayer extracted this agreement when it still held a patent monopoly over NK603. The agreement to impose post-patent royalties is not ancillary to any other part of the agreement. Even if the agreement covered royalties owed in other countries where Bayer's patent rights had not expired, those royalty rates were distinct from United States royalty rates under the agreement. It is not reasonably, or legitimately, necessary to continue charging royalties in the United States when no remaining patent protections exist in the United States. Rather, any agreement to pay post-patent royalites in the United States is a naked restraint on competition that harms the United

States market and its citizens. Any legitimate purpose of requiring royalties for NK603 ended with the expiration of Bayer's United States patent rights, at which point there remained no protectable investment or property right in the United States.

306. Instead, the imposition of royalty rates continued solely to maintain a fixed minimum royalty price, foreclose entry, and prevent rivals from competing on the merits—effects that are horizontal in nature and quintessentially anticompetitive. The agreement neither facilitates nor is it necessary to any legitimate integration and makes economic sense only as a mechanism to suppress rivalry after lawful exclusivity ended; it is a naked restraint subject to condemnation.

307. In addition to imposing post-patent royalties, this agreement also precluded Corteva from including NK603 in any stacked trait offering to ISCs containing Corteva's own GE events. This restriction effectively foreclosed competition between Bayer and Corteva in the Relevant Markets. The restriction was not reasonably necessary to the licensing agreement. Its sole purpose was to further Bayer's monopolization of the Relevant Market by foreclosing Corteva from growing its share of the stacked GE events licensed to ISCs. Even if there was a legitimate purpose prior to the expiration of Bayer's NK603 patent rights in the United States, such purpose ended on that date. It is, thus, a naked restraint of trade for the reasons stated above.

308. According to press reports, in February 2026, Corteva and Bayer settled litigation over Corteva's obligation to continue paying royalties in the United States. Pursuant to the settlement, Corteva would be able to sell hybrid corn seed containing NK603 royalty-free to Bayer. In exchange, however, Corteva paid Bayer an up-front fee of $610 million. This settlement has not yet restored competition in the market: that fee is a fixed cost that Corteva must recoup, at least in part, through its ongoing pricing. As a result, it is anticompetitive and Bayer's charging of supracompetitive prices continues without competitive restraint.

309. The agreement was not reasonably necessary to any lawful settlement, nor limited in duration to the life of any valid U.S. patent.

310. As a result of its agreement, and its interpretation of that agreement, with Corteva, Bayer has unlawfully extended its monopoly over NK603 post-patent, restrained competition, and charged supracompetitive prices.

311. Bayer has other "licensing" agreements with major seed manufacturers, including Syngenta. On information and belief, other agreements contain restrictions that have contributed to the delay, or preclusion, of generic NK603 entering the market after November 2022.

**B. Bayer Uses its Monopoly to Impose Substantial Barriers to Entry of Other Generic Competitors in NK603 and to Raise Rivals Costs to Maintain Its Illegal Monopoly**

312. Bayer engages in other anticompetitive conduct to raise the barriers to entry to other, potential providers of generic NK603. Bayer uses its market power to carry out this conduct. Bayer's conduct raises rivals' costs and forecloses substantial competition.

**1. Bayer has used, and uses, its market power to contractually restrict breeding of generic NK603.**

313. Bayer's perpetual contractual restrictions, which exceed the rights permitted by U.S. patent law, have delayed, or prevented, emergence of generic NK603 competition.

314. These restrictions are contained in Bayer's trait licenses (including the CPLA and Addenda and the Stewardship Agreement), bag-tag restrictions, and control over access to foundational genetic materials, which prevent independent breeders and seed companies from obtaining and using the biological inputs necessary to commercialize competing "generic" traited seed at scale. These restrictions, combined with consolidation and control over downstream channels, foreclose effective post-patent competition, keeping royalties and seed prices elevated.

315. These agreements, extracted by Bayer during the period of its patent monopoly over NK603, have raised extensive barriers to entry of generic competition by restricting the post-patent use of Parental Inbred Seed and hybrid corn produced from Parental Inbred Seed containing NK603

316. To obtain a patent, an inventor, or their assignee, is supposed to disclose enough information in the public patent that a person skilled in the art can adequately duplicate the invention. This requirement exists to ensure that, once the patent expires, the public has all the information necessary to re-produce the invention, eliminating the inventor's, or its assignee's, monopoly over the invention.

317. In 2023, the USDA reported, in a report titled MORE AND BETTER CHOICES FOR FARMERS: PROMOTING FAIR COMPETITION AND INNOVATION IN SEEDS AND OTHER AGRICULTURAL INPUTS, that some such disclosures "may only provide information that the patenting firm would be able to understand" or may be classified as confidential, preventing those skilled in the art from re-producing the invention upon expiration of the patent period (at pp.25-26). This inhibits the public's ability to "understand and improve on the claimed invention," (at p.29), or to replicate it after the patent expires.

318. Pursuant to the aforementioned licensing agreements with Bayer, ISCs obtain Parental Inbred Seed containing NK603, which is used to grow hybrid corn seed. But Bayer strictly restricts the use of this Parental Inbred Seed to compete with Bayer, even after the patents have expired.

319. These restrictions exceed the rights granted to Bayer by U.S. patent law, which allows Bayer to preclude the practice of its invention only during the patent period. Additional contractual limitations were not necessary to protect or enforce Bayer's patent rights. Rather,

Bayer uses the contractual limitations in the CPLA and similar agreements with breeders and others in the supply chain to extend restrictions on use of the invention post-patent, which is anti-competitive.

320. Bayer's contractual control over seed containing NK603 is complete. It includes ISCs, breeders, dealers, growers, and others with access to seed containing the NK603 event.

321. Bayer obtained these contractual limitations using its monopoly power by conditioning access to NK603 on these post-patent restrictions.

322. Bayer's contracts exceed its patent rights in, at least, the following ways. First, Bayer restricts the use of seed, including Parental Inbred Seed, containing the patented trait perpetually, not merely until the patent expires. Second, Bayer prevents licensees or their agents from using the seed for research to innovate new or better forms of expressing the trait or to breed seed lines containing the trait post patent. Third, Bayer prevents licensees or agents from saving seed grown from the planted seed for replanting or resale.

323. These restrictions have no legitimate business purpose when used to extend rights that expired under U.S. patent law or to prevent further innovation, which patent law exists to promote. They only exist to make it more difficult for competitors to develop seed containing NK603 after the U.S. patent has expired. And, they have, in fact, been successful, as demonstrated by the absence of competition for the NK603 event in U.S. corn seed.

324. Bayer obtained these restrictions with its monopoly power, forcing ISCs, growers, breeders, and all others with access to seed containing the NK603 event to agree to these restrictions in exchange for access to NK603 during the patent period.

325. The restrictions are anti-competitive and raise additional barriers to entry of generic competition, precluding emergent seed companies from entering the market and offering NK603

68

at lower prices.

326. As a result of these limitations and restrictions: (1) Bayer forecloses those with access to seed containing NK603 from developing a generic, non-royalty bearing NK603 or entering the market and competing with Bayer's supra-competitive, post-patent prices for NK603 and (2) Bayer ensures that ISCs and growers continue to license, at supracompetitive prices, NK603 from Bayer.

327. Bayer's web of contractual restrictions is comprehensive, effectively restricted the ability to breed generic NK603.

328. Violating these contractual restrictions is not an option for licensees like ISCs. Bayer can terminate their license for breaching these provisions, including their license to produce still-patented GE events and stacked traits. Thus, Bayer also continues to use its existing patents to maintain a monopoly over expired events, like NK603.

### 2. Bayer imposes post-patent royalties on NK603-traited products.

329. Bayer continues to charge, and recently increased, post-patent royalties on NK603, which are illegal and not permitted by its contracts. As a result, Bayer has raised the costs of potential rivals, such as ISCs, and reduced their margins, making it less likely for them to have the resources to compete with Bayer in the Relevant Markets.

330. Charging post-patent royalties is illegal conduct.

331. In the United States, a patent grant "shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications [such as being designated as a continuation in part of an earlier patent

69

application] from the date on which the earliest such application was filed." 35 U.S.C. § 154(a)(2).

332. When the term expires, the patentor's exclusive rights to practice the patent expires, and the public may freely use the invention.

333. Any attempt to extend the monopoly after the limited term of exclusivity "runs counter to the policy and purposes of the patent laws." *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)).

334. The Supreme Court has held that a patent holder is prohibited from charging patent royalties following expiration of the patent. Charging post-expiration patent royalties constitutes unlawful patent misuse. *Brulotte v. Thys*, 379 U.S. 29, 30 (1964).

335. Bayer does not offer a no-royalty RR2 Corn seed.

336. Bayer has precluded competitors from offering a no-royalty corn seed containing NK603.

337. Bayer does not offer ISCs royalty-free access to or use of the NK603 trait. Rather, as explained above, Bayer continues to condition access to NK603 on ISCs paying royalties to Bayer.

338. As explained above, Bayer has precluded competitors from offering royalty-free (or lower royalty) access to or use of the NK603 trait.

339. Through its cross-licensing agreements with other companies, as alleged above, Bayer has precluded those seed companies from offering seed containing the NK603 event on a generic basis. Likewise, Bayer has used the demand for stacked traits, including for seed containing both glyphosate-tolerance and insect-resistant events to ensure Bayer continues to be the monopoly supplier of NK603. Bayer has, thus, maintained its monopoly over NK603, and continued to charge royalties, despite the expiration of the patent.

340. Through its Licensed Product Addenda and product schedules, Bayer still charges ISCs royalties for access to the unpatented NK603 trait, uncoupled with any other patented trait or proprietary germplasm material.

341. It also ties its germplasm and stacks its patented (unexpired) traits with NK603 so that it can continue to extract unlawful license fees from ISCs. Bayer's conduct has caused hundreds of millions of dollars or more in overcharges.

342. Latham and other ISCs must and do pay these post-patent royalties or face termination of their CPLA for all products, effectively ending their ability to grow and sell glyphosate-tolerant corn seed or corn seed containing any of Bayer's GE traits.

343. Bayer's ability to charge (and increase) post-patent royalties for the expired NK603 trait, and for its other products stacked with the expired NK603 trait, was and is only possible due to Bayer's monopoly power in the Relevant Markets.

344. Bayer's post-patent royalties on NK603, coupled with the threat of termination if an ISC refuses to pay them, forecloses competition by restricting the emergence of generic NK603, raising prices

345. Bayer has not only continued to charge post-patent royalties but has increased those royalties to raise barriers to the entry of generic competition.

346. Prior to the expiration of the last patent covering the NK603 event (the '980 patent) in November 2022, Bayer's royalty fees for NK603 trait-only held steady at ███ per Unit (80,000 seeds). This was the royalty rate each year from at least 2017 through the last year of the patent.

347. In May 2022, six months prior to the last patent expiring, Bayer announced a ███ per Unit price increase on all its traited corn products for FY 2023. This price increase extended to the NK603 trait-only (RR2 Corn) product.

348. Despite coming off patent in 2022, Bayer did not eliminate or even reduce the patent royalties charged to Latham and other ISCs for the NK603 trait either individually or as part of stacked traits.

349. To the contrary, as discussed above, Bayer *increased* those royalties by over 30% to ██ per Unit.

350. In addition to increasing royalties on NK603 in the year it was coming off patent, Bayer also announced that NK603 trait-only (RR2) corn would no longer be eligible for future per-Unit PPP rebates. This further increased ISCs' royalties for the expired NK603.

351. Bayer also imposed the same ██ per Unit price increase on every one of its corn seed products stacked with the post-patent NK603 trait.

352. Despite Bayer's promise at the time of its acquisition of Monsanto that increased prices would only be accompanied by additional value or services, no new value or services were added to the NK603 trait, or to the stack of traits, to justify charging any post-patent royalty, much less a 30% increase on NK603.

