UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LATHAM QUALITY, INC., on behalf of itself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 4:26-cv-00591-MAL |
| v. | ) ) | |
| BAYER AKTIENGESELLSCHAFT, *et al.,* | ) ) | |
| | ) | Rule 23 Class Action |
| Defendants. | ) | |

**DEFENDANTS BAYER CROPSCIENCE LLC, BAYER CROPSCIENCE LP, MONSANTO COMPANY, AND CHANNEL BIO LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**TABLE OF CONTENTS** ........................................................................................ ii

**TABLE OF AUTHORITIES** ................................................................................. v

**PRELIMINARY STATEMENT** .......................................................................... 1

**FACTUAL BACKGROUND** ............................................................................... 3

    A. The Parties ................................................................................................. 3

    B. NK603 And The Alleged Markets .............................................................. 4

    C. The Corn Product Licensing Agreement ("CPLA") .................................. 4

    D. The Premier Performance Program ("PPP") And Market Funding ........... 5

    E. Plaintiff's Loss Of Customers .................................................................... 5

    F. The Agrigenetics License Agreement And Corteva Litigation ................. 6

    G. Plaintiff's Claims ....................................................................................... 6

**LEGAL STANDARD** .......................................................................................... 7

**ARGUMENT** ....................................................................................................... 8

**I. PLAINTIFF RELIES ON IMPERMISSIBLE GROUP PLEADING** ................... 8

**II. PLAINTIFF FAILS TO STATE ANY VIABLE ANTITRUST CLAIM** .............. 9

    A. Charging For NK603 Is Not Anticompetitive. ........................................... 9

        1. Charging A High Price Is Not Anticompetitive Conduct ................... 9

        2. Charging For NK603 After Patent Expiration Is Not Unlawful ......... 10

    B. Defendants' Licensing Conduct Is Permitted By The Patent Laws And Does Not Violate The Antitrust Laws ................................................................... 12

        1. Conduct Permitted By The Patent Laws Does Not Violate The Antitrust Laws. ................................................................................................ 13

        2. Plaintiff Challenges License Terms That Have Previously Been Found Lawful Because They Are Within The Scope Of The Patent Grant ............................. 13

    C. Defendants' Offer Of Lower Prices To Plaintiff's Customers Is Not Unlawful ..... 15

    D. Defendants' Rebate Program ("PPP") Does Not Harm Competition ...................... 16

    E. The Complaint Fails To Allege A Tying Claim ....................................................... 17

    F. Plaintiff Fails To Allege That Defendants Are The Proximate Cause Of Its Inability To Obtain "Generic NK603" ..................................................................... 18

    G. Plaintiff's Antitrust Claims Based On A "Corn Seed" Market Fail To Allege A Relevant Market And Market Or Monopoly Power ............................................... 19

    H. Plaintiff's Robinson-Patman Claim (Count 3) Fails  Because A License Is Not The Sale Of A "Commodity" Subject To The Robinson-Patman Act ("RPA") ............. 20

**III. THE COMPLAINT FAILS TO STATE CLAIMS UNDER STATE LAW**........ 22

   A. Plaintiff's Claim For Breach Of The CPLA (Count 4) Fails Because It Alleges No Breach And The Contract Terms Permit The Challenged Conduct. ...................... 22

      1. Plaintiff Does Not Adequately Allege Any Breach ......................................... 22

      2. The CPLA's Express Terms Defeat The Breach of Contract Claim ................. 22

      3. *Brulotte* Does Not Save Plaintiff's Contract Claim ......................................... 24

   B. Plaintiff's Fair Dealing Claim With Respect To Royalties (Count 5) Fails Because The Express Terms Of The Contract Permit The Challenged Conduct.................... 25

      1. The CPLA Allows Bayer To Set The Royalty Amount. ................................... 25

      2. Missouri Law Does Not Permit Plaintiff To Use An Implied Covenant Of Good Faith To Create New Contract Terms ................................................................ 27

   C. Plaintiff's Unjust Enrichment Claim For Post-Expiration Royalties (Count 6) Is Barred By the Contract Or, Alternatively, The Voluntary Payment Doctrine......... 27

      1. Plaintiff's Claim Fails Because A Contract Governs Royalties ........................ 28

      2. The Voluntary Payment Doctrine Bars Recovery. ........................................... 28

      3. Defendants' Retention Of The Benefit Would Not Be Unjust .......................... 29

   D. Plaintiff's Fair Dealing Claim Respecting The PPP (Count 7) Fails For Lack Of A Contract, Or Because Any Contract Permits The Challenged Conduct .................. 30

      1. Plaintiff Fails To Allege A Contract, A Required Element Of The Claim ........ 30

      2. If Any Contract Existed, It Permitted The Challenged Conduct ....................... 31

   E. Plaintiff's Failure to Allege Definite Terms Or Mutual Obligations Dooms Its Breach Of Contract Claim Regarding 2025 Market Funding (Count 8).............................. 31

   F. The Court Should Dismiss Plaintiff's Promissory Estoppel Claims (Counts 9-11) Because They Seek to Add Obligations Not Included In The Parties' Contract And, In Any Case, Do Not Allege Sufficiently Definite Promises ................................. 33

      1. Plaintiff's Promissory Estoppel Counts Fail Because They Attempt To Add Obligations Not Included In The Parties' Contract .......................................... 33

      2. Each Of Plaintiff's Promissory Estoppel Claims Fails Because Plaintiff Does Not Allege A Sufficiently Definite Promise, Or A Promise At All. ....................... 35

   G. Plaintiff's Negligent Misrepresentation Claim (Count 12) Fails Because It Does Not Allege Falsity, The CPLA's Termination Negates Justifiable Reliance, And If A Contract Existed, The Economic Loss Doctrine Bars Recovery ............................. 36

      1. Plaintiff Fails To State A Claim Because It Does Not Allege Falsity ............... 36

      2. Plaintiff Could Not Have Justifiably Relied As A Matter Of Law ................... 37

      3. The Economic Loss Doctrine Bars Plaintiff's Misrepresentation Claim........... 37

H. Plaintiff's Trade Secrets Act Claim (Count 13) Fails Because It Does Not Adequately Allege Either A Trade Secret Or Misappropriation .................................................. 38

    1.   Plaintiff Fails To Allege A Trade Secret ............................................................ 38

    2.   Plaintiff Fails To Sufficiently Allege Misappropriation .................................... 39

I. Plaintiff's Claim for Tortious Interference (Count 14) Fails Because Missouri Law Bars Claims For Interference With Relationships Arising Out Of The Parties' Contract And Plaintiff Does Not Properly Allege Lack Of Justification ................ 41

    1.   Plaintiff Cannot Base A Claim For Tortious Interference On Alleged Interference With Relationships That Existed Due To The CPLA ........................................ 41

    2.   Plaintiff Fails To Allege Absence Of Justification Or Improper Means ........... 42

J. The Limitation Of Damages Provision In The CPLA Bars Plaintiff's Claims For Loss Of Business (Counts 13 and 14) ............................................................................ 44

**CONCLUSION** ......................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. & E. Plastik Pak Co. v. Monsanto Co.*,
396 F.2d 710 (9th Cir. 1968) ...................................................................................15

*AIDS Healthcare Found. v. Express Scripts, Inc.*,
658 F. Supp. 3d 693 (E.D. Mo. 2023)......................................................................29

*Anderson v. Kimberly-Clark Corp.*,
570 F. App'x 927 (Fed. Cir. 2014) .............................................................................2

*Arconic Corp. v. Novelis Inc.*,
670 F. Supp. 3d 196 (W.D. Pa. 2023)......................................................................24

*Aronson v. Quick Point Pencil Co.*,
440 U.S. 257 (1979).................................................................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................7, 43

*Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*,
339 U.S. 827 (1950).............................................................................................24, 25

*B. Braun Med., Inc. v. Abbott Lab'ys*,
124 F.3d 1419 (Fed. Cir. 1997)................................................................................13

*Ballard v. City of Creve Coeur*,
419 S.W.3d 109 (Mo. App. 2013) ...........................................................................28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................7

*Bextermueller News Distribs. v. Lee Enters., Inc.*,
2023 WL 2187465 (E.D. Mo. Feb. 23, 2023)..........................................................42

*Bishop & Assocs., LLC v. Ameren Corp.*,
520 S.W.3d 463 (Mo. banc 2017).................................................................41, 42, 44

*Bishop v. Shelter Mut. Ins. Co.*,
129 S.W.3d 500 (Mo. App. 2004) .................................................................25, 26, 31

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) ...................................................................................19

*Boggs v. Am. Optical Co.*,
  2015 WL 300509 (E.D. Mo. Jan. 22, 2015) ................................................................8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ............................................................................................10, 15

*Brulotte v. Thys Co.*,
  379 U.S. 29 (1964) .......................................................................................... *passim*

*Cavalleri v. Hermes Int'l*,
  2025 WL 2662897 (N.D. Cal. Sept. 17, 2025) ......................................................18

*Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC*,
  422 S.W.3d 312 (Mo. banc 2014) ..........................................................................38

*CIBC Bank USA v. Williams*,
  669 S.W.3d 298 (Mo. App. 2023) ..........................................................................31

*Clark v. Washington Univ.*,
  906 S.W.2d 789 (Mo. App. 1995) ...........................................................32, 33, 35

*Clearly Can. Beverage Corp. v. Am. Winery, Inc.*,
  257 F.3d 880 (8th Cir. 2001) .................................................................................33

*Clevenger v. Oliver Ins. Agency, Inc.*,
  237 S.W.3d 588 (Mo. banc 2007) ....................................................................33, 35

*Cmty. Title Co. v. Roosevelt Fed. Savings & Loan Ass'n*,
  796 S.W.2d 369 (Mo. banc 1990) ..........................................................................43

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ...........................................................10, 15, 16, 18

*Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*,
  2000 WL 33739340 (E.D. Mo. Dec. 6, 2000) ......................................................38

*Corteva Agriscience LLC v. Monsanto Co.*,
  2024 WL 4197718 (Del. Super. Sept. 16, 2024) ......................................1, 11, 12

*In re Crop Inputs Antitrust Litig.*,
  172 F.4th 570 (8th Cir. 2026) ...................................................................................8

*Doe v. St. Louis Univ. Sch. of Med.*,
  2013 WL 1305825 (E.D. Mo. Mar. 28, 2013) ......................................................32

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
  136 F.3d 554 (8th Cir. 1998) .................................................................................19

*Dubinsky v. Mermart, LLC*,
    595 F.3d 812 (8th Cir. 2010) ...................................................................................37

*Eaton v. CMH Homes, Inc.*,
    461 S.W.3d 426 (Mo. banc 2015).............................................................................29

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997)......................................................................................19

*Energizer Brands, LLC v. Procter & Gamble Co.*,
    2016 WL 2894708 (E.D. Mo. May 18, 2016) .............................................................8

*ESM Techs., LLC v. Biova, LLC*,
    2011 WL 13137369 (W.D. Mo. Jan. 12, 2011) .........................................................44

*Fedynich v. Massood*,
    342 S.W.3d 887 (Mo. App. 2011) .............................................................................31

*Freitas v. Wells Fargo Home Mortg., Inc.*,
    703 F.3d 436 (8th Cir. 2013) ....................................................................................36

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ..................................................................................20

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
    305 U.S. 124 (1938)..................................................................................................13

*GlaxoSmithKline Consumer Healthcare, LP v. ICL Perf. Prods., LP*,
    2009 WL 2151190 (E.D. Mo. July 16, 2009) ...........................................................23

*Gott v. First Midw. Bank of Dexter*,
    963 S.W.2d 432 (Mo. App. 1998) .............................................................................43

*Greater Kansas City Laborers Pension Fund v. Superior Ge. Contrs.*,
    104 F.3d 1050 (8th Cir. 1997) ....................................................................................8

*Guidry v. Seven Trails W., LLC*,
    2014 WL 4386744 (E.D. Mo. Sept. 5, 2014)..........................................................8, 9

*Halls Ferry Invs. v. Smith*,
    985 S.W.2d 848 (Mo. App. 1998) .............................................................................33

*Hardee's Food Sys., Inc. v. Hallbeck*,
    2011 WL 5307807 (E.D. Mo. Nov. 3, 2011)..............................................................27

*Hartford-Empire Co. v. United States*,
    323 U.S. 386 (1945)..................................................................................................13

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992)..................................................................................................18

*Huch v. Charter Commc'ns, Inc.*,
   290 S.W.3d 721 (Mo. 2009) .....................................................................................28

*In re E. I. DuPont de Nemours & Co.*,
   96 F.T.C. 653 (1980)................................................................................................15

*In re EpiPen Direct Purchaser Antitrust Litig.*,
   2022 WL 1017770 (D. Minn. Apr. 5, 2022)............................................................19

*In re Indep. Serv. Orgs. Antitrust Litig.*,
   203 F.3d 1322 (Fed. Cir. 2000)................................................................................13

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   946 F.3d 995 (8th Cir. 2019) ...................................................................................18

*Innomed Labs, LLC v. ALZA Corp.*,
   368 F.3d 148 (2d Cir. 2004)......................................................................................21

*Inventory Sales, LLC v. Packer Fastener & Supply Inc.*,
   2026 WL 40066 (E.D. Mo. Jan. 6, 2026) ...........................................................39, 40

*Jacobson Warehouse Co. v. Schnuck Markets, Inc.*,
   2017 WL 5885669 (E.D. Mo. Nov. 29, 2017)..........................................................45

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984).....................................................................................................17

*Jennings v. Board of Curators of Mo. State Univ.*,
   386 S.W.3d 796 (Mo. App. 2012) ............................................................................27

*Kearney Com. Bank v. Popejoy*,
   119 S.W.3d 143 (Mo. App. 2003) ............................................................................33

*Keveney v. Mo. Military Acad.*,
   304 S.W.3d 98 (Mo. banc 2010)..............................................................................22

*Kimble v. Marvel Entm't*,
   576 U.S. 446 (2015)..........................................................................................*passim*

*KMG Kanal-Muller-Gruppe Int'l GmbH & Co. v. Inliner U.S.A. Inc.*,
   1999 WL 1078556 (S.D. Tex. May 13, 1999)..........................................................20

*Kreisler Drug Co. v. Mo. CVS Pharm., LLC*,
   2016 WL 5844145 (W.D. Mo. Oct. 4, 2016)............................................................40

*L&F Brands, Inc. v. Crown Valley Winery, Inc.*,
2020 WL 3447738 (E.D. Mo. June 24, 2020) ...............................................................28

