# Att. 1

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

## CORN PRODUCT LICENSE AGREEMENT

*(without Development Rights)*

This Corn Product License Agreement without Development Rights (the "Agreement") is made and effective by and between Monsanto Company and

Latham Hi-Tech Hybrids, Inc.                                            ,

regarding a non-exclusive license of certain proprietary rights of Monsanto Company, including patents and other intellectual property, technical information, expertise, and know-how for certain Corn products defined herein.

## Section 1 - Background and Parties

1.01    Monsanto Company ("Monsanto") is a corporation organized and existing under the laws of the State of Delaware with principal offices at 800 N. Lindbergh Boulevard, St. Louis, Missouri 63167.

1.02    Latham Hi-Tech Hybrids, Inc.                                    ("Licensee")

is a   limited liability company           organized and existing under the laws of the State of

Iowa                                        with principal offices at:

208 Brickyard Court

Sheffield, IA 50475                                                      .

1.03    Monsanto has certain proprietary rights, including patents and other intellectual property, technical information, expertise, and know-how, relating to agriculturally-useful Corn products, and also to methods of producing and using such products.

1.04    Licensee is interested in obtaining a limited license under Monsanto's proprietary rights, in order to produce and sell certain Corn products.

1.05    Monsanto desires to grant Licensee a limited license for certain Corn products defined in this Agreement and the applicable Licensed Product Addendum(s), all upon the terms and conditions provided herein and in the Licensed Product Addendum(s).

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A95676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

1.06    In the future, Licensee may desire to receive other licenses from Monsanto in order to produce and sell additional Corn products.

1.07    The Parties wish to establish a convenient means for managing licenses granted under Monsanto's proprietary rights for Corn products, including a means for reducing the number of separate agreements needed, should Monsanto determine (in its sole discretion) to grant any rights to Licensee for additional Corn products.  Therefore, the Parties are establishing this Agreement with certain terms and conditions that can be conveniently used, extended, added to, and/or modified by Monsanto, in the event that Monsanto determines to grant Licensee any rights for additional Corn products.

1.08    Based on the mutual consideration between the Parties recited below, the Parties agree and covenant as set forth below.

## Section 2 - Definitions

For purposes of this Agreement, the following words and phrases shall have the following meanings:

2.01    The term "Affiliate" (in the singular or plural) shall mean with respect to an entity, any other entity that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with that entity (as of the Effective Date or any date thereafter).

2.02    The term "Channeling Program" shall mean a terminal use or restricted delivery plan for grain harvested from Licensed Product as may be designated from time to time by Monsanto.

2.03    The term "Change in Control" shall mean the acquisition of Control of a Party to this Agreement by any Person that did not previously Control such Party.

2.04    The term "Commercial Product Standard" shall mean the efficacy and/or quality standards for a given Licensed Product, as set forth in the exhibit entitled, "Quality Assurance Guidelines" attached to the applicable Licensed Product Addendum, which exhibit may be modified by Monsanto from time to time upon written notice to Licensee.

2.05    The term "Contract Dealer" means a Person, company or other entity acceptable to Monsanto and bound by a written Model Dealer Agreement with Licensee that is a document separate from (but may be an addendum to) any other dealer agreement with Licensee and is in the form attached as Appendix A, which may be amended by Monsanto from time to time.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A95676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

2.06     The term "Contract Producer" means a Person, company or other entity acceptable to Monsanto and bound by a written agreement with Licensee that is in conformance with the applicable provisions of this Agreement.

2.07     The term "Control," "Controlling," or "Controlled by," with respect to any Person, means the power to direct the management and policies of such other entity, directly or indirectly, whether through the ownership of voting securities, by contract, or otherwise; and/or the ownership of more than fifty percent (50%) of the voting shares entitled to elect the directors of such entity.

2.08     The term "Corn" shall mean *Zea mays*.

2.09     The term "Cover," or "Covering," with respect to a patent and Plant Breeder Rights, shall mean that a given Licensed Product cannot be used, produced and/or sold within the Licensed Retail Field or Licensed Production Field (as the case may be) without infringing the rights granted by such patent or Plant Breeder Rights.

2.10     The term "De-Licensed Grower" shall mean the grower, and any other Person which Monsanto designates as "not authorized" for purchase and/or use of Monsanto technology by notice to Licensee or by posting on www.corn-states.com.

2.11     The term "Effective Date" shall mean:

(a)     in the case of this Agreement, the latest date upon which a duly authorized representative of Monsanto and Licensee have both executed this Agreement; and

(b)     in the case of a Licensed Product Addendum, the latest date upon which a duly authorized representative of Monsanto and Licensee have both executed the applicable Licensed Product Addendum.

2.12     The term "Electronic Transmission" shall mean any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

2.13     The term "Fiscal Year" shall mean a twelve-month period ending August 31, e.g. Fiscal Year 2009 is the 12 month period that ends on August 31, 2009.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A95676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

2.14    The term "Glyphosate" shall mean any herbicidally effective form of N-phosphonomethylglycine including any salt thereof or any other 5-enolpyruvyl-3-shikimate phosphate synthase inhibitor.

2.15    The term "Involved Third-Party Co-licensor" shall mean any Person that is a co-licensor to a Licensed Product Addendum.

2.16    The term "Licensed Event" (in the singular or plural) shall mean a transformation event or specific combination of transformation events (as the case may be) that are licensed by Monsanto and/or where applicable an Involved Third Party Co-Licensor subject to the terms of a Licensed Product Addendum.

2.17    The term "Licensed Grower" shall mean the grower holding a valid and non-revoked Monsanto Grower Agreement, and all Persons which such grower legally binds under the terms of the Monsanto Grower Agreement.  The term expressly excludes all De-Licensed Growers.

2.18    The term "Licensed Product" (in the singular or plural) shall mean the hybrid Corn seed products listed on a separate schedule to each Licensed Product Addendum, as each schedule may be amended by Monsanto from time to time pursuant this Agreement and/or an applicable Licensed Product Addendum.

2.19    The term "Licensed Product Addendum" (in the singular or plural) shall mean any unexpired and non-terminated product-specific addendum to this Agreement that has been duly executed by both Parties and an Involved Third-Party Co-licensor, as the case may be.  Each Licensed Product Addendum may modify, substitute or add to any terms and conditions of this Agreement with respect to the applicable Licensed Product or Licensed Event.  Each Licensed Product Addendum shall be independently terminable from this Agreement.

2.20    The term "Licensed Production Field" shall mean seed multiplication in the Territory by Licensee, or by a Contract Producer acting on behalf of Licensee, of Licensed Product by crossing the two Parental Inbreds that result in a specific Licensed Product for restricted sale of such product within the Licensed Retail Field.

2.21    The term "Licensed Retail Field" shall mean the restricted sale by Licensee or its Contract Dealers of Licensed Product in the Territory to a Licensed Grower, under the Licensee Brand, for planting in the Territory by that Licensed Grower during the first growing season following such sale to produce a single commercial grain crop.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A95676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

2.22    The term "Licensed Rights" shall mean any valid and unexpired:

(a)    patent claims contained in any patent owned or controlled by a Third Party in the Territory that are licensed by Monsanto with the right to sublicense, or where applicable by an Involved Third Party Co-Licensor, that Cover a Licensed Product, and are posted on www.corn-states.com for the Licensed Product or a Licensed Event (as may be amended by Monsanto from time to time); and

(b)    Plant Breeder Rights owned or controlled by a Third Party in the Territory that are licensed by Monsanto with the right to sublicense, or where applicable licensed by an Involved Third Party Co-Licensor with the right to sublicense, that Cover a Licensed Product or Corn inbred line and are posted on www.corn-states.com for the Licensed Product or a Corn inbred line listed in a Licensed Product Addendum (as may be amended by Monsanto from time to time).

2.23    The term "Licensee Brand" shall mean, subject to the terms of subsection 3.03, the brands set forth in Appendix C and no other brand.

2.24    The term "Monsanto Grower Agreement" shall mean the license agreement between Monsanto and a grower, and where applicable an Involved Third Party Co-Licensor, in the form provided by Monsanto (as may be amended by Monsanto from time to time), which establishes (among other things) the terms and conditions governing that grower's limited license to acquire and use seed containing a Licensed Event or combination of Licensed Events for producing a single crop of grain, and the Persons that are bound by that grower's entering such agreement.  The Monsanto Grower Agreement may also be referred to as the "Monsanto Technology/Stewardship Agreement."

2.25    The term "Monsanto Know-How" shall mean any knowledge and information provided by Monsanto to Licensee under this Agreement (and/or the applicable Licensed Product Addendum) and which is reasonably required for Licensee to perform the licensed activities within the Licensed Production Field and Licensed Retail Field.

2.26    The term "Monsanto Rights" shall mean all valid and unexpired:

(a)    patent claims contained in any patent in the Territory owned by Monsanto or its Affiliates that Cover a Licensed Product and are posted by Monsanto on www.corn-states.com for that Licensed Product (as may be amended by Monsanto from time to time); and

(b)    Plant Breeder Rights in the Territory owned by Monsanto that Cover a Licensed Product or a Parental Inbred Seed and are posted on www.corn-states.com for that Licensed Product (as may be amended by Monsanto from time to time).

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A95676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

2.27 The term "Parental Inbred Seed" shall mean the seed of Corn inbred lines that are specifically listed by Monsanto in an exhibit to a Licensed Product Addendum as the two parental inbred lines licensed to produce a given hybrid Licensed Product.

2.28 The term "Party" shall mean either Monsanto or Licensee, as the case may be. The term "Parties" shall mean Monsanto and Licensee, collectively.

2.29 The term "Person" shall mean any individual, corporation, proprietorship, firm, partnership, limited liability company, trust, associations, or form of business entity, whether formed under the laws of any state of the United States, the District of Columbia, or the laws of any foreign country or any state or political subdivision thereof.

2.30 The term "Plant Breeder Rights" shall mean all rights granted under a statutory protection system for plant varieties under the U.S. Plant Variety Protection Act (e.g., Plant Variety Protection Certificates).

2.31 The term "Product Royalty" shall mean the per Unit fee set forth by Monsanto annually for each Licensed Product which is payable to Monsanto by Licensee for those Units of Licensed Product sold or transferred (other than as commodity grain) and not returned to Licensee, or planted or otherwise used commercially by Licensee or any of its Affiliates, including but not limited to Units of seed used as sample, test, plot, or promotional seed, under this Agreement and the applicable Licensed Product Addenda.

2.32 The term "Roundup® Agricultural Herbicide" shall mean any Glyphosate formulation sold by Monsanto that is registered for use on Corn and includes herbicide sold under the Roundup® brand name or any other brand name designated by Monsanto to Licensee from time to time.

2.33 The term "Seed Treatment" shall mean the approved seed treatment options identified in a Licensed Product Addendum which may be amended from time to time by Monsanto.

2.34 The term "Territory" shall mean the United States of America.

2.35 The term "Third Party" shall mean any Person other than Monsanto, Licensee, and their respective Affiliates.

2.36 The term "Trademark Usage Guidelines" shall mean the guidelines set forth in each Licensed Product Addendum.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A95676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

2.37    The term "Trait" (in the singular or plural) shall mean a phenotypic characteristic (e.g., agronomic or quality characteristic) of a Corn seed, plant, plant part or extract, attributable to one or more native nucleic acid sequences and/or inserted nucleic acid molecules.  Examples of agronomic traits include, without limitation, increased yield, drought and environmental stress tolerance, insect resistance and herbicide tolerance; and quality traits include, without limitation, modified protein and/or oil content. "Trait-bearing" with reference to a hybrid, inbred or line means that such hybrid, inbred or line contains one or more Traits.

2.38    The term "Unit" shall mean a quantity of approximately eighty thousand (80,000) kernels, or other quantity or weight that Monsanto shall establish by written notice to Licensee, provided, however, that Monsanto shall provide Licensee with written notice of any such change on or before March 1st in order for the change to be in effect for the next full Fiscal Year.  Any sale or transfer of a quantity different from 80,000 kernels shall be converted to an 80,000 kernel unit on a pro-rated basis by Licensee prior to reporting Units sold for each Licensed Product.

2.39    The term "www.corn-states.com" shall refer to this particular internet address, or any other internet address that Monsanto may designate from time to time as a replacement by notice to Licensee.

## Section 3 - Conveyance of Rights

3.01    **Licenses Granted by Monsanto**:

(a)    As set forth in each Licensed Product Addendum, Monsanto hereby grants, and Licensee hereby accepts a limited, non-transferable, revocable, non-exclusive, royalty-bearing license in the Territory under the Licensed Rights, the Monsanto Rights, and the Monsanto Know-How to: (i) sell and have sold each Licensed Product in the Licensed Retail Field, and (ii) produce and have produced each Licensed Product in the Licensed Production Field.  This license is subject to all of the terms and conditions of this Agreement and the applicable Licensed Product Addendum.

(b)    Upon written notice by Monsanto, Licensee shall treat Licensed Products (i) with one or more Seed Treatments from the Monsanto approved list to be provided in any Licensed Product Addendum hereto, and/or (ii) to the minimum seed treatment standards as required by Monsanto.  Upon such notice Monsanto will also specify if some specific portion or if all of Licensee's Licensed Products must be so treated.  Monsanto may provide such notice and update any Licensed Product Addendum on or before May 1 of each Fiscal Year for sales of Licensed Products in the following Fiscal Year.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A95676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

3.02     **General Restrictions:**

(a)     <u>Distribution to Third Parties</u>.  Licensee is not licensed to, and shall not sell or transfer any Licensed Product to any Third Party, except as expressly authorized in this Agreement.