353. Bayer informed ISCs that failure to pay the post-patent royalties on NK603 would result in termination of their CPLA, depriving them of the ability to license any of Bayer's patented GE traits.

354. In FY 2024, Bayer again increased its royalties for the NK603 trait—to ██ per Unit.

355. Again, no new value and no new services justified any post-patent royalty, much less an increase.

356. In FY 2025, Bayer also increased its royalty rates on each of its corn seed products stacked with the expired NK603 trait.

357. In defending its post-patent price increases on NK603-traited products in FY 2025, Bayer told Latham and its other ISCs: "we have every intention of not only defending our lead market position but also continue to build on that market momentum for short and long-term growth." Bayer 2025 Final Royalty Presentation Deck.

358. In 2023, the Independent Professional Seed Association ("IPSA"), a trade group that represents ISCs, wrote a letter to Bayer inquiring about the justification for charging post-patent royalties on NK603. Matthew Brandt, Bayer's Vice President of US Sales Licensing, responded on November 20, 2023. Bayer told IPSA that "our licensees get to judge how we are performing against that mission on an ongoing basis and have the final say. In the event that a licensee determines the Roundup Ready 2 (RR2) corn products licensed from Bayer do not provide more value than they cost, the licensee has the ability choose an alternate product from a competitor to serve that need in their portfolio and/or stop selling RR2 corn products altogether."

359. Bayer's statement was dishonest. Bayer had monopolized the market for "an alternative product," which was only available from Corteva, a supplier that Bayer has secretly locked-in to paying post-patent royalties on NK603 and which contractually could not sell NK603 seed to ISCs. Bayer knew that GA21 was not an adequate alternative to NK603, as explained above, and that stacked traits containing NK603 was a necessary market component of competing at scale by ISCs.

360. Furthermore, Bayer had foreclosed, through the means described herein, generic NK603 from being brought to market by any potential competitor. Bayer's deception was, on information and belief, designed to conceal its maintenance of monopoly power.

361. In the letter to IPSA, Brandt also suggested that he had a priority to "increase the openness and transparency" between Bayer and ISCs "to solve for the hesitancy of licensees to

voice their concerns directly to Corn States [Bayer] vs. voicing them anonymously through IPSA."

362. This, too, was dishonest. When ISCs did, in fact, voice concerns, they were swiftly and demonstrably retaliated against by Bayer, as explained below.

363. Bayer's anti-competitive conduct was successful. There are at least 59 ISCs that stopped selling hybrid corn seed between FY 2022 and FY 2024, during the period of Bayer's price increases. Bayer's successful consolidation of a market in which it competes horizontally with these ISCs eliminates potential competitors in the generic market for NK603.

364. Bayer has charged Latham and other ISCs hundreds of millions of dollars or more in post-patent royalties on the expired NK603 trait without any additional value or services.

### 3. Bayer uses its monopoly power to retaliate against ISCs that attempt to enter the generic NK603

365. Bayer's use of its monopoly power to retaliate against ISCs to foreclose generic competition in the supply of NK603 is not hypothetical but observable.

366. In 2021, Latham formed Eagle Genetics, a separate entity to research and develop a corn line containing germplasm resistant to tar spot.

367. Tar spot in corn is a serious foliar disease caused by a fungus, appearing as small, raised, black spots (stromata) on leaves, sheaths, and husks that cannot be rubbed off. It thrives in cool, humid conditions and can cause significant yield losses (over 50 bushels/acre) by reducing grain fill and causing premature plant death.

368. According to Bayer's website, corn products currently grown in the US Corn Belt "have been found to have various levels of tolerance to tar spot; however, none of these corn products have been identified as having elevated levels of resistance. Ask your local seed dealer or extension office for information on specific corn product recommendations."

(last visited March 17, 2026).

369. Bayer offers hybrid corn seed that has some tolerance to tar spot. It also licenses germplasm that has tolerance to tar spot.

370. Latham, through Eagle Genetics, was developing its own germplasm that showed improved resistance to tar spot. If commercialized, it would have competed directly with Bayer's products or licensing.

371. Latham did not use, or enable Eagle Genetics to use, Bayer's Parental Inbred Seed or Licensed Products in the breeding program, even after the last NK603 patent expired due to Bayer's restrictive and anticompetitive contractual terms.

372. After learning that Latham's related entity was engaged in a corn breeding effort, however, Bayer's representative met with Latham in late April 2022 and warned it to end Eagle Genetics' breeding program. Latham was told that it needed to remain loyal to its "partner" Bayer and abandon any efforts to research, breed its own corn products, or develop generics.

373. In the same meeting, Latham also was told by a Bayer representative that ISCs that try to develop corn products with post-patent traits will lose because big biotech companies still own all the genetics in the marketplace and that ISCs should want post-patent traits off the market entirely because they "take money out of the market."

374. Latham was not violating any provisions of the CPLA or Addenda.

375. It continued its breeding efforts in the summer of 2022.

376. In late November and early December 2022, Bayer retaliated against Latham. It dispatched sales representatives from Channel and for its DEKALB brand to obtain Latham's customers by offering prices that were significantly below what Latham could reasonably offer. Latham could not reasonably offer competing prices because, in the same year, Bayer substantially

75

increased Latham's and other ISCs' royalty rates, as explained above.

377. Channel and DEKALB offered Latham's customers deep, below-cost discounts on Bayer hybrid corn and soybean seed that those customers had previously—in some cases for years—purchased from Latham.

378. Bayer targeted Latham's customers and offered pricing below Latham's costs if they entered into exclusive-dealing agreements with Bayer's own seed brands, Channel or DEKALB.

379. In the span of about two weeks, Latham lost over $8 million in annual sales to seed dealers, a significant portion of which was lost to Channel or DEKALB.

380. On information and belief, Bayer was able to so successfully, swiftly, and efficiently target Latham's customers by using Latham's proprietary customer sales information, which Latham had produced to Bayer as required under the CPLA.

381. On information and belief, Bayer improperly provided that information to Channel and DEKALB sales personnel, including Latham's detailed GPOS data and number of units of each product sold.

382. Bayer demands highly sensitive information from licensees, including financial statements as well as customer names and addresses, product, volume, and type of purchases. ISCs are required to provide such information under the CPLA. The contract provides that grower data is to be maintained in a way to preserve confidentiality but licensees risk improper use to undercut them through Bayer's own seed company competitors such as DEKALB and Channel. *See* Capitol Forum Article (Vol. 14, No. 267), *Bayer and Corteva Customer Data* (March 25, 2026) (reporting that ISCs are required to submit extensive point-of-sale data enabling targeting of customers| and raising "enormous competitive concerns").

383. On information and belief, there is no functional firewall between Bayer and its subsidiary brands, Channel and DEKALB. If there is one, it is not adhered to. Using Latham's confidential proprietary information, in a matter of about two weeks, Channel and DEKALB sales representatives dispatched to Latham's dealers with below-cost pricing offers open for short periods of time to force immediate decisions.

384. Bayer's retaliatory, predatory campaign was successful. Bayer stole millions in business from Latham in a two-week period. Latham's customers expressed regret that they could no longer afford to do business with Latham because Channel or DEKALB offered staggering discounts of $50-70 off per Unit of corn compared to Latham's prices. Such prices were below cost—less than the royalties Latham paid to Bayer to sell the same seed being offered by Bayer's own brands.

385. The losses were devasting to Latham, which had already incurred the costs of producing seed that was not sellable.

386. There was no legitimate economic benefit to Bayer's conduct: these customers were already buying Bayer seed from Latham at a higher royalty to Bayer.

387. Bayer's conduct could only have been designed for the express purpose of harming Latham to foreclose competition in breeding new hybrid corn seed containing generic NK603 and made possible only by Bayer's dominant market power.

388. But targeting Latham's customers was not enough. Bayer later cut off its "market funding" to Latham, which ISCs (Corn Product Licensees under the CPLA) rely upon (like rebates) to remain financially viable. Market funding is normally used to address supply disruptions, pricing pressure, or other operational challenges. However, ISCs who attempt to compete risk losing it. When Latham did so, the market funding Latham depended on was eliminated.

389. This occurred in 2025. Despite a written promise to Latham to provide market funding, which Latham relied upon in hiring a sales person to target an area identified specifically by Bayer, setting seed prices, and taking orders from dealers that year, Bayer unlawfully refused to comply with its agreement, pulling the funding and costing Latham several hundred thousand dollars after sales were largely complete. Bayer's withdrawal of its agreement occurred after John Latham testified at a Congressional committee hearing describing Bayer's anti-competitive conduct and was retaliatory as it lacked any legal or other justification.

390. On information and belief, the purpose of Bayer's retaliatory actions was, at least, two-fold. First, Bayer perceived that if Latham developed improved germplasm, which could be combined with non-royalty bearing NK603, it would erode Bayer's market share and its ability to charge supracompetitive prices. Second, Bayer sought to make Latham an example for other ISCs that might attempt to develop generic-based seed traits or complain about Bayer's anti-competitive tactics.

391. Such practices employ monopoly power and vertical integration to neutralize potential rivals, misappropriate proprietary customer and sales information, and divert sales. The intended effect is to eliminate ISCs as potential competitors and maintain or deepen Bayer's monopoly power.

392. The very ability to undercut Latham's pricing by $50-70 per Unit of corn, charging prices below Latham's costs, is and was made possible by supra-competitive market pricing and monopolization of the hybrid GE corn market and submarkets or markets described above.

393. Bayer understands that any short-term loss of profits can be recouped later once it has eliminated rivals. Corn Product Licensees like Latham are forced to turn over sensitive data because Bayer requires it. Channel's pricing was rational only because Bayer could recoup its

losses through sustained supra-competitive pricing enabled by its monopoly control of GE corn traits.

394. Latham's seed brand could not survive the retaliatory attack on its business, could not match the predatory pricing, and could not source glyphosate-resistant, NK603, and/or other stacked trait corn products from another biotech manufacturer as an adequate substitute.

395. Bayer's actions were, on information and belief, sent as a warning to other ISCs not to attempt to enter the generic NK603 market, which furthers Bayer's monopoly and raises additional barriers to entry.

### 4. The PPP excludes equally efficient rivals and raises rivals' costs to further preclude entry of generic manufacturers.

396. Bayer also uses its "loyalty program" to raise barriers and costs and to substantially foreclose a market for generic NK603.

397. Starting in 2018, while finalizing the acquisition, Bayer launched a revised Premier Performance Program ("PPP") for 2019. The PPP is a "loyalty" program by which Bayer forecloses competition and, beginning in 2019, exerted market power to tie, bundle, enter into exclusive deals.

398. Essentially, under the PPP, Bayer sets a baseline or reference, which is the prior-year units sold. ISCs that sell, in the subsequent year, a certain minimum percentage of the prior year units sold receive royalty rebates at the end of the sales season. The rebate amounts scale with loyalty—the higher percentage of prior-year units sold, the greater percentage rebate that is awarded. The highest returns required ISCs to exceed 100% of their prior-year-units sold.

399. The PPP program is retroactive and all-or-nothing. The percentage rebate applied is retroactive to all qualifying units sold below the threshold reached. It is also economically all-

or-nothing because if an ISC fails to meet the minimum threshold, they receive no rebates at all. This structure magnifies the risk to ISCs: a small shortfall can eliminate all incentives, not just incremental benefits. It, thus, penalizes ISCs that do not meet the highest thresholds for rebates.

400. In addition, the PPP is effectively a multi-year program. An ISC that does not meet the minimum threshold in year one receives no incentives that year. And, as a further penalty for failing short, the PPP caps the ISC's eligible rebate in year two at the lowest rebate threshold. In other words, even though a reduced prior-year baseline should make it mechanically easier to meet PPP's percentage thresholds the next year, the PPP caps eligibility to earn a rebate in the year *after* an ISC fails to qualify, making it a multi-year endeavor to restore full eligibility. Because PPP payments scale with absolute units and higher tiers require growth to or above prior-year volumes, falling off the program reduces total incentive dollars, erodes margins, and makes it more difficult to regain competitive scale in subsequent years.