*Linzer Prods. Corp. v. Sekar*,
499 F. Supp. 2d 540 (S.D.N.Y. 2007)...........................................................................21

*Lucero v. Curators of Univ. of Mo.*,
400 S.W.3d 1 (Mo. App. 2013) ....................................................................................22

*Meredith Corp. v. SESAC LLC*,
1 F. Supp. 3d 180 (S.D.N.Y. 2014) ..............................................................................19

*Midw. Bankcentre v. Old Republic Title Co. of St. Louis*,
247 S.W.3d 116 (Mo. App. 2008) ...........................................................................22, 31

*Millstone Prop. Owners Ass'n v. Nithyananda Dhyanapeetam of St. Louis*,
701 S.W.3d 633 (Mo. banc 2024).................................................................................33

*Monsanto Co. v. McFarling*,
2002 WL 32069634 (E.D. Mo. Nov. 5, 2002)..............................................................10

*Monsanto Co. v. McFarling*,
363 F.3d 1336 (Fed. Cir. 2004).....................................................................................14

*Monsanto v. Scruggs*,
342 F. Supp. 2d 568 (N.D. Miss. 2004)...................................................................14, 20

*Morgan v. Ponder*,
892 F.2d 1355 (8th Cir. 1989) ......................................................................................15

*Nitro Distrib., Inc. v. Alticor, Inc.*,
2008 WL 11384211 (W.D. Mo. Feb. 8, 2008) ..............................................................44

*O'Neal v. Stifel, Nicolaus & Co.*,
996 S.W.2d 700 (Mo. App. 1999) .................................................................................37

*Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*,
2023 WL 7184042 (N.D. Tex. Nov. 1, 2023)................................................................23

*OS33 v. CenturyLink Commc'ns, LLC*,
350 F. Supp. 3d 807 (E.D. Mo. 2018)...........................................................................37

*Pac. Bell Tel. Co. v. linkLine Commc'ns*,
555 U.S. 438 (2009)......................................................................................................10

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
268 F. Supp. 3d 1071 (C.D. Cal. 2017) ........................................................................17

- ix -

*Par v. Wolfe Clinic, P.C.*,
     70 F.4th 441 (8th Cir. 2023) ...................................................................19

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
     310 F. Supp. 3d 1002 (E.D. Mo. 2018)...................................................34

*Park Ridge Assocs. v. U.M.B. Bank*,
     613 S.W.3d 456 (Mo. App. 2020) ...........................................................26

*Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.*,
     59 S.W.3d 505 (Mo. banc 2001).............................................................44

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
     124 F.3d 430 (3d Cir. 1997)....................................................................17

*Ramey v. RE/MAX Kansas City*,
     2010 WL 11508733 (W.D. Mo. Aug. 24, 2010).....................................34

*Reitz v. Nationstar Mortg., LLC*,
     954 F. Supp. 2d 870 (E.D. Mo. 2013)..............................................30, 31

*Restored Images Consulting, LLC v. Dr. Vinyl & Assocs., Ltd.*,
     2016 WL 4036049 (W.D. Mo. July 27, 2016).............................24, 27, 28

*Roth v. Equitable Life Assur. Soc'y*,
     210 S.W.3d 253 (Mo. 2006) ....................................................................33

*S R Distrib., LLC v. Pepperidge Farm, Inc.*,
     2019 WL 5394501 (E.D. Mo. Oct. 22, 2019)..........................................42

*SCM Corp. v. Xerox Corp.*,
     645 F.2d 1195 (2d Cir. 1981)..................................................................13

*Se. Mo. Hosp. v. C.R. Bard, Inc.*,
     2008 WL 199567 (E.D. Mo. Jan. 22, 2008) ...........................................20

*Se. Mo. Hosp. v. C.R. Bard, Inc.*,
     642 F.3d 608 (8th Cir. 2011) ..................................................................16

*Self v. Equilon Enters., LLC*,
     2005 WL 3763533 (E.D. Mo. Mar. 30, 2005) ........................................38

*Simpson v. Union Oil Co. of Cal.*,
     377 U.S. 13 (1964)...................................................................................13

*Sports Capital Holdings (St. Louis), LLC v. Schindler Elevator Corp.*,
     2014 WL 1400159 (E.D. Mo. 2014).......................................................44

*St. Luke's Hosp. of Kan. City v. Benefit Mgmt. Consultants, Inc.*,
626 S.W.3d 731 (Mo. App. 2021) ...................................................................................34

*Stahl v. Dep't of Agric.*,
327 F.3d 697 (8th Cir. 2003) .........................................................................................7

*State v. Nationwide Life Ins. Co.*,
340 S.W.3d 161 (Mo. App. 2011) .................................................................................25

*Stehno v. Sprint Spectrum, LP*,
186 S.W.3d 247 (Mo. banc 2006)...........................................................................43, 44

*Sterling Merch., Inc. v. Nestle, S.A.*,
656 F.3d 112 (1st Cir. 2011) .........................................................................................17

*Summer Chase Second Addition Subdivision Homeowners Ass'n v. Taylor-Morley, Inc.*,
146 S.W.3d 411 (Mo. App. 2004) .................................................................................36

*Tension Envelope Corp. v. JBM Envelope Co.*,
876 F.3d 1112 (8th Cir. 2017) ................................................................................38, 39

*Thompson v. Redflex Traffic Sys., Inc.*,
2016 WL 6464472 (E.D. Mo. Nov. 1, 2016).................................................................29

*Thys Co. v. Brulotte*,
382 P.2d 271 (1963).......................................................................................................24

*Times-Picayune Publ'g Co. v. United States*,
345 U.S. 594 (1953).................................................................................................17, 18

*Top Priority Transit, LLC v. Cape Auto Pool, Inc.*,
680 S.W.3d 536 (Mo. App. 2023) .................................................................................27

*Trace X Chem., Inc. v. Can. Indus.*,
738 F.2d 261 (8th Cir. 1984) .........................................................................................10

*Tri-State Broad. Co. v. United Press Int'l, Inc.*,
369 F.2d 268 (5th Cir. 1966) .........................................................................................21

*Trone Health Servs., Inc. v. Express Scripts Holding Co.*,
974 F.3d 845 (8th Cir. 2020) .........................................................................................40

*TV Signal Co. of Aberdeen v. AT&T Co.*,
462 F.2d 1256 (8th Cir. 1972) .......................................................................................20

*United States v. Microsoft Corp.*,
87 F. Supp. 2d 30 (D.D.C. 2000)...................................................................................17

*United States v. Studiengesellschaft Kohle, m.b.H.*,
 670 F.2d 1122 (D.C. Cir. 1981) ......................................................................13

*Unverferth v. City of Florissant*,
 419 S.W.3d 76 (Mo. App. 2013) ......................................................................29

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP*,
 540 U.S. 398 (2004)........................................................................................9, 10

*Vilcek v. Uber USA, LLC*,
 902 F.3d 815 (8th Cir. 2018) ...........................................................................43

*W. Cent. Mo. Reg'l Lodge No. 50 v. Bd. of Police Comm'rs of Kansas City, Mo.*,
 939 S.W.2d 565 (Mo. App. 1997) ....................................................................35

*W. Forms, Inc. v. Pickell*,
 308 F.3d 930 (8th Cir. 2002) ...........................................................................39

*World Enters., Inc. v. Midcoast Aviation Servs., Inc.*,
 713 S.W.2d 606 (Mo. App. 1986) ....................................................................44

*Zean v. Fairview Health Servs.*,
 858 F.3d 520 (8th Cir. 2017) .............................................................................7

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
 395 U.S. 100 (1969).........................................................................................25

*Zila, Inc. v. Tinnell*,
 502 F.3d 1014 (9th Cir. 2007) .........................................................................10

**Statutes**

15 U.S.C. § 1....................................................................................................9

15 U.S.C. § 2....................................................................................................9

15 U.S.C. § 13(a) ............................................................................................20

35 U.S.C. § 112(a) ............................................................................................2

35 U.S.C. § 154(a)(1)......................................................................................13

Missouri Antitrust Law, RSMo. § 416.011 *et seq.* ....................................6, 9

Missouri Uniform Trade Secrets Act, RSMo. § 417.450 *et seq.* .......... *passim*

RSMo. § 416.141 ..............................................................................................9

RSMo. § 417.463 ............................................................................................44

**Other Authorities**

37 CFR §§ 1.801-1.809.................................................................................................2

37 CFR § 1.802(b) .......................................................................................................2

Fed. R. Civ. P. 8 ..........................................................................................................8

Fed. R. Civ. P. 9(b) .....................................................................................................9

Fed. R. Civ. P. 12(b)(6)............................................................................................4, 7

Justice & Federal Trade Comm'n, *Antitrust Guidelines for the Licensing of
Intellectual Property* § 2.1 ......................................................................................15

**PRELIMINARY STATEMENT**

Latham Quality, Inc. ("Latham"), a sophisticated commercial party, freely entered into a Corn Product Licensing Agreement ("CPLA") with Monsanto Company ("Monsanto") almost two decades ago.[1] Latham accepted the benefits of that agreement knowing that Monsanto's NK603 patent would expire in November 2022, and continued for years to license new, additional patented technology from Monsanto, and later Bayer CropScience LLC, f/k/a Bayer CropScience LP ("CropScience").[2] Latham knowingly continued to pay royalties after the NK603 patent expired and chose not to terminate, despite a right to do so.[3]

In December 2024, CropScience—not Latham—terminated the CPLA.[4] Only then, after its long-accepted benefits were out of reach, did Latham file a sprawling 692-paragraph Complaint seeking to recast ordinary technology licenses as antitrust violations. The Complaint challenges the contract Latham freely entered into, as well as a decades old agreement between Monsanto and a different company that included similar royalties and use restrictions. The only court to consider that other agreement affirmed it as lawful. *See Corteva Agriscience LLC v. Monsanto Co.*, 2024 WL 4197718, at *9-12 (Del. Super. Sept. 16, 2024) (rejecting challenge that agreement was unlawful because royalties extended past last NK603 U.S. patent). Latham's challenge, attempting to reframe disappointment in contract terms it agreed to as an antitrust class action, is meritless.

Regarding royalties, Latham's antitrust theory depends on a fundamental misreading of

---

[1] Compl. ¶¶ 185, 611.

[2] *See, e.g.*, Compl. ¶¶ 22, 199, 654 (Latham licensed and sold SmartStax corn, which contains five genetically-engineered traits). CropScience assumed the agreement as assignee of Monsanto.

[3] Compl. ¶ 14 (Latham paid royalties after the NK603 patent expired); Att. 1 § 8.02(h) (allowing Latham to terminate at any time, for any reason, on 30 days' notice, without penalty).

[4] Compl. ¶ 621 (CPLA terminated due to change in control at Latham).

*Brulotte v. Thys Co.*, 379 U.S. 29 (1964).[5] *Brulotte* addressed whether federal **patent law** preempted state contract law where a patentee sought to enforce post-expiration royalty obligations; it did not hold that such royalties constitute an antitrust violation. *Id.* at 32-33. In any event, *Brulotte* does not apply here. That case concerned royalties extending past the **last-to-expire** patent used by the licensee. *See Kimble v. Marvel Entm't*, 576 U.S. 446, 454 (2015). Here, Latham's allegations establish that products it sold under the CPLA incorporated traits covered by patents that have not expired.[6]

Latham's challenge to use restrictions likewise fails. Latham, like all market participants, may use Defendants' NK603 patent and its enabling disclosure, including royalty-free biological materials, to develop generic seed.[7] Indeed, Latham alleges that such biological materials are available.[8] Latham complains that it is burdensome for someone to invest in R&D to create a generic—**not** that Defendant impeded anyone from doing so. What Latham demands is something antitrust law does not require: free access to Defendants' proprietary parental seed, which includes proprietary state-of-the-art germplasm, so that it can avoid the cost, time and risk of developing competing seed incorporating NK603.[9] Neither patent law, antitrust law, nor any principle of law

---

[5] *See* Compl. ¶ 334 (relying on *Brulotte*).

[6] *See, e.g.*, Compl. ¶ 22 (trait patents in VT Double Pro and SmartStax expire in 2026 and 2027).

[7] *See* 35 U.S.C. § 112(a) (providing that patents contain a written description sufficient "to enable any person skilled in the art" to "make and use" the invention); 37 CFR §§ 1.801-1.809 (regulations for the deposit of biological materials to support § 112(a)'s enablement requirement).

[8] *See* Compl. ¶ 12 (Latham obtained NK603 seed not subject to any use restrictions). The patent also confirms royalty-free NK603 seed is available. *See* Att. 3, U.S. Patent No. 9,701,980 col. 18 ll. 27-35 (filed Mar. 6, 2014) (issued July 11, 2017) ("A deposit of the … (nk603) disclosed above has been made … with the American Type Culture Collection … [and] … will be maintained … for a period of 30 years … ."); 37 CFR § 1.802(b) (biological material in depository is "considered to be readily available"); *Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 932 n.3 (Fed. Cir. 2014) ("a court make take judicial notice of patents").

[9] *See* Compl. ¶¶ 111, 162 (parental seed includes Defendants' corn genetics, i.e. germplasm); *see also id.* ¶ 29 (seeking injunction "requiring Bayer to provide its non-patented technology").

or fairness require this largesse. A refusal to donate proprietary inputs is not exclusionary conduct, and contractual limits on the use and transfer of licensed technology are ordinary incidents of technology licensing. Because Latham's grievances are merely contract and patent-law objections repackaged as antitrust claims, and because courts have approved materially similar licensing arrangements, the Court should dismiss the antitrust claims.

Latham's state-law claims are likewise deficient. Its breach of contract claim is belied by the CPLA's unambiguous terms, which permit royalties after November 2022 on licensed products. And its other claims are barred by various defenses as a matter of law, including the voluntary payment doctrine and the economic loss doctrine.

In sum, none of Latham's causes of action states a claim, and this Court should dismiss the Complaint in its entirety.

## FACTUAL BACKGROUND

### A.      The Parties

Plaintiff **Latham Quality, Inc.** is an independent seed company ("ISC") that, prior to 2024, sold seed under its own retail brand to seed dealers, who in turn sold to growers. Compl. ¶¶ 31-34. Plaintiff entered into an agreement with Defendant **Monsanto Company**, the CPLA, to allow Plaintiff to produce and sell seed that contained Monsanto's corn seed traits and genetics. *Id.* ¶¶ 35, 111, 185. Plaintiff alleges, upon information and belief, that Monsanto assigned its rights and obligations under the CPLA to Defendant Bayer Aktiengesellschaft ("**Bayer AG**") and/or affiliates, including Defendant **Bayer CropScience LLC**, formerly known as **Bayer CropScience LP**. *Id.* ¶ 91. Defendant **Channel Bio LLC** is an affiliate of Monsanto and "a direct competitor of independent seed companies like Latham." *Id.* ¶¶ 79, 81. The Complaint refers to all Defendants

as "Bayer."[10] Plaintiff purports to bring certain of its claims on behalf of a putative class of ISCs who entered into materially similar CPLAs. *Id.* ¶ 483.