(b)     <u>No sublicensing</u>.  This license does not include the right to grant sublicenses under any Licensed Rights, Monsanto Rights, or Monsanto Know-How.

(c)     <u>Reservation of Rights</u>.  Except for those rights expressly granted in this Agreement and in each Licensed Product Addendum, Monsanto reserves all other rights and privileges.

(d)     <u>Field of Use Restriction</u>.  The rights granted to Licensee are strictly limited to the Licensed Production Field and Licensed Retail Field.  Licensee is not licensed to, and shall not use any Licensed Product or Licensed Event or Monsanto technology for any other purpose outside of the Licensed Production Field and Licensed Retail Field.

(e)     <u>No Breeding.</u>  Licensee is not licensed to, and shall not conduct any breeding activities with any Parental Inbred Seed or Licensed Product.

(f)     <u>Territorial Restrictions</u>.  Licensee is not licensed in any country outside the Territory for any purpose.  Licensee shall not introduce or use any Licensed Product or biological materials containing a Licensed Event in any country outside of the Territory or make any use of materials containing any Licensed Event (alone or in combination with other Licensed Events) supplied to Licensee by a Third Party that is not expressly licensed by Monsanto to supply such materials to Licensee in the Territory.

(g)     <u>Material Breach</u>.  Any breach of this subsection 3.02 shall constitute a material breach of this Agreement.

3.03     **Additional License Conditions – Branding, Production, Distribution, Brokerage:**

(a)     <u>Licensee Brand</u>.  Except for brands or logos otherwise required to be used in this Agreement, Licensee is not licensed to, and shall not sell, market, or promote (collectively "market") any Licensed Product under any brand or logo other than the Licensee Brand.  Any marketing of Licensed Product under a brand or logo other than the Licensee Brand, any marketing of Licensed Product under Licensee Brand after it has ceased to be an authorized brand under this Agreement, and any other breach of provisions of this subsection 3.03 shall constitute a material breach of this Agreement.

(i)     <u>Approval by Monsanto Required</u>.  Any changes or additions to the Licensee Brand listed in Appendix C must be approved in writing by Monsanto through an amendment to Appendix C, and no Licensed Product may be marketed under any additional brand or logo prior to that brand's or logo's addition to Appendix C.

(ii)     <u>Ownership and Use of Licensee Brands While Authorized</u>.  It is understood that the Licensee Brand is being authorized for use with Licensed Products so as to allow Licensee to use the Licensee Brand to clearly represent itself as the unique source of Licensed Products sold by Licensee.  Monsanto does not intend to authorize the use of, and Licensee does not intend to use,

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

the Licensee Brand in a way that could suggest that a Third Party is the source of seed products produced or sold by Licensee under license from Monsanto or in a way that could suggest that Licensee is the source of seed products produced or sold by or for a Third Party under a separate license from Monsanto, and any such use during a period when Licensee Brand is an authorized brand under this Agreement would constitute a breach of this subsection 3.03. In partial furtherance of these principles, unless Appendix C or this subsection 3.03 is first amended in writing to specifically provide otherwise, a Licensee Brand will, without any further action required by Monsanto, be immediately and automatically removed from Appendix C and cease to be an authorized Licensee Brand if at any time after the Effective Date:

(A) the Licensee Brand is not wholly owned by Licensee;

(B) Licensee has provided, through license, sale or otherwise, a Third Party with exclusive or sole rights in any field or territory in the Territory to market a seed product under the Licensee Brand; or

(C) the Licensee Brand is used in connection with the distribution of Third Party seed products, *provided* that the Licensee Brand will not be automatically removed from Appendix C where the Licensee Brand is part of and appears only as part of the legal name of Licensee, and such legal name is used along with contact information for Licensee solely in a manner reasonably necessary to indicate that Licensee is functioning as a distributor of the Third Party seed products, and *provided further* that the in-licensing and subsequent sale of Third Party traits or germplasm for use in the production of finished seed to be sold under Licensee Brand (as opposed to the distribution of finished Third Party seed) will not trigger the automatic removal of Licensee Brand from Appendix C under this subsection 3.03(a)(ii)(C).

Licensee shall provide Monsanto with written notice if a Licensee Brand no longer meets the criteria for use as set out in this subsection within thirty (30) days of the change in such status.

(iii) <u>Trade Dress and Indicia</u>. Licensee's packaging for Licensed Products must contain all of the indicia (including bag colors, labeling, logos, etc.) and all other trademarks and/or trade dress that are customarily and uniquely identified with the marketing of all of Licensee's Corn seed in the Territory ("Licensee Indicia"), and no other indicia. The Licensee Brand (and Licensee Indicia) must uniquely identify Licensee's Licensed Products in contrast to Third Party brands in commercial use.

(iv) <u>Licensee Brand Maintenance</u>. If sales of Licensed Product in a given Licensee Brand is less than five thousand (5000) Units per Fiscal Year of Licensed Product in each of two consecutive Fiscal Years, beginning with sales in Fiscal Year 2011, then such brand shall automatically and immediately cease to be an authorized Licensee Brand under this Agreement; provided that this subsection 3.03(a)(iv) shall not apply if only one Licensee Brand is authorized under this Agreement.

(v) <u>Branding, Packaging Requirements, and Contact Information</u>. The Licensee Brand shall be the only seed company brand designation on the packaging and marketing materials associated with Licensed Products. All packaging and promotional materials associated with Licensed Products shall also contain contact information for Licensee, including Licensee's name and

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

complete mailing address.  Any references to distributors or dealers on packaging of Licensed Product (and on marketing materials associated with Licensed Products), if used, shall be in plain text and no larger than 14 point font and will not exceed the font size used for Licensee's own contact information on such materials.  Other than the applicable name and contact information, no trademarks, logos, designs or trade dress components of any distributors or dealers or Third Parties shall be used on the packaging or marketing materials associated with the Licensee Brand of Licensed Products.

(vi)     <u>Third Party Trademarks</u>.  Licensee is not licensed to, and shall not use any Third Party trademark or logo in connection with marketing the Licensee Brand of Licensed Products, except for the approved Third Party trademarks set forth in Appendix B attached hereto, or as may otherwise be approved in writing by Monsanto (or in the applicable Licensed Product Addendum).

(vii)     <u>De-Authorization</u>.  Monsanto may (in its sole discretion) immediately terminate the authorization it has previously granted for any Licensee Brand that does not meet (and continue to satisfy) all of the terms and conditions of this subsection 3.03.

(b)     <u>Distribution to Third Parties</u>.  Licensee is not licensed to, and shall not sell or transfer any Licensed Product to any Third Party, except as expressly authorized in this subsection 3.03(b).

(i)     <u>Contract Production of Licensed Product</u>.

(1)     If Licensee chooses to utilize a Third Party to produce a Licensed Product on its behalf, Licensee shall only transfer to the Contract Producer the required amount of Parental Inbred Seed needed to produce the contracted amount of the subject Licensed Product (for subsequent production by that Contract Producer within the Licensed Production Field and subject to the terms of an unexpired production agreement between such Contract Producer and Licensee).  Any failure on the part of Licensee's Contract Producers to fully comply with the terms of this Agreement (including any terms of an applicable Licensed Product Addendum) shall be considered a material breach of this Agreement by Licensee.  Licensee shall maintain control of all Parental Inbred Seed provided to such Third Party by Licensee and all Licensed Product produced by such Third Party for Licensee and all unused Parental Inbred Seed shall be returned to Licensee.  Further, all Licensed Product not transferred to Licensee shall be disposed of as commodity grain in full accordance with all terms and conditions of the Monsanto Grower Agreement between Monsanto and such Third Party.

(2)     If Licensee chooses to utilize a Third Party seed company licensed to the applicable Licensed Product to produce such Licensed Product on its behalf, Licensee shall only transfer to such seed company licensee the required amount of Parental Inbred Seed needed to produce the contracted amount of the subject Licensed Product for subsequent production by that Third Party seed company licensee within the Licensed Production Field and subject to the terms of an unexpired production agreement between such Third Party seed company licensee and Licensee.  Licensee shall maintain control of all Parental Inbred Seed provided and Licensed Product produced by such Third Party and all unused Parental Inbred Seed shall be returned to Licensee.  Further, all Licensed Product not

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

transferred to Licensee shall either be: (x) disposed of as commodity grain, or (y) retained by such Third Party seed company licensee.  In both cases, such disposal or subsequent use shall be subject to all terms and conditions of the license agreement(s) between Monsanto and such Third Party seed company for the applicable Licensed Product.

(3)    From time to time during the period of this Agreement, Licensee shall permit, and shall cause its Contract Producers to permit, properly qualified and authorized representatives of Monsanto to have reasonable access to the production fields for Licensed Product and the personnel involved in the production of Licensed Products for the sole purpose of verifying that Licensee is in compliance with the provisions of this Agreement.

(ii)    <u>Direct Sales to Licensed Growers</u>.  If Licensee directly sells Licensed Product, Licensee shall only sell such Licensed Product within the Licensed Retail Field to Licensed Growers, including Licensee if Licensee is a grower.  Licensee is not licensed to, and shall not sell or transfer Licensed Product to any Third Party for planting unless such Third Party is licensed by Monsanto.  For purposes of clarity, Licensee is not licensed to, and shall not sell or transfer Licensed Product to any De-Licensed Grower.

(iii)    <u>Sale to Licensed Growers by Retailers and/or Dealers</u>.  If Licensee chooses to distribute Licensed Product through dealers and/or retailers and/or other agents, Licensee shall only do so through Contract Dealers (for subsequent sale of such Licensed Product by that entity in the Licensed Retail Field).   Licensee and its Contract Dealers are not licensed to, and shall not sell or transfer Licensed Product to any Third Party for planting unless such Third Party is licensed by Monsanto.

(iv)    <u>Production, Conditioning, and Selling of Licensed Product By a Single Entity</u>.  Notwithstanding the foregoing provisions, Licensee is not licensed to, and shall not authorize or cause a single Contract Producer to produce, condition, and sell any Licensed Product produced on behalf of Licensee by such Contract Producer, except in the case where such Contract Producer: (1) is an established distributor/retailer of agricultural seeds, (2) has entered into a dealer agreement with Licensee as set forth in Appendix A, and (3) is in full compliance with the terms and conditions of the applicable terms of this Agreement.

(c)    <u>Administration of Monsanto Grower Agreements</u>.

(i)    <u>Monsanto's Discretion</u>.  Monsanto shall have the sole right to license any Person under the Monsanto Grower Agreement.  Further, Monsanto shall have sole discretion concerning all aspects of the Monsanto Grower Agreement, including the terms and conditions thereof, the timing and content of any amendments to a Monsanto Grower Agreement, and the decision to enter or terminate the Monsanto Grower Agreement with any Person.

(ii)    <u>De-Licensing Due to Violations of Monsanto Grower Agreement</u>.  Monsanto may refuse to enter a Monsanto Grower Agreement, or terminate any existing Monsanto Grower Agreement, with any grower (or other Person that obtains seed therefrom) that Monsanto

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

reasonably believes has violated (or may violate) the terms of the Monsanto Grower Agreement, or that has supported or assisted in such violations.

(iii)   Signing of Monsanto Grower Agreements.   Licensee shall provide the skill, personnel, equipment, facilities and supplies required to administer the Monsanto Grower Agreement in connection with any sales or transfers of Licensed Product sold under the Licensee Brand, in the form and manner (including electronically) mandated by Monsanto from time to time.   In doing so, Licensee and its Contract Dealers shall not sign a Monsanto Grower Agreement on behalf of any Person except when the Licensee and/or its Contract Dealer is the grower, as the case may be.   Licensee shall keep copies of all signed Monsanto Grower Agreements.

(d)   Wholesale Transactions.   Except as may be provided to the contrary in a given Licensed Product Addendum, in order to give Licensee the opportunity to sell excess quantities of certain Licensed Products at wholesale, Licensee may sell such excess quantities to another of Monsanto's licensees having the rights to sell such Licensed Product(s) under its own authorized brand if and only if such wholesale transactions are: (1) in the case of Licensed Product(s) originated by Monsanto, its Affiliates or their respective germplasm licensors, authorized by or brokered through Corn States LLC, of Des Moines, Iowa, or its designee; or (2) in the case of authorized Third Party sources other than Monsanto, its Affiliates or their respective germplasm licensors, brokered through such Third Party or its designee.

### 3.04   Supply and Maintenance of Parental Inbred Seed:

(a)   Parental Inbred Seed Purchases and Maintenance.   Licensee is not licensed to produce, and shall not produce any Parental Inbred Seed.   Licensee shall purchase from Monsanto or its designee (or the designated Third Party supplier of a given Parental Inbred Seed) all of Licensee's requirements of Parental Inbred Seed needed to produce Licensed Product.

(b)   Supply Constraints.   Monsanto (or the Third Party supplier for a given Parental Inbred Seed) has sole discretion over decisions to produce and/or supply Parental Inbred Seed, including whether Monsanto (or the Third Party supplier) will produce and/or supply none, some, or all of the Parental Inbred Seed requested.   Licensee understands and accepts that its ability to produce a given Licensed Product may be limited if Monsanto (or the Third Party supplier) does not supply all of the requested volumes of Parental Inbred Seed to Licensee.