401. For an ISC, obtaining the rebates is essential to a profitable or even break-even year. ISCs typically operate on small margins. Royalties paid to seed manufacturers, like Bayer, represent a significant portion (often well over 50%) of ISCs' total cost to produce and sell their end product (seed). In addition, ISCs typically must decide what type and volume of seed to produce in advance of the marketing period, even before Bayer discloses its final royalty rates for the year. Then, they must price, market, and sell the seed to dealers, and growers, long before they know the net per-unit royalty price (after rebates) that Bayer will extract. ISCs cannot adequately compete, either with one another or with Bayer's and Corteva's direct-sales channels, without predicting what rebates they will ultimately obtain under the PPP and incorporating anticipated rebates into the prices at which they offer seed to dealers. Thus, the rebates are not "additional profit" but necessary to even generate a profit.

402. As a result, ISCs must effectively commit to selling Bayer technologies, and seed, far in advance of ever selling a single bag of seed to their customers. Obtaining rebates under the PPP is economically mandatory to a successful ISC.

403. Furthermore, the PPP is structured in a manner to prevent ISCs from responding to better prices from any of Bayer's competitors. It does not just reward *growth* in Bayer market share sold by ISCs year over year. It penalizes switching to a competitor product, and conditions necessary incentives on maintaining a large share of Bayer products. The "incentive cliff," whereby failing to hit the minimum threshold affects the price of *all* seed sales, further sharply disincentivizes the cost of partial switching to a competitor product, increasing the risk of experimenting with rival traits.

404. The PPP is also structured to "raise rivals' cost" by making it more expensive and riskier for ISCs to buy from one of Bayer's competitors even if the price offered is lower or if rivals are equally efficient. This is evident in the fact that the incentives are retroactive and all-or-nothing based on a minimum loyalty threshold. Even a modest number of sales of a non-Bayer product can cause the ISC to lose the incentives necessary to price Bayer's products at profit, not just for the current year but for the subsequent year. To compete, a rival must be able to offer a large enough discount to offset the lost PPP rebate across all Bayer units of seed (not just the units sold by the rival), raising its effective marginal cost of competing. These effects foreclose even equally efficient rivals, because a rival offering seed at the same or lower incremental cost cannot profitably offset the loss of rebates imposed across an ISCs entire Bayer portfolio.

405. The PPP has the effect of "raising rivals' costs" to raise barriers to entry for potential generic NK603 providers.

406. In FY 2019, Bayer added a new condition to the PPP, requiring Latham and other

ISCs to sell *both* Bayer corn and soybean traits by conditioning *any* royalty rebates payments, vital to their profit margins, on meeting thresholds in both corn and soybean sales, effectively bundling Bayer's corn and soybean seed product lines.

407. Before 2019, the thresholds for corn and soybean were independent. The failure to meet a threshold in soybean did not preclude the ISC from obtaining incentive payments on corn if it met the threshold on corn. After 2019, an ISC would only receive rebates if its year-over-year ("YOY") minimum sales were met on both seed and corn.

408. Beginning in FY 2019, the revised PPP required Latham and other ISCs to meet the minimum threshold YOY sales percentage with its *combined* corn and soybean seed sales to qualify for the incentive payment. In other words, Bayer used its PPP to financially penalize ISCs who did not meet minimum sales thresholds of (and remain "loyal" to) Bayer's traited soybean seeds.

409. The timing of Bayer's bundled PPP was not accidental. Corteva's E3 soybeans were poised to enter the market and become widely available to ISCs in 2020. E3 soybeans were gaining popularity among growers, who became less and less interested in Bayer's troubled RR2 Xtend soybeans, which relied on the troubled Dicamba herbicide.

410. If Latham and other ISCs grew and sold Corteva's E3 soybean seed, Bayer would financially penalize both their soybean and corn business. This had the effect of increasing Latham's and other ISCs costs and lowering, or eliminating, their profit margins.

411. As a result of the tie or bundle, Latham and ISCs lost rebates on GE corn royalties they would have otherwise qualified for under the PPP, which on information are substantial and run into at least hundreds of millions of dollars.

412. Bayer's PPP program continued to bundle corn and soybean seed until at least FY 2024.

413. For FY 2025, Bayer again revised the PPP to separate the incentive calculations by crop, effectively unbundling corn and soybean seed sales. At the same time, however, Bayer increased the PPP's minimum YOY sales requirement to earn an incentive payment from 55% to 85%, effectively increasing the loyalty requirements for each crop. If an ISC such as Latham did not sell at least 85% or more of its prior year's Bayer-traited corn seed sales, it would fall off the incentive payment cliff and receive zero incentive payment.

414. Even when the minimum was 55%, the rebates offered at that threshold were low. To profit, ISCs realistically needed to meet the higher thresholds, even prior to Bayer raising the minimum to 85%.

415. To earn the highest PPP incentive payment, necessary to achieve an adequate profit margin to weather other market uncertainties and compete with Bayer's own seed brands, Latham and other ISCs needed to sell more than 100% of their prior year's units of Bayer's traited corn products.

416. Bayer's ability to impose the restrictive PPP loyalty program requiring ISCs to sell at least 85% to 110% of their prior year's Bayer-traited corn seed products to earn an incentive payment was only possible due to Bayer's monopoly power in the Relevant Markets.

417. In early 2026, Bayer announced it will remove the minimum thresholds for the PPP program in FY 2027.

418. The timing of Bayer's elimination of the PPP's loyalty thresholds was not accidental. In the fall 2025, Congress took an interest in Bayer's PPP program as potential anti-competitive conduct driving up prices for U.S. agriculture. John Latham testified before a

congressional subcommittee, including describing how Bayer's loyalty program forecloses competition and punishes ISCs. Shortly thereafter the President issued the Dec. 6, 2025 Executive Order. Later that month, Bayer retaliated against Latham by refusing to honor its promise for market funding, after Latham had produced, priced, and taken sales orders for Bayer-traited seed in reliance on that funding.

419. On information and belief, Bayer then publicly responded to the government's interest by revising its PPP program to remove the loyalty thresholds as a potential effort to stave off a government investigation.

420. In addition to raising rivals' costs, Bayer's de facto exclusive dealing through the PPP raised barriers to entry by making it uneconomical for ISCs to service a significant market for generic RR2 corn seed.

### 5. The PPP unlawfully ties or bundles NK603 with Bayer's other GE corn traits.

421. Bayer's PPP is designed to leverage its dominant and near-unavoidable control over NK603, and in the Relevant Markets, to compel Latham and other ISCs to purchase all Bayer's traited corn products, including those with unnecessary or less-desired trait stacks.

422. For example, nearly all growers demand NK603. Many growers also want an insect-resistant trait. But Bayer has used the PPP loyalty program to financially tie ISC's ability to obtain NK603 to their purchase of Bayer's insect-resistant traits, as well as other GE corn traits, including other stacked corn traits.

423. By tying all Bayer traits to must-have NK603, Bayer ensures Latham and other Corn Product Licensees sell primarily Bayer products, foreclosing competition on these other products.

424. This is true even if grower demand is lower for certain products. It is a de facto tie because without the loyalty rebates Latham and other Corn Product Licensees could not continue to operate profitably. Because NK603 is a competitively mandatory input and ISCs cannot source it or an equivalent from any rival, the PPP's conditioning of rebates on portfolio-wide loyalty effectively coerces ISCs into accepting Bayer's other traits regardless of independent demand.

425. Independently and in addition to the de facto tie described above, the PPP operated as an unlawful bundled-rebate scheme that imposed de facto exclusivity across Bayer's GE corn trait portfolio. Bayer conditioned access to substantial rebates on an ISCs performance across Bayer's distinct and comprehensive portfolio of traits, including Bayer-patented traits that ISCs cannot secure from competitors. This portfolio could not be replicated by competitors. Rebate eligibility hinged on meeting portfolio-wide, YOY performance, such that failure to meet target thresholds in the portfolio resulted in loss of rebates across all qualifying products. The structure of the PPP made partial dealing with Bayer economically irrational because reliance on only some qualifying product or inclusion of a rival's traits prevented ISCs from satisfying rebate tiers necessary to remain profitable. The size of the rebates calculated across the entire portfolio created coercive financial incentives for ISCs to carry Bayer's full suite of traits rather than rival products that would cost them those discounts.

426. Because the rebates were calculated retroactively across Bayer's entire portfolio, an equally efficient rival could not profitably discount its own traits sufficiently to offset the loss of rebates imposed on all Bayer products, resulting in foreclosure that cannot be explained by competition on the merits.

427. Bayer's largest competitor, Corteva, was effectively precluded from competing given that: (1) the Bayer-Corteva NK603 Agreement precluded Corteva from sub-licensing to

ISCs and (2) Corteva had to pay per-unit royalties to Bayer on its direct sales. These combined restraints meant that Corteva was effectively precluded from competing, allowing Bayer to maintain its monopoly.

### 6. The PPP is also a de facto exclusive dealing program, which raises barriers to entry.

428. Prior to 2025, although Bayer used lower "minimum" thresholds for incentive qualification, Bayer tied corn and soybean traits for purposes of incentive qualification, which was exceptionally difficult to meet given Bayer's lower-quality, less-desired soybean traits; and, the minimum incentives were not sufficient to offer ISCs prices that were economically rational. As a result, this suppressed competition.

429. Since 2025, Bayer eliminated the tie between corn and soybean but raised the threshold for minimum incentives to 85% which, given the retroactive loss of rebates and portfolio-wide pricing reliance on incentives, functions as near-exclusive dealing by making economically meaningful purchases from rivals impracticable

430. The PPP has been successful in contributing to Bayer's maintenance of its monopoly over NK603, and in the Relevant Markets, even after expiration of Bayer's patents on NK603 by foreclosing economically viable switching and preventing rivals from gaining scale necessary to discipline prices.

431. The duration of the PPP program also supports its negative impact on competition. Although incentives are calculated each year, the practical effect is an indefinite lock-in because rebates are awarded based on market share and prior YOY sales. It is not a traditional volume discount; incentives are conditioned on loyalty and share maintenance, producing a practical lock-in that prevents rivals from incrementally gaining share, particularly in light of Bayer's

monopolization of NK603, as alleged above.

432. The incentives are retroactive and non-linear, meaning they punish ISCs that fail to meet a threshold by even a small amount. ISCs must set production levels and price their seed for resale without knowing what, if any, incentives they will qualify for. At the same time, to compete for grower market share, ISCs must assume they will hit the incentive thresholds, which reduces competition by requiring ISCs to commit to near-exclusive selling of Bayer's products before marketing or sales even begins and by foreclosing even equally efficient rivals that cannot offset the loss of retroactive rebates.

433. Competition faces significant barriers to entry, as discussed above.

C. **Supra-Competitive and Increasing Royalty Fees**

434. After monopolizing the Relevant Markets, Bayer increased the royalties it charged Latham and other ISCs without providing any additional "value to farmers" as it previously represented.

435. Bayer sets its royalties at such a high rate that Latham and other ISCs must earn PPP loyalty payments to generate any meaningful profit margin and return on investment. This was (and still is) because Bayer's own seed brands, including Channel and DEKLAB, compete directly with ISCs to sell and distribute GE hybrid corn seed products.

436. Bayer's actions harm competition in two, mutually co-dependent ways. Bayer charges ISCs supra-competitive royalties, and if ISCs cannot survive as a result of those high input costs, Bayer is able to grow its downstream market share via Channel or DEKLAB, expanding its monopoly both horizontally and vertically.