### B.    NK603 And The Alleged Markets

Plaintiff alleges that Defendants possess market power in a "trait market" for genetically engineered ("GE") corn seed traits, particularly NK603, a trait that confers glyphosate resistance. *Id.* ¶¶ 94-165.[11] The U.S. patent on NK603 expired in November 2022. *Id.* ¶¶ 7, 176. The Complaint also identifies other Bayer traits whose patents have not expired. *Id.* ¶ 22. Plaintiff also alleges a market for the sale of traited corn seed to seed dealers and growers. *Id.* ¶¶ 166-84.

### C.    The Corn Product License Agreement ("CPLA")

Under the CPLA, ISCs receive the right to "produce and sell certain corn seed containing Bayer's GE traits" and proprietary seed genetics ("germplasm"). *Id.* ¶¶ 162, 190, 542.[12] To implement this, the CPLA grants ISCs a suite of Defendants' proprietary rights, including patents, plant breeder rights granted under the U.S. Plant Variety Protection Act, trademarks, and know-how. For ISCs to produce seed incorporating Defendants' traits and germplasm, they also require **physical seed** containing those traits and germplasm. ISCs with an active CPLA may purchase this physical seed, referred to as parental seed. *Id.* ¶¶ 111, 469, 532. The ISCs may then: produce their own seed, i.e., seed containing Bayer traits and germplasm grown from Defendants' parental seed; package the seed, typically under the ISC's own brand name; and sell their seed to dealers who, in turn, sell to growers. *Id.* ¶¶ 113-14, 161-62. ISCs may only sell seed grown from

---

[10] This memorandum refers to "Defendants" when neither the Complaint nor the CPLA make clear which Defendant is implicated by Plaintiff's allegations. It uses "Bayer" as an adjective to modify products, traits, or other intellectual property belonging to one of Defendants.

[11] Facts in this Section are taken from the Complaint given that this is a Rule 12(b)(6) motion. Defendants, however, do not admit the truth, accuracy, or legal sufficiency of any allegations.

[12] *See also* Att. 1 § 1.04 (describing a "limited license under Monsanto's proprietary rights in order to produce and sell certain Corn products").

Defendants' parental seed to dealers with a CropScience license. *Id.* ¶ 203 (citing CPLA § 3.03).

Under the CPLA, ISCs agree to pay a royalty for every unit of seed they sell that was grown from Defendants' parental seed. Compl. ¶¶ 195, 544. As Defendants develop new corn seed products (i.e., a new specific combination of GE traits and germplasm), Defendants and the ISCs enter into a Licensed Product Addendum for the specific suite of additional rights needed to produce and sell that seed, and each year, Defendants issue a product schedule that lists the royalty for each corn seed product. *Id.* ¶¶ 191, 196.[13]

"At all relevant times," Plaintiff produced corn seed containing Defendants' GE traits and germplasm "pursuant to" the CPLA. *Id.* ¶ 35. The seed Plaintiff continued to produce and sell pursuant to the CPLA included not only NK603, but also traits covered by patents whose protections have not expired. *See, e.g.*, *id.* ¶¶ 22, 454. The CPLA did not preclude Plaintiff from obtaining NK603-traited seed from other sources; indeed, Plaintiff did so. *Id.* ¶ 12.

CropScience terminated the CPLA with Plaintiff on December 17, 2024. *Id.* ¶¶ 621, 623.

### D.    The Premier Performance Program ("PPP") And Market Funding

Historically, Monsanto offered the PPP, a loyalty program for ISCs. *Id.* ¶ 19. Under the PPP, each ISC had a baseline determined by the number of units it sold the previous year. *Id*. ¶ 398. If it sold a minimum percentage of the baseline, it received rebates. *Id*. The higher the percentage of units sold compared to the baseline, the greater the rebate. *Id*. Defendants also sometimes provided ISCs "market funding" to support ISCs in their sale of licensed Bayer products. *Id*. ¶¶ 388, 610-15. Market funding is "discretionary." *Id*. ¶ 460.

### E.    Plaintiff's Loss Of Customers

ISCs compete with "Bayer" in the sale of seed. *Id.* ¶ 112. Defendants make direct sales

---

[13] *See also* Att. 1 § 2.19 (defining "Licensed Product Addendum").

through two brands: DEKALB and Channel. *Id.* ¶ 107. In late November and early December 2022, sales representatives for DEKALB and Channel marketed Bayer-traited seed directly to dealers with which Plaintiff did business. *Id.* ¶¶ 376-77. Plaintiff allegedly lost over $8 million in annual dealer sales, "a significant portion of which was lost to Channel or DEKALB." *Id.* ¶ 379. Plaintiff asserts that Defendants targeted its customers "using Latham's proprietary customer sales information, which Latham had produced to Bayer as required under the CPLA." *Id.* ¶ 380.

### F.      The Agrigenetics License Agreement And Corteva Litigation

In September 2002, Monsanto entered into a licensing agreement with Agrigenetics, a seed producer affiliated with Corteva, a major corn seed and trait producer. *Id.* ¶ 207. Agrigenetics received a non-exclusive license to use Bayer traits to produce corn seed containing NK603. *Id.* ¶ 208. Corteva and "Bayer" litigated Agrigenetic's duty to pay royalties. *Id.* ¶ 209. In February 2026, Corteva paid money as part of a settlement in exchange for the right to sell corn seed containing NK603 without paying per-unit royalties. *Id.* ¶¶ 308, 515.

### G.      Plaintiff's Claims

Count 1 alleges a claim on behalf of a putative class for conspiracy to restrain trade in violation of Sections 1 of the Sherman Act and the Missouri Antitrust Law. *Id.* ¶¶ 505-20. Count 2 alleges a claim on behalf of a putative class for monopolization in violation of Sections 2 of the Sherman Act and the Missouri Antitrust Law. *Id.* ¶¶ 521-30. Count 3 alleges a claim on behalf of a proposed subclass for price discrimination. *Id.* ¶¶ 531-40.

The remainder of Plaintiff's claims are state-law claims. Counts 4, 5, and 6 are brought on behalf of Plaintiff and the proposed class. Count 4 alleges a claim for breach of contract, i.e., the CPLA, related to royalty payments. *Id.* ¶¶ 541-51. Count 5 alleges a claim for breach of the duty of good faith, also based on the CPLA. *Id.* ¶¶ 552-74. Count 6 alleges a claim for unjust enrichment based on the alleged payment of royalties for non-patented traits. *Id.* ¶¶ 575-94.

The remaining Counts are asserted on behalf of Plaintiff alone. Count 7 alleges a claim for breach of the duty of good faith based on allegations related to the PPP. *Id.* ¶¶ 595-608. Counts 8-11 relate to market funding: Count 8 alleges a claim for breach of contract, *id.* ¶¶ 609-28, Counts 9-11 for promissory estoppel, *id.* ¶¶ 629-62, and Count 12 for negligent misrepresentation, *id.* ¶¶ 663-70. Count 13 alleges a claim under the Missouri Trade Secret Acts for misappropriation of customer information. *Id.* ¶¶ 671-85. Finally, Count 14 alleges a claim for tortious interference with business expectancy based on Defendants' direct seed sales. *Id.* ¶¶ 686-92.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept the complaint's factual allegations as true but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555).

At the motion to dismiss stage a court may consider documents "necessarily embraced by the complaint," including those "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (cleaned up). In particular, this Court may properly consider the CPLA. *See Stahl v. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (affirming district court's consideration of a contract provided by defendant on motion to dismiss where plaintiff did not attach contract).[14]

---

[14] Because Plaintiff failed to attach the contract for the Court's consideration, Defendants have done so. *See* Att. 1 (CPLA), Att. 2 (SmartStax Addendum).

## ARGUMENT

### I.    PLAINTIFF RELIES ON IMPERMISSIBLE GROUP PLEADING.

"To survive a motion to dismiss, the complaint must specify which of the defendants are responsible for which acts or omissions." *In re Crop Inputs Antitrust Litig.*, 172 F.4th 570, 577 (8th Cir. 2026) (quotations omitted). "A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Boggs v. Am. Optical Co.*, 2015 WL 300509, at *2 (E.D. Mo. Jan. 22, 2015) (quotations omitted). The Complaint names five defendants: Bayer AG (which has not been served), Monsanto, Bayer CropScience LP, Bayer CropScience LLC, and Channel Bio LLC, referring to all collectively as "Bayer." *See* Compl. at p. 2. The Complaint makes no effort to allege which Defendant did what.

Plaintiff tries to evade its pleading requirements by alleging generally that all Defendants are part of a "single business enterprise" and "operate as part of a unified business group," and all "are either alter-egos or agents of one another" or "have engaged in a joint venture, joint enterprise, or conspiracy with respect to" matters alleged. *Id.* ¶ 83. An allegation that all Defendants are subsidiaries of Bayer AG is insufficient. *See Energizer Brands, LLC v. Procter & Gamble Co.*, 2016 WL 2894708, at *2 (E.D. Mo. May 18, 2016) (dismissing for failure to satisfy Rule 8 where only a parent-subsidiary relationship was alleged). And conclusory allegations that Defendants are alter egos of one another or engaged in a joint enterprise are insufficient to pierce the corporate veil. Corporations are "presumed to be separate and may be disregarded only under narrowly prescribed circumstances." *Greater Kansas City Laborers Pension Fund v. Superior Ge. Contrs.*, 104 F.3d 1050, 1055 (8th Cir. 1997). Monsanto, CropScience, and Channel Bio LLC are Delaware entities. Compl. ¶¶ 55, 71, 73, 78. Delaware law therefore determines whether there is a basis to disregard their separate entities. *See Guidry v. Seven Trails W., LLC*, 2014 WL 4386744, at *9

- 8 -

(E.D. Mo. Sept. 5, 2014). Under Delaware law, "'[p]iercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.'" *Id.* at *11 (quoting *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005)). The Complaint does not allege fraud at all, let alone with the particularity required by Fed. R. Civ. P. 9(b). Thus there is no basis to pierce the corporate veil.

## II.   PLAINTIFF FAILS TO STATE ANY VIABLE ANTITRUST CLAIM.

Count 1 of the Complaint claims that Defendants' agreement with Corteva is an unreasonable restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Missouri law. Count 2 claims that Defendants' conduct involving ISCs is an act of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Missouri law. These Sherman Act and Missouri Antitrust Law claims fail on a number of independent grounds.[15] And Plaintiff's Robinson-Patman Act claim, asserted in Count 3, fails because a license is not a "commodity" subject to the Act.

### A.   Charging For NK603 Is Not Anticompetitive.

The heart of Plaintiff's complaint regarding Defendants' license terms is that Defendants charged Corteva and ISCs like Plaintiff a license fee for the NK603 trait after its U.S. patents expired. *See, e.g.*, Compl. ¶¶ 215-18, 329-64. This allegation fails to state an antitrust claim, either as an unreasonable restraint of trade with respect to the Corteva agreement in Count 1, or as an act of monopolization with respect to royalties charged to ISCs in Count 2.

#### 1.   Charging A High Price Is Not Anticompetitive Conduct.

Charging a high price is not an antitrust violation. *Verizon Commc'ns v. Law Offices of*

---

[15] Missouri courts construe the Missouri Antitrust Law consistently with, and no more broadly than, federal antitrust law. *See* RSMo. § 416.141 ("[The Missouri Antitrust Law] shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes."). Plaintiff's Missouri antitrust claims thus rise and fall with Plaintiff's federal antitrust claims.

*Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). As the Eighth Circuit recognized twenty years before *Trinko*: "[S]etting a high price is not in itself anti-competitive." *Trace X Chem., Inc. v. Can. Indus.*, 738 F.2d 261, 268 (8th Cir. 1984). Rather, "profit-maximizing prices [are] … the normal, rational response of a business ... seeking to maximize profits, sales or revenues." *Id.* (cleaned up).

That Defendants charge a high price for traits and a low price for its own seed does not state an antitrust claim either. A "price squeeze" is not unlawful unless the defendant is both pricing below cost and has a duty to deal in the upstream market. *Pac. Bell Tel. Co. v. linkLine Commc'ns*, 555 U.S. 438, 451-52 (2009). Low prices are not unlawful unless they are below cost. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061 (8th Cir. 2000). The Complaint does not allege that Defendants price seed below cost. And Defendants have no duty to supply patented seeds and traits to their competitors. *Monsanto Co. v. McFarling*, 2002 WL 32069634, at *4 (E.D. Mo. Nov. 5, 2002), *aff'd*, 363 F.3d 1336 (Fed. Cir. 2004) ("[A] patent holder who has a lawful patent can't be liable for maintaining a monopoly of power based simply on refusing to license the patent to others. That's what a patent gives you."). Any antitrust claim premised on Defendants' royalty rates thus fails.

### 2. Charging For NK603 After Patent Expiration Is Not Unlawful.

While it is not unlawful to charge a high price, Plaintiff asserts that the Supreme Court held in *Brulotte* that it is unlawful to charge a royalty after patent expiration. Compl. ¶ 334. Not so.

First, *Brulotte* addressed the question of whether the Patent Act displaces state contract law under the Supremacy Clause to prevent a licensor from enforcing royalties on sales made after the expiration of the last patent covering the product. 379 U.S. at 30, 32 (holding the license agreement unenforceable "insofar as it allows royalties to be collected which accrued after the last of the patents incorporated into the machines had expired"); *see also Zila, Inc. v. Tinnell*, 502 F.3d 1014,

- 10 -

1023-24 & n.7 (9th Cir. 2007) ("*Brulotte* derives only from federal Supremacy Clause principles."). *Brulotte* was not an antitrust case and has nothing to say about whether post-expiration royalties violate the antitrust laws. *See Kimble*, 576 U.S. at 462 ("*Brulotte* is a patent rather than an antitrust case."). In *Kimble*, the Supreme Court noted that *Brulotte* "did not rely on the notion that post-patent royalties harm competition." *Id*. Indeed, the Court agreed that post-patent royalties "more often increase than inhibit competition" by lowering royalty rates, thus "enabl[ing] more companies to afford a license, fostering competition among the patent's own users." *Id*. at 460; *see also id*. at 461 ("A broad scholarly consensus supports Kimble's view of the competitive effects of post-expiration royalties, and we see no error in that shared analysis.").