(c)   Fees for Parental Inbred Seed.   Licensee will pay a fee for all Parental Inbred Seed purchased as determined by using the most recent price list published by Monsanto for that subject Licensed Product (or by the Third Party supplier for the Parental Inbred Seed).

### 3.05   Product Labeling:

(a)   General provisions.   Licensee shall conspicuously display directly on all packages containing Licensed Products to be transferred to Third Parties the most current patent notice,

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

logo, stewardship statement, and/or other notice provisions as specified by Monsanto from time to time, including notice that purchasers must obtain a license from Monsanto before purchasing or using any Licensed Product.  Licensee agrees that Monsanto may provide Licensee with notice of such marking requirements by making them available at www.corn-states.com, and Licensee agrees to obtain and use the most current requirements prior to printing any packaging or other materials for Licensed Products.

(b)     Changes to Labeling.  Monsanto reserves the right to amend or otherwise specify substitute language for any patent notice, logo, stewardship statement, or other notice provisions under this subsection 3.05.  Licensee agrees to consult this information before printing new bags or labeling materials and to promptly implement and use any such amended or substituted notice.

3.06    **Trademark Requirement and Usage:**  The trademarks that Monsanto requires Licensee to use with any Licensed Products shall be licensed to Licensee on a non-exclusive basis pursuant to each applicable Licensed Product Addendum.  Licensee shall comply with all provisions of the applicable Trademark Usage Guidelines which may be amended from time to time by Monsanto, or where applicable by an Involved Third Party Co-Licensor, in each Licensed Product Addendum.  Licensee agrees that Monsanto may provide Licensee with notice of marking requirements by making them available at www.corn-states.com, and Licensee agrees to obtain and use the most current requirements prior to printing any packaging or promotional materials for any given Licensed Products. Any breach of the trademark provisions of a Licensed Product Addendum shall be deemed a material breach of this Agreement.

3.07    **Stewardship and Product Management:**

(a)     General Stewardship Plan.  Licensee shall have in place a general stewardship plan designed to meet applicable stewardship and regulatory requirements, to satisfy the terms of this Agreement, and to maintain the integrity, identity, purity and control of Licensed Events and Licensed Products.  This plan will consist of Licensee's standard operating procedures and best practices to carry out those elements set forth below, and any other elements of the product life cycle which are applicable to Licensee's operations and activities authorized or required under this Agreement.  Examples of the elements of product life cycle stewardship include:  product launch stewardship; a quality control ("QC") testing plan; post launch stewardship requirements such as weed or insect resistance management and surveillance, grain marketing, accounting or disposition management plans, and volunteer monitoring; material identification and traceability; processes for maintaining intended product identity and purity including field isolation, equipment cleaning, material segregation, material labelling, and QC testing; and product discontinuation processes and documentation.  The requirements for such stewardship plan applicable to a subject Licensed Event and Licensed Products shall be made available to Licensee by Monsanto posting such requirements at www.corn-states.com, and Licensee agrees to obtain and

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676A0

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

implement the most current stewardship requirements applicable to and posted for such Licensed Events and Licensed Products.

(b)    Participation in Trait-Related Stewardship Programs.    To the extent that Monsanto has established trait stewardship programs applicable to a particular Licensed Event and Licensed Product, Licensee agrees to participate in and support any Trait-related stewardship programs (such as insect or weed resistance management plans) as directed by Monsanto from time to time.  In its participation, Licensee agrees to strictly adhere to the program designated by Monsanto.    The requirements of such program will be set forth in the Monsanto Technology Use Guide and/or made available to Licensee by Monsanto posting such requirements at www.corn-states.com.    Licensee understands and agrees that, in participating and supporting such programs, Licensee may be required to:

(i)    print resistance management and stewardship statements on all product containers and/or bulk product label sheets;

(ii)    train all Contract Dealers and agronomists in the latest resistance protocols and direct them to educate growers on proper product stewardship;

(iii)    conduct follow-up calls on purchasers of Licensed Products to determine compliance with the Monsanto Grower Agreement and any resistance and management program which may include mandated refuge areas;

(iv)    if the Licensed Product is an insect protection product, collect insects for the purpose of insect resistance management or investigation of a performance complaint by a grower, and provide the collected insects to Monsanto; and/or

(v)    report sales of each individual Licensed Product by county or other geographic area requested by Monsanto from time to time.

(c)    Regulatory and Legal Compliance.  Licensee will perform all duties under this Agreement in accordance with all applicable U.S., state or country laws and regulations, and with all Monsanto compliance, quality assurance and control and stewardship requirements, including the requirement in all cases to immediately report any compliance infraction to Licensee's Monsanto contact.

(d)    Legal Permits, Notifications, Authorizations.    To the extent that any legal approvals or documents are required to enable the activities under this Agreement, Monsanto shall obtain such approvals and documents, and Licensee shall follow the requirements of such approvals and maintain full regulatory and legal compliance.  This includes USDA permits and notifications, EUPs, country or state authorizations or approvals, certificates for regulated materials (e.g. phytosanitary), and necessary approvals for seed movement, importing, or exporting seed.  To the extent that any legal approvals or documents are required in the ordinary course of Licensee's business, and not related to the regulated status of Licensed Events or Licensed Products, the Licensee shall obtain such approvals and documents.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

(e)     <u>QC Testing Plan</u>.  Licensee shall have a QC testing plan with defined sampling and acceptance criteria (i.e., specifications) for product identity, event and trait purity.

(f)     <u>Audit</u>.   Monsanto, at its sole discretion, shall have the right to audit the stewardship and quality processes and plans of Licensee and any contractor of Licensee at reasonable intervals and times for compliance with this Agreement or to contract a Third Party on its behalf and at its expense to conduct such audit.  Monsanto may share the results of the audit with the Involved Third Party Co-Licensor where applicable.  Licensee must respond to audit findings and take appropriate actions, approved by Monsanto, to remedy findings of non-compliance with this Agreement.  Licensee must permit properly requested inspections by authorized regulatory officials, and must notify Monsanto immediately of any such requests.

(g)     <u>Biotechnology Material Control and Traceability</u>.   Licensee must have documented processes and procedures in place to maintain the integrity and control of Licensed Events and Licensed Products, including preventing contamination with any unintended biotechnology event.  Licensee must keep accurate, detailed and auditable records of the custody, location and movement/transfer of all plant materials received under this Agreement and of all progeny seed produced therefrom, and of all associated activities under this Agreement.

(h)     <u>Incident Response</u>.  Licensee must have a process in place that is designed to effectively manage internal and external communications and actions in the event of a significant non-conformance with the potential to impact product integrity, regulatory compliance, stewardship/quality standards or affect external stakeholders and/or markets.  Any significant non-conformance, including unintended presence or loss of material control, should be reported to the Monsanto quality assurance lead for the geography immediately.  Licensee will execute and/or support an incident response plan approved by Monsanto that is specific to the situation at hand including appropriate documentation and record keeping.

(i)     <u>Quality Management Systems</u>.  Licensee must establish a process-based quality management system designed to satisfy the requirements of this Agreement, as further detailed in Appendix E and any applicable quality assurance plan set forth in a Licensed Product Addendum, and/or as may be set forth in the Monsanto Technology Use Guide, and/or as may be made available to Licensee by Monsanto posting such requirements at <u>www.corn-states.com</u>.  Licensee must self-certify that it has appropriate process based quality management systems in place designed to be consistent with leading industry programs, including the Excellence Through Stewardship™ program (<u>www.excellencethroughstewardship.com</u>), to meet applicable regulatory requirements and industry standards, and to meet the terms of this Agreement.

(j)     <u>Contract Production</u>.  Licensee must require that any and all contractors meet the quality, stewardship and documentation requirements required of contractor under this Agreement.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

3.08    **Product Specification and Promotion:**

(a)    <u>General.</u>  All Licensed Products being sold under this Agreement must meet the applicable Commercial Product Standard in the applicable Licensed Product Addenda for such Licensed Products.

(b)    Licensee shall cooperate with Monsanto in the implementation of marketing programs developed for Licensed Products by Monsanto.  Licensee shall also participate with Monsanto in conducting marketing research which may include customer surveys targeted at growers.

(c)    Licensee shall submit to Monsanto a marketing plan for Licensed Products prior to each selling season and shall include positioning statements and taglines that are approved by Monsanto on all promotional materials.

(d)    Licensee shall invite Monsanto representatives to participate in annual sales meetings or other meetings to the extent such meetings are requested by Monsanto as part of its communication plan, to communicate information about the applicable Licensed Product, including market positioning, resistance management strategies and grower follow-up to assess Licensed Product performance and compliance with the Monsanto Grower Agreement.

3.09    **Additional Responsibilities of Licensee:**

(a)    <u>General</u>.  The services of this subsection 3.09 shall be performed in an efficient, safe and timely manner at Licensee's location and in accordance with such instructions provided by Monsanto from time to time.  The services set forth in this subsection 3.09 may be reasonably amended by Monsanto from time to time.

(b)    <u>Additional Responsibilities</u>.  Licensee agrees to perform the following activities:

(i)    <u>Handling of Licensed Product</u>.  Licensee shall be responsible for its own production, packaging, distribution and sale of Licensed Products, and ensuring its compliance with the terms and conditions of this Agreement and the applicable Licensed Product Addendum.

(ii)    <u>Trademarks and Promotional Materials</u>.  Licensee shall include the trademark, logo, and positioning statements or taglines for the applicable Licensed Product specified by Monsanto for use on all promotional materials for such Licensed Product in accordance with the Licensed Product Addendum.  Licensee agrees to use promotional efforts for products sold under this Agreement and the applicable Licensed Product Addendum that are at least comparable to promotional efforts for other comparable Trait-bearing products.

(iii)    <u>Customer Inquiries or Complaints</u>.  Licensee shall handle the initial stages of any customer inquiries or complaints regarding the performance of any Licensed Product.  In the event that such inquiry or complaint involves issues regarding resistance or resistance management, Licensee shall immediately notify Monsanto.  Licensee shall document all complaints and provide a product performance report (claim submission) within thirty (30) days of the close of each Fiscal Year.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

Monsanto shall have the right to participate in any and all responses to grower complaints and claim submission settlements (currently provided through Roundup Rewards®) at its sole discretion.

(iv)  <u>Licensed Product Training</u>.  Licensee shall conduct technical training meetings for its employees and Contract Dealers as may be appropriate in its discretion.  Any training materials regarding Licensed Products not provided directly by Monsanto must be approved in writing by Monsanto prior to use by Licensee or its Contract Dealers.

(v)  <u>Grower Education Plan</u>.  Licensee shall conduct meetings as may be provided for in Monsanto's Grower Education Plan, to explain to growers the benefits of Licensed Products as well as the stewardship responsibilities for use of Licensed Products, where the term "Grower Education Plan" means the most recent product use information provided by Monsanto in written and electronic form including Monsanto Technology Use Guides, resistance management guides, protocols and literature, computer and on-line training and grower meeting speaking points as they may be published from time to time.

(vi)  <u>Performance Data</u>.  Upon request by Monsanto, Licensee shall provide to Monsanto performance data for each Licensed Product compared to competitive cropping systems designated by Monsanto, including but not limited to: yield information within thirty (30) days of collection by Licensee, grower testimonials, and secondary benefits.  Monsanto shall be permitted to pool data collected for Licensed Products with similar data from other licensees of the applicable Licensed Event and use the pooled data for sales promotion activities.

(c)  <u>Grower Data</u>.  Licensee shall permit Monsanto to use the names and addresses of purchasers of Licensed Products in direct marketing of Licensed Events and/or for direct communications regarding Channeling Programs; provided, however, that Monsanto shall not disclose the specific names and addresses of purchasers of Licensed Product to any Third Party seed company except in the form of a licensed grower list such as that posted to <u>www.corn-states.com</u> or as required by law.  Monsanto shall take reasonable action to use separate personnel to handle the names and addresses of individual growers purchasing from Licensee from the personnel directly involved in the marketing of Corn products under brands used by Monsanto or its Affiliates, however Monsanto and its Affiliates may use common data entry and data management staff to process data and prepare reports.

3.10  **<u>Addition or Removal of Licensed Products</u>.**

(a)  <u>General</u>.  Monsanto shall have full discretion to add or remove any or all Licensed Products from any schedule of Licensed Products associated with a Licensed Product Addendum at any time; provided, however, Monsanto shall provide three (3) years prior written notice of the removal of Licensed Products.  Subject to all other terms of this Agreement and any applicable License Product Addendum, Licensee shall have the right to continue selling such Licensed Products during such three (3) year notice period.

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

(b)    <u>Final Destruction</u>.  At the expiration of such three (3) year period, Licensee shall within ten (10) business days of such expiration destroy and/or dispose of as commodity grain all remaining seed of the withdrawn Licensed Product and any Parental Inbred Seed that is not to be used in the production of another, remaining Licensed Product.  Licensee shall certify such destruction and/or disposal to Monsanto.