437. Bayer also uses its monopoly power to manipulate market prices, raising Latham and other ISCs' costs after they have begun production, so Bayer's own seed brands (Channel and

DEKALB) can swoop in with below-cost prices and thereby maintain its monopoly.

438. Bayer's first major royalty increase, following its acquisition of Monsanto, was imposed on Latham and other ISCs in FY2022 for the 2021-2022 sales season. In February 2021, Bayer announced that it expected to raise its royalties on VT2 PRO by ▮▮ per unit going into the next season.

439. Despite this announcement in February, Bayer ultimately imposed a ▮▮ per unit increase across the board on all VT2 PRO corn products. This significant price increase was not announced until June 2021, *after* Latham and other ISCs had finalized their production plans, purchased Parental Inbred Seed, and begun production. This was the biggest price increase Bayer had ever imposed on VT2 PRO technology.

440. VT2 PRO technology is Bayer's first-generation double stack corn, containing the NK603 trait stacked with an above-ground, insect-resistant Bt trait. At the time of Bayer's announced price increase, in June 2021, VT2 PRO was 80% of Latham's corn sales and it invested heavily in producing hybrids in this technology.

441. At the same time, Bayer also increased its royalty prices on its SmartStax corn products, which contain the NK603 trait, stacked with the Liberty Link glufosinate-tolerant trait and Bt traits for above- and below-ground insect resistance.

442. Despite this massive price increase, Bayer's own corn seed brands (DEKALB, Channel, and ASI brands) did not similarly increase their prices. Bayer's royalty increase put Latham and other ISCs in a difficult position with their dealer customers, leaving them with large inventories and lost profits.

443. Bayer's ability to charge supra-competitive prices for VT2 PRO and its other NK603-traited products was only possible due to its monopoly power in the Relevant Markets.

444. Bayer's royalty increases, coupled with its new PPP bundling corn and soybean sales requirements, caused Latham to experience significant lost profits for the first time in 2022.

445. Latham's lost profits were the direct result of Bayer's anti-competitive conduct.

446. In FY 2023, Bayer increased its royalties again. In February 2022, Bayer announced it expected to increase royalty fees between ▇ and ▇ on all its traited corn products. In May 2022, again after Latham and other ISCs had finalized their production plan, ordered their Parental Inbred Seed, and begun production, Bayer announced its decision to raise all its traited-corn product royalties by ▇—the highest amount in the estimate range.

447. Bayer assured Latham and other ISCs that the whole market would be going up in price, but after Latham and other ISCs announced the price increase to their dealer customers, Bayer's own seed brands (Channel and DEKALB) announced they would not similarly increase their prices. Worse, at Channel's kickoff meeting later that season, it announced that Latham and other ISCs were forced up in price, but their own prices for Bayer brands would not reflect such large increases.

448. In fact, by November 2022, Channel and DEKALB significantly discounted their prices.

449. By forcing Latham and other ISCs to go substantially up in price, Bayer renders them unable to compete in the downstream market for NK603-traited corn.

450. Ultimately, in the 2022 sales season, Latham lost approximately $8 million in sales to Channel, DEKALB, and Bayer's preferred ISCs with long-term incentive agreements (described below).

451. In FY 2024 and FY 2025, Bayer continued to increase its royalty fees.

452. Because of the supra-competitive royalties, Latham and other ISCs were and are

unable to compete with lower prices of Bayer's own seed brands (*e.g.* Channel and DEKALB). This leaves Latham and other ISCs with substantial inventories of unsold seed to carry into the following sales year. Due to anti-competitive restrictions imposed on ISCs by Bayer in the CPLA, Bayer makes it economically difficult for ISCs to sell unsold inventory.

453. Under the CPLA, Bayer imposes a royalty rate based on the year the seed is sold to a grower. As a result, when Bayer increased royalties it impacted not only future seed produced by Latham and other ISCs but seed already produced but unsold from prior years. This makes it even harder to sell at a profit. In some cases, Latham and other ISCs must destroy their carry-over seed inventory and eat the losses.

454. Despite recently raising royalties on VT2 PRO and SmartStax, Bayer has announced that both products will be phased out and no longer available to ISCs after 2027. Bayer's withdrawal is timed with the expiration of the last remaining patents on those stacked traits, respectively. The same barriers Bayer has raised to the emergence of generic NK603 applies equally to these GE traits in the post-patent world.

## V. Defendants' Anticompetitive Conduct Substantially Forecloses Competition in the Relevant Markets

455. Defendants' conduct forecloses a substantial share of competitive opportunities in the Relevant Markets.

456. As noted, nearly all (~92%) of planted corn seed acres in the United States contain GE traits. Nearly all of those acres are planted with seed containing NK603, the foundation of farmers' weed control. Bayer controls all, or nearly all, of the NK603 input market, as alleged above.

457. Through its monopoly, Bayer substantially forecloses competition.

90

458. The PPP is a de facto exclusive dealing arrangement that forecloses a substantial share of the available distribution channels to rivals. It economically disincentivizes ISCs from growing and selling a competitor's traited corn seed, or introducing generic NK603 corn seed alternatives into the market, by imposing retroactive rebate penalties, advance commitment requirements, and near-exclusive volume thresholds that make deviation economically irrational.

459. ISCs cannot profitably carry seed lines from competing trait manufacturers at volume as a result of the PPP. Because of their need for the rebates, they must make early, pre-pricing commitments to grow inventory, which necessarily locks them into Bayer for the entire annual sales season. They cannot switch to another seed manufacturer after selecting and beginning the seed growing process. Nor can they economically switch in the subsequent year because rebates are tied to YOY market growth.

460. At the same time, competitors are effectively blocked, or severely restrained, from sublicensing NK603 to ISCs. And ISC-led breeding efforts are controlled and suppressed by Bayer's licensing restrictions, retaliatory withdrawal of discretionary funding, and targeting of nascent breeding programs/companies.

461. The duration and lock-in effects of all such conduct are substantial. Although the PPP is evaluated annually, its practical effect is an indefinite lock-in. Because of Defendants' exclusionary conduct, Latham and other Corn Product Licensees cannot source glyphosate-tolerate corn seed from an alternative supplier as it is economically irrational to risk losing significant rebates.

462. Latham and other Corn Product Licensees thus lack any meaningful exit option during or after the contract period. The absence of alternative sources, combined with advance booking requirements, sunk seed-production costs, inventory carry-over that can only be sold in

future years if ISCs maintain a CPLA, and retroactive rebates ensure that ISCs are locked into Bayer year after year.

463. Barriers to entry are prohibitively high. NK603 is a must-have input for which there is no viable substitute. Despite expiration of NK603, Defendants' exclusionary conduct has prevented emergence of generic NK603 and substantially barred rivals from selling to ISCs as explained above. As such, it is economically irrational and nearly impossible for potential entrants to come to market and meaningfully compete.

464. Barriers to entry also prohibit emergent competitors. Research and design costs for alternative GE events are exorbitant and prohibitive. Beginning a breeding program and seeing it through regulatory approvals, production and marketing would require hundreds of millions of dollars. This is especially true given that NK603 genetic data has been effectively locked up by Bayer The barriers to entry are evident: as of 2026, there is still no widely available generic NK603 traited corn seed available to growers, even though the last patent covering NK603 expired in November 2022.

465. Defendants' layered exclusionary conduct forecloses competition even to equally efficient rivals. Indeed, an entire class of potential generic entrants capable of competing with Defendants on price are prevented from doing so.

## VI. Bayer Engages in Price Discrimination.

466. In the input market for GE trait licensing, Bayer also engages in unlawful price discrimination between ISCs and other, favored seed companies.

467. Bayer offers long-term incentive contracts ("LTIs") to a handful of large, favored ISCs, charging them significantly lower prices than Latham and other ISCs for the same corn traits.

468. Bayer does not offer the same or equivalent LTI pricing, allowances, or concessions

to other ISCs.

469. Bayer sells genetics, in the form of Parental Inbred Seed, which is a commodity, accompanied with the license rights, to ISCs with and without LTIs. The Parental Inbred Seed is the necessary physical component of producing seed containing GE events for resale. The license is the legal right necessary to do so without infringing Bayer's intellectual property rights. Since the last patent covering NK603 expired, a license has not been legally required but Bayer has continued to require ISCs to pay it.

470. Such sales are in interstate commerce.

471. The GE corn traits in Parental Inbred Seed are of like grade and quality whether sold to an ISC with a LTI or without a LTI.  NK603, for example, is the same trait and does not vary from one purchaser to another.  Other traits stacked with NK603 are also the same and do not vary from one purchaser to another. Likewise, Bayer sells substantially the same genetics in Parental Inbred Seed to an ISC with or without an LTI. But Bayer charges different prices for both the GE corn traits and the genetics depending on whether the ISC has an LTI with Bayer.

472. Discriminatory pricing is significant and not transient. After Bayer increased prices to non-LTI ISCs, the ISCs with an LTI were able to sell corn seed grown from Bayer's Parental Inbred Seed, and containing licensed traits, at $50-70 a bag cheaper than ISCs without an LTI, which would only be economically rational if ISCs with an LTI were not subject to the same price increases by Bayer as ISCs without an LTI.

473. Discriminatory pricing is not justified by an equivalent cost saving in the manufacture, sale, or delivery of the licensed rights and commodity. Bayer is providing substantially the same Parental Inbred Seed (in quality and quantity) to ISCs with and without an LTI.

474. Discriminatory pricing is not a concession given in good faith to meet a competitor's price.

475. Discriminatory pricing to only a few large ISCs block other ISCs from growing their brands, increasing their market share, and/or generating sufficient profits to enable their own innovation or entry into the breeding or generic NK603 market.

476. Upon information and belief, Bayer also uses LTIs to block and/or limit large ISCs' breeding and innovation efforts and, in turn, to foreclose competition within the Relevant Markets.

477. Bayer encourages the few ISCs with LTIs to buy up struggling Corn Product Licensees' seed brands, telling them they can acquire these brands for "pennies on the dollar" when they are on the brink of bankruptcy with no other options.

478. By reducing the number of ISCs and consolidating among large ISCs with LTIs, Bayer is also able to maintain its monopoly because fewer ISCs are easier to control through Bayer's restrictive licensing agreements.

479. Bayer does not inform Latham and other Corn Product Licensees of the favorable pricing, concessions, and/or allowances given to ISCs with LTIs.

480. Upon information and belief, confidentiality requirements are imposed on ISCs with LTIs to conceal the price discrimination from other Corn Product Licensees.

481. This price discrimination further concentrates and eliminates competition in the Relevant Markets.

482. This price discrimination is made possible due to Bayer's market power, dominant market share, sole pricing power, and lack of any legitimate product substitute in the Relevant Markets.

## CLASS ACTION ALLEGATIONS

483.     Plaintiff brings this action on behalf of itself and others similarly situated.  Pursuant to Federal Rule of Civil Procedure 23(b)(2) & (b)(3), Plaintiff seeks certification of the following Class and Subclass:

All Persons or entities in the United States who produced and sold hybrid corn seed containing NK603, pursuant to a "Corn Product License Agreement (without Development Rights)," or pursuant to an agreement with materially the same terms, with Monsanto Company and/or its Assignee, during the Relevant Period (the "CPL Class"); and

All Persons or entities in the United States who produced and sold hybrid corn seed containing NK603, pursuant to a "Corn Product License Agreement (without Development Rights)," or pursuant to an agreement with materially the same terms, with Monsanto Company and/or its Assignee, and who did not have a Long-Term Incentive Agreement with Defendants, during the Relevant Period (the "Price Discrimination Subclass").

484.     The Relevant Period begins on the date of the earliest injury occurring as a result of the conduct alleged in the Complaint and ending on the date of entry of final judgment.

485.     Excluded from the Class and Subclass are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, and agents; and governmental entities.