Second, post-expiration royalties for NK603 would not run afoul of *Brulotte* even if the issue were the CPLA's enforceability rather than the plausibility of Plaintiff's antitrust claims. A Delaware court rejected a *Brulotte* challenge brought by Corteva against Monsanto because "'[u]nder *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires." *Corteva*, 2024 WL 4197718, at *10 (quoting *Kimble*, 576 U.S. at 454). The court explained the critical difference between the patents in *Brulotte* and the patents in Monsanto's license to Corteva:

> In *Brulotte*, the Court dealt with a U.S. royalty license on seven subject patents. All seven expired, but the issued licenses continued beyond each agreed-upon patent's expiration. … Contrarily, the subject license agreement between these parties involves a royalty license that lasts until the latest-running patent covered. As the *Kimble* court identified, and other courts have confirmed, royalties under a latest-running-patent license agreement differ from the licensing agreement interpreted in *Brulotte* and are lawful. That's just what we have here.

*Id.* The court further recognized that Monsanto's licensing arrangement was tied not only to patent rights, but also to "additional non-patent rights." The agreement there granted:

> a license to patent rights … **and** non-patent rights—Biological Materials and MONSANTO Know-How. Because the post-expiration royalties are tied to non-

- 11 -

patent rights, they aren't precluded by *Brulotte*.

*Id.* at *11. The court concluded that under *Kimble*, it was "clear that such agreements are enforceable." *Id.* at *12 (finding no patent misuse).

This reasoning applies equally here. First, Plaintiff does not (and cannot) allege that it is party to any agreement with Defendants that licenses only NK603 and not other still-patented traits, or that Defendants' patents on the germplasm Plaintiff has licensed have all expired. *See, e.g.*, Compl. ¶ 213 (alleging Defendants also licensed insect-resistance traits); *id*. ¶ 284 (alleging licensing of other "stacked traits"). Second, like Monsanto's license with Corteva, the CPLA licenses not just patents, but "other intellectual property, technical information, expertise, and know-how." Att. 1 § 1.03; *see also id.* § 2.25 (defining "Monsanto Know-How"); *id.* § 3.01(a) (licensing Monsanto Know-How in addition to patent rights); § 3.06 (licensing trademarks). The SmartStax Addendum to the CPLA also licenses trademarks in addition to patents and know-how. *See, e.g.*, Att. 2, § 3.01 (licensing patents and know-how); § 3.04 (licensing trademarks); Compl. ¶ 654 (alleging that as of 2024 Plaintiff sold SmartStax).[16] Patent law—like antitrust law—holds that such "post-expiration royalties are allowable." *Kimble*, 576 U.S. at 454; *see also Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262, 266 (1979) (holding that "[f]ederal patent law is not a barrier" to  royalties continuing on trade secrets even after they are generally disclosed).

**B.      Defendants' Licensing Conduct Is Permitted By The Patent Laws And Does Not Violate The Antitrust Laws.**

Counts 1 and 2 of the Complaint also challenge a variety of other provisions in Defendants' license agreements with Corteva and with ISCs like Plaintiff. All are permitted by the Patent Act

---

[16] Plaintiff does not and cannot allege it ever sought to license NK603 without also licensing Defendants' proprietary corn germplasm, know-how, and trademarks. Thus, Plaintiff's allegation that it paid "**patent** royalties," Compl. ¶ 25 (emphasis added), is belied by the CPLA. The CPLA refers to royalties as "**Product** Royalties." Att. 1 § 4.01 *et seq.* (emphasis added).

and cannot violate the antitrust laws. Courts have repeatedly upheld the challenged conduct, often in cases involving Monsanto, CropScience's predecessor in interest. *See* Section II.B.2, *infra*.

### 1. Conduct Permitted By The Patent Laws Does Not Violate The Antitrust Laws.

The Patent Act affords patentees the right to exclude others from making, using, or selling the patented product. 35 U.S.C. § 154(a)(1). The exercise of that right does not violate the antitrust laws because "[a] patent owner is not … under any obligation to see that the public acquires the free right to use the invention. He has no obligation either to use it or to grant its use to others." *Hartford-Empire Co. v. United States*, 323 U.S. 386, 432 (1945). A limited license that conveys a right to practice less than all of the patentee's rights is also permissible under the antitrust laws. *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 305 U.S. 124, 127 (1938); *see also B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (upholding field-of-use restriction).

"Conduct permissible under the patent laws cannot trigger any liability under the antitrust laws." *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981); *see also Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 24 (1964) (the "patent laws … are in *pari materia* with the antitrust laws"); *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1328 (Fed. Cir. 2000) ("Xerox was under no obligation to sell or license its patented parts and did not violate the antitrust laws by refusing to do so"); *United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1129 (D.C. Cir. 1981) (same). Rather, conduct involving a patent is potentially unlawful only where it goes beyond exclusionary rights inherent in a patent grant.

### 2. Plaintiff Challenges License Terms That Have Previously Been Found Lawful Because They Are Within The Scope Of The Patent Grant.

The Complaint challenges so-called "stacking" restrictions, i.e., limits on Corteva's right to combine Monsanto's NK603 with Corteva's own traits. Compl. ¶ 307. But courts have upheld this as a proper field of use restriction within the scope of the patent grant, and rejected antitrust

- 13 -

challenges to this very restriction. *See Monsanto v. Scruggs*, 342 F. Supp. 2d 568, 575 (N.D. Miss. 2004) ("[T]hey are clearly field of use restrictions which fall within the scope of the patent monopoly and are, therefore, lawful."), *aff'd* 459 F.3d 1328, 1340 (Fed. Cir. 2006). Courts have likewise upheld as proper field-of-use limitations the prohibition the Complaint challenges (at ¶ 322) restricting use of the licensed technology for research purposes. *Scruggs*, 459 F.3d at 1340 ("[this] policy is a field of use restriction and is also within the protection of the patent laws"). The Complaint's challenge to provisions that "prevent[] licensees … from saving seed grown from the planted seed for replanting or resale," Compl. ¶ 322, is similarly lawful under the Patent Act and thus outside the reach of the antitrust laws. *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1343 (Fed. Cir. 2004). And Defendants' decision not to allow sublicensing of its traits is similarly legal as a lawful field-of-use restriction.

Even after some (but far from all) of Defendants' patents expired, these decisions hold. First, these cases apply because products Plaintiff continued to license under the CPLA included not only NK603 but also traits and germplasm whose patent protections had not expired. *See, e.g.*, Compl. ¶¶ 22, 454. If Defendants could not apply field-of-use restrictions to products covered by valid, unexpired patents merely because they also happened to include NK603, then Defendants would either be forced to stop including the NK603 trait in any of their products or else forego their lawful patent rights for other traits. The law does not compel such a perverse result. The former would hurt consumers, rather than benefit competition, as Plaintiff alleges that the NK603 trait still had value to growers even after patent expiration. *See, e.g.*, Compl. ¶ 178 (alleging value to growers of glyphosate resistance), ¶ 286 (alleging value to growers of stacking traits). And the latter would eviscerate the Patent Laws.

Second, the field use restrictions continued to be lawful after NK603 patents expired given

- 14 -

that Defendants also licensed their trade secrets and trademarks. *See, e.g.*, *A. & E. Plastik Pak Co. v. Monsanto Co.*, 396 F.2d 710, 715 (9th Cir. 1968) (applying same rules to patents and trade secrets); *In re E. I. DuPont de Nemours & Co.*, 96 F.T.C. 653, 749 (1980) (upholding refusal to license trade secrets because "recent … cases suggest that firms (monopolists and non-monopolists) that have achieved success through superior products and business acumen, and not unlawful anticompetitive conduct, are under no duty to license or disclose their technology to their rivals"); *see generally* U.S. Dep't of Justice & Federal Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.1 ("Although there are clear and important differences in the purpose, extent, and duration of protection provided under the intellectual property regimes of patent, copyright, and trade secret, the governing antitrust principles are the same.").

## C.     Defendants' Offer Of Lower Prices To Plaintiff's Customers Is Not Unlawful.

Plaintiff complains that Defendants targeted Plaintiff's customers by offering them "prices that were significantly below what Latham could reasonably offer." Compl. ¶ 376. "[C]utting prices in order to increase business often is the very essence of competition, which antitrust laws were designed to encourage," not prohibit. *Concord Boat*, 207 F.3d at 1061. Accordingly, to state a viable monopolization claim in Count 2 premised on price-cutting, Plaintiff must allege that the prices Defendants offered were below Defendants' costs. *Brooke Grp.*, 509 U.S. at 222, 224; *Concord Boat*, 207 F.3d at 1061. Plaintiff does not allege this. Instead, it alleges that Defendants' pricing was below **Plaintiff's** costs. Compl. ¶ 378 ("Bayer targeted Latham's customers and offered pricing below Latham's costs … ."). This is irrelevant to a predatory pricing claim. *See Morgan v. Ponder*, 892 F.2d 1355, 1360 (8th Cir. 1989) (rejecting as insufficient evidence that defendant's price was substantially below plaintiff's). Because Plaintiff fails to allege that Defendants' prices were below Defendants' own costs, its allegations do not raise an inference of harm to competition and therefore fail to state a claim for monopolization in Count 2.

- 15 -

**D.      Defendants' Rebate Program ("PPP") Does Not Harm Competition.**

Plaintiff's allegations about Defendants' rebate program fail to state a monopolization claim under Count 2 for the same reason. Plaintiff complains that ISCs were harmed from "lost rebates" under the PPP when they purchased from Defendants' competitors. Compl. ¶¶ 410-11. But rebate programs are only anticompetitive when they substantially foreclose competition. *Concord Boat*, 207 F.3d at 1059. Plaintiff does not allege competitors were foreclosed by the PPP because it fails to allege that ISCs were contractually obligated to participate in PPP, much less to do so for any length of time. Participation in PPP was voluntary and the CPLA allows licensees like Plaintiff to terminate the entire licensing arrangement on 30 days' notice. Att. 1 § 8.02(h).

Even if ISCs chose to participate in PPP, this still did not preclude them from purchasing seed from Defendants' competitors. While Plaintiff characterizes the PPP as a "de facto" exclusive arrangement because selling non-Bayer products could reduce ISCs' Bayer product sales to the point of ineligibility for rebates, Compl. ¶ 399, this does not allege exclusive dealing. To substantiate an exclusive dealing claim, a plaintiff must establish the existence of an agreement that **requires** exclusivity. *Concord Boat*, 207 F.3d at 1059 (reversing jury verdict in favor of plaintiffs because challenged discount agreements were voluntary and purchasers sometimes switched to competitors). The notion that rebates may be too attractive to forego, *see, e.g.*, Compl. ¶ 401, is not enough, at least where purchasers are "free to walk away from the discounts at any time." *Concord Boat*, 207 F.3d at 1059; *see also Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 612 (8th Cir. 2011) (affirming summary judgment for defendant where agreements were terminable at will and purchasers were free to forego discounts and purchase from competitors).

Finally, even if Plaintiff had alleged exclusivity, it alleges no facts that would show PPP foreclosed competition in a "substantial share" of the market, as is required to state a claim. *Concord Boat*, 207 F.3d at 1059. As Justice O'Connor explained over forty years ago, "[e]xclusive

- 16 -

dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring in the judgment). In the decades since, courts have routinely rejected exclusive dealing claims where the challenged agreements lock up less than 30-40% of the market. *See, e.g.*, *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 123-24 (1st Cir. 2011); *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 52-53 (D.D.C. 2000), *aff'd in part, rev'd in part and remanded*, 253 F.3d 34 (D.C. Cir. 2001). The Complaint fails to allege that Plaintiff and other ISCs that participate in the PPP collectively account for 30% of the GE corn seed market.

### E.     The Complaint Fails To Allege A Tying Claim.

Plaintiff claims that through the PPP, Defendants compel ISCs to purchase traits other than NK603. Compl. ¶¶ 421-27.[17] A tying claim "requires a finding that two separate product markets exist and a determination **precisely** what the tying and tied product markets are." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997) (emphasis added) (affirming dismissal) (quotations omitted); *see also Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1083 (C.D. Cal. 2017) ("An antitrust complaint must define the relevant market for both the tying product and the tied product."). The Complaint suggests that NK603 is the tying product, but does not clearly define the allegedly tied product. Plaintiff states "[m]any growers …

---

[17] Plaintiff also alleges that the PPP forced licensees to license soybean seed (the tied product) if they wanted to license corn seed (the tying product), Compl. ¶¶ 407-11—though it also alleges that customers refused to take soy and thus the tie was ineffective, *id.* ¶ 411. Regardless, even if it were successful, the alleged tie would harm competition in soybean seed, not in corn seed. Because the Complaint does not allege harm to competition in soybean seed (let alone define a soybean seed market), it fails to state a claim with respect to a corn/soy tie. *See Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 614 (1953) ("The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity … resulting in economic harm to competition in the 'tied' market.").

want an insect-resistant trait," and avers "Bayer has used the PPP loyalty program to financially tie ISC's [sic] ability to obtain NK603 to their purchase of Bayer's insect-resistant traits, as well as other GE corn traits, including other stacked corn traits." Compl. ¶ 422. But it fails to specify what traits other than NK603 are the tied product. Because the essence of a tying arrangement is "the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product," *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 614 (1953), the Complaint's failure to identify a second, distinct tied trait is fatal to its tying theory and the allegations cannot support Plaintiff's Count 2 monopolization claim. *See, e.g.*, *Cavalleri v. Hermes Int'l*, 2025 WL 2662897, at *1, *3 (N.D. Cal. Sept. 17, 2025) (dismissing tying claim based on consumers wishing to purchase a Birkin bag being forced to purchase "other Hermes products" because the "'tied market' alleged here is a kaleidoscope of products" and the complaint was "bereft of any facts that might support lumping such a hugely diverse array of non-substitutable products into a single market").

F.   **Plaintiff Fails To Allege That Defendants Are The Proximate Cause Of Its Inability To Obtain "Generic NK603."**

An antitrust plaintiff must plead that the alleged violation is a proximate cause of its injury. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-69 (1992); *see also In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019) (antitrust violation must be a "material and substantial factor causing [plaintiff's] alleged injuries"); *Concord Boat*, 207 F.3d at 1055 (same). Plaintiff alleges that pursuant to a settlement agreement, Corteva is able to sell corn seed containing NK603 "royalty-free," but suggests that Corteva has not offered to do so based on a need to recoup its up-front settlement payment. Compl. ¶ 308. But Plaintiff fails to allege that it ever sought to obtain seed from Corteva containing "royalty-free" NK603, that Corteva provided seed on that basis, or why Corteva would have any interest in doing so. Nor does Plaintiff allege

- 18 -

it sought to obtain royalty-free NK603 from anyone else or that any other supplier was interested in providing royalty-free NK603 to Plaintiff. Absent such allegations, the Complaint fails to allege Defendants are the proximate cause of Plaintiff's claimed injury for either Count 1 or Count 2.