(c)    <u>Other Withdrawal</u>.   Notwithstanding any of the foregoing provisions of this subsection 3.10, Monsanto may (at its discretion) require Licensee to immediately cease producing and/or selling such Licensed Product.  In such instances, Monsanto shall notify Licensee in writing to that effect and, from the effective date of such notice, Licensee shall no longer produce and/or sell (as the case may be) the applicable Licensed Product if: (1) a Licensed Product has been erroneously included in a schedule to this Agreement or any Licensed Product Addendum, or (2)  Monsanto reasonably concludes that any activities Licensed under this Agreement or any applicable Licensed Product Addendum with respect to any or all Licensed Products should be halted (whether temporarily or permanently) due to a proposed or issued order by a governmental body (e.g., court or regulatory authority), and/or a pending or threatened Third Party suit against Monsanto (or any of its licensees or where applicable an Involved Third Party Co-Licensor), relating to such Licensed Product(s), or (3) Monsanto reasonably concludes that the continued sale of Licensed Products should be halted and Monsanto halts sales of its own and its Affiliates' products containing the same Licensed Event(s).  Upon such notice from Monsanto, Licensee shall immediately cease all sales and production of the applicable Licensed Product, and remove and secure any existing inventories of Licensed Products, or seed of such Licensed Product then in production.  If otherwise legally permissible, Licensee shall be allowed to sell the seed of the affected Licensed Products as commodity grain.  Monsanto shall not be liable for any claims against Licensee, or costs or damages sustained by Licensee as a result of its compliance with the terms of this subsection.

(d)    <u>Material Breach</u>.  Any breach of this subsection 3.10 shall constitute a material breach of this Agreement.

### <u>Section 4 – Product Royalty, Payments, Reports and Record Retention</u>

4.01    **<u>Product Royalty:</u>**

(a)    <u>General</u>.  Each Fiscal Year, Licensee shall pay a Product Royalty to Monsanto for every Unit of Licensed Product sold or transferred to Third Parties (other than as commodity grain) and not returned to Licensee, or planted or otherwise used commercially by Licensee or any of its Affiliates in such Fiscal Year, including but not limited to Units of seed used as sample, test, plot, or promotional seed.  The Product Royalty (per Unit) for each Licensed Product shall be set forth in the schedule to the applicable Licensed Product Addendum.  Subject to the terms of subsection 4.01(c), the

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

Product Royalty payable by Licensee shall be the Product Royalty effective at the time of planting such Licensed Product.

(b)    Estimated Product Royalty Range.  Monsanto shall supply Licensee with a Product Royalty range for each Licensed Product on or before March 1 for the subsequent Fiscal Year (e.g., March 2009 for the 2010 Fiscal Year).  This notice is a forecast only, and shall not obligate Monsanto to charge a Product Royalty within the range disclosed pursuant to this subsection.

(c)    Product Royalty Notice.  Monsanto shall notify Licensee of the final amount of the Product Royalty for each Licensed Product on or before July 1 for the subsequent Fiscal Year.  The Product Royalty included in such notice shall be effective until a subsequent notice is given.  If for any reason a Licensed Product or withdrawn Licensed Product is listed without specifying the Product Royalty, then upon written request by Licensee, Monsanto shall at its discretion either amend the applicable exhibit to remove that product or specify a Product Royalty for such product.

(d)    Final sales.  After the sell-off period set forth in subsection 3.10(a), the Product Royalty for any such Licensed Product shall no longer be included in any Product Royalty notices, and the provisions of subsection 3.10(b) shall apply.

4.02    **Payments to Monsanto by Licensee:**

(a)    Product Royalty.  The Product Royalty shall be paid as follows:

(i)    By June 25 of each Fiscal Year, Licensee shall remit to Monsanto a partial Product Royalty payment of at least seventy percent (70%) of the total Product Royalty payable by Licensee in the last full Fiscal Year.

(ii)    By August 15 of each Fiscal Year, Licensee shall remit to Monsanto the full Product Royalty payable by Licensee for the then-current Fiscal Year, minus the amount already remitted to Monsanto under subsection 4.02(a)(i), above.  If no such additional payment is due from Licensee, a written report from Licensee shall so state.  If the payment made under subsection 4.02(a)(i) above exceeds the total Product Royalty due in a given Fiscal Year, then Monsanto shall reimburse Licensee for any such overpayment within thirty (30) days of receipt of Licensee's final report pursuant to subsection 4.03(c).

(b)    Parental Inbred Seed Fees.  Fees for all Parental Inbred Seed purchased from Monsanto or its designee shall be paid by June 25 of each year, or net thirty (30) days if invoiced after May 25 but on or before August 15 of that Fiscal Year.

(c)    Failure to Make Payments.  Any failure to timely pay a fee for Parental Inbred Seed and/or Product Royalty shall constitute a breach of this Agreement.  Any delinquent payment in excess of five thousand dollars ($5,000.00) shall also constitute a material breach of this Agreement.

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

4.03    **Forecasting and Reporting**:

(a)    <u>General</u>.  Licensee shall provide to Monsanto reports on all Licensed Products (including the seed supply, the production forecast and the sales forecast for the remainder of each current Fiscal Year and the subsequent Fiscal Year), on a product by product basis, on or before the twenty-fifth (25th) day of the following months:  January, April, June, July and November or such other dates as Monsanto may specify from time to time.  The reports shall be in the form provided by Monsanto which may be reasonably amended from time to time upon notice.  This information shall be deemed Confidential Information and subject to Section 9 below.

(b)    <u>Forecasts</u>.  Licensee shall provide to Monsanto reports (on dates and in such form specified by Monsanto) on all Licensed Products including the seed production forecast and sales forecast for the remainder of the current Fiscal Year and the seed production forecast and sales forecast for the upcoming Fiscal Year.  These reports shall specify the hybrids and the source of the germplasm (if from a Third Party) for the supply and the sales forecast.  Each report shall also include forecast and actual sales for total Units of any Corn hybrid for both the current Fiscal Year and the upcoming Fiscal Year.  This information shall be deemed Confidential Information and subject to Section 9 below.

(c)    <u>Sales Reporting Obligations.</u>  Each Fiscal Year, unless otherwise set forth in the applicable Licensed Product Addendum, on or before August 10th Licensee shall submit to Monsanto a final report for the entire current Fiscal Year summarizing the total number of Units of Licensed Products sold or transferred for planting in such Fiscal Year, or otherwise used by Licensee in such Fiscal Year, that includes details on a Licensed Product and geographic basis (e.g. county or other geographic area as specified by Monsanto) regarding the Product Royalty owed to Monsanto.  The reports shall be in the form provided by Monsanto which may be reasonably amended from time to time upon notice.  This information shall be deemed Confidential Information and subject to Section 9 below.

(d)    <u>GPOS Reporting Obligations.</u>   Unless otherwise set forth in the applicable Licensed Product Addendum, on or before September 25th of each Fiscal Year Licensee shall submit grower point of sale ("GPOS") data (including but not limited to, grower name, address, Monsanto Grower Agreement number and Units of each Licensed Product) for all Units of Licensed Product transferred by Licensee during the immediately preceding Fiscal Year.  In the event that Units of Licensee Brand of Licensed Product were sold or transferred to a co-op or purchasing group, such sales must be disaggregated to identify the individual growers' GPOS data and Units of each Licensed Product purchased by each.

(e)    <u>Electronic Transmission of Reports by Licensee</u>.   Monsanto may, at its discretion, require that the reports to be provided by Licensee to Monsanto under this subsection 4.03 be delivered by Electronic Transmission.   Monsanto may use the method of Electronic Transmission provided for under subsection 10.01(a) and the provisions of subsection 10.01(b) shall apply.

(f)    <u>Material Breach</u>.  The failure to provide the reports required under this subsection 4.03 shall constitute a material breach of this Agreement.

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

4.04    **Ongoing Financial Assurances:**

    (a)    Financial Records.  During the term of this Agreement, Licensee shall, on an annual basis, provide to Monsanto audited financial statements (including balance sheet, income statement, statement of cash flows, with Third-Party auditor comments) within ninety (90) days following the end of Licensee's fiscal year.  If for the most recent Fiscal Year, Licensee's aggregate royalty under all trait and germplasm agreements between Licensee and Monsanto or its Affiliates was less than Ten Million Dollars ($10,000,000.00) Licensee may provide unaudited financial statements.

    (b)    Further Assurances Required.  If the annual financial statements provided by Licensee under this subsection 4.04, or any other information (e.g., credit reports) available to Monsanto at any time, should reasonably cause Monsanto to have concerns regarding Licensee's ability to pay amounts due, or forecasted to be due, under this Agreement, or any other agreements Licensee and its Affiliates have with Monsanto and its Affiliates, or if Licensee (and/or its Affiliates) should fail to make a timely payment to Monsanto and/or its Affiliates, Monsanto may so notify Licensee in writing and Licensee shall have thirty (30) days from the date of receipt of such notice to provide assurances of payment to the satisfaction of Monsanto.  The assurances required by Monsanto may include, for example, Licensee providing more frequent audited financial statements, advance payment of estimated Product Royalties, or an irrevocable standby letter of credit.  In the event Licensee fails to provide adequate assurances of payment within such thirty (30) day period, such non-compliance shall be deemed an uncured breach of this Agreement and Monsanto shall have the right to terminate this Agreement by providing written notice to Licensee.

4.05    **Set-off for Amounts Owed by Licensee:**

    (a)    General.  Licensee agrees that, without further notice to Licensee, Monsanto may apply any or all payments received under this Agreement against any unsatisfied past-due amount owed by Licensee (and/or any of its Affiliates) to Monsanto (and/or any of its Affiliates) under any other agreement between such entities, and/or withhold any payments due to Licensee under any such other agreements in satisfaction of any past-due debts owing under this Agreement.  Monsanto shall have sole discretion in choosing whether to offset such debts, and the amount of such offset.

    (b)    No Waiver.  Monsanto's election to offset any past debt shall in no way constitute a waiver or release of any claim by Monsanto (or its Affiliates) against Licensee (or its Affiliates) for the breach of any agreement with Monsanto or its Affiliates.  Further, any partial offset of a debt owed by Licensee and/or its Affiliates shall in no way relieve Licensee and its Affiliates from paying the remaining amount owed, including any interest and other financial damages and penalties that may have accrued.

4.06    **Records Retention and Audits:**

    (a)    General Record Keeping.  Licensee shall keep accurate and complete books and records in accordance with generally accepted accounting principles ("GAAP") of the Financial

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

Accounting Standards Board ("FASB") showing the amount and identity of all Licensed Products sold or otherwise transferred (including but not limited to, wholesale transactions) to Third Parties or planted or otherwise used commercially by Licensee, and the records establishing the delivery, processing, cleaning, conditioning and disposition of all seed of all Licensed Products (including, but not limited to, seed and/or grain harvested from the Licensed Production Field, regardless of whether produced for use by Licensee or another Monsanto licensee) subject to the terms of this Agreement. If Licensee utilizes another Monsanto licensee to produce Licensed Product, the records for such production may be kept by such other Monsanto licensee.

(b)     Audit Rights. Licensee further shall permit and cooperate in the examination of their books and records described in this subsection 4.06 as requested by Monsanto or its auditors from time to time in order to verify compliance with this Agreement or any other agreement between Monsanto (and/or its Affiliates) and Licensee (and/or its Affiliates). Such confidential examination will be made at Monsanto's discretion by either: (i) an independent auditing firm appointed by and at the expense of Monsanto, which firm shall be reasonably acceptable to Licensee, or (ii) Monsanto's internal auditors. Such records shall be kept and examination thereof shall be limited to a period of time no more than three (3) Fiscal Years immediately preceding the request for examination. Upon request by Monsanto or its auditors to examine Licensee's books and records under this Agreement or any other agreement between Monsanto (and/or its Affiliates) and Licensee (and/or its Affiliates), Licensee shall schedule a time for such examination, reasonably acceptable to Monsanto or its auditors, within thirty (30) days of such request. In the event that Monsanto or its auditors notify Licensee of the materials and information that must be made available for inspection and the personnel that must be made available for interview prior to any such examination or interview, and Licensee fails to make any material, information, or personnel available at a single location as requested, then Licensee shall immediately reimburse Monsanto for the full cost of such attempted examination and the completion of the requested examination.

(c)     Underpayment by Licensee. In the event that any audit of Licensee's performance under this Agreement or any other agreement between Monsanto (and/or its Affiliates) and Licensee (and/or its Affiliates) shall uncover an underpayment to Monsanto or its Affiliates of more than one percent (1%) of any amount due under this Agreement or any such other agreement for any Fiscal Year, then Licensee shall immediately reimburse Monsanto for the full cost of such audit unless the aggregate underpayment under all agreements is less than five thousand dollars ($5,000.00).

4.07     **Methods for Payment:**

(a)     Each payment to Monsanto hereunder shall be so designated and either be:

DocuSign Envelope ID: E57E97C3-A59B-4A5F-9A3E-2B44A05676A0

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

(i)      made by wire transfer to Monsanto's account:

Northern Trust
ABA 071000152
Account # 30729297
Account Name: Corn States Product Royalty Receipts
Wire Detail:  Corn States Product Royalty Payment for Account #
             and Account Name

or another account in the United States which Monsanto may subsequently designate from time to time by notice to Licensee.  Licensee shall provide written notice of each such wire transfer to Monsanto; or

(ii)      made by check sent by mail to:

Monsanto Company
75 Remittance Drive – Suite 1675
Chicago, IL 60675-1675

or another location in the United States which Monsanto may subsequently designate from time to time by notice to Licensee; or

(iii)      made by check sent by reputable courier service to:

Northern Trust Company
Attn: Monsanto Company – Suite 1675
Receipts & Dispatch – 8th Floor
350 North Orleans Street
Chicago, IL 60654
Phone number 312-660-5124 (if required by the carrier for delivery)

or another location in the United States which Monsanto may subsequently designate from time to time by notice to Licensee.