486.     <u>Numerosity</u>: the CPL Class and the Price Discrimination Subclass each consist of members so numerous and geographically dispersed that joinder of all members is impracticable. At least two hundred (200) Persons or entities produced and sold NK603-traited corn seed pursuant to a CPL with Defendants during the relevant time period.  At least one hundred and fifty (150) Persons or entities produced and sold NK603-traited corn seed pursuant to a CPL with Defendants and were not offered an LTI or equivalent pricing during the relevant time period.  The Persons and entities in the CPL Class and the Price Discrimination Subclass are spread across several states.

487.     <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class and Subclass members, which substantially

predominate over any individual questions.  Common questions of law and fact include but are not limited to:

a. Whether Defendants have monopoly power in one or more of the Relevant Markets;

b. Whether Defendants achieved or maintained their monopoly in each Relevant Market using unreasonable methods;

c. Whether the Defendants engaged in anti-competitive acts;

d. Whether Defendant and Corteva, or other seed manufacturers, engaged in an anti-competitive agreement;

e. Whether the PPP loyalty program is a de facto exclusive dealing agreement;

f. Whether the PPP loyalty program is a de facto tying/bundling agreement;

g. Whether it is legal to charge post-patent royalties on expired traits (NK603);

h. Where it is unjust or inequitable to charge and retain post-patent royalties on expired traits (NK603);

i. Whether Plaintiff and the Class or Subclass conferred a benefit on Defendants in paying post-patent royalties on expired traits (NK603);

j. Whether Defendants breached the CPLA or Addendum with Plaintiff and the Class or Subclass.

k. Whether Bayer's restrictive license agreements have the effect of blocking other biotechnology companies from selling or sublicensing NK603 in the Relevant Markets, even after it came off patent;

l. Whether the practice of offering below-cost pricing to drive out ISCs and/or secure exclusive dealing agreements with seed-dealer customers is impermissibly anti-competitive;

m. Whether the conduct alleged unreasonably restrains competition causing harm to the Class and Subclass;

n. Whether preferential pricing to certain licensees with Long-Term Incentive Agreements ("LTIs") constitutes price discrimination in violation of the Robinson-Patman Act;

o. Whether Defendants took actions to conceal their anticompetitive acts such that tolling of the statute of limitations is warranted;

p. Whether Defendants were unjustly enriched entitling Plaintiff and Class Members and Subclass Members to disgorgement of all benefits derived by Defendants;

q. The appropriate measure and amount of damages to which Plaintiff and other Class members are entitled.

488. All members of the Class and Subclass are ascertainable by reference to objective criteria. Defendants have access to addresses and other contact information, which can be used for notice purposes.

489. Typicality: Plaintiff's claims are typical of other members of the Class and Subclass because all of the claims arise from the same course of conduct and all Class Members and Subclass Members paid supra-competitive prices for GE hybrid corn traits and genetics. Accordingly, by proving its own claims, Plaintiff will necessarily prove the Class Members' and Subclass Members' claims.

490. Adequacy: Plaintiff can and will fairly and adequately represent and protect the interests of the Class and Subclass Members and has no interests that conflict with or are antagonistic to those of the Class or Subclass. Plaintiff's attorneys are experienced and competent in class action and antitrust litigation. Plaintiff and its attorneys are committed to vigorously

prosecuting this action on behalf of Class Members and Subclass Members and have the financial resources to do so.

491. <u>Superiority</u>: Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because, among other things, such treatment will permit many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

492. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

493. Defendants have acted on grounds generally applicable to the Class and Subclass, thereby making final injunctive relief appropriate with respect to the Class and Subclass as a whole.

494. To the extent not all issues or claims, including the amount of damages, can be resolved on a class-wide basis, Plaintiff invokes Fed. R. Civ. P. 23(c)(4), reserving the right to seek certification of a class action with respect to particular issues, and Fed. R. Civ. P. 23(c)(5), reserving the right to divide the class into subclasses.

## **TOLLING**

495. Defendants fraudulently concealed their anticompetitive conduct such that any applicable statute of limitations for Plaintiff and the Class and Subclass has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense.

496. First, antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants did not reveal facts that would put Plaintiff or the Class and Subclass on inquiry notice that they were blocking entrants into the relevant markets, imposing licensing restrictions on other biotechnology manufacturers (such as Syngenta and Corteva), misappropriating Licensees' customer lists and sales data to divert business to themselves, offering substantially lower prices for equivalent corn traits to Licensees with LTIs, and other anticompetitive conduct that will no doubt be unearthed during discovery.

497. In addition, Defendants acted affirmatively to conceal their anticompetitive conduct. As discussed above, Defendants have structured the markets for corn trait licenses to maximize opacity to covertly maintain and grow a monopoly of these markets.

498. Confidentiality restrictions in CPLAs and LTIs or other agreements were designed to, and did, conceal the class-wide nature of Defendants' anticompetitive conduct, as well as discriminatory pricing.

499. Defendants actively concealed their anticompetitive acts by referring to Class Members and Subclass Members as "partners," inducing them to believe Defendants would act fairly toward them, such to enable growth or a least viability within—rather than attempt to drive them out of—the relevant markets.

500. Bayer specifically stated, prior to its acquisition of Monsanto, that it would not raise prices without providing additional value, which was false.

501. Bayer and Monsanto, while promising to maintain confidentiality of commercially sensitive customer and sales data, can and do use that data to solicit customers, offering them predatory or below-cost pricing, and locking them into exclusive dealing agreements. Defendants actively concealed these acts. Latham, for example, did not learn that its proprietary data had been

revealed until after it was used to solicit and steal away approximately $8 million of business, and only after these customers contacted Latham to report that Channel had contacted them to offer massive discounts, below Latham's hard costs, to enter into exclusive-dealing arrangements.

502. Defendants also actively conceal the preferred pricing they offer to Licensees with LTIs. Latham and other Subclass Members did not learn of the preferred pricing or existence of LTIs until Latham attempted to sell its financially devastated seed brand and inventory to larger ISCs and learned that these companies were unwilling to sell Latham's seed under Latham's brand because Defendants charged their brand substantially lower royalties pursuant to an LTI with favored pricing. In other words, Licensees with an LTI could bag and sell Latham's same inventory in a different bag with a different brand name and save substantially on royalties, earning a much higher profit margin.

503. Plaintiff and Class and Subclass Members had neither actual nor constructive knowledge of the facts constituting their claims for relief at the time the acts occurred. They did not discover, nor could they have discovered through the exercise of reasonable diligence, Defendants' anticompetitive conduct alleged herein until recently, because of the deceptive practices and secrecy employed.

504. Additionally, and in the alternative, Defendants' anticompetitive acts are continuing violations of the Sherman Act and accordingly each purchase at supracompetitive prices re-starts the statute of limitations. Defendants' anticompetitive conduct began as early as June 7, 2018, and continues through the present. As a direct result of Defendants' unlawful conduct throughout the Class Period, Plaintiff, Class, and Subclass Members paid artificially inflated prices for GE hybrid corn traits and genetics throughout the Class Period.

## CLAIMS FOR RELIEF

### COUNT ONE
**Conspiracy to Restrain Trade**
Violation of Section 1 of the Sherman Act
15 U.S.C. § 1
Violation of Section 1 of the Missouri Antitrust Law
RSMo. 416.031 §1
(On Behalf of Plaintiff and the Class)

505. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

506. Bayer and Corteva are horizontal competitors in the Relevant Markets. In September 2002, they (through their predecessors) entered into a written agreement to restrain trade.

507. Pursuant to the Bayer-Corteva NK603 Agreement, Corteva agreed to pay Bayer per-unit royalties for a license to practice Bayer's patents governing the NK603 event in Corteva's GE corn seed, including as later amended corn seed containing stacked traits. These royalties, an input cost to Corteva, were necessarily incorporated into the price of Corteva's GE corn seed, which competes with Bayer-branded GE corn seed and corn seed sold by ISCs. In addition, the agreement prohibited Corteva from sub-licensing NK603 to ISCs, foreclosing its ability to compete in the stacked traits market to ISCs.

508. Bayer was, thus, able to extract supracompetitive prices through the sale of NK603 in all sales channels, including direct sales, licensing to ISCs, and licensing to Corteva. The Agreement materially contributed to, and expanded, Bayer's monopoly over the Relevant Markets. by maintaining or increasing Bayer's market share to include over 90% of GE hybrid corn seed.

509. Pursuant to the terms of the Agreement, and as alleged by Bayer in prior litigation between the two companies referenced above, Corteva continued to pay Bayer royalties on hybrid

101

corn seed sold containing NK603 after Bayer's last United States patent on NK603 expired.

510. After November 2022, the Agreement operated as a naked, horizontal agreement between competitors that both fixed prices and allocated customers and channels of distribution.

511. In addition, under the Agreement, Corteva was barred from sublicensing NK603 to ISCs, which foreclosed the ISC market to Corteva, providing Bayer exclusive control over NK603 licensing and sales to ISCs. Corteva was permitted to sell NK603-containing seed only directly to growers, and only as part of royalty-bearing stacked products subject to Bayer's royalty fee. By maintaining or increasing Corteva's costs for selling GE hybrid corn seed in the United States through post-patent royalties and restricting access to the ISC channel, Bayer and Corteva agreed that Bayer would control access to, pricing of, and licensing of NK603, while Corteva would be excluded for competing for a key part of the NK603 market. Their agreement effectively fixed the minimum price of GE corn seed and the cost of obtaining NK603 in both the input and downstream seed markets.

512. The Agreement affected interstate commerce because Bayer and Corteva sell GE hybrid corn seed throughout the United States and the Agreement affected prices nationwide.

513. As a result of the Agreement, the parties to it foreclosed substantial competition, including but not limited to:

     a.    Maintaining an artificial price floor for hybrid corn seed containing NK603 across the Relevant Markets, including after expiration of the last patent in the United States cover NK603;

     b.    Suppressing entry of generic NK603 in the Relevant Markets, including to ISCs;

     c.    Maintaining supracompetitive prices of GE hybrid corn seed, including seed containing NK603, in the Relevant Markets, despite patent expiration in the United States;

> d. Precluding Corteva from offering ISCs licensing for its GE traits in combination with NK603; and/or

> d. Deterring an incentive to innovate and to offer herbicide-tolerant traits that would agronomically and economically compete with NK603.

514. But for the Agreement, Plaintiff and the Class and Subclass would have paid less to license NK603 in the United States; Bayer would not have been able to charge supracompetitive prices post patent in the United States; Corteva would have been able to immediately license its traits with NK603 to ISCs and would have been able to sell hybrid corn seed with NK603 without paying royalties to Bayer, which would have resulted in lower prices across the Relevant Markets.

515. In February 2026, Corteva and Bayer entered into a Settlement Agreement ("Settlement"), which according to press reports, allowed Corteva to cease paying per-unit royalties on NK603. Despite the Settlement, competition has not been restored to the market and prices remaining supracompetitive. For example, Corteva paid Bayer an up-front fee of $610 million, which is a fixed cost Corteva must recoup, at least in part, that it continues to distort future pricing. ISCs and growers, thus, continue to pay supracompetitive fees for NK603.

516. The Agreement and the Settlement contain naked restraints of trade that are not ancillary to any legitimate, pro-competitive terms. Upon expiration of Bayer's last U.S patent on NK603, any continued royalty obligation and channel restrictions were no longer ancillary to any legitimate licensing. The Agreement served no purpose other than to suppress competition by fixing the baseline price and allocating the NK603 market between horizontal competitors. The marginal cost to Bayer to provide a license for NK603 is minimal. Bayer recouped its investments in NK603 several times over, including by collecting royalties from Corteva before the U.S. patent expired. Extending the royalty term following expiration of the patent has no pro-competitive benefits or effects.