G.      **Plaintiff's Antitrust Claims Based On a "Corn Seed" Market Fail To Allege A Relevant Market And Market Or Monopoly Power.**

Plaintiff must "adequately plead a relevant market" for both its Section 1 and Section 2 claims, as well as market power and monopoly power, respectively. *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446 (8th Cir. 2023) (requirement for Section 2 claim); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (requirement for Section 1 claim subject to the rule of reason); *see also id.* at 559 (vertical agreements are subject to rule of reason); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (rule of reason applies even if a "distributer and manufacturer also compete at the distribution level, where … the manufacturer distributes its products through a distributor and independently"); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 206 (S.D.N.Y. 2014) (applying rule in license context, where copyright owner and licensee sometimes competed).

Plaintiff purports to plead both a GE corn "trait" market and a "seed" market. *See* Compl. ¶ 222. But its allegations regarding a seed market fail to plausibly plead a relevant market because Plaintiff's allegation of a nationwide market is wholly implausible. *See id.* ¶¶ 228-31. As the Eighth Circuit has affirmed, "individual seed varieties can be used only in particular geographies." *Blades v. Monsanto Co.*, 400 F.3d 562, 571-72 (8th Cir. 2005) ("the market for seeds is highly individualized, requiring particularized evidence to determine the competitive price that would have prevailed in the locality of any individual farmer").

Plaintiff also fails to adequately allege market power or monopoly power in its purported seed market. For the former, a "market share of less than 40% would likely be insufficient." *In re*

*EpiPen Direct Purchaser Antitrust Litig.*, 2022 WL 1017770, at \*9 (D. Minn. Apr. 5, 2022). For the latter, "[m]arket shares of less than 60% are generally not sufficient." *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 n.10 (8th Cir. 1999). The Complaint alleges only that "Bayer **and Corteva** produce and sell over 70% of all corn seed in the United States (and an even larger share of GE corn seed)." Compl. ¶ 277 (emphasis added). The combined share of "Bayer" and another party is irrelevant to any evaluation of "Bayer's" market or monopoly power. *See Se. Mo. Hosp. v. C.R. Bard, Inc.*, 2008 WL 199567, at \*9 (E.D. Mo. Jan. 22, 2008). As to "Bayer," Plaintiff makes only conclusory allegations that Defendants have market and monopoly power over the GE corn seed market based on their alleged control over a single input, i.e., the NK603 trait. *See, e.g.*, Compl. ¶ 290. This conclusion, however, relies on attributing seed sales by CropScience **licensees** to Defendants. Courts have squarely rejected this theory as "remarkable" and supported by "[n]o legal precedent." *Scruggs*, 342 F. Supp. 2d at 583 ("Monsanto's market share must be determined solely on the quantity of goods and/or services Monsanto sold to consumers."; discounting shares attributed to Monsanto "seed partners"). Because the Complaint fails to allege that Defendants have a dominant share of the corn seed market—as distinguished from its share of any market for a single input into finished seed—Plaintiff's Sherman Act claims based on a "seed" market fail.

> **H.** **Plaintiff's Robinson-Patman Claim (Count 3) Fails Because A License Is Not The Sale Of A "Commodity" Subject To The Robinson-Patman Act ("RPA").**

The RPA applies only to discrimination "between different purchasers of **commodities** of like grade and quality." 15 U.S.C. § 13(a) (emphasis added). "Commodities" under the RPA are "products, merchandise or other tangible goods." *TV Signal Co. of Aberdeen v. AT&T Co.*, 462 F.2d 1256, 1259 (8th Cir. 1972) (quotations omitted). The RPA thus does not reach discrimination in the sale of intangibles, such as technology licenses, because they are not commodities. *See KMG Kanal-Muller-Gruppe Int'l GmbH & Co. v. Inliner U.S.A. Inc.*, 1999 WL 1078556, at \*4 (S.D.

Tex. May 13, 1999) (patent license is not a "commodity" for RPA purposes).

Plaintiff alleges that Defendants have engaged in price discrimination in an "input market for GE trait licensing." Compl. ¶ 466. The CPLA provides ISCs like Plaintiff the right to corn genetics and traits, which they commercialize through the "multiplication, production, and conditioning of hybrid seed grown from Parental Inbred Seed" they license. *Id.* ¶ 111; *see also id*. ¶¶ 161-62 (describing process of producing seed by crossing parent lines). The Complaint challenges not a difference in the price of a bag of seed, but a difference in the license fees that ISCs must pay when they multiply and resell seed. *Id*. ¶¶ 467, 472. Because an intellectual property ("IP") license is not the sale of a commodity, Plaintiff's RPA claim fails.

The fact that Plaintiff also buys parental seed from Defendants (which it multiplies and sells under license) does not change the result. Licenses often involve the transfer of physical products necessary to use the licensed technology. *See, e.g.*, *Tri-State Broad. Co. v. United Press Int'l, Inc.*, 369 F.2d 268, 270 (5th Cir. 1966) ("Virtually no transfer of an intangible in the nature of a … right … can be accomplished without the incidental involvement of tangibles[.]"). There is no RPA claim where the license or other sale of intangibles is the "true focus" of a transaction involving the sale of both physical products and intangibles. *See, e.g.*, *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 159 (2d Cir. 2004). In *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 556 (S.D.N.Y. 2007), for example, the court concluded that a license agreement conveying "patent rights, trade secrets, and know-how" was not covered by the RPA even where the licensee purchased machines from the licensor to reproduce the patented technology. That the licensee paid for the machines was immaterial because ultimately the dominant nature of the agreement was the license of IP rights to manufacture patented products, not the purchase of the machines. *Id.*

The CPLA here is the same. Plaintiff purchases parental seed that it uses to reproduce

- 21 -

licensed traits and germplasm to implement the core of the transaction, which is Defendants' license of a right to reproduce and sell seeds and traits covered by their intellectual property. Compl. ¶¶ 111, 113. Consequently, Plaintiff fails to make out a cognizable RPA claim.

## III.   THE COMPLAINT FAILS TO STATE CLAIMS UNDER STATE LAW.

### A.   Plaintiff's Claim For Breach Of The CPLA (Count 4) Fails Because It Alleges No Breach And The Contract Terms Permit The Challenged Conduct.

Plaintiff alleges Defendants breached the CPLA by "charg[ing] a royalty for NK603" after it is "no longer subject to a 'valid and unexpired' patent." Compl. ¶¶ 549-50. To state a claim for breach of contract, a plaintiff must plead: (1) the existence and terms of a contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damages. *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010).[18]

#### 1.   Plaintiff Does Not Adequately Allege Any Breach.

To plead a breach, a plaintiff must allege the defendant's "failure to perform **the obligations imposed by the contract**." *Midw. Bankcentre v. Old Republic Title Co. of St. Louis*, 247 S.W.3d 116, 128 (Mo. App. 2008). That is, a plaintiff must point to an "identifiable contractual promise" that the defendant failed to honor. *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 5, 9 (Mo. App. 2013) (holding that where contract terms alleged to have been breached do "not constitute specific, discrete promises" they do not support a breach). Plaintiff fails to plead this element. It does not allege that the CPLA prohibits the charging of royalties after the NK603 patent expired, but only that the CPLA is silent on this point. *See* Compl. ¶ 548 (CPLA does not "provide that a royalty may be imposed for Licensed Products containing GE traits no longer patented.").

#### 2.   The CPLA's Express Terms Defeat The Breach Of Contract Claim.

A plaintiff also fails to properly plead the breach element where the alleged breach is

---

[18] The CPLA provides that Missouri law governs. Compl. ¶ 85; Att. 1 § 10.09.

contradicted by the contract's plain terms. *See GlaxoSmithKline Consumer Healthcare, LP v. ICL Perf. Prods., LP*, 2009 WL 2151190, at \*5 (E.D. Mo. July 16, 2009) (dismissing because "the language of the [contract] clearly negates any claim").

The CPLA expressly contradicts Plaintiff's faulty breach of contract premise. Section 4.01 sets out Plaintiff's obligation to pay royalties for each unit of Licensed Product sold. *See* Att. 1 § 4.01; *see also* Compl. ¶ 544. Licensed Product means any product listed on a separate Addendum—regardless whether it encompasses patented products, unpatented products or both. *See* Att. 1 § 2.18; *see also* Compl. ¶ 543. The term of the CPLA, in turn, extends until the "last to expire Licensed Product Addendum attached hereto unless earlier terminated." Att. 1 § 8.01. Plaintiff does not allege the "last to expire" Addendum. Nonetheless, the CPLA's terms, including its Addenda, are incorporated into the pleadings and reveal that, at a minimum, Plaintiff executed a Licensed Product Addendum on December 29, 2021, which absent termination was not set to expire until August 31, 2026 (the "SmartStax Addendum"). Att. 2 § 8.01. Consistent with Plaintiff's own allegations, nothing in the contract ended Plaintiff's duty to pay royalties earlier. *See* Compl. ¶ 544 ("Corn Product Licensees must pay a royalty each year for every unit of Licensed Product as set out in a schedule to the Licensed Product Addendum ('Addendum'). *See* CPLA §§ 2.31, 4.01."). If Plaintiff had desired to cease paying royalties earlier, it could have terminated the CPLA and/or the SmartStax Addendum without cause or penalty, on 30 days' notice. *See* Att. 1 § 8.02(h); Att. 2 § 8.02(f).[19] It chose not to. The Court should reject as a matter of law an attempt

---

[19] The CPLA extends until the last-to-expire Addendum, not the last-to-expire patent. Compl. ¶ 187. But, in any case, the SmartStax Addendum licenses a product that includes 5 events, **none of which are NK603**. *See* Att. 2 § 2.12. None of those patents have expired, and the patent on MON87411, which confers glyphosate tolerance, lasts until 2034. *See Ortiz & Assocs. Consulting, LLC v. VIZIO, Inc.*, 2023 WL 7184042, at \*2 (N.D. Tex. Nov. 1, 2023) ("The Court takes judicial notice of the respective expiration dates of the Asserted Patents") (citing Fed. R. Evid. 201(b)(2))).

to evade a bargain entered into by two sophisticated commercial actors.

### 3.      *Brulotte* Does Not Save Plaintiff's Contract Claim.

Given Plaintiff's failure to allege breach and the CPLA's unambiguous terms requiring payment of the royalty, the crux of Plaintiff's contract claim is actually an argument that *Brulotte* preempts the CPLA's plain terms because Defendants cannot lawfully charge seed company licensees a royalty after the U.S. NK603 patent expired. *See* Compl. ¶ 334 (citing *Brulotte*).

Plaintiff's argument is misplaced. *Brulotte* involved a licensee raising patent misuse as a **defense** against the licensee's enforcement of a contractual royalty provision. Here, by contrast, Defendants have not brought an action to enforce the CPLA. Rather, Plaintiff voluntarily paid royalties for the CPLA's entire term and the CPLA has now terminated. *Compare with Brulotte*, 379 U.S. at 30 ("Petitioners **refused** to make royalty payments … . This suit followed. One **defense** was misuse of the patents … .") (emphasis added).[20] *Brulotte* does not apply to breach of contract actions asserted by the licensee. Even if the royalty provisions were unenforceable after expiration of the NK603 patent (and they were not), one party asking another to comply with an unenforceable provision is not a breach of contract. *See also Arconic Corp. v. Novelis Inc.*, 670 F. Supp. 3d 196, 203-204 (W.D. Pa. 2023) ("All courts agree that the patent misuse doctrine cannot be asserted for monetary relief.") (quotations omitted); *Restored Images Consulting, LLC v. Dr. Vinyl & Assocs., Ltd.*, 2016 WL 4036049, at *13 (W.D. Mo. July 27, 2016) (failure to refund overpaid royalty fees is not a breach of contract where no provision requires a refund).

In any case, even if *Brulotte* applied, the CPLA's royalties terms are enforceable. Licenses may require royalties for as long as they include the right to use an unexpired patent. *See Kimble*, 576 U.S. at 454; Section II.A.2, *supra*; *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339

---

[20] *Brulotte* also did not involve a contract terminable at will. *See Thys Co. v. Brulotte*, 382 P.2d 271, 276 (1963), *rev'd*, 379 U.S. 29 (1964).

U.S. 827, 831-34 (1950) (holding it was not patent misuse to require licensee to pay royalties based on sales so long as the licensee had the "privilege to use" any unexpired patent); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136-39 (1969) (confirming consistency between *Brulotte* and *Automatic Radio*). Here, Plaintiff not only had the "privilege to use" unexpired patents under the CPLA the whole time it paid royalties, *Automatic Radio*, 339 U.S. at 833, but in fact, used Defendants' unexpired patents for the entire term of the CPLA. *See* Compl. ¶¶ 22, 440, 654-55 (Plaintiff sold SmartStax and VT2 Pro products, whose patents do not expire until 2026 and 2027); *see also id.* ¶¶ 199, 454. Thus, the CPLA must be enforced according to its terms.[21]

**B.      Plaintiff's Fair Dealing Claim With Respect To Royalties (Count 5) Fails Because The Express Terms Of The Contract Permit The Challenged Conduct.**

Plaintiff purports to state a claim for breach of the implied covenant of good faith and fair dealing arising from Defendants' practice of charging increased royalties post-patent (Compl. ¶¶ 566, 568-69), as well as charging royalties higher than initial estimates and the related timing (*id.* ¶¶ 561, 564-65, 567). In fact, Plaintiff fails to state a claim because an implied covenant of good faith cannot create new obligations that contradict those in an express contract.

**1.      The CPLA Allows Bayer To Set The Royalty Amount.**

Missouri law follows the "general principle … that there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." *Bishop v. Shelter Mut. Ins. Co.*, 129 S.W.3d 500, 505 (Mo. App. 2004) (quotations omitted); *see also State v. Nationwide Life Ins. Co.*, 340 S.W.3d 161, 194 (Mo. App. 2011) ("An implied covenant will not … be imposed where the parties expressly address the matter at issue in their

---

[21] Even if Plaintiff had paid royalties after the last-to-expire patent expired, *Brulotte* still would not apply, as the CPLA grants non-patent rights. *See Kimble*, 576 U.S. at 454; Section II.A.2, *supra*.

contract."). Plaintiff thus cannot craft any legal claim to "supersede the express agreement" and impose liability for conduct the CPLA permits. *Bishop*, 129 S.W.3d at 506.