(b)      Each payment to Licensee hereunder shall be made by check sent to:

Latham Hi-Tech Hybrids, Inc.

208 Brickyard Court

Sheffield, IA 50475

or another location in the United States which Licensee may subsequently designate from time to time by notice to Monsanto.

4.08    **Late Payments:**

(a)      If Licensee or Monsanto fails to pay on the due date any amount which is payable under this Agreement to either Monsanto or Licensee, respectively, then, without prejudice to other subsections of this Agreement, that amount shall bear interest compounded quarterly from the due date until payment is made in full, both before and after any judgment, at an annual rate of four (4) percentage points above the prime interest rate offered by Citibank (or other major bank designated by

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

Monsanto from time to time upon written notice) on the day payment was due, until paid, which amount shall not exceed the limits of applicable laws.

(b)     Licensee agrees to pay expenses, including attorneys' fees, reasonably incurred by Monsanto in efforts to collect any amounts due Monsanto or otherwise enforce any provision of this Agreement.

## Section 5 - Regulatory Approval and Channeling Programs

5.01    **Regulatory Submissions:**   Licensee is not licensed to, and shall not perform any regulatory testing or make any regulatory submissions involving any Licensed Event(s) in a Licensed Product.  All decisions concerning regulatory submissions and testing of any Licensed Events shall be left to the sole discretion of Monsanto (and in some cases, the discretion of Monsanto and certain Third Party licensors of a given Trait).

5.02    **Channeling Programs:**  If it is determined that a given Licensed Product should be subject to a Channeling Program for any reason, Monsanto shall provide written notice of such to Licensee, with the relevant details of such Channeling Program.  Thereafter, Licensee shall comply with the requirements of such Channeling Program in any production and/or sales of the applicable Licensed Products.

## Section 6 – Intellectual Property Rights

6.01    **Patent Procurement:**   Monsanto shall have the exclusive right to apply for, seek issuance of, and maintain or abandon any or all of the Monsanto Rights.

6.02    **Patent Enforcement:**

(a)     Notice of Infringement.   Licensee and its Affiliates shall give prompt notice to Monsanto of any infringement or claim of infringement of the Monsanto Rights or Licensed Rights which may come to their attention.

(b)     Monsanto Legal Actions.   Monsanto shall have the exclusive right (but not the obligation) to institute and conduct legal action against Third Party infringers of the Monsanto Rights, and to enter into such settlement agreements as may be deemed appropriate by Monsanto.  Monsanto shall receive the full benefits of any action it takes pursuant to this subsection 6.02.

(c)     Cooperation by Licensee.   Licensee and its Affiliates shall cooperate fully in efforts to protect intellectual property rights for all products for which Licensee has obtained or subsequently obtains a license from Monsanto, including, but not limited to Licensed Products.  Such cooperation shall include, without limitation, providing information regarding whether a suspected infringer

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

is a customer of Licensee or its Affiliates, providing copies of original sales documentation reflecting any seed and chemistry (if applicable) transactions, joining Monsanto in a suit against a grower believed to be using infringing seed, and asserting in such suit any additional intellectual property that they can assert to abate such infringing seed.

6.03    **Monsanto Ownership:**  The operation of this Agreement does not transfer ownership of any materials or rights, including Monsanto Know-How, Monsanto Rights, Licensed Products, or Licensed Events or any other proprietary right owned by Monsanto or Monsanto's Affiliates.

6.04    **Ownership of Licensed Rights:**  Ownership of Licensed Rights is not transferred by this Agreement.

6.05    **Grant-backs from Licensee:**

(a)    License Option.  Licensee and its Affiliates agree to grant and hereby grant to Monsanto and its Affiliates irrevocable options to world-wide, non-exclusive, royalty-bearing licenses (with the right to grant sublicenses to Monsanto's licensees and their customers) under any patent rights owned or controlled (now or at any time hereafter) by Licensee or any of its Affiliates which may dominate the use of any Licensed Event, but excluding those inventions subject to subsection 6.05(b) below.  The license shall have terms and conditions that are deemed commercially-reasonable and customary in the field of agricultural biotechnology.  Licensee and its Affiliates shall not be required to provide Monsanto with any biological material under the terms of such license.  The options to license any patent rights shall survive expiration or termination of this Agreement and be effective for twenty (20) years from the expiration or termination of this Agreement and the applicable Licensed Product Addendum.  Licenses resulting from exercises of any such option shall be for the life of any such patent rights.  The above grant shall not include rights to proprietary germplasm of Licensee or its Affiliates.

(b)    License Grant.  Licensee and its Affiliates agree to grant and hereby grant to Monsanto and its Affiliates irrevocable, world-wide, non-exclusive, royalty-free licenses (with the right to grant sublicenses to Monsanto's licensee's and their customers) under any proprietary rights owned (now or at any time hereafter) by Licensee or any of its Affiliates which are produced or otherwise reduced to practice through Licensee's use of any Parental Inbred Seed and/or any Licensed Product and/or any Licensed Event, or that Cover any Parental Inbred Seed and/or any Licensed Product and/or any Licensed Event.  Licenses resulting shall be for the life of any such proprietary rights.  The above grant shall not include rights to proprietary germplasm of Licensee or its Affiliates.

(c)    Exercise of Option.  The option(s) for licenses of subsection 6.05(a) can be exercised by Monsanto and/or any of its Affiliates at any time during the period set forth in subsection 6.05(a), including after expiration or termination of this Agreement and/or the applicable Licensed Product Addendum, by Monsanto or its Affiliates giving written notice of such exercise to Licensee.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3F-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

(d) <u>Terms of License for Exercised Option</u>. If despite good faith negotiations, Monsanto and Licensee cannot reach agreement on the terms of such license, then determination of the license terms in dispute shall be submitted to arbitration pursuant to the provisions set forth in Appendix D of this Agreement, if requested by either Monsanto or Licensee.

(e) <u>Material Breach</u>. The failure to grant the licenses in subsections 6.05(a) and 6.05(b) shall constitute a material breach of this Agreement.

### Section 7 - Warranties and Liabilities

7.01 **Representations and Warranties:**

(a) Monsanto represents and warrants that:

(i) It is the owner of the Monsanto Rights to the extent required for the grant of rights contained herein; and

(ii) It has not previously granted, and will not grant to any Third Party during the term of this Agreement or the applicable Licensed Product Addendum, any rights and licenses under the Monsanto Rights or the Licensed Rights that are in conflict with the rights granted to Licensee herein.

(b) Licensee represents and warrants that:

(i) It has had the opportunity to and has consulted with legal counsel before entering into this Agreement and the applicable Licensed Product Addendum; and

(ii) It is legally entitled to and hereby binds its Affiliates, none of which shall take any action or omit any action that would, if performed or omitted by Licensee, constitute a breach of this Agreement or any Licensed Product Addendum.

7.02 **No Other Warranties:** EXCEPT FOR THE EXPRESS WARRANTIES IN SUBSECTION 7.01, MONSANTO MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, REGARDING:

(a) MONSANTO RIGHTS, LICENSED RIGHTS, MONSANTO KNOW-HOW (INCLUDING, WITHOUT LIMITATION, THE VALIDITY OR SCOPE OF THE MONSANTO RIGHTS OR LICENSED RIGHTS); OR

(b) LICENSED PRODUCTS, PARENTAL INBRED SEED OR LICENSED EVENTS (INCLUDING, WITHOUT LIMITATION, PERFORMANCE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR THE NON-INFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS BY SUCH); OR

(c) THE ABILITY TO OPERATE OR CONTINUE OPERATING UNDER ANY OF THE RIGHTS AND LICENSES GRANTED HEREIN; OR

(d) THE RECEIPT AND/OR MAINTENANCE OF REGULATORY APPROVALS NECESSARY FOR LAWFUL PRODUCTION AND/OR SALE OF LICENSED PRODUCTS, PARENTAL INBRED SEED OR LICENSED EVENTS.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

7.03    **Indemnification:**

(a)    EXCEPT TO THE EXTENT CAUSED BY A BREACH BY MONSANTO OF ITS WARRANTIES UNDER SUBSECTION 7.01(a) ABOVE, LICENSEE SHALL DEFEND AND INDEMNIFY AGAINST, AND HOLD MONSANTO AND ITS EMPLOYEES, DIRECTORS, OFFICERS AND AGENTS HARMLESS FROM ANY LOSS, COST, LIABILITY OR EXPENSE (INCLUDING COURT COSTS AND REASONABLE FEES OF ATTORNEYS AND OTHER PROFESSIONALS) INCURRED FROM ANY CLAIM ARISING OR ALLEGED TO ARISE OUT OF THE DEVELOPMENT, PRODUCTION, USE, DISTRIBUTION, SALE, EXPORT, AND/OR IMPORT OF ANY LICENSED  PRODUCT BY LICENSEE; PROVIDED, THAT MONSANTO SHALL PROVIDE NOTICE PROMPTLY TO LICENSEE OF ANY ACTUAL OR THREATENED CLAIM OF WHICH MONSANTO IS GIVEN WRITTEN NOTICE BY A CLAIMANT; AND PROVIDED FURTHER THAT: (I) LICENSEE SHALL HAVE CONTROL OF SUCH DEFENSE; (II) LICENSEE SHALL KEEP MONSANTO REASONABLY INFORMED OF ALL DEVELOPMENTS; (III) LICENSEE SHALL CONSULT WITH MONSANTO PRIOR TO SETTLING ANY SUCH DISPUTE; AND (IV) NO SETTLEMENT SHALL BE FINALIZED IF SUCH SETTLEMENT HAS ANY ADVERSE FINANCIAL IMPACT ON MONSANTO.

(b)    THE INDEMNIFICATION UNDER SUBSECTION 7.03(a) SHALL NOT APPLY TO ANY CLAIM AGAINST MONSANTO FOR INFRINGEMENT OF A PATENT OWNED BY A THIRD PARTY PATENTEE, INSOFAR AS SUCH CLAIM ARISES OUT OF LICENSEE'S PRODUCTION, USE, OR SALE OF LICENSED PRODUCT AND TO THE EXTENT SUCH CLAIM SPECIFICALLY ALLEGES PATENT INFRINGEMENT BASED ON A CLAIM THAT LICENSEE'S PRODUCTION, USE, OR SALE OF SUCH LICENSED PRODUCT IS INFRINGING THE PATENT RIGHTS OF SUCH THIRD PARTY.

7.04    **Limited Liability:**  NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY LOSS OF PROFITS, LOSS OF BUSINESS, INTERRUPTION OF BUSINESS, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY KIND SUFFERED BY SUCH OTHER PARTY FOR BREACH HEREOF, WHETHER BASED ON CONTRACT OR TORT CLAIMS OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS.

## Section 8 - Term and Termination

8.01    **Term:**  The term of this Agreement shall begin on the Effective Date of this Agreement and shall end on the last to expire Licensed Product Addendum attached hereto unless earlier terminated.

8.02    **Termination Rights**

(a)    Termination for Breach.  Either Party may send a notice of breach to the other Party if the other Party has breached any of the terms of this Agreement or any applicable Licensed

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

Product Addendum.  In the notice of breach a Party may demand cure of the breach and reasonable evidence that such cure has been achieved by the breaching Party.  If either: (i) the breach is not curable, or (ii) the breaching Party does not cure the breach to the non-breaching Party's reasonable satisfaction and provide the reasonable evidence of the cure within thirty (30) days of receipt of the notice, the non-breaching Party may terminate this Agreement and/or any or all of the Licensed Product Addenda with immediate effect upon delivery of written notice to the breaching Party.  For purposes of clarity, the Licensed Product Addenda shall be separately terminable from each other and this Agreement, or may be collectively terminated (at the discretion of the non-breaching Party).

(b)     Cross Termination for Fraud or Breach of Any Agreement.  If Monsanto or its Affiliates terminate any agreement, including but not limited to this Agreement and/or any Licensed Product Addendum, with Licensee and/or any of its Affiliates because of an uncured breach by Licensee and/or any of its Affiliates (or because of fraud committed by Licensee and/or any of its Affiliates), then Monsanto and/or its Affiliates may terminate this Agreement, any Licensed Product Addendum, and any other agreements between Licensee and its Affiliates and Monsanto and its Affiliates, with immediate effect by providing written notice of such to Licensee.

(c)     Termination Due to Challenge to Monsanto Rights.  Monsanto shall have the right to terminate this Agreement and all Licensed Product Addenda with immediate effect by written notice to Licensee in the event that Licensee, its Affiliate(s), or a Third Party acting with the support of Licensee or its Affiliate(s) or a Third Party acting with the support of Licensee or its Affiliates (i) challenges, or continues to maintain any existing challenge, or materially supports a Third Party in a challenge, of the validity of any of the Monsanto Rights and/or Licensed Rights (including any pending applications for such patents) relating to a Licensed Product or (ii) files for re-examination of any of the Monsanto Rights.  This right to terminate shall also apply in the event that a challenge to validity or a re-examination is filed or maintained for any ex-U.S. counterpart of a Monsanto Right.

(d)     Termination for Fraud by Licensee.  Notwithstanding any provision of this Agreement or a Licensed Product Addendum to the contrary, if Monsanto obtains reasonably credible evidence (through audit or otherwise) that Licensee has knowingly issued a false or misleading invoice, or filed a false Product Royalty report or otherwise perpetrated a fraud against Monsanto with respect to the terms of this Agreement or any other agreement with Monsanto or its Affiliates, or any marketing or warranty program of Monsanto or its Affiliates, Monsanto may terminate this Agreement (and any Licensed Product Addenda) with immediate effect by providing written notice to Licensee.