517. The antitrust violation arises not merely from the existence of post-expiration royalties, but from the horizontal agreement between competitors that fixed the cost of NK603, the allocation of customers and distribution channels by assigning Bayer exclusive control over NK603 licensing and ISC sales, and foreclosure of competition—all after patent rights had lapsed.

518. Accordingly, the Agreement and Settlement constitute a naked horizontal restraint of trade subject to per se condemnation under Section 1 of the Sherman Act.

519. In addition to and in the alternative, the Agreement and Settlement unreasonably restrain trade under the rule of reason. Bayer possessed substantial—indeed dominant—market power of the Relevant Markets through its control of NK603. The Agreement and Settlement raised Corteva's costs, constrained output, and increased prices, while foreclosing Corteva's ability to compete on price or innovation after patent expiration. It further raised costs for ISCs and facilitated Bayer's charging of supracompetitive prices. The restraint lacks any legitimate business justification or pro-competitive effect and constitutes exclusionary conduct and willful maintenance of monopoly power in violation of Sections 1 and 2 of the Sherman Act.

520. As a result of Bayer's conduct, Plaintiffs and Class and Subclass Members have suffered antitrust injury, including suppressed competition and inflated licensing fees higher than what purchasers would otherwise pay in a competitive environment.

**COUNT TWO**
**Monopolization**
Violation of Section 2 of the Sherman Act
15 U.S.C. § 2
Violation of Section 2 of the Missouri Antitrust Law
RSMo. 416.031 §2
(On Behalf of Plaintiff and the Class)

In addition or in the alternative to Count I, Plaintiff asserts on behalf of itself and those similarly situated this Count II for violation of Section 2 of the Sherman Act and Section 2 of the

Missouri Antitrust Law.

521.    Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

522.    The Relevant Markets are relevant antitrust product markets within the United States. Bayer engages in interstate commerce in the Relevant Markets.

523.    Bayer possesses monopoly power in the Relevant Markets, controlling 100% or nearly 100% of commercial licensing of NK603 and provision of Parental Inbred Seed containing NK603. Given the absence of close substitutes to NK603, Bayer's market power extends to the entire market for glyphosate-tolerant traits used in United States hybrid corn seed production. This is a foundational, "bottleneck" input to all GE hybrid corn seed in the United States.

524.    There are substantial barriers to entry and expansion in these markets, including regulatory approval requirements, long research and development (R&D) timelines, large amount of capital, and Bayer's exclusionary restraints.

525.    Bayer has the power to control market prices and exclude competition. In fact, it does so.

526.    Following the expiration of Bayer's last United States patent covering NK603 in November 2022, Bayer no longer possessed any lawful right to exclude competitors or compel royalties to use NK603. Generic competition should have immediately emerged but, as a result of Bayer's anticompetitive conduct, has not, and prices have remained above a competitive level.

527.    Bayer has willfully maintained its monopoly power in the Relevant Markets through *inter alia*:

   a. Entering into anticompetitive agreements restricting emergence of generic NK604 that extend beyond the United States patent period (such as the Agreement with Corteva);

b. Entering into anticompetitive agreements that preclude competitors from stacking NK603 with other GE events and licensing those stacked traits to ISCs;

c. Raising barriers to entry of generic NK603 by *inter alia*: (1) restricting access to or use of Parental Inbred Seed containing NK603 even after Bayer's United States patent rights had expired, (2) forcing ISCs to participate in near-exclusive dealing programs such as the PPP; (3) tying or bundling access to NK603 with Bayer's other, patented GE traits; (4) neutralizing emerging competitors including by using its monopoly power to eliminate rivals and to retaliate against potential rivals; and/or (5) engaging in price discrimination to weaken potential rivals.

528. As a result of its conduct, Bayer has prevented the competitive transition and emergence of generic alternatives that typically follow patent expiration. This has allowed Bayer to maintain supracompetitive prices.

529. As a result of Bayer's conduct, Plaintiffs and Class and Subclass Members have suffered antitrust injury, including suppressed competition and payment of inflated licensing fees higher than what purchasers would otherwise pay in a competitive environment.

530. Bayer's conduct lacks legitimate business justification and constitutes willful maintenance of monopoly power in violation of Section 2 of the Sherman Act.

**COUNT THREE**
**Robinson-Patman Act**
Violation of Section 2(a) of the Clayton Act
15 U.S.C. §§ 13(a) & 15
(On behalf of Plaintiff and the Subclass)

In addition or in the alternative to Counts I-II, Plaintiff asserts on behalf of itself and those similarly situated this Court III for violation of Section 2(a) of the Clayton Act.

531. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

532. ISCs, including Plaintiff, purchase both a license and a commodity from Bayer, which is the Parent Inbred Seed. The license to use the traits contained in Parental Inbred Seed is

106

ancillary legal permission tied to the purchase of the commodity. The Parent Inbred Seed is the dominant, and a necessary, part of the transaction because it provides the ability to grow hybrid corn seed for resale that contains the licensed GE events.

533. As a result of the contractual limitations imposed upon the market by Bayer, without Parent Inbred Seed, there can be no production or distribution of corn seed containing the licensed GE traits.

534. This transaction occurs in commerce and across state lines throughout the United States.

535. Bayer engages in unlawful price discrimination in a significant manner including:

    a.    Offering lower prices and/or providing ISCs with LTIs greater rebates and incentives, which reduce the net price for the same Parent Inbred Seed and related licensing, that it offers or provides to ISCs; and/or

    b.    Offering and providing Channel the Parental Inbred Seed and related licensing at net prices that are lower than it charges to ISCs offered or provided the same products.

536. Bayer's conduct harms, or has a reasonable probability of harming, competition in the following ways:

    a.    It disadvantages ISCs without LTIs by restricting their ability to sell the same hybrid corn seed to dealers and growers, causing ISCs lost business and is of such a sustained nature as to constitute a harm to competition;

    b.    It supports Bayer's attempts to consolidate the downstream market, limiting that market to itself, Channel, and/or larger seed companies with LTIs over which Bayer has long-term arrangements and greater control, excluding traditional, independent seed companies that compete with Bayer in the downstream market; and/or,

    c.    It furthers Bayer's monopolization through vertical and horizontal consolidation, as Bayer will recoup any below-cost pricing in future transactions once the market is consolidated.

537. Bayer's conduct has caused damages including in the form of higher prices paid to

Bayer and in the form of lost sales, and lost rebates or incentives, due to Bayer's conduct.

538. These losses were not the result of Plaintiff's or ISCs' own competitive shortcomings but were caused by Bayer's price discrimination.

539. These losses were not the result of a cost justification by Bayer because supplying Parent Inbred Seed or licenses does not carry differences in the cost of manufacture, sale or delivery nor is the price discrimination the result of economies of scale, quantity-related savings, logistics savings, billing differences, or servicing differences.

540. In addition, Bayer does not offer these discounts to meet competition with any relevant competitor as a matter of business survival. Bayer maintains a monopoly in the hybrid corn seed market, as alleged above.

**COUNT FOUR**
**Breach of Contract**
**(On behalf of Plaintiff and the Class)**

In addition or in the alternative to Counts I-III, Plaintiff asserts on behalf of itself and those similarly situated this Count IV for breach of contract.

541. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

542. The CPLA uniformly provides that Monsanto has certain proprietary rights, including patents and other intellectual property, and that Latham and other Corn Product Licensees wish to obtain a limited license under such proprietary rights in order to produce and sell certain corn products. *See* CPLA §§1.03-1.05.

543. Under the CPLA, Monsanto grants a limited license under, as relevant here, "Monsanto Rights" to produce and sell a Licensed Product containing one or more GE traits. *See* CPLA § 3.01. That phrase is defined as "valid and unexpired" patent claims owned by Monsanto

that cover a Licensed Product. *See* CPLA §§ 2.26, 3.01.

544.    Corn Product Licensees must pay a royalty each year for every unit of Licensed Product as set out in a schedule to the Licensed Product Addendum ("Addendum"). *See* CPLA §§ 2.31, 4.01.

545.    The Addendum states that it is made by and between Bayer CropScience LP and the licensee in respect to the license of certain "patent rights and proprietary technology owned by or licensed to Bayer CropScience LP" for use in producing seed containing transgenic events.

546.    On information and belief, Monsanto licensed NK603 to Bayer CropScience LP, an affiliate, to effectuate licensing to others including ISCs.

547.    The Addendum incorporates the definitions, terms and conditions of the CPLA.

548.    Neither the CPLA, nor the Addendum provide that a royalty may be imposed for Licensed Products containing GE traits no longer patented.

549.    NK603 is no longer subject to a "valid and unexpired" patent or patent rights of either Monsanto or Bayer CropScience LP.

550.    Corn Product Licensees, however, are charged a royalty for NK603 in breach of the CPLA.

551.    Corn Product Licensees have been damaged as a result of the breach in the amount of royalties paid for the unpatented NK603 trait.

**COUNT FIVE**
**Breach of Good Faith and Fair Dealing**
**(On behalf of Plaintiff and the Class)**

In addition or in the alternative to Counts I-IV, Plaintiff asserts on behalf of itself and those similarly situated this Count V for breach of good faith and fair dealing.

552.    Plaintiff incorporates and realleges each allegation in the preceding paragraphs of

this Complaint as though fully set forth herein.

553. The CPLA provides that all questions regarding construction of the agreement and "the rights and liabilities of the parties" thereto either under the agreement "or in any other respect" are governed by Missouri law without effect to conflict of law rules. CPLA § 10.09.

554. Under Missouri law, a covenant of good faith and fair dealing is implied in every contract.

555. Bad faith in the performance of a contract includes "evasion of the spirit of the bargain" as well as "abuse of a power to specify terms." Restatement (Second) Contracts § 205, cmt d. One party also may not exercise a judgment conferred by terms of an agreement in such a manner so as to evade the spirit of the transaction or so as to deny the other party expected benefits of the agreement.

556. Among other things, the CPLA allows Monsanto, now Bayer, discretion to, each year, modify a schedule to the Addendum setting out royalty amounts. *See* CPLA §§ 2.18, 2.19, 4.01. Monsanto and Bayer have unilateral ability to set royalty amounts.

557. Each year, an estimated royalty range is announced for the next fiscal year. *See* CPLA §4.01(b).

558. As Monsanto and Bayer know, Corn Product Licensees, by necessity, utilize that estimate to formulate their own production plan, including deciding the type and quantity of seed they will produce and sell and purchasing the necessary parental inbred seed to begin production.

559. After Monsanto, then Bayer, provides estimated price ranges, Corn Product Licensees purchase Licensed Product, as well as other inputs tailored to production of the particular seed crop (*e.g.* fertilizers, equipment), and plant the parent seed.

560. As Monsanto and Bayer know, Corn Product Licensees must, and do, utilize the

estimate not only in planning and production activities but in determining their own pricing, which depends in part on the royalties that constitute a significant part of their costs.

561. When Bayer announces final royalty amounts is discretionary. It did and does choose to do so after Corn Product Licensees have already committed to, purchased, and planted parent seed so that they have no realistic choice about looking elsewhere regardless of the royalty amount ultimately charged.

562. As Monsanto and Bayer know, Corn Product Licensees must, and do, utilize the royalty amount not only to decide their planning and production activities but to determine their own pricing, which depends in large part on the royalties that constitute a significant part of their costs.

563. The amount charged also is unilaterally set at the discretion of Monsanto / Bayer.

564. For years, the variance from estimate to final amount was zero or slight.

565. After Bayer took the reins, this changed.

566. As NK603 was set to come off patent, Bayer started increasing final royalty prices on products containing NK603. It has done so from 2021 to present except one year in 2026.

567. During the 2021 planning and planting cycle, for example, Bayer estimated a royalty increase between 5%-10% (mid-range of 7.5%). After Corn Product Licensees purchased parent seed, Bayer announced the actual royalty would increased over the mid and upper estimate to 15%.