Plaintiff alleges that "the CPLA allows Monsanto … discretion to, each year, modify a schedule to the Addendum setting out royalty amounts. *See* CPLA §§ 2.18, 2.19, 4.01." Compl. ¶ 556; *see also id.* ("Monsanto and Bayer have unilateral ability to set royalty amounts."). Plaintiff also alleges that "[w]hen Bayer announces final royalty amounts is discretionary," as is the "amount charged." *Id.* ¶¶ 561, 563. The CPLA, moreover, expressly permits the final royalty amount to vary from initial estimates. *See* Att. 1 § 4.01(b) ("notice is a forecast only, and shall not obligate Monsanto to charge a Product Royalty within the range disclosed pursuant to this subsection"); *cf.* Compl. ¶ 557 (alleging that "Bayer" announced an "estimated royalty range," citing § 4.01(b), without alleging the estimate was binding).

Yet, this discretionary conduct is exactly what Plaintiff challenges. *See* Compl. ¶¶ 564-74; *see also id.* ¶ 573 (challenging conduct as "abuse of discretion"). The Missouri Court of Appeals affirmed dismissal of a good-faith-and-fair-dealing claim in analogous circumstances in *Park Ridge Assocs. v. U.M.B. Bank*, 613 S.W.3d 456, 460-65 (Mo. App. 2020), where the plaintiffs conceded "the contract permitted" a foreclosure sale at any price, yet claimed the sale "at an artificially reduced price" breached the duty of good faith. *Id.* Because Plaintiff alleges Defendants had a contractual right to set royalties, vary them from estimates,[22] and act on their chosen timetable, Missouri law forecloses Plaintiff's claims.

---

[22] The Complaint alleges that historically "the variance … was zero or slight," seemingly suggesting that Defendants waived the right to vary the actual royalty from the estimate. Compl. ¶ 564. This could not constitute waiver as a matter of law. *See* Att. 1 § 10.08(a) ("No waiver by any Party … of any right … shall be deemed to constitute a continuing waiver … . Failure of a Party to exercise any right shall not be deemed a waiver of such right or rights in the future.").

- 26 -

### 2. Missouri Law Does Not Permit Plaintiff To Use An Implied Covenant Of Good Faith To Create New Contract Terms.

To the extent Plaintiff premises its fair dealing claim on Defendants' supposed failure to increase royalties on Bayer-branded seed (*see* Compl. ¶ 572), this too fails because an implied covenant of good faith cannot create contract terms out of whole cloth. In *Jennings v. Board of Curators of Mo. State Univ.*, 386 S.W.3d 796, 798 (Mo. App. 2012), the court explained that the basis of a fair-dealing claim is using "express contract terms in bad faith to deny Plaintiff an expected contract benefit or evade the spirit of the transaction." It thus affirmed dismissal where the plaintiff alleged that defendant's actions were "taken in violation of the" contract, but failed to explain "how … any of the foregoing [was] allegedly 'in violation'" or "what 'duties'" were at issue. *Id.* at 799 (noting the claim "wholly fails to allege … **express contract terms** that MSU supposedly misused in bad faith" and "[b]are mention" of contracts or "duties" was insufficient).

Plaintiff challenges being charged different royalty rates than Bayer-affiliated seed brands, but does not allege that equal treatment was expected under the CPLA. *See Top Priority Transit, LLC v. Cape Auto Pool, Inc.*, 680 S.W.3d 536, 548 (Mo. App. 2023) (holding that a duty is implied to prevent "one party from depriving the other party of its expected benefits under the contract") (quotations omitted); *see also Hardee's Food Sys., Inc. v. Hallbeck*, 2011 WL 5307807, at *4 (E.D. Mo. Nov. 3, 2011) (dismissing claim, noting case law overwhelmingly rejects implied duty claims "based on discrepancy in treatment") (string citing cases). This fails to state a claim.

### C. Plaintiff's Unjust Enrichment Claim For Post-Expiration Royalties (Count 6) Is Barred By The Contract Or, Alternatively, The Voluntary Payment Doctrine.

"To state a claim for unjust enrichment, a plaintiff must prove that: '(1) [it] conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances.'" *Restored Images*, 2016

- 27 -

WL 4036049, at *13 (quoting *Binkley v. Am. Equity Mortg., Inc.*, 447 S.W.3d 194, 199 (Mo. banc 2014)). Plaintiff alleges unjust enrichment based on continued royalty payments after expiration of the NK603 patent (*see* Compl. ¶¶ 576, 579)—the identical factual predicate as its contract claim.

### 1.    Plaintiff's Claim Fails Because A Contract Governs Royalties.

Plaintiff's unjust enrichment claim stumbles out of the gate because it simply restates Plaintiff's contract claim. "It is a well-settled principle of law that implied contract claims [such as unjust enrichment] arise only where there is no express contract." *L&F Brands, Inc. v. Crown Valley Winery, Inc.*, 2020 WL 3447738, at *3 (E.D. Mo. June 24, 2020) (quoting *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo. App. 2014)). "Accordingly, a plaintiff cannot recover under an equitable theory when she has entered into an express contract for the very subject matter for which she seeks to recover." *L&F Brands*, 2020 WL 3447738, at *3 (quoting *Lowe*, 430 S.W.3d at 349). Plaintiff, therefore, could plead contract **and** unjust enrichment claims only by alleging, in the alternative, "there was no valid contract." *L&F Brands*, 2020 WL 3447738, at *3 (dismissing claim where plaintiff did not plead absence of contract in the alternative). It includes no such allegation.

### 2.    The Voluntary Payment Doctrine Bars Recovery.

Even if Plaintiff could reframe its contract claim as one for unjust enrichment, it would fail under the voluntary payment doctrine, which bars recovery of money voluntarily paid absent fraud, duress, or a mistake of fact. *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 726 (Mo. 2009); *Ballard v. City of Creve Coeur*, 419 S.W.3d 109, 123 (Mo. App. 2013); *see also Restored Images*, 2016 WL 4036049, at *13 (rejecting unjust enrichment claim for allegedly overpaid royalties). Plaintiff makes no allegations to support these exceptions. At most, it claims a mistake of law, i.e., not understanding that royalties purportedly violated *Brulotte*. *See* Compl. ¶¶ 576-84.[23]

---

[23] *See also* Compl. ¶¶ 582-84 (alleging that if the CPLA allowed continued royalties on NK603, the terms would be unconscionable). The contract is not unconscionable. But, regardless,

A mistake of law is irrelevant. Under Missouri law, the voluntary payment doctrine applies "even if the payment is made under protest" and "**even if there was no liability to pay in the first instance,** and the payor made the payment under the false impression that the demand was legal." *Unverferth v. City of Florissant*, 419 S.W.3d 76, 106 (Mo. App. 2013) (emphasis added), *o'ruled on other grounds by City of Moline Acres v. Brennan*, 470 S.W.3d 367 (Mo. 2015). *Unverferth* involved claims against a municipality relating to tickets. 419 S.W.3d at 83. The plaintiff paid the fines, but then challenged the underlying ordinance as invalid. The Missouri Court of Appeals affirmed dismissal of the unjust enrichment claim because "a mistake as to the validity and enforceability" of an obligation is a mistake of law, which does not preclude application of the voluntary payment doctrine. *Id.* at 106-07; *see also Thompson v. Redflex Traffic Sys., Inc.*, 2016 WL 6464472, at *4 (E.D. Mo. Nov. 1, 2016) (granting judgment on the pleadings on an unjust enrichment claim because invalidity of ordinance did not negate application of the doctrine). Accordingly, even if Plaintiff could establish there was no legal basis for Defendants to collect post-patent royalties, the voluntary payment doctrine would still bar its claim as a matter of law.

### 3.    Defendants' Retention Of The Benefit Would Not Be Unjust.

Plaintiff includes allegations designed to suggest it paid royalties in exchange only for a patent license. In particular, Plaintiff alleges that the CPLA granted it "Monsanto Rights," which "is defined as 'valid and unexpired' patent claims owned by Monsanto that cover a Licensed Product." Compl. ¶ 543 (citing CPLA § 3.01). Even putting aside the fact that Plaintiff received the right to use many **unexpired** patents under the CPLA (*see* Compl. ¶¶ 22, 454), Section 3.01 in fact grants Plaintiff not only patent rights, but also **other rights**, including to Monsanto Know-

---

unconscionability does not negate the voluntary payment doctrine. Unconscionability is a common law **defense** to breach, *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 432 (Mo. 2015), and federal courts do not allow plaintiffs to "assert unconscionability as a basis for recovering damages." *AIDS Healthcare Found. v. Express Scripts, Inc.*, 658 F. Supp. 3d 693, 704 (E.D. Mo. 2023).

- 29 -

How. *See* Att. 1 § 3.01. "Monsanto Know-How" means "knowledge and information provided by Monsanto … which is reasonably required for Licensee to perform the licensed activities … ." *Id.* § 2.25. Moreover, the CPLA in no way ties the payment of royalties to licenses granted under Section 3.01. Neither the definition of Product Royalty (§ 2.31) nor the description of what it is paid for (§ 4.01), make such a connection. And other licenses, rights, and consideration granted under the CPLA to Plaintiff include trademark rights,[24] trade secrets,[25] and biological materials,[26] to name but a few. Where Plaintiff received rights to unexpired patents, as well as a multitude of other benefits under the CPLA, and had a right to terminate at any time without penalty (§ 8.02(h)), it cannot be unjust as a matter of law that it paid royalties after the NK603 patent expired. Plaintiff has thus failed to adequately plead this element of a claim for unjust enrichment.

> **D.** **Plaintiff's Fair Dealing Claim Respecting the PPP (Count 7) Fails For Lack Of A Contract, Or Because Any Contract Permits The Challenged Conduct.**

Plaintiff asserts that Defendants breached the covenant of good faith by paying Plaintiff at the 75% level under the PPP program, rather than the 90% level for year-over-year sales, when Plaintiff's sales results were allegedly due to circumstances beyond its control. Compl. ¶¶ 605-08.

> **1.** **Plaintiff Fails To Allege A Contract, A Required Element Of The Claim.**

"Under Missouri law, a proper pleading of a claim for breach of the covenant of good faith and fair dealing requires the pleading of an existing contract." *Reitz v. Nationstar Mortg., LLC*, 954 F. Supp. 2d 870, 892 (E.D. Mo. 2013). Where a plaintiff "fail[s] to do this, [its] claim for breach of the covenant of good faith and fair dealing fails to state a claim upon which relief can be

---

[24] *See, e.g.*, Att. 2  § 3.04 (granting a "royalty-free license … to use the trademarks listed").

[25] *See, e.g.*, Att. 1 § 9.01(b) (contemplating Monsanto would provide Plaintiff "trade secrets").

[26] *See, e.g.*, Att. 1 §§ 8.03(b), 9.01(b) (contemplating Monsanto would provide "biological materials," i.e., "germplasm and biological and other physical materials").

granted." *Id.* Plaintiff does not allege a PPP contract—as opposed to discretionary payments by Defendants, without any consideration from Plaintiff. *See* Compl. ¶ 600 (alleging "qualification for PPP payment was at Bayer's sole discretion"). As such, its claim fails at the outset.

### 2.    If Any Contract Existed, It Permitted The Challenged Conduct.

Even if Plaintiff had pled the existence of a PPP contract, its own allegations would still preclude its claim as a matter of law. Plaintiff alleges that "[t]he Corn Product Licensee's qualification for PPP payment was at Bayer's sole discretion." *Id.* Defendants' alleged "abuse of discretion" in granting PPP funds cannot state a claim where the contract itself granted that discretion. *Bishop*, 129 S.W.3d at 506 ("there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract"); *see also* Section III.B, *supra* (discussing requirement for good-faith-and-fair-dealing claim respecting Count 5).

### E.    Plaintiff's Failure To Allege Definite Terms Or Mutual Obligations Dooms Its Breach Of Contract Claim Regarding 2025 Market Funding (Count 8).

Plaintiff asserts a breach of a supposed contract for Defendants to provide 2025 market funding based on communications between John Latham, on the one hand, and "Bayer" employees, on the other. Compl. ¶¶ 613-16.

To state a claim for breach of contract under Missouri law, a plaintiff must plead the "existence and terms" of the contract, *CIBC Bank USA v. Williams*, 669 S.W.3d 298, 305 (Mo. App. 2023), as well as "mutual obligations arising under [those] terms," in addition to a breach and resulting damages, *Midw. Bankcentre v. Old Republic Title Co. of St. Louis*, 247 S.W.3d 116, 128 (Mo. App. 2008). "The nature and extent of the contract's essential terms must be certain or capable of certain interpretation" and "[n]o contract is formed where the terms … are unduly uncertain or indefinite." *Fedynich v. Massood*, 342 S.W.3d 887, 891 (Mo. App. 2011).

Plaintiff has alleged the terms of the supposed contract with insufficient definiteness, and without identification of any obligation on Plaintiff's part, such that it is impossible to discern a meeting of the minds or mutuality. In particular, Plaintiff alleges no contract terms identifying what, under the alleged agreement, **it** must do to perform. At most, Plaintiff alleges its rationale for wanting the money (Compl. ¶ 613). But the Complaint is silent as to any obligations Plaintiff owed in spending that money, or otherwise.[27] Nor does Plaintiff allege there was any contract term obligating Defendants to pay market funding, as opposed to simply announcing the rates Plaintiff would receive if it were eligible and Defendants elected to provide "discretionary funding." *Id.* ¶ 460. Plaintiff does not even allege which Defendant, or Defendants, entered into the contract.

The absence of definite terms is especially conspicuous given that market funding was to support Plaintiff's sale of licensed Bayer products and, by 2025, CropScience had terminated Plaintiff as a licensee. *See id.* ¶ 615 (Plaintiff sought "market funding" to support a "production plan of Bayer products"); ¶¶ 621-23 (contract terminated December 2024). The CPLA is clear that Plaintiff had no right to sell Bayer licensed product after that point. *See* Att. 1 § 8.03(b) (requiring Plaintiff to "cease all production and sales of the applicable Licensed Product and associated Parental Inbred Seed" upon termination). Indeed, Plaintiff was under a duty to "destroy any remaining Parental Inbred Seed and Licensed Products" within 10 days of termination. *Id.* Plaintiff alleges a new contract about discretionary funding as an adjunct to a seed-selling relationship, but fails to allege any terms of this alleged new contract enabling it to actually sell Bayer seed.