(e)     Termination for Insolvency.  Either Party (Monsanto or Licensee) may terminate this Agreement with immediate effect upon written notice to the other Party if, at any time:

(i)     the other Party makes an assignment for the benefit of creditors or admits in writing its inability generally to pay or is generally not paying its debts as such debts become due;

SUBJECT TO CONFIDENTIALITY RESTRICTIONS

(ii)    any decree or order for relief is entered against the other Party under any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debt, dissolution or liquidation or similar law;

(iii)    the other Party petitions or applies to any tribunal for, or consents to, the appointment of, or taking possession by, a trustee, receiver, custodian, liquidator or similar official, of such other Party or any substantial part of its assets, or commences a voluntary case under the bankruptcy law of any jurisdiction;

(iv)    any such petition or application is filed, or any such proceedings are commenced, against the other Party and such other Party by any act indicates its approval thereof, consent thereto or acquiescence therein, or an order, judgment or decree is entered appointing any such trustee, receiver, custodian, liquidator or similar official, or approving the petition in any such proceedings, and such order for relief, order, judgment or decree remains unstayed and in effect for more than sixty (60) days; or

(v)    any order, judgment or decree is entered in any proceedings against the other Party decreeing the dissolution of such other Party and such order, judgment or decree remains unstayed and in effect for more than sixty (60) days.

(f)    Termination due to Change in Control of Licensee.  Monsanto shall have the right (but not the obligation) to terminate this Agreement in the event that Licensee undergoes a Change in Control.  Such termination shall be effected by written notice from Monsanto to Licensee (or the acquiring party if such Change in Control has already occurred).  Upon such notice from Monsanto, the effective date of such termination shall be deemed to be the last business day preceding such Change in Control.

(g)    Termination due to Regulatory and/or Public Acceptance Issue.  Monsanto shall have the right to terminate this Agreement and/or any applicable Licensed Product Addendum by giving thirty (30) days written notice to Licensee if, in Monsanto's reasonable business judgment, the requirements to attain or maintain regulatory approval and public acceptance for a Licensed Event in a given Licensed Product in the Territory and/or any other necessary destination export markets are prohibitive.

(h)    Termination by Licensee.  Licensee may terminate this Agreement by giving notice to Monsanto.  The termination shall be effective thirty (30) days following receipt of that notice by Monsanto.

8.03    **Effects of Expiration or Termination.**

(a)    Surviving Obligations.  Expiration or termination of this Agreement shall not relieve the Parties of any obligation accruing prior to or upon such expiration or termination of this Agreement and/or the applicable Licensed Product Addendum.  For avoidance of doubt, the obligations set forth in subsections 4.01, 4.02, 4.05, 4.06, 4.07, 4.08, 6.05, 7.03, 7.04 and 8.03 and Sections 2 and 9

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

are included in the obligations that shall survive expiration or termination of this Agreement and/or the applicable Licensed Product Addendum.

(b)  <u>Effect of Expiration or Termination</u>.  Upon expiration or  termination of this Agreement (and/or any applicable Licensed Product Addendum), Licensee shall cease all production and sales of the applicable Licensed Product and associated Parental Inbred Seed, and within ten (10) business days of such expiration, shall destroy any remaining Parental Inbred Seed and Licensed Products (except that Licensee may sell only as commodity grain (i) within such time period, any untreated Parental Inbred Seed and Licensed Product in inventory and (ii) immediately upon harvest, Licensed Product growing at the time of the notice of termination) and/or biological materials which contain any Licensed Event, and all Confidential Information relating to such; and such destruction and/or sale as commodity grain shall be promptly certified to Monsanto by Licensee in writing.  Any expiration or termination of this Agreement shall automatically result in the termination of all Licensed Product Addenda (including all Exhibits thereto).

(c)  <u>Termination of Production Rights Only</u>.  In the event of a breach of this Agreement or a Licensed Product Addendum with respect to the production of Licensed Product, then Monsanto shall have the option (at its sole discretion) to terminate Licensee's rights within the Licensed Production Field, rather than terminating all rights under this Agreement.  If Monsanto chooses to effect such a partial termination, it shall give notice to Licensee of such partial termination, and provide an amended agreement effecting the rescission of Licensee's rights to produce or have-produced any Licensed Product (and requiring Licensee to obtain all of its finished Licensed Product from a Monsanto Third Party licensee of the Licensed Product).  Upon such notice, Licensee shall immediately cease all production of the applicable Licensed Product (i.e., no further planting of the corresponding Parental Inbred Seed shall be performed by Licensee or its Contract Producers). Any Licensed Product growing at the time of the notice of termination may be carried through to harvest for sale only as commodity grain and the sale of such Licensed Products as commodity grain shall be certified to Monsanto by Licensee in writing.  The partial termination by Monsanto under this subsection shall in no way constitute a waiver of any other rights or remedies relating to Licensee's breach of the Agreement, or excuse any of Licensee's obligations or damages accruing as a result of such breach.

## Section 9 - Confidentiality

9.01  **Obligations of Confidentiality:**

(a)  <u>General</u>.  It is anticipated that it will be necessary, in connection with their obligations under this Agreement and all applicable Licensed Product Addenda, and in future discussions relating to new Traits and products containing such or relating to other products outside of this Agreement, for Licensee and Monsanto to disclose to each other Confidential Information.

(b)  <u>Identity of Confidential Information</u>.  For purposes of this Agreement, "Confidential Information" shall mean any and all proprietary information (including without limitation,

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

information related to technical, business and intellectual property matters), know-how, data, intellectual property, trade secrets, and germplasm and biological and other physical materials owned or held by either Party to this Agreement, now and in the future which is disclosed by either Party to the other Party in connection with this Agreement or in future discussions relating to new Monsanto Traits and products containing such or relating to other Monsanto products outside of this Agreement.  The Confidential Information shall include proprietary information disclosed in writing or other tangible form, including samples of materials.  If disclosed orally, the Confidential Information shall be summarized in written form within thirty (30) days by the disclosing Party and a copy provided to the recipient.

9.02    **Confidentiality and Limited Use**:

(a)    With respect to all Confidential Information and biological materials supplied under this Agreement, both Licensee and Monsanto agree as follows, it being understood that "recipient" indicates the Party receiving the Confidential Information from the other "disclosing" Party.  Confidential Information and biological material provided or disclosed to the recipient shall remain the property of the disclosing Party and shall be maintained in confidence by the recipient and shall not be provided or disclosed to Third Parties by the recipient.  All confidentiality and limited use obligations with respect to the Confidential Information and biological material shall terminate twenty (20) years after the termination date of this Agreement.

(b)    Notwithstanding any provision to the contrary, a Party may disclose the Confidential Information of the other Party: (i) in connection with an order of a court or other government body or as otherwise required by or in compliance with law or regulations; provided that the disclosing Party provides the other Party with notice and takes reasonable measures to obtain confidential treatment thereof; (ii) in connection with a request from a regulatory authority; provided that the disclosing Party provides the other Party with notice and takes reasonable measures to obtain confidential treatment thereof; (iii) in confidence to recipient's attorneys, accountants, banks and financial sources and its advisors; or (iv) in confidence, in connection with the sale of substantially all the business assets to which this Agreement relates, so long as, in each case, the entity to which disclosure is made is bound to confidentiality on terms consistent with those set forth herein.

9.03    **Exceptions**:  The obligations of confidentiality and limited use shall not apply to any information which:

(a)    is publicly available by publication or other documented means or later becomes likewise publicly available through no act or fault of recipient; or

(b)    is already known to recipient before receipt from the disclosing Party, as demonstrated by recipient's written records; or

(c)    is made known to recipient by a Third Party who did not obtain it directly or indirectly from the disclosing Party and who does not obligate recipient to hold it in confidence; or

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

(d)    is independently developed by the recipient as evidenced by credible written research records of recipient's employees or agents who did not have access to the disclosing Party's Confidential Information.  Specific information should not be deemed to be within any of these exclusions merely because it is embraced by more general information falling within these exclusions.

9.04    **Disclosures to Personnel:**  Recipient agrees to advise those of its officers, directors, employees, associates, agents, consultants, and Affiliates who become aware of the Confidential Information, of these confidentiality and limited use obligations and agrees, prior to any disclosure of Confidential Information to such individuals or entities, to make them bound by obligations of confidentiality and limited use of the same stringency as those contained in this Agreement.

9.05    **Return of Confidential Information:**  Upon termination of this Agreement and/or all applicable Licensed Product Addenda, originals and copies of Confidential Information in written or other tangible form and all biological material shall be returned to the disclosing Party by recipient or destroyed by recipient.  One copy of each document may be retained in the custody of the recipient's legal counsel solely to provide a record of what disclosures were made.

9.06    **Confidential Status of Agreement:**

(a)    The terms of this Agreement and all Licensed Product Addenda shall be deemed to be Confidential Information and shall be dealt with according to the confidentiality requirements of this Section 9.  Neither Party will make public disclosures concerning terms of this Agreement without obtaining the prior written consent of the other Party, which consent shall not be unreasonably withheld.

(b)    Notwithstanding anything to the contrary, Licensee shall not disclose to any Third Party any information concerning financial terms, including but not limited to the Product Royalty.

## Section 10 - Miscellaneous

10.01    **Notices:**

(a)    Any notice or other communication required or permitted to be given by either Party under this Agreement and all applicable Licensed Product Addenda shall be given in writing, which shall include Electronic Transmission if given by Monsanto, and shall be effective when delivered if delivered by hand or reputable courier service, five (5) days after mailing if mailed by registered or certified mail, postage prepaid and return receipt requested, or on the date sent if dispatched by Electronic Transmission, addressed to each Party at the following addresses or such other address as may be designated by notice pursuant to this subsection 10.01:

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

If to Monsanto:

Monsanto Company
800 North Lindbergh
St. Louis, Missouri 63167

Attention:        Director, Corn States Trait Licensing

with a copy to:

Monsanto Company
800 North Lindbergh
St. Louis, Missouri 63167

Attention:        Deputy General Counsel - Intellectual Property

If to Licensee:

Latham Hi-Tech Hybrids, Inc.

208 Brickyard Court

Sheffield, IA 50475

john@lathamhybrids.com used instead of physical address if Electronic Transmission)

Attention:        Mr. John Latham

Monsanto may use for Electronic Transmission the DocuSign® online document delivery and signature service of Third Party vendor DocuSign, Inc., or such other method of Electronic Transmission as to which Monsanto may notify Licensee from time to time.

(b)    Licensee's Electronic Address.  Licensee will be required to provide and maintain an operable address of an electronic nature through which the specified manner of Electronic Transmission can be accomplished.  Such address may be changed by Licensee upon notice by hand, courier or mail under subsection 10.01(a) above, or upon notice by Electronic Transmission as Monsanto may specify.

(c)    Confirmation.  Notwithstanding that any notice given by Electronic Transmission shall be effective on the date of dispatch, Licensee may be required to give acknowledgement of receipt of notice by Electronic Transmission; provided that the effective date of the notice shall remain as the date of dispatch, not the time of acknowledgement; and further provided that failure of Licensee to acknowledge receipt shall not affect the effectiveness of the notice.

10.02    **Severability:**  If any clause, provision, or section of this Agreement and all applicable Licensed Product Addenda shall, for any reason, be held illegal, invalid or unenforceable, the Parties shall negotiate in good faith and in accordance with reasonable standards of fair dealing, a valid, legal, and enforceable substitute provision or provisions that most nearly reflect the original intent of the Parties under this Agreement and/or the applicable Licensed Product Addenda in a manner that is commensurate in magnitude and degree with the changes arising as a result of any such substitute provision or provisions.  All other provisions in this Agreement and the applicable Licensed Product

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

Addenda shall remain in full force and effect and shall be construed in order to carry out the original intent of the Parties as nearly as possible (consistent with the necessary reallocation of benefits) and as if such invalid, illegal, or unenforceable provision had never been contained herein.

10.03    **Provisions Contrary to Law**:    In performing this Agreement and all valid Licensed Product Addenda, the Parties shall comply with all applicable laws and regulations.    Nothing in this Agreement or the Licensed Product Addenda shall be construed so as to require the violation of any law, and wherever there is any conflict between any provision of this Agreement or the Licensed Product Addenda and any law the law shall prevail, but in such event the affected provision of this Agreement and/or the Licensed Product Addenda shall be affected only to the extent necessary to bring it within the applicable law.

10.04    **Force Majeure:**

(a)    No liability.    Except for payment obligations of the Parties, none of the Parties shall be liable for any delay in performance of any obligation under this Agreement or any valid Licensed Product Addendum caused by any of the following: Act of God, war, riot, fire, explosion, accident, flood, sabotage, compliance with governmental orders or requests, laws, regulations, orders or actions, national defense requirements or any other event beyond the reasonable control of such Party; or labor trouble, strike, lockout or injunction (provided that neither of the Parties shall be required to settle a labor dispute against its own best judgment).

(b)    Notice.    The Party invoking this subsection 10.04 shall give the other Party written notice and full particulars of such force majeure event.

(c)    Mitigation.    All Parties shall use reasonable efforts to mitigate the effects of any force majeure on their respective part.