568. Increases continued even after NK603 lost patent protection.

569. During the past five years, royalties have gone from approximately 42% of the costs to approximately 70% of the costs for a bag of corn.

570. Those who fail to timely pay royalties charged are subject to sanctions including

monetary penalty, compounded interest, collection costs, and termination.

571. Corn Product Licensees bear the risk and financial burden of increased and increasing royalties.

572. At the same time as Bayer increased royalty amounts charged to Corn Product Licensees, it did not do so commensurately as to Channel or the DEKALB brand, which can and do compete with them.

573. Such conduct violates the covenant of good faith and fair dealing, is in bad faith, an abuse of discretion, and contrary to law and public policy including patent protection that is to last 20 years but not longer.

574. As a result, Corn Product Licensees have been damaged

## COUNT SIX
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

In addition or in the alternative to Counts I-V, Plaintiff asserts on behalf of itself and those similarly situated this Count VI for unjust enrichment.

575. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

576. A right to charge royalties for a non-patented trait is not part of the CPLA. Yet Monsanto and Bayer did and do charge and extract payment from Corn Product Licensees for NK603.

577. They have continued to do so even after the last U.S. patent has expired.

578. That conduct is against public policy and violates the U.S. patent and antitrust laws.

579. Plaintiff and Corn Product Licensees provided benefit to Bayer and Monsanto at least equal to the post-patent royalties paid on NK603.

112

580. Bayer and Monsanto accepted that benefit. In fact, Bayer and Monsanto conditioned Plaintiff and Corn Product Licensees ability to license NK603 on the payment of such royalties, even though the U.S. patents had expired.

581. It would be unfair for Bayer and Monsanto to retain the benefit of the royalties. The royalties paid reflect an increase on the royalties being paid prior to the expiration of the U.S. patents. No new, additional, or enhanced benefits or services were provided to Plaintiff and Corn Product Licensees. Rather, Monsanto and Bayer were able to extract post-patent royalties, in violation of public policy and the U.S. law, based on its market power in NK603

582. Even if there were a contractual provision allowing royalites on NK603, it would be unenforceable as unconscionable, illegal, and against public policy.

583. The CPLA is a contract of adhesion and procedurally unconscionable. It is a form contract created and imposed by a stronger party on weaker ones. There is no ability for ISCs to negotiate or modify terms of the contract. Further, Bayer has enormous power due to dominance over GE traits, including NK603 conferring tolerance to glyphosate, which is used by the vast majority of corn growers.

584. The CPLA also is substantively unconscionable. Contract terms are unreasonably harsh, one-sided, and exploitive, but ISCs have few to no other options. Among other things, NK603 is available only from Bayer, and, until Bayer's February 2026 settlement with Corteva, it could not be sublicensed from another biotech manufacturer. Comparable alternatives to NK603 do not exist.

585. The inequality of the parties' positions, as well as contract terms imposed on ISCs is gross and manifest. Among other things, and without limitation, Bayer demands yearly documented financial assurances, auditing rights, prompt payment, adherence to stewardship

procedures, "education" meetings the licensee must conduct to "explain to growers the benefits of Licensed Products" as well as the stewardship responsibilities for use of Licensed Products, and access to proprietary grower sales data that, despite contractual protections, has been used to compete with Corn Product Licensees via Bayer-affiliated sellers. There are strict restrictions on where and to whom Corn Product Licensees can sell. They are made spokes in Bayer's licensing snare, permitted to sell only to dealers or growers who themselves are licensed by Monsanto

586.    ISCs have no realistic choice as to any of this due to Bayer's dominance and control over essential GE technology, including NK603 despite expiration of patent protection.

587.    Among other abuses are timing and amount of royalty payment extracted from Corn Product Licensees.

588.    For many years, there was little difference between the estimated royalty range and actual royalty finally charged. Substantial increase - beginning in advance of NK603's patent expiration - was unprecedented. Charging for and substantially *increasing* a royalty for an off-patent trait does not comport with an objectively reasonable expectation of persons in the position of Corn Product Licensees, and making matters even worse, rebates became available only upon terms further solidifying Bayer's market dominance.

589.    Royalties for NK603 following its patent expiration are extra-contractual but if not, unconscionable and unenforceable.

590.    Such royalties also are illegal.

591.    The CPLA provides that the parties "shall comply with all applicable laws," that nothing in the agreement (or Addendum) shall be construed so as to require the violation of any law, and that whenever there is a conflict between any contract provision and any law, "the law shall prevail" as to the affected provision. *See* CPLA § 10.03.

592. Charging royalties for use of an invention no longer covered by patent constitutes patent misuse and is unlawful.

593. No contract provision should thus be interpreted to permit a royalty on NK603 after November 2022, which if so interpreted, is unenforceable.

594. Monsanto and Bayer have been unjustly enriched by at least the amount of royalties extracted from Corn Product Licensees from the date the NK603 patent expired to present.

**COUNT SEVEN**
**Breach of good faith and fair dealing – PPP Program**
**(On behalf of Plaintiff)**

In addition to Counts I-VI, Plaintiff asserts on behalf of itself this Count VII for failure to pay amounts under the PPP program in breach of good faith and fair dealing.

595. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

596. Plaintiff was a participant in the PPP program.

597. As alleged, the PPP program was, at all relevant times, a loyalty program incentivizing Corn Product Licensees to purchase not just Bayer-traited corn but soybean seed, and to produce seed for sale to dealers and ultimately growers.

598. Terms of the PPP program are set out in a writing signed by Bayer.

599. For the 2023-24 fiscal year, a Corn Product Licensee could obtain a "Performance Incentive" of certain amounts per unit if it met a 90% threshold, determined by stated formula, of units sold the prior year. Payment at substantially lower amounts were to be made if sales were at lesser percentages of: (1) at least 75%; and (2) at least 55%. of last year's amount.

600. The Corn Product Licensee's qualification for PPP payment was at Bayer's sole

discretion.

601. The amount of sales by a Corn Product Licensee may be reduced by circumstances outside its control.

602. Among those circumstances are weather conditions and Bayer's "prevent plant" accommodation to growers who, although purchasing seed, are permitted to return it.

603. Bayer's practice was to not penalize a Corn Product Licensee for shortfalls outside its control such as prevent plant reductions.

604. On May 22, 2024, John Latham and Bayer's Vice President of US Seed Licensing, Matthew Brandt, discussed Mr. Latham's concern that a number of dealers and customers were considering the prevent plant option. Mr. Brandt assured Mr. Latham that historically, Bayer had not penalized a Corn Product Licensee for weather-related prevent plant returns.

605. Latham performed its end of the bargain. Despite selling more than 90% of its prior year's sales, a number of Latham's customers exercised prevent plant options. Through no fault of its own, Latham came in at 88.1%, barely short of the 90% level.

606. Notwithstanding its admitted, and reiterated practice, Bayer did penalize Latham for prevent-plant returns, ultimately paying Latham at the 75% rather than the 90% amount, representing hundreds of thousands of dollars less than reasonably expected by Plaintiff.

607. This was an abuse of discretion, which evaded the spirit of the transaction and denied Plaintiff expected benefits of the agreement in violation of the covenant of good faith and fair dealing.

608. Plaintiff has been damaged as a result.

## COUNT EIGHT
## Breach of Contract
## (On behalf of Plaintiff)

In addition to Counts I-VII, Plaintiff asserts on behalf of itself this Count VIII for breach of contract for failure to pay amounts owed under agreement to provide market funding in 2025.

609. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

610. In addition to the PPP program, Bayer can and does extend market funding.

611. Bayer extended Latham market funding every year for approximately 15 years until December 2025.

612. Market funding is determined and provided annually per unit of corn and/or soybean seed sold. It is not conveyed as an offset to royalty payments but rather, an amount paid by Bayer after seed is sold based on a per-unit amount agreed to in advance.

613. On March 27, 2025, John Latham met with Bayer representatives Scott Shisler and Matthew Brandt to discuss matters including the still unpaid PPP, as well as market funds for 2025-26. In this meeting, Mr. Shisler and Mr. Brandt indicated that Bayer wanted to take sales from Pioneer (Corteva's seed brand) in NW Iowa and would be willing to provide market funding to support Plaintiff's production and sales efforts in NW Iowa.

614. On March 28, 2025, John Latham emailed Scott Shisler stating: "We need some answers soon on [the prior year's unpaid PPP] and our marketing funds."

615. On March 31, 2025, he followed up with Mr. Shisler, stating: "We have a big production plan of Bayer products, but we have to know what the plan is for market funding before going to plant."

117

616. On April 1, 2025, Scott Shisler responded by email stating:

> The following is your market funding for the 2025 season.
>
> Corn 1.00 per unit.
>
> Soybeans 5.00 per unit.
>
> The budgets are based on
>
> Corn 39,000 units
>
> Soybeans 51,000 units.

617. On May 2, 2025 John Latham sent an email to Bayer representative Matthew Brandt stating that he understood the commitment made for market funding in April 2025. Latham also accepted that funding by performance.

618. Bayer knew that Latham would rely on Bayer's promise to pay market funds at the stated rate, and Latham in fact did so.

619. As of mid-December, 2025, Latham had already contracted with growers, the seed was grown, it was priced to dealers and a majority of orders were on the books. Latham had already hired and paid a sales representative to grow Bayer's market share.

620. Bayer, however, failed and refused to pay the market funds.

621. By email dated December 19, 2025, Scott Shisler stated that the funding would not be provided because "license agreements between Bayer and Latham Hi-Tech, Inc. were terminated on December 17, 2024, due to a change in control" and new license agreements were executed with M.S. Technologies, L.L.C.

622. Termination of the CPLA, however, occurred months before April 1, 2025, when Bayer offered Plaintiff market funding, which Plaintiff accepted.

623. Bayer, which sent a notice of termination, knew as of December, 2024 that the

CPLA had been terminated based on change of control.

624. At no time did Bayer notify Latham that market funding was conditioned on an active CPLA with Latham. To the contrary, it extended market funding with knowledge that Latham's own license agreement had been terminated and that Latham was acting in reliance on the offered market funding accepted.

625. The agreement was capable of being performed within one year.

626. In addition, Latham acted upon the agreement to a degree that denying it would be unjust. As Bayer understood that it would, Latham took and completed production activities and hired and paid a salesperson to increase Bayer's market share, in Bayer's chosen territory, in reliance on promised market funds, all of which facilitated and made ultimate sales of Bayer-traited seed possible.

627. Bayer failed and refused to pay in breach of the parties' agreement.

628. Plaintiff was damaged as a result.

**COUNT NINE**
**Promissory Estoppel**
**(On behalf of Plaintiff)**

In addition to Counts I-VIII, Plaintiff asserts on behalf of itself this Count IX for promissory estoppel respecting failure to pay amounts owed for market funding in 2025.

629. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

630. Plaintiff dealt with Scott Shisler as Bayer' representative for years prior to April 2025, and for years had received market funding in amounts provided by Shisler on Bayer's behalf.

631. At all times, Bayer insisted that the market funding arrangement not be put in writing.

632. For over a dozen years, Bayer had honored agreed-to funding.

633. As alleged, Shisler did on this occasion provide funding amounts to Latham in a written email after Latham's CPLA had been terminated and a new license agreement executed with M.S. Technologies, L.L.C., with whom Bayer knew Latham had a continuing business arrangement.

634. Bayer knew that Latham was relying on Bayer's agreement to provide market funding, in the amounts stated, in taking actions to produce and prepare seed for sale and to direct its sales efforts to help Bayer grow its market share in NW Iowa.

635. Latham reasonably and detrimentally relied on Bayer's promise to pay market funding when carrying out and incurring the costs of seed production, pricing its seed, and directing its marketing activities.

636. Bayer was well aware that Latham would do so and at minimum, reasonably could foresee that it would do so in reliance on the funding.