*Clark v. Washington University*, 906 S.W.2d 789 (Mo. App. 1995), is instructive. There the Missouri Court of Appeals affirmed dismissal of a breach of contract claim where the alleged

---

[27] Relatedly, Plaintiff's claim is deficient for failure to allege consideration. *Doe v. St. Louis Univ. Sch. of Med.*, 2013 WL 1305825, at *15 (E.D. Mo. Mar. 28, 2013) (finding plaintiff failed to state a claim for breach of contract where he did not adequately allege consideration).

contract was a letter stating an employee's salary for the following year, but not that the employee was actually reappointed to the position for the next year. *Id.* at 790-91. This lack of definiteness was "insufficient to establish a contract"; the defendant "was not under any obligation to" the plaintiff; and the plaintiff failed to state a claim. *Id.* at 791-92. So too, here.

**F.    The Court Should Dismiss Plaintiff's Promissory Estoppel Claims (Counts 9-11) Because They Seek To Add Obligations Not Included In The Parties' Contract And, In Any Case, Do Not Allege Sufficiently Definite Promises.**

Plaintiff's promissory estoppel claims are premised on Defendants' alleged "promises" to provide market funding: Count 9 for 2025 funding; Count 10 for Riverton funding in 2023-2024; and Count 11 for SmartStax funding in 2023-2024. Promissory estoppel is "not a favorite of the law," *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007), and must be applied "with caution, sparingly, and only in extreme cases." *Kearney Com. Bank v. Popejoy*, 119 S.W.3d 143, 146 (Mo. App. 2003) (quotations omitted). To state a claim for promissory estoppel, a plaintiff must allege: "(1) a promise; (2) promisee detrimentally relies on the promise; (3) promisor could reasonably foresee the precise action the promisee took in reliance; and (4) injustice can only be avoided by enforcement of the promise." *Millstone Prop. Owners Ass'n v. Nithyananda Dhyanapeetam of St. Louis*, 701 S.W.3d 633, 645 (Mo. banc 2024) (cleaned up).

**1.    Plaintiff's Promissory Estoppel Counts Fail Because They Attempt To Add Obligations Not Included In The Parties' Contract.**

Where the parties have a contract, "promissory estoppel cannot be used to create rights not included in the contract." *Clearly Can. Beverage Corp. v. Am. Winery, Inc.*, 257 F.3d 880, 890 (8th Cir. 2001); *accord Halls Ferry Invs. v. Smith*, 985 S.W.2d 848, 853 (Mo. App. 1998); *Roth v. Equitable Life Assur. Soc'y*, 210 S.W.3d 253, 262 (Mo. 2006). The rule makes eminent sense; a contracting party should be entitled to rely on the controlling effect of its express contract.

Here, the CPLA comprehensively governs Monsanto's, and later CropScience's, provision

of know-how, biological materials, patent licenses, and trademark licenses to enable Plaintiff to grow and sell licensed corn products. *See generally* Compl. & Att. 1 (including provisions regarding sales to growers and dealers, marketing, branding, regulatory compliance, quality control, training, customer education, and more). The CPLA also includes an integration clause providing that it "constitutes the full understanding of the Parties" and that "**no** conditions, usage of trade, course of dealing or performance, understanding or **agreement purporting to** modify, vary, explain or **supplement the terms or conditions of this Agreement shall be binding unless hereafter made in writing** and signed by the Party to be bound … ." Att. 1 § 10.08(a) (emphasis added). The possibility of funding to support marketing, branding, and sales to licensed dealers falls squarely within the CPLA's broad scope. *See Ramey v. RE/MAX Kansas City*, 2010 WL 11508733, at \*4 (W.D. Mo. Aug. 24, 2010) (holding promissory estoppel claim failed where the alleged promise "related to" the subject matter of a contract between the parties and rejecting argument that the promises were "outside the scope" of the contract).

In *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002 (E.D. Mo. 2018), the Court applied this reasoning to dismiss a promissory estoppel claim. It found that a claim based on a supposed "promise" contained in an unsigned email failed. It noted that the "contract included a standard integration clause" and reasoned that, given this clause, an email from the defendant could not be construed as "a novation of an essential provision of [the parties'] Agreement." *Id.* at 1024, *aff'd*, 911 F.3d 505, 515-16 (8th Cir. 2018) (citing *Clearly Can.*, 257 F.3d at 890). The Court should find likewise here.[28]

---

[28] As to Count 9, Plaintiff specifically alleges not just the CPLA but also a separate contract specific to 2025 funding. *See* Compl. ¶¶ 609-28. Under Missouri law, a promissory estoppel claim is unavailable where there is a claim for breach of contract because the plaintiff has an adequate remedy at law. *See St. Luke's Hosp. of Kan. City v. Benefit Mgmt. Consultants, Inc.*, 626 S.W.3d 731, 754-55 (Mo. App. 2021). Plaintiff has not stated a valid claim for breach of a contract to

**2.      Each Of Plaintiff's Promissory Estoppel Claims Fails Because Plaintiff Does Not Allege A Sufficiently Definite Promise, Or A Promise At All.**

Under Missouri law, a promise is a required element of a claim for promissory estoppel and "the promise giving rise to the cause of action must be definite, and the promise must be made in a contractual sense." *Clevenger*, 237 S.W.3d at 590; *accord W. Cent. Mo. Reg'l Lodge No. 50 v. Bd. of Police Comm'rs of Kansas City, Mo.*, 939 S.W.2d 565, 569 (Mo. App. 1997). Each of Plaintiff's promissory estoppel counts falls short.

In Count 9, Plaintiff alleges that it requested market funding amounts in April 2025, and a "Bayer" employee responded with an email stating, "The following is your market funding for the 2025 season," and listing amounts. Compl. ¶ 616; *see also id.* ¶¶ 629-33. This does not suffice as a "promise." *Clark v. Washington University* (discussed *supra* at pp. 32-33) is analogous. There the defendant, who had employed the plaintiff for a decade, sent a letter announcing that the plaintiff's "compensation for the year 1991-92 … will be … $47,600.00." 906 S.W.2d at 790. The letter did not, however, include language "reappointing" the plaintiff. *Id.* at 791. The plaintiff failed to state a claim because the defendant "did not make a promise … sufficient to support a claim of promissory estoppel" where it did not promise reappointment. *Id.* at 792 (affirming dismissal). As in *Clark*, an email stating what "compensation [i.e., market funding] … will be" did not "promise" that Plaintiff would receive that funding, or even to reinstate Plaintiff's license.

In Counts 10 and 11, Plaintiff alleges that a "Bayer" employee, in one case, "confirmed" an agreement to provide market funding over the phone and, in the other, "offered" Plaintiff SmartStax market funding dollars. Compl. ¶¶ 645, 654. Where Plaintiff does not provide the exact language used by the employee–or even a paraphrase or reasonable approximation of that

---

provide 2025 funding. *See* Section III.E, *supra*. If, however, the Court holds otherwise, then Count 9 necessarily fails because Plaintiff has an adequate remedy at law.

language–it cannot support the required element of a definitive promise.[29]

Moreover, Plaintiff's own allegations about the "discretionary" nature of the funding and Defendants' refusal to put the "arrangement" in writing undercut its claim. *Id.* ¶¶ 460, 631, 642. In *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 438 (8th Cir. 2013), the plaintiffs alleged that the defendant had promised their mortgage "would be modified upon receipt of requested documentation," but simultaneously alleged they were never able "to receive a consistent and candid answer … regarding a loan modification." The Eighth Circuit, applying Missouri law, affirmed dismissal because the plaintiffs' allegations "negate[d] any reasonable inference that" there was an actual "promise." *Id.* at 440. The same is true here.

**G.     Plaintiff's Negligent Misrepresentation Claim (Count 12) Fails Because It Does Not Allege Falsity, The CPLA's Termination Negates Justifiable Reliance, And If A Contract Existed, The Economic Loss Doctrine Bars Recovery.**

Plaintiff's negligent misrepresentation claim arises from the same facts as Count 8 (breach of contract) and Count 9 (promissory estoppel), on the theory that if Defendants did not intend to pay 2025 market funding, then their statements were false. Negligent misrepresentation requires, among other things, that the speaker's statement was false due to a failure to exercise reasonable care, and that the listener justifiably relied. *Summer Chase Second Addition Subdivision Homeowners Ass'n v. Taylor-Morley, Inc.*, 146 S.W.3d 411, 418-19 (Mo. App. 2004). Plaintiff fails to adequately allege either falsity or justifiable reliance.

**1.     Plaintiff Fails To State A Claim Because It Does Not Allege Falsity.**

Plaintiff alleges, "**If** Bayer's practice was to not pay market funding to those without an active CPLA, and/or notwithstanding promised funding or activities undertaken that benefited

---

[29] Regarding the SmartStax "offer," Plaintiff alleges Defendants "historically" provided $15 per unit on sales, but does not allege anyone promised this in August 2023. *Id.* ¶ 654. Plaintiff alleges at most a course of performance rather than a promise, which is not a basis for promissory estoppel.

Bayer, the representation in April 2025 was false and Bayer failed to exercise reasonable care to obtain or communicate true information." Compl. ¶ 669 (emphasis added). Plaintiff does **not** allege Defendants' practice, or any statement about their practice. It has thus failed to allege falsity.[30]

### 2.    Plaintiff Could Not Have Justifiably Relied As A Matter Of Law.

Plaintiff's allegations about the discretionary nature of market funding also defeat its claim because they preclude justifiable reliance as a matter of law. *See id.* ¶ 460 (referring to Defendants' "discretionary funding"). Further, the marketing funds that are the subject of Plaintiff's claim were to support the selling of Bayer seed. But CropScience's termination of the CPLA meant that Plaintiff had no right to sell Bayer seed. Even putting aside the discretionary nature of the funding, Plaintiff could not have justifiably relied on an alleged promise to provide market funding when it knew that a CPLA was required to sell Bayer-traited seed and Plaintiff did not have one.

### 3.    The Economic Loss Doctrine Bars Plaintiff's Misrepresentation Claim.

While Plaintiff does not adequately allege a 2025 market funding contract (*see* Section III.E, *supra*), if it had, then the economic loss doctrine would apply. The economic loss doctrine "bars recovery of purely pecuniary losses in tort where the injury results from a breach of a contractual duty." *OS33 v. CenturyLink Commc'ns, LLC*, 350 F. Supp. 3d 807, 815 (E.D. Mo. 2018) (quoting *Dubinsky v. Mermart, LLC*, 595 F.3d 812, 819 (8th Cir. 2010)).[31] The determining factor is whether the tort claim "arises out of" the parties' contractual relationship; a plaintiff may assert a tort claim for economic loss "only if it arises from acts that are separate and distinct from the contract." *Dubinsky*, 595 F.3d at 819-20; *accord O'Neal v. Stifel, Nicolaus & Co.*, 996 S.W.2d

---

[30] Nor does Plaintiff allege that anyone told it Defendants would pay funding notwithstanding the CPLA being terminated, which denied Plaintiff the right to sell any licensed Bayer products at all.

[31] "Although the Missouri Supreme Court has not addressed the issue, the Eighth Circuit has predicted it would hold that the economic loss doctrine bars negligent misrepresentation claims." *OS33*, 350 F. Supp. 3d at 815-16 (citation omitted).

700, 702 (Mo. App. 1999).

Here, Plaintiff does not allege any wrong independent of the subject matter of the alleged 2025 market funding agreement. *See* Compl. ¶ 665 (alleging the same April 2025 email that is alleged in the contract claim (at ¶ 616) as the misrepresentation). Its negligent misrepresentation claim merely echoes its Count 8 contract count. Because Plaintiff "seek[s] to recover in tort for losses that are contractual in nature and the only damages asserted are purely economic losses," it fails to state a tort claim under Missouri law. *Self v. Equilon Enters., LLC*, 2005 WL 3763533, at *11 (E.D. Mo. Mar. 30, 2005) (dismissing misrepresentation claim under economic loss doctrine).

### H.   Plaintiff's Trade Secrets Act Claim (Count 13) Fails Because It Does Not Adequately Allege Either A Trade Secret Or Misappropriation.

Plaintiff claims Defendants violated the Missouri Uniform Trade Secrets Act ("MUTSA") by misappropriating data Plaintiff provided under the CPLA, including "customer names, addresses, and other sales and product-related data," and using that information to sell directly to seed dealers. Compl. ¶¶ 672, 675, 678. The elements of a claim under the MUTSA are "(1) a trade secret exists, (2) the defendant misappropriated the trade secret, and (3) the plaintiff is entitled to either damages or injunctive relief." *Cent. Trust & Inv. Co. v. Signalpoint Asset Mgmt., LLC*, 422 S.W.3d 312, 320 (Mo. banc 2014) (citing §§ 417.453, 417.455, and 417.457 RSMo.). Plaintiff's claim fails because it insufficiently alleges the first two elements.

#### 1.   Plaintiff Fails To Allege A Trade Secret.

Plaintiff fails to allege a trade secret because the information it alleges was misappropriated does not qualify as a trade secret. Regarding customer names and contact information, the Eighth Circuit in *Tension Envelope Corp. v. JBM Envelope Co.*, 876 F.3d 1112, 1122 (8th Cir. 2017), affirmed dismissal because this information cannot support an MUTSA claim. *Id.* (citing *W. Blue Print Co. v. Roberts*, 367 S.W.3d 7, 18 (Mo. banc 2012)); *accord Conseco Fin. Servicing Corp. v.*

*N. Am. Mortg. Co.*, 2000 WL 33739340, at *10 (E.D. Mo. Dec. 6, 2000); *Inventory Sales, LLC v. Packer Fastener & Supply Inc.*, 2026 WL 40066, *10 (E.D. Mo. Jan. 6, 2026). That is particularly the case where the information is already known or readily knowable. *See, e.g.*, *W. Forms, Inc. v. Pickell*, 308 F.3d 930, 933-34 (8th Cir. 2002) (holding that customer list was not a trade secret because "the important [customers] were the companies in the area which had use for large quantities of industrial oils, known to anybody in the business") (internal quotations omitted). Here, the allegations are that Defendants knew the identity of all Bayer seed dealers. As the Complaint alleges, "**Every** farmer, agribusiness company, **seed dealer**, and seed grower wanting to use a Monsanto (or Bayer) trait … was and is required to execute a license agreement." Compl. ¶ 139 (emphasis added); *accord id.* ¶¶ 203, 585. Because the existence, location and contact information of these dealers was already known to Defendants, it is implausible that Defendants needed Plaintiff's customer list to market to dealers (a fact that Plaintiff alleges "on information and belief"). *Id.* ¶ 678.[32]

A similar analysis applies to the "sales and product-related data" of Plaintiff's customers. In *Tension*, the Eighth Circuit's holding extended beyond simply customer names and contact information, to find that customers' "unique requirements" also did not support an MUTSA claim because the defendant "could have acquired [this information] from the customers themselves." 876 F.3d at 1122-23 (cleaned up); *accord Inventory Sales*, 2026 WL 40066, at *9 (holding that "knowledge of a customer's purchase volume or purchase preferences does not constitute a trade secret" because the information is "readily ascertainable" by "simply ask[ing] the customers for that information"). Here, Plaintiff does not allege Defendants acquired any data that was not

---

[32] Plaintiff's other allegations also confirm the identity of seed dealers was widely known, as Plaintiff alleges it lost dealer sales to parties other than Defendants. *See* Compl. ¶ 379.

discoverable "simply by ask[ing] the customers for that information." *Inventory Sales*, 2026 WL 40066, at *9. The Court should dismiss because the MUTSA does not protect any of the allegedly misappropriated information.