10.05    **Relationship of the Parties**:    The relationship of Monsanto, for itself and as agent for any Involved Third-Party Co-licensor under a Licensed Product Addendum, and Licensee is strictly one of licensor and licensee and the Parties acknowledge that neither this Agreement nor any valid Licensed Product Addendum creates a joint venture, partnership, or the like, between them.    The various obligations imposed by Monsanto, for itself and as agent for any Involved Third-Party Co-licensor under a Licensed Product Addendum, and undertaken by Licensee in this Agreement and all valid Licensed Product Addenda with respect to marketing, promotion, etc. are provided as a means of permitting Monsanto to exercise control in connection with the use of the Monsanto trademarks licensed herein. Licensee and dealer/distributors are and shall always remain independent contractors in their performance of any activities set forth in this Agreement.  The provisions of this Agreement and the valid Licensed Product Addenda shall not be construed as authorizing or reserving to Monsanto or any Involved Third-Party Co-licensor under a Licensed Product Addendum, any right to exercise any control

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

or direction over the operations, activities, officers, employees, or agents of Licensee, or Contract Dealers in connection with this Agreement and the Licensed Product Addenda, it being understood and agreed that the entire control and direction of such operations, activities, officers, employees, or agents shall remain with Licensee. No Party to this Agreement shall have any authority to employ any Person as an employee or agent for or on behalf of another Party to this Agreement for any purpose, and no Party to this Agreement, nor any Person performing any duties or engaging in any work at the request of such Party, shall be deemed to be an employee or agent of another Party to this Agreement.  In addition, Licensee, or dealer/distributors are not and shall not act or purport to act as a commercial agent in any capacity for Monsanto or for any Involved Third-Party Co-licensor under a Licensed Product Addendum.

10.06    **Use of Names**:    Neither Party shall use the name of the other in any promotional materials or advertising without the prior written consent of the other except as specifically provided in this Agreement or other related agreements, except that Monsanto may use Licensee's name in promotional material to identify Licensee as being licensed to produce and/or sell the applicable Licensed Products.

10.07    **Assignability/Succession/Change in Control**:

(a)    <u>No assignment by Licensee</u>.  The rights acquired herein by Licensee are not assignable or transferable in whole or part (by assignment, operation of law or otherwise) to any Third Party.  Any attempted assignment or transfer of this Agreement to any Third Party shall be deemed void and of no force or effect.   Any breach of this provision shall constitute a material breach of this Agreement.

(b)    <u>Change in Control of Licensee</u>.  In the event of a Change in Control of Licensee, Licensee shall promptly notify Monsanto of such Change in Control (including the legal status of Licensee following the Change in Control, and the identity of the acquiring parties), and Monsanto shall either:

(i)    provide written notice that Monsanto is terminating this Agreement and the existing Licensed Product Addenda due to such Change in Control in accordance with subsections 8.02 and 8.03; or

(ii)    provide written notice that Monsanto will waive its right to terminate this Agreement (and the existing Licensed Product Addenda) due solely to such Change in Control on the condition that, as consideration for Monsanto waiving such rights, the acquiring party first enters a separate agreement with Monsanto that binds the acquiring party and all of its Affiliates to all terms and conditions of this Agreement (including without limitation the licenses granted to Monsanto under subsection 6.05 and the provisions of subsection 8.02(c)), and that such acquiring party also assumes all obligations and liabilities of Licensee accruing prior to the Change in Control (referred to as the "Assumption Agreement").  The acquiring party is not licensed to, and shall not exercise or enjoy any rights under this Agreement or a Licensed Product Addendum unless and until that acquiring party has first entered such Assumption Agreement with Monsanto.  Further, any attempted assignment or transfer

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

of this Agreement (or any Licensed Product Addendum) to any acquiring party (by assignment, operation of law or otherwise) shall be deemed void and of no force or effect in the absence an Assumption Agreement duly executed by both Parties. Any breach of this subsection shall constitue a material breach of this Agreement.

(c) <u>Assignment by Monsanto</u>. Monsanto shall have the right to assign this Agreement in connection with the reorganization, consolidation, spin-off, sale or transfer of substantially all of the stock or assets related to that portion of its business pertaining to the subject matter of this Agreement, either alone or in conjunction with other Monsanto businesses as part of an overall reorganization of Monsanto. In addition, Monsanto shall have the right to assign its respective rights or obligations and delegate its performance hereunder, in whole or in part, to any of its Affiliates. In either event, the assignee shall agree in writing to be bound by all the terms of this Agreement, and Monsanto shall thereafter be released from all obligations hereunder.

10.08 **<u>Entire Agreement; Amendments; Waiver</u>**:

(a) <u>Entire Agreement</u>. This Agreement constitutes the full understanding of the Parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement relating to the subject matter hereof and supersedes any and all prior agreements, whether written or oral, that may exist between the Parties with respect thereto. Except as otherwise specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless hereafter made in writing and signed by the Party to be bound and no modification shall be effected by the acknowledgment or acceptance of documents containing terms or conditions at variance with or in addition to those set forth in this Agreement. No waiver by any Party with respect to any breach or default or of any right or remedy and no course of dealing or performance, shall be deemed to constitute a continuing waiver of any other breach or default or of any right or remedy, unless such waiver be expressed in writing signed by the Party to be bound. Failure of a Party to exercise any right shall not be deemed a waiver of such right or rights in the future.

(b) <u>Electronic Transmissions</u>. Monsanto may, at its discretion, require that any agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement, and any Product Royalty reports and other reports, schedules and other information to be provided by Monsanto to Licensee under this Agreement, be signed and/or delivered by Electronic Transmission by one or both Parties. Monsanto may use the method of Electronic Transmission provided for under subsection 10.01(a) and the provisions of subsection 10.01(b) shall apply with respect to such Electronic Transmissions.

10.09 **<u>Choice of Law; Submission to Jurisdiction</u>**: ALL QUESTIONS WITH RESPECT TO THE CONSTRUCTION OF THIS AGREEMENT AND THE RIGHTS AND LIABILITIES OF THE PARTIES

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

HERETO EITHER UNDER THIS AGREEMENT OR IN ANY OTHER RESPECT SHALL BE DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MISSOURI APPLICABLE TO BUSINESS ARRANGEMENTS ENTERED INTO AND PERFORMED ENTIRELY WITHIN THE STATE OF MISSOURI WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PROVISIONS.   THE PARTIES HERETO IRREVOCABLY: (A) SUBMIT TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE CIRCUIT COURT FOR ST. LOUIS COUNTY, MISSOURI (FOR STATE COURT) AND THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION (FOR FEDERAL COURT), IN ANY SUIT, ACTION OR OTHER LEGAL PROCEEDING RELATING TO: (I) THIS AGREEMENT; (II) ANY APPLICABLE LICENSED PRODUCT ADDENDUM; OR (III) THE RELATIONSHIP OF THE PARTIES; (B) AGREE THAT ALL CLAIMS IN RESPECT OF ANY SUCH SUIT, ACTION OR OTHER LEGAL PROCEEDING MUST BE HEARD AND DETERMINED IN, AND ENFORCED ONLY IN AND BY, SUCH COURTS; AND (C) WAIVE ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO VENUE IN SUCH COURTS OR THAT SUCH COURTS ARE AN INCONVENIENT FORUM.

10.10   **Export Control**:   Notwithstanding any other provisions of this Agreement, Licensee agrees to make no disclosure or use of any Monsanto Know-How or Confidential Information of Monsanto furnished or made known to Licensee pursuant to this Agreement, except in compliance with the laws and regulations of the United States of America, including the Export Administration Regulations promulgated by the Office of Export Administration International Trade Administration, United States Department of Commerce; and in particular, Licensee agrees not to export, directly or indirectly, either: (i) the technical data furnished or made known to Licensee pursuant to this Agreement; or (ii) the "direct product" thereof; or (iii) any commodity produced using such technical data, to any country or countries for which a validated license is required unless a validated license is first obtained pursuant to the Export Administration Regulations.   The term "direct product" as used above, is defined to mean the immediate product (including process and services) produced directly by the use of the technical data.

10.11   **Meet and Confer**:   It is the intention of the Parties that in the event any dispute arises under this Agreement, the Parties shall first meet and confer with one another to attempt to negotiate a resolution of such dispute without recourse to litigation.

10.12   **Remedies**:   Except as otherwise expressly stated in this Agreement, the rights and remedies of a Party set forth herein with respect to failure of the other to comply with the terms of this Agreement (including, without limitation, rights of full termination of this Agreement) are not exclusive, the exercise thereof shall not constitute an election of remedies and the aggrieved Party shall in all events be entitled to seek whatever additional remedies may be available in law or in equity.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

10.13 **Fees:** Except as otherwise provided herein, each Party shall bear its own legal fees incurred in connection with the transactions contemplated hereby.

10.14 **Headings:** Headings herein are for convenience of reference only and shall in no way affect interpretation of this Agreement.

10.15 **Counterparts:** This Agreement may be executed in any number of counterparts with the same effect as if all Parties had signed the same document. All such counterparts shall be deemed an original, shall be construed together and shall constitute one and the same instrument. An electronic signature made through the means of Electronic Transmission under subsection 10.01 shall be as legally binding as a physical signature.

10.16 **Appendices:** The appended Appendices form an integral part of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, with either Party or both Parties having executed through use of the DocuSign® online document signing and delivery service provided by Third Party vendor DocuSign, Inc., to be effective as of the Effective Date.

Latham Hi-Tech Hybrids, Inc. _____**(LICENSEE)**



By: *John Latham*
DocuSigned By: John Latham
F12F333759BE4CA

Title: President _____

Date: 12/21/2009 _____

**MONSANTO COMPANY**

By: *Mark Dostal*
DocuSigned By: Mark Dostal
383ECA203737447...

Title: Manager, Traits and Genetics Licensing _____

Date: 12/28/2009 _____

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

### Appendix A – Model Dealer Agreement

### (October 2009)

## MODEL AGREEMENT SETTING FORTH OBLIGATIONS OF DEALERS/DISTRIBUTORS OF LICENSED CORN PRODUCTS

[*Insert Licensee Name*] ("Licensee") has received a license from Monsanto Company ("Monsanto") and where applicable an involved third-party co-licensor that permits Licensee to offer corn products incorporating certain technology protected under patents owned by Monsanto and where applicable an involved third-party co-licensor. These products are marketed with one or more trademarks owned by Monsanto. The license under which Licensee offers seed containing such patented technology is a limited license that limits who may purchase and sell Licensee seed containing such patented technology ("Licensed Corn Products") and the conditions under which those transactions may take place. Before [*Insert Dealer Name*] ("Dealer") may purchase or sell Licensed Corn Products, Monsanto requires that Licensee obtain Dealer's commitment to the provisions set forth below, which enforce the limited nature of Monsanto's license to Licensee.

In entering into this Agreement ("Agreement"), Dealer understands that:
- (i) Monsanto is a third-party beneficiary of this Agreement;
- (ii) Monsanto may enforce this Agreement as if it had been entered into between Dealer and Monsanto; and
- (iii) The obligations of Dealer under Sections 5 and 9 of this Agreement shall survive termination of this Agreement and such obligations may not be terminated without the written consent of Monsanto.

Dealer agrees as follows:

1. Dealer warrants to Monsanto and Licensee that Dealer will only sell Licensed Corn Products to growers who have signed a Monsanto Technology/Stewardship Agreement that has been accepted by Monsanto.

2. Dealer will not present a Monsanto Technology/Stewardship Agreement or sell Licensed Corn Products to any grower who is listed as "not authorized" by Monsanto at www.corn-states.com or to any grower for whom Dealer has received from Monsanto a specific notice not to sell.

3. Dealer will not sign a Monsanto Technology/Stewardship Agreement for a grower other than when the Dealer is the grower.

4. Dealer will not sell Licensed Corn Products to a wholesaler or other reseller or buy Licensed Corn Products from a wholesaler or other reseller unless that wholesaler or reseller has an agreement with Licensee obligating them to terms materially similar to this Agreement.

5. Dealer will keep and retain complete and original records with respect to the sale and transfer of Licensed Corn Products and copies of signed Monsanto Technology/Stewardship Agreements. The records for sales and transfers must include the names, addresses, dates, quantities, hybrid(s), lot numbers, beginning inventory counts, net seed purchases and transfers in by lot number, ending inventory counts, and seed volumes sold or transferred out including seed given away as promotion seed, test plot seed, replants, and authorized disposals of excess seed. Licensed Corn Product reported as "dumped" will not be sold for planting purposes nor will it be transferred for disposal as packaged goods. Such records will be maintained for at least three (3) years from the close of the Fiscal Year in which they were sold or transferred (with Fiscal Years ending August 31st).

6. Dealer will only sell Licensed Corn Products in the United States and will only sell Licensed Corn Products for use in the United States.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

7.      Dealer agrees to participate in Monsanto grain channeling programs and resistance management programs, including reporting of grower sales information, distribution of grain marketing and resistance management materials, training of personnel, cooperating with Monsanto and/or EPA audits for compliance, and other activities as may be communicated from time to time.

8.      Dealer agrees to cooperate fully in efforts to protect intellectual property rights Monsanto or Licensee may have in Licensed Corn Products, and agrees to notify Monsanto and Licensee whenever Dealer has a reasonable basis for concluding that such rights may be infringed.

9.      Dealer grants Monsanto the right to audit Dealer's books and records for up to three (3) calendar years prior to the date of the audit and to inspect any premises to verify Dealer's compliance with its limited right to sell and transfer products containing Monsanto technology.