637. Bayer did not provide Latham the promised market funding.

638. Injustice can only be avoided by enforcement of the promise to pay market funding at the amounts stated.

### COUNT TEN
### Promissory Estoppel
### (On behalf of Plaintiff)

In addition to Counts I-IX, Plaintiff asserts on behalf of itself this Count X for promissory estoppel respecting failure to pay amounts owed for market funding in 2023-2024.

639. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of the Complaint as though fully set forth herein.

640. On Wednesday, December 6, 2023, Latham emailed Bayer (Scott Shisler)

expressing concern that one of Latham's larger dealers, Riverton Seeds, had been approached by Bayer's own Asgrow to start buying seed directly from Asgrow, rather than Latham.

641. Riverton Seeds was a larger dealer selling over 2,500 units of corn and around 6,000 units of soybeans, most of which included Bayer traits.

642. Scott Shisler called Latham to take the email conversation offline, consistent with Bayer's refusal to put funding discussions in writing.

643. Latham asked Bayer to step in and provide market funding to help keep Riverton's business.

644. On December 7, 2023, Scott Shisler asked Latham for the city where the dealer was located, and Latham said that it needed $11 per unit on soybeans to keep the business.

645. On Monday, December 11, 2023, Latham (Amy Rohe and John Latham) spoke with Scott Shisler on a joint call, during which Scott Shisler confirmed Bayer's agreement to provide the $11 per unit funding on approximately 6,643 units of seed.

646. Bayer knew that Latham was relying on Bayer's agreement to provide market funding, in the amounts stated, in taking actions to secure Riverton's business.

647. Latham reasonably and detrimentally relied on Bayer's promise to pay market funding when carrying out and incurring the costs of selling seed to Riverton at an $11 per unit discount on approximately 6,643 units of seed.

648. Bayer was well aware that Latham would do so and at minimum, reasonably could foresee that it would do so in reliance on the funding.

649. Bayer (Matthew Brandt) acknowledged in letters to Latham dated May 9, 2025, and June 13, 2025, that it owes Latham approximately $73,067.94 for the Riverton market funding it promised, but it blames its failure to remit payment to Latham on a "system error."

650. At the time of this Complaint, Bayer still has not paid Latham the Riverton market funding.

651. Injustice can only be avoided by enforcement of the promise to pay market funding at the amounts stated.

**COUNT ELEVEN**
**Promissory Estoppel**
**(On behalf of Plaintiff)**

In addition to Counts I-X, Plaintiff asserts on behalf of itself this Count XI for promissory estoppel respecting failure to pay amounts owed for market funding in 2023-2024.

652. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of the Complaint as though fully set forth herein.

653. On August 31, 2023, Latham (John Latham and Amy Rohe) met with Bayer (Scott Shisler) at the Dutch Oven Bakery in Boone, Iowa to discuss Bayer's market funding offer to Latham for the 2023-2024 season.

654. During this meeting, Shisler offered Latham certain market funding dollars, including what the parties had historically referred to as SmartStax LCA (limited competitive reaction), which provided Latham $15 per Unit for SmartStax sales, allowing Latham to discount its SmartStax products by $15 per Unit, which Bayer would reimburse.

655. These market funding dollars were reasonably necessary to enable Latham to retain the business of certain dealer customers.

656. These same SmartStax LCA dollars were promised to Latham and paid by Bayer in every year since 2016 (8 years).

657. In every year until 2024, Bayer honored its promise to pay Latham SmartStax LCA market funding.

658. Bayer knew that Latham was relying on Bayer's agreement to provide market funding, in the amounts stated, in taking actions to discount and sell its SmartStax products.

659. Latham reasonably and detrimentally relied on Bayer's promise to pay SmartStax LCA market funding for the 2023-2024 season when it sold approximately 6,965 Units of SmartStax at a $15 per Unit discount, costing it approximately $104,475.

660. Bayer was well aware that Latham would do so and at minimum, reasonably could foresee that it would do so in reliance on the funding.

661. Bayer refused to pay Latham the promised SmartStax market funding dollars for 2023-2024.

662. Injustice can only be avoided by enforcement of the promise to pay market funding at the amounts stated.

## COUNT TWELVE
### Negligent Misrepresentation
### (On behalf of Plaintiff)

In addition or in the alternative to Counts I-XI, Plaintiff asserts on behalf of itself this Count XII for negligent misrepresentation respecting failure to pay amounts owed for market funding in 2025.

663. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

664. As of April 2025, Bayer knew or minimally should have known that Latham's CPLA had been terminated in December 2024 based on change in control. Bayer itself terminated Latham's CPLA and sent it notice of same in December 2024.

665. The April 2025 email from Bayer representative Shisler was an expression of Bayer's present intention to pay market funding and do so notwithstanding termination of the

CPLA based on change in control.

666. The information was intentionally supplied by Shisler in the course of Bayer's business for guidance to Latham in reference to a particular business transaction.

667. Latham reasonably relied on the representation to its detriment.

668. Whether to pay market funding was and is within Bayer's control.

669. If Bayer's practice was to not pay market funding to those without an active CPLA, and/or notwithstanding promised funding or activities undertaken that benefited Bayer, the representation in April 2025 was false and Bayer failed to exercise reasonable care to obtain or communicate true information.

670. As a result of the negligent misrepresentation and its reasonable reliance thereon, Plaintiff was damaged.

**COUNT THIRTEEN**
**Violation of Missouri Trade Secret Acts**
**(on behalf of Plaintiff)**

In addition or in the alternative to Counts I-XII, Plaintiff asserts on behalf of itself this Count XIII for violation of the Missouri Trade Secret Act, Mo. Rev. Stat. §417.450, et seq.

671. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of this Complaint as though fully set forth herein.

672. As alleged, the CPLA requires Corn Product Licensees, including Latham, to provide extensive point-of-sale information. This includes customer names, addresses, and other sales and product-related data.

673. Customer, dealer, sales, and product-related data are among Latham's most valuable business assets. It consistently has maintained robust systems, policies, and controls to ensure that such information is protected, restricted, and only accessible on a strict need-to-know

basis. Safeguards include computer-system protections as well as employment agreements that govern use and protection of such data.

674. Such data constitutes a trade secret. It is not public knowledge but proprietary to licensees like Latham, and has economic value from not being generally known or readily ascertainable by others who could obtain economic value from its disclosure or use, and is subject of efforts to maintain its secrecy by Latham, and purportedly, by Defendants.

675. The CPLA provides that such data is to be maintained in a way to preserve confidentiality. *See* CPLA § 3.09 (providing that Monsanto "shall not disclose the specific names and addresses of purchasers of Licensed Products to any Third Party seed company" except in the form of grower list such as posted to www.corn-states.com, and that Monsanto "shall take reasonable actions to use separate personnel to handle the names and addresses of individual growers purchasing from Licensee" from those involved with marketing).

676. After learning that Latham was engaged in a corn breeding effort, Bayer's representative in late April 2022 warned it to stop that effort and stay 100% loyal to Bayer.

677. When Latham did not, Channel and DEKALB sales representatives contacted Latham's customers dealers with below-cost pricing offers open for short periods of time to force immediate decisions.

678. On information and belief, this was accomplished by accessing and providing Latham's customer list, which included detailed GPOS data and number of units of each product purchased, to Channel and DEKALB sales representatives, who used that information without Latham's consent.

679. Monsanto and Bayer misappropriated that information by disclosure and by use without consent despite knowing or having reason to know that the confidential information was

125

acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, which did not permissibly extend to competing sales offers.

680. Channel misappropriated such information knowing or having reason to know that the confidential information was acquired under circumstances giving rise to duty to maintain its secrecy or limit its use, or alternatively, knew or had reason to know that knowledge of the information was derived from or through Monsanto and/or Bayer, who owed a duty to Latham to maintain its secrecy or limit its use, which did not permissibly extend to competing sales offers.

681. Monsanto, Bayer and Channel used such information, without Latham's consent, to send representatives to Latham's customers with below-cost and time-limited pricing offers to force immediate decisions.

682. Latham lost sales as a result of Defendants' conduct.

683. Such conduct violates the Missouri Trade Secrets Act.

684. Pursuant to Mo. Rev. Stat § 417.457, Latham is entitled to and seeks damages, including both actual loss caused by the misappropriation and unjust enrichment caused by misappropriation not already accounted for in computing actual loss.

685. Defendants' conduct also was outrageous because of evil motive or reckless indifference to the rights of others such that punitive damages are warranted and should be awarded. *See* Mo. Rev. Stat § 417.457.2.

**COUNT FOURTEEN**
**Tortious Interference with Business Expectancy**
**(on behalf of Plaintiff)**

In addition or in the alternative to Counts I-XIII, Plaintiff asserts this Count XIV for tortious interference with business expectancy.

686. Plaintiff incorporates and realleges each allegation in the preceding paragraphs of

126

this Complaint as though fully set forth herein.

687. Latham had valid business expectancies with existing or potential future customers contacted by Channel and DEKALB sales representatives.

688. Defendants knew of such relationships and existence of Latham's business expectancy, or at minimum, knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the business expectancies and Latham's interest therein.

689. Defendants intentionally interfered with these relationships and business expectancies via steep discounts off Latham's prices.

690. Defendants did so by wrongful and improper means, including misappropriation of Latham's confidential customer lists and data, and conduct that was retaliatory, predatory, and in restraint of trade.

691. Plaintiff was damaged as a result.

692. Defendants acted intentionally to harm Latham or with malicious, deliberate and flagrant disregard for the rights and/or safety of others. Punitive damages are thus warranted and should be awarded.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of itself and all others similarly situated pray the Court:

A. Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constituted a per se violation, or in the alternative engaged in an unreasonable restraint of trade in violation, of Section 1 of the Sherman Act and Missouri Antitrust Law;

B. Adjudge and decree that Defendants unlawfully monopolized the Relevant Markets in violation of Section 2 of the Sherman Act and Section 2 of the Missouri Antitrust Law;

C. Adjudge and decree that Defendants engaged in unlawful price discrimination in violation of Section 2(a) of the Clayton Act;

D.      Adjudge and decree all remaining claims and causes of action in favor of the Plaintiff and/or Plaintiff and the Class or Subclass, as appropriate;

E.      Enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class and/or Subclass for treble damages determined to have been sustained by Plaintiff and the Class and/or Subclass by virtue of Defendants' and their co-conspirators', joint venture partners', alter egos', agents', principals', and enterprise members' violations of the Sherman Act, Clayton Act, and Missouri Antitrust Laws;

F.      Awarding to Plaintiff its attorneys' fees, costs, expenses, and interest at the maximum rate(s) as allowable by law;

G.      Enter an injunction to prohibit and restrain Defendants' anticompetitive acts and to restore free and fair competition to the marketplace; and/or

H.      Enter such other and further relief as the Court may deem just and proper or to which Plaintiff and the Class or Subclass are entitled.

Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Respectfully Submitted,

*/s/ Bradley T. Wilders*

George A. Hanson, 43450(MO)
Bradley T. Wilders, 60444(MO)
Stefon David, Mo. Bar. 72761 (Pro Hac Vice Forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd Suite 200
Kansas City, Missouri 64113
816-714-7100 – telephone
hanson@stuevesiegel.com
wilders@stuevesiegel.com
david@stuevesiegel.com

Tracey F. George, 52361(MO)
**DAVIS GEORGE, LLC**
1600 Genessee St., Ste 328
Kansas City, MO 64102
816-569-2629 - telephone
tracey@dgmlawyers.com

128

Don M. Downing, 30405(MO)
Gretchen Garrison, 33963(MO)
**GRAY RITTER GRAHAM**
701 Market St., Ste. 800
St. Louis, MO 63101
314-241-5620 - telephone
ggarrison@grgpc.com
ddowning@grgpc.com

*Attorneys for Plaintiff and Proposed Class*