### 2.    Plaintiff Fails To Sufficiently Allege Misappropriation.

Even if Plaintiff had sufficiently alleged a trade secret, it still fails to adequately allege misappropriation because the CPLA does not limit the use of dealer data. Plaintiff cites Section 3.09(c) of the CPLA (at Compl. ¶¶ 672, 675), but that provision requires Defendants to "'take reasonable actions to use separate personnel to handle the names and addresses of individual **growers** purchasing from Licensee' from those involved with marketing" (*id.* ¶ 675 (emphasis added)). The Complaint does not allege that Defendants used individual grower data.

Instead, Plaintiff alleges it sold to "**dealer**-customers who, in turn, sold the seed to growers" and that Defendants "contacted Latham's customer <u>dealers</u> with below-cost pricing offers." *Id.* ¶¶ 34, 677 (bolded emphasis added; underlined emphasis in original); *see also id.* ¶ 379 ("Latham lost over $8 million in annual sales to seed dealers … ."). The Complaint cites no CPLA provision that limited Defendants' use of **dealer** data.[33]

Moreover, even if grower data were at issue, the allegations still could not establish misappropriation. In *Trone Health Services, Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 855-86 (8th Cir. 2020), the court affirmed dismissal of an MUTSA claim because customer lists were not misappropriated where the plaintiff agreed to provide access to the information and did not forbid the defendant from using it for direct sales. *See also Kreisler Drug Co. v. Mo. CVS*

---

[33] Plaintiff also alleges the CPLA prevents Defendants from "'disclos[ing] the specific names and addresses of purchasers of Licensed Products to any Third Party seed company.'" Compl. ¶ 675 (quoting CPLA § 3.09). But that likewise does not apply to Plaintiff's claim. *See* Att. 1 § 2.35 (defining "Third Party" to exclude "Affiliates"); *id.* § 2.01 (defining "Affiliate" by reference to "control"); Compl. ¶ 107 (alleging that DEKALB and Channel are "controlled by Bayer").

*Pharm., LLC*, 2016 WL 5844145, at *7-8 (W.D. Mo. Oct. 4, 2016) (holding customer information had not been misappropriated where plaintiff agreed to provide it). Here, as there, Plaintiff provided information voluntarily and did not forbid its use. Rather, the CPLA provided only that Defendants would "take reasonable actions to use separate personnel to handle the names and addresses of individual growers purchasing from Licensee from those involved with marketing." Compl. ¶ 675. Plaintiff makes no allegations about what personnel "handle[d] the names and address of individual growers," what personnel handled "marketing," or what steps Defendants did or did not take to keep them "separate." And if Plaintiff believed that Defendants had actually breached this term regarding Defendants' "reasonable actions to use separate personnel," it stands to reason that Plaintiff would have asserted a claim for breach of contract on this basis. It did not.

In sum, because Plaintiff has failed to allege a trade secret, much less misappropriation of one, the Court should dismiss Plaintiff's claim under the MUTSA.

**I.     Plaintiff's Claim For Tortious Interference (Count 14) Fails Because Missouri Law Bars Claims For Interference With Relationships Arising Out Of The Parties' Contract And Plaintiff Does Not Properly Allege Lack of Justification.**

Plaintiff alleges a claim for tortious interference with business expectancy based on Defendants selling seed to dealers whom Plaintiff had previously sold to. Compl. ¶ 687; *see also id.* ¶ 677. Under Missouri law, "[t]ortious interference with a contract or business expectancy requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. banc 2017) (cleaned up). Plaintiff's claim fails for multiple independent reasons.

**1.     Plaintiff Cannot Base A Claim For Tortious Interference On Alleged Interference With Relationships That Existed Due To The CPLA.**

Plaintiff's tortious interference claim is based on an alleged business expectancy created

by Plaintiff's contractual relationship with Defendants. Missouri law forbids such a claim.

That was the holding in *Bextermueller News Distribs. v. Lee Enters., Inc.*, 2023 WL 2187465, at *3-4 (E.D. Mo. Feb. 23, 2023). There, the plaintiffs claimed a business expectancy in home delivery of newspapers and that the defendants interfered by creating a system of delivering newspapers electronically. *Id.* at *1, *3. The court dismissed because the expectancy arose entirely from the parties' agreement. *Id.* at *3-6 ("Absent the agreements, Plaintiffs would have no expectancy in the ongoing delivery of St. Louis Post-Dispatch newspapers, nor would they have any delivery routes to sell."). The case, therefore, fell "squarely within the rule that when a contract alone creates a business expectancy, [a] plaintiff cannot bring a claim for interference with a business expectancy against a party to that contract." *Id.* at *4 (cleaned up); *see also S R Distrib., LLC v. Pepperidge Farm, Inc.*, 2019 WL 5394501, at *1, *6-7 (E.D. Mo. Oct. 22, 2019) (dismissing claim for interference with plaintiff's distribution of defendant's product, where defendant began selling directly to some stores, because plaintiff's "relationships with retail stores … result solely from" its contract with defendant, which "alone creates the business expectancy").

That is precisely the situation here. Plaintiff could sell Bayer-traited seed to dealers only because it had a CPLA. *See, e.g.*, Compl. ¶¶ 111-14. In other words, just like the plaintiff in *Bextermueller News*, "[a]bsent the agreements [with Defendants], Plaintiff[] would have no expectancy in the ongoing [sale of Bayer-traited seed], nor would [it] have any [Bayer-traited seed] to sell." 2023 WL 2187465, at *6. And it is the sale of Bayer-traited seed that Plaintiff alleges was the "interference." *E.g.*, Compl. ¶ 377. Because the business expectancy with which Defendants allegedly interfered existed only by virtue of the CPLA, Missouri law bars Plaintiff's claim.

**2.    Plaintiff Fails To Allege Absence Of Justification Or Improper Means.**

Plaintiff's claim for tortious interference also fails because Plaintiff fails to adequately allege an absence of justification. *Bishop*, 520 S.W.3d at 472. As the Missouri Supreme Court has

explained, "[i]f the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." *Stehno v. Sprint Spectrum, LP*, 186 S.W.3d 247, 252 (Mo. banc 2006); *see also Cmty. Title Co. v. Roosevelt Fed. Savings & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990) ("[T]here is no impropriety of self-interested interference when a defendant has a legitimate economic interest … ."). Here, Defendants had a legitimate economic interest in competing for sales to seed dealers and Plaintiff fails to allege improper means.[34]

> ### a) *Defendants had a legitimate economic interest in competing with Plaintiff for sales to seed dealers.*

A party is justified in interfering with a business expectancy where it engages in competitive conduct to further its own economic interest. *See Gott v. First Midw. Bank of Dexter*, 963 S.W.2d 432, 438 (Mo. App. 1998). For example, in *Vilcek v. Uber USA, LLC*, 902 F.3d 815, 817 (8th Cir. 2018), plaintiff taxicab drivers sued Uber for tortious interference in the ride-for-hire market. The Eighth Circuit affirmed dismissal because Uber had "a legitimate economic interest" in the ride-for-hire market where Uber and the drivers were "direct competitors." *Id.* at 819 (quoting *W. Blue Print*, 367 S.W.3d at 20). Similarly here, Plaintiff alleges that Defendants are its competitors and compete for business from seed dealers. *See* Compl. ¶¶ 12, 112, 415, 435, 677, 681-82. Thus, Defendants were justified in their actions as competitors of Plaintiff.

> ### b) *Plaintiff does not adequately allege Defendants used improper means to compete.*

Because Defendants had a valid economic interest in competing with Plaintiff, the tortious

---

[34] Plaintiff alleges that Defendants received no "legitimate economic benefit" from selling seed directly. Compl. ¶ 386. But this allegation is implausible and should be disregarded. *See Iqbal*, 556 U.S. at 678-79. Plaintiff specifically alleges it was designing its own non-licensed seed to "compete[] directly with Bayer's products." Compl. ¶ 370. That alone gave Defendants financial incentive to establish direct sales to seed dealers so that Defendants would have established relationships when they needed to counter Plaintiff's directly competing products.

interference claim fails on the justification element unless Plaintiff alleged facts showing Defendants competed through improper means. *See Bishop*, 520 S.W.3d at 472; *Stehno*, 186 S.W.3d at 252. Plaintiff claims two types of "improper means": (1) "misappropriation of Latham's confidential customer lists and data" and (2) "conduct that was retaliatory, predatory, and in restraint of trade." Compl. ¶ 690. But Plaintiff's claims based on misappropriation and antitrust violations fail for the reasons discussed *passim*.[35] Since those claims fail, Plaintiff's allegations of improper means likewise fall short. *See Nitro Distrib., Inc. v. Alticor, Inc.*, 2008 WL 11384211, at *12 (W.D. Mo. Feb. 8, 2008) (holding that where the claims of improper conduct are dismissed, they "cannot serve as bases on which to support Plaintiffs' tortious interference claims"). The Court should dismiss Count 14 for this additional reason.

> **J.** **The Limitation Of Damages Provision In The CPLA Bars Plaintiff's Claims For Loss Of Business (Counts 13 and 14).**

Counts 13 and 14 should be dismissed for the additional reason that both seek damages for alleged loss of business in the form of lost sales to seed dealers, and the CPLA bars such claims.

Under Missouri law, limitation of liability clauses are enforceable as long as they are not unconscionable or against public policy. *See Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 508-09 (Mo. banc 2001) ("Sophisticated parties may contractually limit future remedies."); *see also World Enters., Inc. v. Midcoast Aviation Servs., Inc.*, 713 S.W.2d 606, 610-11 (Mo. App. 1986) (holding that limitation of liability "serve[d] as a complete defense"); *Sports Capital Holdings (St. Louis), LLC v. Schindler Elevator Corp.*, 2014 WL 1400159, at *5 (E.D.

---

[35] And if Plaintiff's MUTSA claim did not fail, its tortious interference claim would be preempted to the extent it relies on misappropriation as the "improper means." *See* § 417.463 RSMo. (MUTSA "displace[s] conflicting … laws ... providing civil remedies for misappropriation of a trade secret"); *ESM Techs., LLC v. Biova, LLC*, 2011 WL 13137369, at *2-3 (W.D. Mo. Jan. 12, 2011) (dismissing tortious interference claim as preempted by the MUTSA after finding it was "based on facts related to the misappropriation claim").

Mo. 2014) (dismissing "to the extent plaintiffs seek damages that are expressly barred by the parties'" contractual limitation of liability); *Jacobson Warehouse Co. v. Schnuck Markets, Inc.*, 2017 WL 5885669, at \*4-6 (E.D. Mo. Nov. 29, 2017) (dismissing claim to the extent it sought damages barred by limitation of liability because "[i]t is well-settled in Missouri that sophisticated business entities may contractually limit future remedies").

Plaintiff claims tortious interference based on alleged "misappropriation of Latham's confidential customer lists and data." Compl. ¶ 690. And it alleges an MUTSA claim based on the same allegations, specifically pointing to the allegedly misappropriated data as having been provided pursuant to the CPLA. *Id.* ¶¶ 672-75, 678-80. For both, the alleged injury to Plaintiff is a loss of business. Specifically, Plaintiff alleges that Defendants dealt directly with seed dealers and that Plaintiff lost sales as a result. *See id.* ¶¶ 677, 681-82, 686-91.

Yet the CPLA contains a limited liability provision which specifically provides that neither party is liable to the other for an alleged loss of business. It states:

> **Limited Liability:** NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY LOSS OF PROFITS, **LOSS OF BUSINESS**, INTERRUPTION OF BUSINESS, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND SUFFERED BY SUCH OTHER PARTY FOR BREACH HEREOF, **WHETHER BASED ON CONTRACT OR TORT CLAIMS OR OTHERWISE**, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS.

Att. 1 § 7.04 (emphasis added). This provision specifically precludes the recovery Plaintiff seeks. As such, the Court should dismiss Plaintiff's tortious interference and MUTSA claims.

## CONCLUSION

For the reasons discussed herein, the Court should dismiss Plaintiff's Complaint in its entirety. Plaintiff's grievances are about the difficulty in competing in the biotechnology industry, not about any unlawful tactics that created that difficulty. It should be held to the bargain it struck in its license agreement, which Defendants have not breached as matter of law.

Dated: July 13, 2026

<div style="margin-left:50%">

Respectfully submitted,
THOMPSON COBURN LLP

By */s/ Sharon B. Rosenberg*
  Sharon B. Rosenberg, #54598MO
  One US Bank Plaza
  St. Louis, MO  63101
  P: 314 552 6000
  F: 314 552 7000
  srosenberg@thompsoncoburn.com

  Jonathan I. Gleklen (*pro hac vice* forthcoming)
  Laura S. Shores (*pro hac vice* forthcoming)
  Barbara Wootton (*pro hac vice* forthcoming)
  ARNOLD & PORTER KAYE SCHOLER LLP
  601 Massachusetts Ave., NW
  Washington, DC 20001
  Phone: (202) 942-5000
  jonathan.gleklen@arnoldporter.com
  laura.shores@arnoldporter.com
  barbara.wootton@arnoldporter.com

  *Attorneys for Defendants Bayer CropScience LLC, Bayer CropScience LP, Monsanto Company, and Channel Bio LLC*

</div>

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 13, 2026 the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record.

<div style="margin-left:40%">

*/s/ Sharon B. Rosenberg*

</div>