10.     Dealer acknowledges that Dealer may be prohibited from dealing in Licensed Corn Products and Licensee may terminate this Agreement with Dealer as a result of any breach by Dealer upon written notice from Licensee.

UNDERSTOOD AND AGREED:

[*Insert Dealer Name*]

_____
Signature

_____
Title

_____
Date

DocuSign Envelope ID: E57E97C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

**Appendix B -
Approved Third Party Trademarks**

**(October 2009)**

Notwithstanding the provisions of subsection 3.03, if Licensee otherwise has any required permission from the trademark owner, Licensee is not prohibited from using the following Third Party trademarks in connection with sales of Licensed Products:

1.      Third Party trademarks associated with Corn seed treatments, except that, if Monsanto requires Licensee to use one or more Seed Treatments and/or minimum seed treatment standards per the terms of subsection 3.01(b), Licensee shall not use any other Third Party trademarks for Corn seed treatments not listed in a Licensed Product Addendum.

2.      Know Before You Grow®

3.



4.      Respect the Refuge®

5.



6.



DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

## Appendix C - Approved Licensee Brand(s)

### (October 2009)

Latham HiTech Hybrids

SUBJECT TO CONFIDENTIALITY RESTRICTIONS

### Appendix D – Arbitration

### (October 2009)

In the event that Monsanto and Licensee do not reach agreement concerning reasonable license terms (including Royalty) pursuant to subsection 6.05(d), a determination of license in dispute shall be made in accordance with the CPR Rules for Non-Administered Arbitration of Patent and Trade Secret Disputes except as herein modified:

A.        **COMPOSITION OF ARBITRATION PANEL:**  The arbitration panel (the "Arbitration Panel") shall include three (3) members appointed as provided in this Appendix D.  Members of the Arbitration Panel shall not have been engaged as an employee or consultant (including an employee of a consultant) of either Party within the five (5) year period prior to selection hereunder and have no personal or financial interest, direct or indirect, in Monsanto or Licensee or in the outcome of their deliberations, provided that it shall not constitute a violation of this provision for a member of the panel to own publicly traded common stock of one or both of the parties or any of its Affiliates valued at $10,000 or less.

B.        **ARBITRATION PROCEDURE:**  Upon notice from either Monsanto (acting for itself and as an agent for any Involved Third-Party Co-licensor under an applicable Licensed Product Addendum) or Licensee that the services of an Arbitration Panel are required under the provisions of this Agreement, the Arbitration Panel shall be formed as described herein and meet to conduct the arbitration in Chicago, Illinois at a time and place selected by a majority vote of the Arbitration Panel upon input of the parties. The Arbitration Panel so constituted shall conduct the arbitration in accordance with the rules hereinafter set forth, except as such rules may be modified for the purpose of the arbitration with the written consent of both Monsanto and Licensee.  The arbitrators shall only consider the pertinent evidence presented by the parties, in connection with a determination of reasonable terms for the subject license including reasonable Royalty terms for the subject technology.

1.        The Party desiring arbitration (the "Claimant") shall so notify the other Party (the  "Respondent") by written notice (the "Arbitration Notice"), which Arbitration Notice shall contain a written statement of Claimant's position on the subject matter of the arbitration.  The Arbitration Notice shall be transmitted by overnight courier service or transmitted by facsimile or other means of electronic data transmission, which transmission shall be confirmed by overnight courier service.

2.        Each Party shall appoint one person to hear and determine the dispute within ten (10) days after receipt of the Arbitration Notice from the Claimant.  The two persons so chosen shall select a third impartial arbitrator and their majority decision shall be final and conclusive upon both parties.  All such arbitrators shall be partners in nationally-recognized patent law firms experienced in licensing of technology in agricultural biotechnology, provided that neither such arbitrators nor their firms (at the time of or following selection hereunder) shall have been engaged in representation of either Party within the five (5) year period prior to selection hereunder.  If either Party fails to designate its arbitrator within 20 days after the Arbitration Notice is received, then the arbitrator designated by the one Party shall act as the sole arbitrator and shall be deemed to be the single, mutually-approved arbitrator to resolve the controversy.  The arbitrators shall be compensated for their services at the average of their normal hourly billing rate.

3.        If the Claimant or Respondent have a substantial need for discovery in order to prepare for the arbitration hearing, the parties shall attempt in good faith to agree on a minimum plan for strictly necessary, expeditious discovery.  Should the parties fail to reach agreement, discovery shall be allowed pursuant to the Federal Rules of Civil Procedure and as the arbitrators determine appropriate under the circumstances.

4.        At the request of either Party, to protect Confidential Information and any other matter that either Party would normally not reveal to Third Parties, the arbitrator(s) shall enter a protective order in such form as the parties shall stipulate or as the arbitrator(s) shall determine is suitable.  Among other things the protective order shall stipulate that the arbitrators themselves shall receive any information designated as "confidential" solely for purposes of assessing the facts for purposes of making a determination of a reasonable Royalty, and shall not otherwise use or disclose such information.  In either

SUBJECT TO CONFIDENTIALITY RESTRICTIONS

event the order shall be entered as an award at the request of either Party and shall enable either Party to obtain the assistance of a court of competent jurisdiction to issue equitable orders to enforce or modify the provisions of the protective order as if the order had been issued by the court.

5.      Within thirty (30) days after receipt of the Arbitration Notice, Respondent shall send to the Claimant and the Arbitration Panel, by overnight courier service, a written statement of Respondent's position on the subject matter of the arbitration.

6.      The Arbitration Panel shall convene a hearing for the purpose of rendering its decision on or before the sixtieth (60th) day following the receipt of the Arbitration Notice by the Respondent or the close of permitted discovery, whichever date is later.  The hearing shall be attended by all the arbitrators and by representatives of both Claimant and Respondent.  The decision of the Arbitration Panel shall be made no later than thirty (30) days following the hearing and shall be immediately transmitted to both Claimant and Respondent by facsimile or other means of electronic data transmission and confirmed by overnight courier service.

7.      If Respondent fails to submit the written statement referred to in paragraph 5 hereinabove within the time period required hereby, or either Claimant or Respondent fails to appear at the hearing referred to in paragraph 6, the Arbitration Panel shall nevertheless proceed with the arbitration on the basis of the material submitted by the Claimant and the oral presentation by the Party attending the hearing.

8.      Only the written statements and evidence submitted to the arbitrators pursuant to paragraphs 1 and 5 and oral presentations made or supplemental written statements (based on information obtained from permitted discovery) submitted at the hearing pursuant to paragraph 6 shall be considered by the Arbitration Panel in making its decision.  The Arbitration Panel shall determine the authenticity, materiality and relevance of any such evidence proffered and the weight to be accorded thereto and shall not be bound by rules governing the admissibility of evidence.

9.      The Arbitration Panel may not permit any Party to submit additional written material relating to subject matter of the arbitration other than the written submissions pursuant to paragraphs 1, 5 and 8 hereof without the consent of both Claimant and Respondent.

10.     All rulings and determinations of the Arbitration Panel shall be by a majority of arbitrators.  The arbitrators shall issue a detailed reasoned written decision with respect to the determination of a reasonable Royalty and other material terms for the subject technology.  The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§-1 *et seq.*  The determination of the Arbitration Panel shall be final and binding upon the Parties and judgment thereon may be entered in any court having jurisdiction thereof; provided however that, either Party shall have the right within ten (10) days to file with the arbitrators a motion to reconsider, and the arbitrators thereupon shall reconsider the issues raised by said motion and either confirm or change their majority decision which shall then be final and conclusive upon both parties hereto.  The costs of such a motion for reconsideration and written opinion of the arbitrators shall be borne by the moving Party.  The decision of the Arbitration Panel on the motion for reconsideration shall be made no later than thirty (30) days following the filing of the motion and shall be immediately transmitted to both Claimant and Respondent by facsimile or other means of electronic data transmission and confirmed by overnight courier service.

11.     Each Party shall bear its own expenses in connection with the preparation for and the presentation of its case at the arbitration.  The other costs of the arbitration shall be pro-rated between the parties based upon the positions of the respective parties at the initiation of the arbitration hearing and the outcome of the arbitration.  For example, if Licensee's offer at the end of negotiations and prior to arbitration is a Royalty rate of three percent (3%) and Monsanto's counter proposal is a Royalty rate of one percent (1%) and the arbitration decision is that a reasonable Royalty rate is two percent (2%), then the parties will share the expenses of the arbitration proceeding equally.  If the arbitration involves only license terms other than Royalty, the other costs of such arbitration shall be borne by the Party requesting the arbitration.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676A0

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

**Appendix E**
**Quality Management Systems**

**(October 2009)**

Licensee is required to self-certify the use of process based quality management systems to meet specified product identity, purity, control and defined quality assurance standards at all stages of product development, production and commercial activities specified in this Agreement.  This includes but is not limited to testing programs and work activities in laboratories, containment facilities (e.g. greenhouses and chambers), field trials, seed multiplication and commercial activities including product launch and discontinuation.

Licensee is required to implement process based quality management systems designed in accordance with leading industry programs to meet applicable regulatory requirements, the terms of this Agreement and maintain intended identity and control of plant materials.  Leading industry quality management programs for plant biotechnology include the *Excellence through Stewardship™* program (www.excellencethroughstewardship.com).

Licensee's quality management system must include the following components and be appropriately documented per subsection 3.07 of this Agreement.

**Documented Procedures and Records:** All field, production and commercial activities with the potential to impact defined stewardship and/or quality standards should be specified in documented procedures (i.e. SOPs, Best Practices).  This includes protocols, procedures and instructions provided by Monsanto to Licensee.  Records of key activities and data should be kept, including planting, harvest, material movement, disposition/destruction of material, equipment cleaning, etc.  Procedures and records should be controlled to ensure the ongoing integrity of the intended Licensed Event and Licensed Product.

**Training:** Defined system for training personnel performing procedures and activities with the potential to impact defined stewardship or quality standards; the system should be designed to assess and respond to ongoing needs and activities and should include appropriate tracking and personnel record keeping.

**Management Structure and Review:** Defined management structure that enables, monitors and continuously improves the quality management system and overall quality assurance.  An internal audit process is a component of effective management review.

**Auditing:** Defined system to conduct internal quality audits including any contractors or growers.  The system should also accommodate audits by external parties, such as Monsanto, or Third Parties acting

# SUBJECT TO CONFIDENTIALITY RESTRICTIONS

on behalf of Monsanto, and results of the audits should be reviewed by Licensee management for appropriate action and continuous improvement.

**Non-Conformance and Complaints:** Defined system for identifying and documenting non-conformances (including customer complaints), and taking appropriate corrective and preventive action(s) to maintain defined quality standards, including material identity and control, and to prevent recurrence. The system should include procedures and actions to contain plant materials in order to prevent unintended movement or use.

**Material Identification, Control and Traceability**: Defined system to appropriately identify, label and maintain the intended control of plant material at all phases of commercialization including material movement, storage, use, and destruction. Appropriate systems for, and records of, material identification and disposition (i.e., current status and location including destruction) should be maintained for all plant materials within the scope of this Agreement.

DocuSign Envelope ID: E57E87C3-A59B-4A5F-9A3E-2B44A05676AC

## SUBJECT TO CONFIDENTIALITY RESTRICTIONS

**<u>Product License Addendum</u>**

**<u>Genuity™ SmartStax™ Corn</u>**



## Certificate of Completion

| | | |
|---|---|---|
| Envelope Number: E57E87C3A59B4A5F9A3E2B44A05676AC | | Status: Completed |
| Subject: Latham Hi-Tech - Corn Product License Agreement | | |
| Source Envelope: | | |
| Document Pages: 56 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Corn States Licensing |
| AutoNav: Enabled | | 800 North Lindbergh |
| EnvelopeId Stamping: Enabled | | St. Louis, MO  63141 |
| | | corn.states.licensing@monsanto.com |
| | | IP Address: 164.144.248.25 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Corn States Licensing | Location: DocuSign |
| 11/6/2009 11:11:01 AM PST | corn.states.licensing@monsanto.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| John Latham<br>john@lathamhybrids.com<br>President<br>Latham Hi-Tech Hybrids<br>Security Level: Email, Account Authentication (Optional)<br>Consumer Disclosure:<br>Not Offered<br>ID: | F12F333759BE4CA<br>*John Latham*<br>**DocuSigned By: John Latham**<br>Using IP Address: 74.42.232.6 | Sent: 11/6/2009 11:11:04 AM PT<br>Delivered: 11/6/2009 12:35:14 PM PT<br>Signed: 12/21/2009 2:13:49 PM PT |
| Mark Dostal<br>mark.dostal@monsanto.com<br>Manager, Traits and Genetics Licensing<br>Monsanto<br>Security Level: Email, Account Authentication (Optional)<br>Consumer Disclosure:<br>Not Offered<br>ID: | 383ECA203737447...<br>*Mark Dostal*<br>**DocuSigned By: Mark Dostal**<br>Using IP Address: 68.188.52.32 | Sent: 12/21/2009 2:13:50 PM PT<br>Delivered: 12/28/2009 6:18:14 AM PT<br>Signed: 12/28/2009 6:18:27 AM PT |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/21/2009 2:13:50 PM PT |
| Certified Delivered | Security Checked | 12/28/2009 6:18:14 AM PT |
| Signing Complete | Security Checked | 12/28/2009 6:18:27 AM PT |
| Completed | Security Checked | 12/28/2009 6:18:27 AM PT |