**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LATHAM QUALITY, INC., on behalf of itself and others similarly situated, | ) | |
| Plaintiff, | ) | Case No. 4:26-cv-00591-MAL |
| v. | ) | **ORAL ARGUMENT REQUESTED**[1] |
| BAYER AKTIENGESELLSCHAFT, *et al.*, | ) | |
| Defendants. | ) | |

**PLAINTIFF LATHAM QUALITY, INC.'S**
**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

[1] Pursuant to E.D. Mo. L.R. 4.02, Plaintiff respectfully requests oral argument. Argument is warranted in this case based on the extensive number of allegations and the scope of the Defendants' motion to dismiss, which covers 14 claims, two federal statutes, a state statute, several common-law claims, a choice-of-law issue, and a lengthy contract. A hearing would allow the parties to answer questions the Court may have, expand upon potentially dispositive issues that were unable to be exhaustively developed in the briefs due to the number of issues needing to be addressed, and place allegations in context given the length of the complaint. Plus, this is an important and interesting case potentially affecting the entire farm industry.

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ........ **iii**

**INTRODUCTION** ........ **1**

**STATEMENT OF FACTS** ........ **2**

I. BAYER CONTROLS A CRITICAL INPUT IN NEARLY ALL CORN SEED. ........ 2

A. The Market for Genetically Engineered Traits is Highly Consolidated. ........ 2

B. Bayer Controls GE Corn Seed and Licensing Markets. ........ 3

C. Bayer Continues to Control the Markets Despite Patent Expiration. ........ 3

II. BAYER'S ILLEGAL AGREEMENTS AND MONOPOLIZATION. ........ 4

A. The Complaint Alleges a Claim under Section 1 of the Sherman Act. ........ 4

B. The Complaint Alleges a Claim under Section 2 of the Sherman Act. ........ 4

III. BAYER ENGAGES IN PRICE DISCRIMINATION. ........ 5

IV. BAYER ENGAGES IN OTHER WRONGFUL CONDUCT. ........ 5

**APPLICABLE STANDARDS** ........ **5**

**ARGUMENT** ........ **6**

I. THE COMPLAINT DOES NOT RELY ON GROUP PLEADING. ........ 6

II. THE COMPLAINT PLEADS CLAIMS UNDER THE SHERMAN ACT ........ 9

A. Patent Law Does Not Bar Antitrust Scrutiny of Defendants' Conduct. ........ 9

B. The Complaint Alleges an Illegal Agreement under the Sherman Act. ........ 11

C. The Complaint Alleges a Section 2 Claim under the Sherman Act. ........ 14

1. Plaintiff adequately alleges Relevant Markets and monopoly power. ........ 14

2. Defendants maintain a monopoly using anti-competitive conduct. ........ 18

a) The Corteva agreement is anti-competitive. ........ 18

b) Breeding restrictions raise barriers to competition. ........ 19

c) The PPP raises costs of rivals offering a generic. ........ 21

d) The complaint adequately alleges illegal bundling. ........ 23

e) Defendants' retaliatory acts also harmed competition. ........ 25

D. Defendants' Proximate-Cause Argument is Meritless. ........ 27

III. THE COMPLAINT STATES A ROBINSON-PATMAN ACT CLAIM. ........ 28

IV. DEFENDANTS ATTACK ON *BRULOTTE* SHOULD BE REJECTED. ........ 30

V. COUNT 4 STATES A CLAIM FOR BREACH OF CONTRACT. ........ 32

A. Latham Identifies a Breach. .... 32
B. The Contract Does Not Permit a Royalty on NK603. .... 33
C. Charging a Royalty after Patent Expiration is Counter to Patent Laws. .... 35
VI. COUNT 5 STATES A CLAIM FOR BREACH OF GOOD FAITH/FAIR DEALING. .... 35
VII. COUNT 6 IS PROPERLY PLEAD IN THE ALTERNATIVE AND THE VOLUNTARY PAYMENT DOCTRINE DOES NOT SUPPORT DISMISSAL. .... 38
A. Count 6 is Properly Plead in the Alternative. .... 38
B. Dismissal Based on the Voluntary Payment Doctrine is Improper. .... 40
VIII. COUNT 7 ALLEGES BREACH OF GOOD FAITH AND FAIR DEALING. .... 41
IX. COUNT 8 ALLEGES BREACH OF CONTRACT REGARDING 2025 MARKET FUNDING. .... 42
X. COUNTS 9-11 STATE CLAIMS FOR PROMISSORY ESTOPPEL. .... 44
XI. COUNT 12 STATES A CLAIM FOR NEGLIGENT MISREPRESENTATION REGARDING 2025 MARKET FUNDING. .... 45
XII. COUNT 13 STATES A CLAIM UNDER MISSOURI'S TRADE SECRET ACT. .... 47
A. Latham's Customer Information and Data is a Trade Secret. .... 47
B. Latham Alleges Misappropriation. .... 49
XIII. COUNT 14 STATES A CLAIM FOR TORTIOUS INTERFERENCE. .... 51
A. Latham's Business Relationships were Not Based Solely on the CPLA. .... 51
B. Latham Alleges a Lack of Justification and Wrongful Means. .... 53
XIV. THE LIMITATION OF LIABILITY DOES NOT BAR COUNTS 13 OR 14. .... 54
**CONCLUSION .... 55**

# TABLE OF AUTHORITIES

*1-800 Contacts, Inc. v. F.T.C.*,
1 F.4th 102 (2d Cir. 2021) ........ 15

*A.O.A. v. Rennert*,
350 F.Supp.3d 818 (E.D. Mo. 2018)........ 7, 8

*A.W.G. Farms, Inc. v. Fed. Crop Ins. Corp.*,
757 F.2d 720 (8th Cir. 1985) ........ 38

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*,
59 F.4th 948 (8th Cir. 2023) ........ 6, 49

*Alexander v. Nat'l Farmers Org.*,
687 F.2d 1173 (8th Cir. 1982) ........ 18

*Am. Bus. Interiors, Inc. v. Haworth, Inc.*,
798 F.2d 1135 (8th Cir. 1986) ........ 36, 53

*Am. President Lines, LLC v. Matson, Inc.*,
633 F.Supp.3d 209 (D.D.C. 2022)........ 25

*Amerinet, Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992) ........ 23, 24

*Anderson v. Waddle*,
474 F.Supp.2d 1116 (E.D. Mo. 2007)........ 7

*Ansel Commc'ns, Inc. v. Novell, Inc.*,
1999 WL 33302368 (N.D. Cal. Mar. 24, 1999)........ 29

*Ash v. Anderson Merch., LLC*,
799 F.3d 957 (8th Cir. 2015) ........ 6

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)........ 26, 27

*Arconic Corp. v. Novelis Inc.*,
670 F.Supp.3d 196 (W.D. Penn. 2023)........ 30

*Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.*,
339 U.S. 827 (1950)........ 31

*B. Braun Medical Inc. v. Abbott Laboratories*,
124 F.3d 1419 (Fed. Cir. 1997)........ 30

*Bailey v. Hawthorn Bank*,
382 S.W.3d 84 (Mo. App. 2012) ........ 46

*Bayer Cropscience LP v. Corteva, Inc.*,
2025 WL 1503764 (Del. Super. Ct. May 5, 2025) ........ 31

*Becker v. State of Mo., Dept. of Soc. Srvs., Bd. of Prob. & Parole*,
689 F.2d 763 (8th Cir. 1982) ........ 43

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 5, 6, 9

*Bell v. Shelter Gen. Ins. Co.*,
701 S.W.3d 614 (Mo. 2024) .......... 32, 34

*Berk v. Choy*,
607 U.S. 187 (2026) .......... 44

*Bishop v. Shelter Mut. Ins. Co.*,
129 S.W.3d 500 (Mo. App. 2004) .......... 35, 37

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) .......... 17, 27

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982) .......... 27

*BMK Corp. v. Clayton Corp.*,
226 S.W.3d 179 (Mo. App. 2007) .......... 51

*Boggild v. Kenner Prods., Div. of CPG Prods. Corp.*,
776 F.2d 1315 (6th Cir. 1985) .......... 31

*Boswell v. Panera Bread Co.*,
2016 WL 1392066 (E.D. Mo. Apr. 8, 2016) .......... 39

*Boyer v. Grandview Manor Care Ctr., Inc.*,
805 S.W.2d 187 (Mo. App. 1991) .......... 51

*Bradley Corp. v. Lawler Mfg. Co., Inc.*,
2020 WL 7027875 (S.D. Ind. Nov. 30, 2020) .......... 31

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) .......... 9, 14, 18, 26

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998) .......... 24

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .......... 16

*Brown v. Adtalem Glob. Educ., Inc.*,
421 F.Supp.3d 825 (W.D. Mo. 2019) .......... 44

*Bruhn's Freezer Meats of Chi., Inc. v. U.S. Dep't of Agric.*,
438 F.2d 1332 (8th Cir. 1971) .......... 8

*Brulotte v. Thys Co.*,
379 U.S. 29 (1964) .......... 30, 31

*Cape Dogwood Redevel. v. Glob. Bowling, LLC*,
2019 WL 4279402 (E.D. Mo. Sept. 10, 2019) .......... 38

*Carpenter v. Countrywide Home Loans, Inc.*,
250 S.W.3d 697 (Mo. 2008) .......... 41

*Carpenters Pension Tr. Fund of Kansas City v. Lankford Enterprises, Inc.*,
570 F.Supp.3d 731 (W.D. Mo. 2021) .......... 34

*Cass Com. Bank v. Cap. Tech. & Leasing, LLC*,
2015 WL 4775102 (E.D. Mo. Aug. 13, 2015) .......... 8

*Cavalleri v. Hermes Int'l*
2025 WL 2662897 (N.D. Cal. Sept. 17, 2025) .......... 24

*Cerner Corp. v. Visicu, Inc.*,
667 F.Supp.2d 1062 (W.D. Mo. 2009) .......... 50

*Children's Broad. Corp. v. Walt Disney Co.*,
245 F.3d 1008 (8th Cir. 2001) .......... 49

*Church Mut. Ins. Co. v. Sands*,
2014 WL 3385208 (W.D. Mo. July 9, 2014) .......... 52, 54

*CIBC Bank USA et al. v. Williams*,
669 S.W.3d 298 (Mo. App. 2023) .......... 52

*City of St. Joseph v. Lake Contrary Sewer Dist.*,
251 S.W.3d 362 (Mo. App. 2008) .......... 35, 36

*Clark v. Washington Univ.*
906 S.W.2d 789 (Mo. App. 1995) .......... 43

*Coffman Indus., Inc. v. Gorman-Taber Co.*,
521 S.W.2d 763 (Mo. App. 1975) .......... 43

*Cole v. Homier Distrib.* Co.,
599 F.3d 856 (8th Cir. 2010) .......... 51

*Colgan v. Washington Realty Co.*,
879 S.W.2d 686 (Mo. App. 1994) .......... 47

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) .......... 21, 22

*Conoco Inc. v. Inman Oil Co., Inc.*,
774 F.2d 895 (8th Cir. 1985) .......... 28

*Conseco Fin. Servicing Corp. v. N. Am. Mortg., Co.*,
2000 WL 33739340 (E.D. Mo. Dec. 6, 2000) .......... 48

*Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co.*,
381 F.3d 811 (8th Cir. 2004) .......... 49

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) .......... 18

*Cook v. Coldwell Banker*,
967 S.W.2d 654 (Mo. App. 1998) .......... 42, 43

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) .......... 7

*Corteva AgriScience LLC v. Monsanto Co.*
2024 WL 4197718 (Del. Sup. Ct. Sept 16, 2024)., ........................................................ 32

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) ........................................................................ 16

*Damon v. City of Kansas City*,
419 S.W.3d 162 (Mo. App. 2013) ........................................................... 40, 41

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) .......................................................... 12, 13, 20

*Dodge Data & Analytics LLC v. iSqFt, Inc.*,
183 F.Supp.3d 855 (S.D. Ohio 2016) ................................................... 25, 26

*Doe 1631 v. Quest Diagnostics, Inc.*,
395 S.W.3d 8 (Mo. 2013) ......................................................................... 8

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
136 F.3d 554 (8th Cir. 1998) ................................................... 9, 11, 16, 17

*Dowling v. Boeing Co.*,
2023 WL 2645566 (E.D. Mo. Mar. 27, 2023) .............................................. 6

*Downing v. Goldman Phipps PLLC*,
2015 WL 4078198 (E.D. Mo. July 6, 2015) ................................................ 6

*Dubinsky v. Mermart, LLC*,
595 F.3d 812 (8th Cir. 2010) .................................................................. 47

*Duncan v. Savannah, LLC*,
637 S.W.3d 633 (Mo. App. 2021) ............................................................ 46

*Dunne v. Res. Converting, LLC*,
991 F.3d 931 (8th Cir. 2021) .................................................................. 47

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) .................................................................. 14

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)................................................................................ 14

*Edmonds Grp., L.L.C. v. Platinum Prot., L.L.C.*,
2011 WL 3444234 (E.D. Mo. Aug. 8, 2011)............................................... 43

*Edoho v. Bd. of Curators of Lincoln Univ.*,
344 S.W.3d 794 (Mo. App. 2011) ............................................................ 36

*Eisel v. Midwest BankCentre*,
230 S.W.3d 335 (Mo. banc 2007)............................................................. 41

*Electronics Comms. Corp. v. Toshiba Am. Consumer Products., Inc.*,
129 F.3d 240 (2d Cir. 1997).................................................................... 11

*Energizer Brands, LLC v. Procter & Gamble Co.*,
2016 WL 2894708 (E.D. Mo. May 18, 2016) .............................................. 7

*Enter. Leasing Co. - S. Cent., LLC v. Heller*,
2025 WL 2731542 (N.D. Fla. Sept. 24, 2025)............................................................. 49

*Envtl. Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.*,
178 S.W.3d 691 (Mo. App. 2005) .............................................................................. 54

*Envt'l. Prot., Insp. & Consulting, Inc. v. City of Kansas City*,
37 S.W.3d 360 (Mo. App. 2000) ................................................................................ 36

*Equal Empl'mt Opp. Comm'n v. Miller's Grill, Inc.*,
2026 WL 1132916 (E.D. Mo. Apr. 27, 2026).............................................................. 40

*Equity Fin. Res., Inc. v. Overman*,
619 S.W.3d 538 (Mo. App. 2021) .............................................................................. 33

*Ervin v. TD Ameritrade, Inc.*,
2020 WL 8367526 (W.D. Mo. Aug. 28, 2020)............................................................ 38

*Ethyl Gasoline Corp. v. U.S.*,
309 U.S. 436 (1940)............................................................................................. 10, 20

*F.T.C. v. Actavis, Inc.*,
570 U.S. 136 (2013)........................................................................................... 9, 10, 11

*F.T.C. v. Endo Pharms. Inc.*,
82 F.4th 1196 (D.C. Cir. 2023)................................................................................... 11

*F.T.C. v. Indiana Fed'n of Dentists*,
476 U.S. 447 (1986).................................................................................................... 14

*F.T.C. v. Syngenta Crop Prot. AG*,
711 F.Supp.3d 545 (M.D.N.C. 2024) .................................................................. 21, 22

*Fellows v. Am. Campus Communities Servs., Inc.*,
2017 WL 2881121 (E.D. Mo. July 6, 2017) ............................................................... 38

*Ferbet v. Hidden Valley Golf & Ski, Inc.*,
618 S.W.3d 596 (Mo. App. 2020) .............................................................................. 54

*Finova Cap. Corp. v. Ream*,
230 S.W.3d 35 (Mo. App. 2007) ................................................................................ 36

*First Comics, Inc. v. World Color Press, Inc.*,
884 F.2d 1033 (7th Cir. 1989) ................................................................................... 29

*Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*,
586 S.W.2d 310 (Mo. 1979) ....................................................................................... 53

*Flegel v. Christian Hosp., Ne.-Nw.*,
4 F.3d 682 (8th Cir. 1993) .................................................................................... 14, 15

*Freeman v. Toyota Motor Sales, USA, Inc.*,
2020 WL 7041810 (E.D. Mo. Nov. 30, 2020)...................................................... 38, 39

*Freitas v. Wells Fargo Home Mortg., Inc.*,
703 F.3d 436 (8th Cir. 2013) ..................................................................................... 44

*Freitas v. Wells Fargo Home Mortg., Inc.*,
2011 WL 5524913 (W.D. Mo. Nov. 14, 2011) .......... 44

*Garrity v. A.I. Processors*,
850 S.W.2d 413 (Mo. App. 1993) .......... 42

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
810 F.2d 795 (8th Cir. 1987) .......... 25

*Giuliano v. Sandisk Corp.*,
2015 WL 10890654 (N.D. Cal. May 14, 2015) .......... 15

*Greater K.C. Laborers Pension Fund v. Superior Gen. Contractors, Inc.*,
104 F.3d 1050 (8th Cir. 1997) .......... 8

*Guidry v. Seven Trails W.*, LLC,
2014 WL 4386744 (E.D. Mo. Sept. 5, 2014) .......... 8

*Haberstick v. Gordon A. Gundaker Real Estate Co., Inc.*,
921 S.W.2d 104 (Mo. App. 1996) .......... 46

*Handly v. Lyons*,
475 S.W.2d 451 (Mo. App. 1971) .......... 41

*Hankins v. Crain Auto. Holdings, LLC*,
129 F.4th 1088 (8th Cir. 2025) .......... 42

*Hardee's Food Sys., Inc. v. Hallbeck*,
2011 WL 5307807 (E.D. Mo. Nov. 3, 2011) .......... 37, 38

*Hartford-Empire Co. v. U.S.*,
323 U.S. 386 (1945) .......... 10

*Hawthorn Bank & Hawthorn Real Estate, LLC v. F.A.L. Investments, LLC*,
449 S.W.3d 61 (Mo. App. 2014) .......... 37, 38

*Hays v. Nissan N. Am. Inc.*,
297 F.Supp.3d 958 (W.D. Mo. 2017) .......... 38

*Heiss Prods., Inc. v. Watlow Elec. Mfg. Co.*,
2026 WL 617328 (E.D. Mo. Mar. 5, 2026) .......... 34

*High Sch. Servicos Educacionais, Ltda v. Curators of Univ. of Missouri*,
2020 WL 13517898 (W.D. Mo. Nov. 6, 2020) .......... 50

*Home Health Specs., Inc. v. Liberty Health Sys.*,
1994 WL 463406 (E.D. Pa. Aug. 24, 1994) .......... 16

*Huch v. Charter Comms., Inc.*,
290 S.W.3d 721 (Mo. 2009) .......... 40, 41, 54

*Hug v. Am. Traffic Sols., Inc.*,
2014 WL 2611832 (E.D. Mo. June 11, 2014) .......... 40

*Illinois Corp. Travel, Inc. v. Am. Airlines, Inc.*,
889 F.2d 751 (7th Cir. 1989) .......... 13

*In re Blue Cross Blue Shield Antitrust Litig.*,
2017 WL 2797267 (N.D. Ala. June 28, 2017) ..... 17

*In re Crop Inputs Antitrust Litig.*
172 F.4th 570 (8th Cir. 2026) ..... 7

*In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*,
779 F.Supp.3d 624 (M.D.N.C. 2025) ..... 23

*In re Generic Pharms. Pricing Antitrust Litig.*,
338 F.Supp.3d 404 (E.D. Pa. 2018) ..... 21

*In re Google Play Store Antitrust Litig.*,
2024 WL 3302068 (N.D. Cal. July 3, 2024) ..... 19

*In re Mushroom Dir. Purch. Antitrust Litig.*,
2015 WL 5767415 (E.D. Pa. July 29, 2015) ..... 17

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F.Supp.2d 367 (D. Mass. 2013) ..... 15

*In re Pork Antitrust Litig.*,
781 F.Supp.3d 758 (D. Minn. 2025) ..... 17

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ..... 14

*In re Wholesale Grocery Prods. Antitrust Litig.*,
752 F.3d 728 (8th Cir. 2014) ..... 12

*Inline Pkg., LLC v. Graphic Pkg. Int'l, LLC*,
962 F.3d 1015 (8th Cir. 2020) ..... 17

*Innomed Labs, LLC v. ALZA Corp.*,
368 F.3d 148 (2d Cir. 2004) ..... 28, 29

*Inventory Sales, LLC v. Packer Fastener & Supply Inc.*,
2026 WL 40066 (E.D. Mo. Jan. 6, 2026) ..... 48, 49

*Irons v. Neske*,
2021 WL 4191614 (E.D. Mo. Sept. 15, 2021) ..... 6

*Jien v. Perdue Farms, Inc.*,
2020 WL 5544183 (D. Md. Sept. 16, 2020) ..... 16

*Jones v. Varsity Brands, LLC*,
618 F.Supp.3d 725 (W.D. Tenn. 2022) ..... 16

*Jones v. Varsity Brands, LLC*,
2023 WL 5662590 (W.D. Tenn. Aug. 31, 2023) ..... 16

*Judah v. Ovsak*,
550 F.Supp.3d 687 (D. Minn. 2021) ..... 7

*Jurisprudence Wireless Commc'ns, Inc. v. CyberTel Corp.*,
26 S.W.3d 300 (Mo. App. 2000) ..... 51

*Kelly v. State Farm Mut. Auto. Ins. Co.*,
218 S.W.3d 517 (Mo. App. 2007) .......... 51

*Kennedy Theater Ticket Serv. v. Ticketron, Inc.*,
342 F.Supp.922 (E.D. Pa. 1972) .......... 29

*Kerr Const. Paving Co., Inc. v. Khazin*,
961 S.W.2d 75 (Mo. App. 1997) .......... 53

*Ketcherside v. McLane*,
118 S.W.3d 631 (Mo. App. 2003) .......... 42, 43

*Kimble v. Marvel Entm't, LLC*,
576 U.S. 446 (2015) .......... passim

*King Drug Co. of Florence v. SmithKline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015) .......... 11

*KMG Kanal-Muller-Gruppe Int'l GmbH & Co. v. Inliner U.S.A. Inc.*,
1999 WL 1078556 (S.D. Tex. May 13, 1999) .......... 30

*Kreisler Drug Co., Inc. Mo. Cvs Pharm., LLC v. Naber*,
2016 WL 5844145 (W.D. Mo. Oct. 4, 2016) .......... 51

*Kruger v. Lely N. Am., Inc.*,
518 F.Supp.3d 1281 (D. Minn. 2021) .......... 7

*La Salle St. Press, Inc. v. McCormick & Henderson, Inc.*,
293 F.Supp.1004 (N.D. Ill. 1968) .......... 29

*Lafarge N. Am., Inc. v. Disc. Grp. L.L.C.*,
574 F.3d 973 (8th Cir. 2009) .......... 46

*Lavery v. Pursuant Health, Inc.*,
126 F.4th 1170 (6th Cir. 2025) .......... 31

*Le v. Zuffa, LLC*,
216 F.Supp.3d 1154 (D. Nev. 2016) .......... 16

*Lee v. Enter. Leasing Co.-W., LLC*,
30 F.Supp.3d 1002 (D. Nev. 2014) .......... 39

*LifeScience Techs., LLC v. Mercy Health*,
632 F.Supp.3d 949 (E.D. Mo. 2022) .......... 54

*Lift Truck Lease & Serv., Inc. v. Nissan Forklift Corp., N. Am.*,
2013 WL 3092115 (E.D. Mo. June 18, 2013) .......... 54

*Linzer Prods. Corp. v. Sekar*,
499 F.Supp.2d 540 (S.D.N.Y. 2007) .......... 29

*Lizama v. Venus Labs., Inc.*,
679 F.Supp.3d 848 (E.D. Mo. 2023) .......... 47

*Lorain J. Co. v. United States*,
342 U.S. 143 (1951) .......... 25

*Lucero v. Curators of University of Missouri*,
400 S.W.3d 1 (Mo. App. 2013) ........................................................................................ 32

*Lyn-Flex W., Inc. v. Dieckhaus*,
24 S.W.3d 693 (Mo. App. 1999) ........................................................................................ 53

*Majestic Milling Co., LLC v. River Valley Ag Exch., LLC*,
733 S.W.3d 563 (Mo. Ct. App. 2026)................................................................................ 33

*Major Brands, Inc. v. Mast-Jagermeister US, Inc.*,
2019 WL 6050731 (E.D. Mo. Nov. 15, 2019).................................................................... 52

*Major Cadillac, Inc. v. Gen. Motors Corp.*,
2008 WL 482398 (W.D. Mo. Feb. 19, 2008) .................................................................... 52

*Matter of E. I. Dupont De Nemours & Co.*,
96 F.T.C. 653 (1980).......................................................................................................... 20

*May Dep't Store v. Graphic Process Co.*,
637 F.2d 1211 (9th Cir. 1980) ........................................................................................... 29

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) ........................................................................................... 15

*McKay v. WilTel Commc'n Sys., Inc.*,
87 F.3d 970 (8th Cir. 1996) ............................................................................................... 39

*McWane, Inc. v. F.T.C.*,
783 F.3d 814 (11th Cir. 2015). ............................................................................... 22, 23, 26

*Midwest Energy, Inc. v. Orion Food Sys., Inc.*,
14 S.W.3d 154 (Mo. Ct. App. 2000).................................................................................. 45

*Minerva Surgical, Inc. v. Hologic, Inc.*,
594 U.S. 559 (2021)............................................................................................................ 11

*Mitchell v. Resid. Funding Corp.*,
334 S.W.3d 477 (Mo. App. 2010) ...................................................................................... 41

*Mo. Hospital v. C.R. Bard, Inc.*,
2008 WL 199567 (E.D. Mo. Jan. 22, 2008) ...................................................................... 17

*Monsanto Co. v. Hensel Seed Solutions*,
2019 WL 2173444 (E.D. Mo. May 20, 2019) .................................................................... 22

*Monsanto Co. v. Hensel Seed Sols. LLC*,
2020 WL 2085653 (E.D. Mo. Apr. 30, 2020)..................................................................... 28

*Monsanto Co. v. McFarling*,
363 F.3d 1336 (Fed. Cir. 2004)........................................................................................... 13

*Monsanto Co. v. Scruggs*,
459 F.3d 1328 (Fed. Cir. 2006)........................................................................................... 13

*Morgan v. Ponder*,
892 F.2d 1355 (8th Cir. 1989) ............................................................................................ 27

*Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.*,
850 F.2d 1286 (8th Cir. 1988) ........................................................................ 18

*Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.*,
878 F.2d 1118 (8th Cir. 1989) ........................................................................ 18

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984)........................................................................................ 12

*NLRB v. Bolivar-Tees, Inc.*,
551 F.3d 722 (8th Cir. 2008) .......................................................................... 8

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F.Supp.2d 1048 (D. Colo. 2004)................................................................ 8

*NTD I, LLC v. Alliant Asset Mgmt. Co., LLC*,
362 F.Supp.3d 664 (E.D. Mo. 2019)............................................................... 39

*O'Neal v. Stifel, Nicolaus & Co.*,
996 S.W.2d 700 (Mo. App. 1999) .................................................................. 47

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
555 U.S. 438 (2009)....................................................................................... 26

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990)........................................................................................ 12

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
310 F.Supp.3d 1002 (E.D. Mo. 2018).............................................................. 45

*Park Ridge Assocs. v. U.M.B. Bank*,
613 S.W.3d 456 (Mo. App. 2020) .................................................................. 35

*Petrie v. LeVan*,
799 S.W.2d 632 (Mo. App. 1990) .................................................................. 39

*Pitman v. City of Columbia*,
309 S.W.3d 395 (Mo. App. 2010) .................................................................. 55

*Pitney Bowes, Inc. v. Mestre*,
701 F.2d 1365 (11th Cir. 1983) ...................................................................... 31

*Pork Plus, LLC v. Choice Genetics USA, LLC*,
2021 WL 9667325 (W.D. Mo. Feb. 22, 2021) ................................................. 38

*Rambo Assocs., Inc. v. S. Tama Cnty. Cmty. Sch. Dist.*,
487 F.3d 1178 (8th Cir. 2007) ........................................................................ 39

*Raycap Holdings LLC v. Ervin*,
2025 WL 1137206 & n.8 (E.D. Mo. Feb. 5, 2025)............................................ 48

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
173 F.3d 995 (6th Cir. 1999) .......................................................................... 15

*Realcomp II, Ltd. v. F.T.C.*,
635 F.3d 815 (6th Cir. 2011) .......................................................................... 16

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .................... 15

*Reliance Ins. Co. in Liquidation v. Chitwood*,
433 F.3d 660 (8th Cir. 2006) .................... 45

*Restored Images Consulting, LLC v. Dr. Vinyl & Assocs., Ltd.*,
2016 WL 4036049 (W.D. Mo. July 27, 2016).................... 30

*Reyna Hotel Corp. v. Lotus Hosp. Mgmt., LLC*,
714 S.W.3d 423 (Mo. App. 2025) .................... 53

*Ryko Mfg. Co. v. Eden Servs.*,
823 F.2d 1215 (8th Cir. 1987) .................... 17

*S&K Leimkuehler, Inc. v. Barcel USA, LLC*,
2018 WL 6004687 (W.D. Mo. Nov. 15, 2018).................... 38

*SanDisk Corp. v. Kingston Tech. Co.*,
2010 WL 11595034 (W.D. Wis. Nov. 15, 2010).................... 19, 27

*Savannah Place, Ltd. v. Heidelberg*,
122 S.W.3d 74 (Mo. App. 2003) .................... 45

*Schoenbaum v. E.I. DuPont de Nemours & Co.*,
517 F.Supp.2d 1125 (E.D. Mo. 2007).................... 10, 12, 14

*Schoenbaum v. E.I. DuPont de Nemours & Co.*,
2007 WL 3331291 .................... 10

*Sezzle, Inc. v. Shopify, Inc.*,
2026 WL 1283922 (D. Minn. May 11, 2026).................... 17

*Shim v. ADT, LLC*,
2020 WL 6703285 (E.D. Mo. Nov. 13, 2020).................... 46

*Simon & Simon, PC v. Align Tech., Inc.*,
533 F.Supp.3d 904 (N.D. Cal. 2021) .................... 27

*Slaughter v. Bass Pro, Inc.*,
648 F.Supp.3d 1108 (W.D. Mo. 2023) .................... 38

*SmithKline Corp. v. Eli Lilly & Co.*,
575 F.2d 1056 (3d Cir. 1978).................... 21

*St. Luke's Hosp. of Kan. City v. Benefit Mgmt. Consultants, Inc.*,
626 S.W.3d 731 (Mo. App. 2021) .................... 44

*Standard Oil Co. (Ind.) v. U.S.*,
283 U.S. 163 (1931).................... 10

*State v. Nationwide Life Ins. Co.*,
340 S.W.3d 161 (Mo. App. 2011) .................... 35

*Stehno v. Sprint Spectrum, L.P.*,
186 S.W.3d 247 (Mo. 2006) .................... 53

*Stutzman Feed Serv., Inc. v. Todd & Sargent, Inc.*,
336 F.Supp.417 (S.D. Iowa 1972) ........ 29

*Sultan v. BAC Home Loans Servicing L.P.*,
2011 WL 1557933 (W.D. Mo. Apr. 25, 2011) ........ 39

*SuperTurf, Inc. v. Monsanto Co.*,
660 F.2d 1275 (8th Cir. 1981) ........ 17

*Synergetics, Inc. v. Hurst*,
477 F.3d 949 (8th Cir. 2007) ........ 49

*Tension Envelope Corp. v. JBM Envelope Co.*,
876 F.3d 1112 (8th Cir. 2017) ........ 48, 49

*The Viability of Antitrust Price Squeeze Claims*,
51 Ariz. L. Rev. 273 (2009) ........ 26

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) ........ 16, 17

*Topchian v. JPMorgan Chase Bank, N.A.*,
760 F.3d 843 (8th Cir. 2014) ........ 6

*Topper v. Midwest Div., Inc.*,
306 S.W.3d 117 (Mo. App. 2010) ........ 53

*Toys "R" Us, Inc.* v. F.T.C.,
221 F.3d 928 (7th Cir. 2000) ........ 15

*Trimble v. Pracna*,
167 S.W.3d 706 (Mo. 2005) ........ 54

*Tri-State Broad. Co. v. United Press Int'l, Inc.*,
369 F.2d 268 (5th Cir. 1966) ........ 30

*Trone Health Servs., Inc. v. Express Scripts Holding Co.*,
2019 WL 1207866 (E.D. Mo. Mar. 14, 2019) ........ 51

*U.S. v. E. I. du Pont de Nemours & Co.*,
351 U.S. 377, 394 (1956) ........ 18

*U.S. v. Google LLC*,
747 F.Supp.3d 1 (D.D.C. 2024) ........ 23

*U.S. v. Google LLC*,
778 F.Supp.3d 797 (E.D. Va. 2025) ........ 27

*U.S. v. Griffith*,
334 U.S. 100 (1948) ........ 10

*U.S. v. Grinnell Corp.*,
384 U.S. 563 (1966) ........ 9, 14, 17

*U.S. v. Masonite Corp.*,
316 U.S. 265 (1942) ........ 9, 12

*U.S. v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .......... passim

*U.S. v. U.S. Gypsum Co.*,
333 U.S. 364 (1948) .......... 10

*U.S. v. Am. Airlines, Inc.*,
743 F.2d 1114 (5th Cir. 1984) .......... 17

*U.S. v. Bestfoods*,
524 U.S. 51 (1998) .......... 7

*U.S. v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005) .......... 19, 21, 22, 23

*Veltman v. Norton Simon, Inc.*,
425 F.Supp.774 (S.D.N.Y. 1977) .......... 41

*Verizon Comms Inc. v. Trinko*,
540 U.S. 398 (2004) .......... 26, 27

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) .......... 18

*Vogt v. State Farm Life Ins. Co.*,
963 F.3d 753 (8th Cir. 2020) .......... 32, 34, 47

*W. Forms, Inc. v. Pickell*,
308 F.3d 930 (8th Cir. 2002) .......... 48

*Watkins v. Algoa Corr. Facility Mo. Dep't of Corr.*,
2022 WL 452476 (W.D. Mo. Feb. 14, 2022) .......... 6

*Weatherly v. Ford Motor Co.*,
994 F.3d 940 (8th Cir. 2021) .......... 40

*Western Blue Print Co. v. Roberts*
367 S.W.3d 7 (Mo. 2012) .......... 48, 53

*Whitney v. Alltel Comms., Inc.*,
173 S.W.3d 300 (Mo. App. 2005) .......... 55

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) .......... 27, 31

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .......... 21, 22

*Zila, Inc. v. Tinnell*,
502 F.3d 1014 (9th Cir. 2007) .......... 31

Statutes

15 U.S.C. § 13 .......... 28

Mo. Rev. Stat. § 416.141 .......... 8

Mo. Rev. Stat. § 417.457 .......... 55

Mo. Rev. Stat § 417.453 (2)(b) .......... 49, 50

Other Authorities

REST. (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 31 (2011) .......... 39

Herbert Hovenkamp & Eric Hovenkamp, *The Viability of Antitrust Price Squeeze Claims*, 51 Ariz. L. Rev. 273 (2009) .......... 26

## INTRODUCTION

Bayer's motion asks the Court to decide disputed facts, draw inferences against Latham, and accept Bayer's defenses over the complaint's allegations. Rule 12 permits none of that.

The federal claims rest on a straightforward theory. Bayer controlled NK603, the foundational glyphosate-tolerant trait used in nearly all genetically engineered corn seed. When Bayer's last U.S. patent expired, competition should have followed and prices should have fallen. Instead, Bayer preserved its monopoly: it secured its largest competitor's agreement not to supply independent seed companies like Latham; imposed post-patent licensing and breeding restrictions that blocked generic entry; used a loyalty program to lock up the principal distribution channel; tied and bundled other traits to NK603; and retaliated when Latham pursued a competing pathway. The result confirms the exclusion alleged: years after patent expiration, no viable generic competitor has emerged and Bayer's prices have not fallen—they have only increased.

Those allegations state both Sherman Act claims. The Bayer-Corteva agreement is plausibly alleged to be a naked horizontal restraint that fixed prices, restricted output, and allocated the independent-seed-company channel. And the same agreement, together with Bayer's other conduct, alleges monopoly maintenance under section 2. Patent-law arguments do not justify dismissal because the complaint challenges restraints extending beyond—and continuing after—the patent grant. Nor may Bayer dismember the alleged scheme and demand that each practice be judged in isolation. The competitive effects must be considered as a whole, and they present fact-intensive questions for discovery.

The remaining claims are equally well pleaded. Because the complaint plausibly alleges every claim—and often supports those claims with facts already corroborated by real-world market outcomes—the motion should be denied.

## STATEMENT OF FACTS

On December 6, 2025, President Trump issued an executive order directing the Attorney General to investigate "anti-competitive behavior" in the food-supply system, noting the "seed" sector "may be vulnerable to anti-competitive manipulation that result[s] in higher prices[.]" Doc. 36 ("Comp.") ¶¶3-4. The order followed John Latham's testimony at a Senate Judiciary Committee hearing. *Id*. ¶389. On April 21, 2026, Mr. Latham's family business, Plaintiff Latham Quality, Inc. ("Latham") filed its complaint. On May 20, 2026, the Department of Justice ("DOJ") Antitrust Division announced it had secured commitments from Bayer CropScience LLC to "remove [certain] potentially anticompetitive provisions from its loyalty program." *See* May 20, 2026 DOJ Press Release. The complaint seeks damages and injunctive relief for Defendants' misconduct.

### I. BAYER CONTROLS A CRITICAL INPUT IN NEARLY ALL CORN SEED.

Defendants are Bayer Aktiengesellschaft ("Bayer AG"), Monsanto Co., Bayer CropScience LLC, Bayer CropScience LP, and Channel Bio LLC ("Channel"). Bayer AG develops and sells genetically engineered ("GE") seed products. *Id*. ¶¶70, 82. Its subsidiaries are divisions of the enterprise. *Id*. ¶¶42. Bayer CropScience LP oversees the North American agricultural business. It and/or Monsanto licenses GE seed traits in the U.S. *Id*. ¶70.

#### A. The Market for Genetically Engineered Traits is Highly Consolidated.

Plaintiff is a family-owned independent seed company ("ISC") that produces hybrid corn and soybean seeds. *Id.* ¶¶1, 31. Since 1947, it has supplied high-quality seed, including GE-traited seed, to growers through a network of 250 dealer-customers. *Id*. ¶¶ 31-32, 34-35. ISCs specialize in the multiplication, production, conditioning, packaging, marketing and sale of hybrid seed. *Id*. ¶111. To grow that seed, they purchase "Parental Inbred Seed" from manufacturers such as Bayer, subject to a licensing agreement that grants them the right to reproduce seed with patented GE traits. *Id*. ¶¶111, 203. Then, they market this seed under their own brand name. *Id*. ¶113.

The seed market is highly consolidated. *Id*. ¶5. Four companies own 95% of the IP rights in corn seed. *Id*. ¶99. Bayer and Corteva AgriScience ("Corteva") control over 70% of the entire corn-seed market and even more of the GE corn seed market. *Id*. ¶277. As a result, seeds are one of the highest input costs for farmers. *Id*. ¶105. Bayer acquired Monsanto in 2018. In response to concern over its increased market power, Bayer insisted it "would not raise prices without providing more value to farmers." *Id*. ¶¶100, 101. A few years later, however, it did raise prices without any added value and on the eve of its most valuable patent expiring. *Id*. ¶¶102, 348, 352.

**B. Bayer Controls GE Corn Seed and Licensing Markets.**

At least two markets are controlled by Bayer: the upstream input market for NK603 that is inserted into hybrid seed and the downstream market for seed containing NK603. *Id*. ¶222. "NK603" is a GE trait that makes corn tolerant to glyphosate, *id.* ¶150, a broad-spectrum herbicide that kills weeds. *Id*. ¶¶120-24. Monsanto's Roundup Ready weed control system (glyphosate and glyphosate-tolerant seed) revolutionized U.S. farming, and generated immense profits for Monsanto, which held exclusive patent rights over both glyphosate and NK603. *Id.* ¶¶131, 135-136, 158. Farmers became dependent, *id*. ¶136, and, by 2000, almost all U.S. corn acres used them. *Id*. ¶143, 154. NK603 became the backbone of the hybrid corn seed market. *Id*. ¶15.

Today, almost all GE corn seed planted in the U.S. contains NK603. *Id*. ¶¶154-157, 159. Monsanto, then Bayer, had exclusive patent rights over NK603, conferring significant market power because NK603 was, and is still, a critical input to almost all GE corn seed. *Id*. ¶¶180-81. By conditioning access on use limitations, Bayer was able to, and did, raise prices, restrict output, and foreclose competition, reaping billions in monopoly profits. *Id*. ¶136, 176, 226.

**C. Bayer Continues to Control the Markets Despite Patent Expiration.**

In November 2022, the last U.S. patent covering NK603 expired (*id*. ¶197), ending Bayer's lawful rights. In a competitive market, lower-priced generic competition would have followed. *Id.*

¶297-98. But using its monopoly power, Bayer kept generic alternatives off the market and created a post-patent monopoly. *Id.* ¶299. As a result, ISCs have continued paying supra-competitive prices. *Id.* ¶¶10, 17, 19, 22, 25, 177, 299.

## II. BAYER'S ILLEGAL AGREEMENTS AND MONOPOLIZATION.

### A. The Complaint Alleges a Claim under Section 1 of the Sherman Act.

Corteva directly competes with Bayer in GE trait licensing and GE corn seed sales. *Id.* ¶¶301, 506. After Bayer's NK603 patent expired, Corteva's entry should have driven prices toward marginal cost. *Id.* ¶301. Instead, under a 2002 agreement, Corteva's predecessor agreed not to supply NK603 to ISCs and to continue paying Bayer royalties after Bayer's last U.S. patents expired. *Id.* ¶¶211-17, 303-10. The agreement preserved Bayer as ISCs' exclusive NK603 supplier, prevented Corteva from competing on price or for ISC sales, and extended Bayer's monopoly beyond the patent term. *Id*. Bayer then increased NK603 royalties by at least 32%, extracted supracompetitive prices through direct seed sales and licenses to ISCs and Corteva, and restricted output, driving at least 59 ISCs out of business. *Id.* ¶¶200, 235, 363, 508, 519. Count 1 therefore plausibly alleges a naked horizontal agreement fixing prices, reducing output, and allocating the ISC distribution channel—a *per se* Sherman Act violation or, alternatively, an unreasonable restraint under the rule of reason. *Id.* ¶¶510, 516, 519.

### B. The Complaint Alleges a Claim Under Section 2 of the Sherman Act.

Count 2 alleges that Bayer maintained its monopoly under section 2 by keeping Corteva out of the generic market and using other anticompetitive acts to foreclose generic competition. *Id*. ¶521-30. Those acts include the Premier Performance Program ("PPP"), a loyalty program that ties and bundles products and creates *de facto* exclusive dealing through lock-in, retroactive all-or-nothing rebates, minimum thresholds, and a multi-year structure that prevents even equally efficient rivals from selling to ISCs at lower prices. *Id.* ¶¶397-404.

Bayer also uses restrictive agreements to block generic competition, raise potential rivals' costs, and extend its monopoly. *Id*. ¶¶13, 320-28. It comprehensively restricts breeding of generic NK603 beyond its legal rights. *Id*. ¶¶319-23. Despite Bayer's high prices yet significant demand, no competitor has emerged four years after patent expiration. *Id*. ¶¶199, 298, 323, 422.

Bayer also uses threats and monopoly power to suppress emergent rivals, preventing ISCs from developing generics. *Id*. ¶¶329, 365. When Latham formed an entity to develop a competing, corn seed line containing generic NK603, *id*. ¶¶366-70, 387, Bayer ordered it to stop and "remain loyal to its 'partner' Bayer," *id*. ¶372, explaining that post-patent traits "take money out of the market." *Id*. ¶373. When Latham continued, Bayer retaliated, cutting off promised market funding, and nearly bankrupting Latham by targeting customers worth millions to Latham by selling seed to them at a loss. *Id*. ¶¶12, 376-95.

## III. BAYER ENGAGES IN PRICE DISCRIMINATION.

Bayer also violates the Robinson-Patman Act's price-discrimination bar. ISCs purchase Parental Inbred Seed, a commodity, along with license rights for genetics and GE traits. *Id*. ¶469. Bayer offers a few large, favored ISCs Long-Term Incentive contracts in exchange for exclusivity, allowing them to sell corn seed $50-70 a bag cheaper than ISCs without it. *Id*. ¶467, 472. Bayer uses the program to cripple ISCs without an LTI and encourages those with an LTI to "buy up [the] struggling" for "'pennies on the dollar.'" *Id*. ¶¶473-77.

## IV. BAYER ENGAGES IN OTHER WRONGFUL CONDUCT.

Bayer's conduct also supports the Missouri-law claims discussed below. *Id*. ¶¶541-692.

## APPLICABLE STANDARDS

Rule 12 requires plausibility, not probability. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Even "very remote and unlikely" claims proceed when pleaded facts permit a

reasonable inference of liability. *Id.* (citation omitted). And allegations on information and belief are accepted as true when supporting proof is exclusively within the defendant's control or sufficient facts make culpability plausible. *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023) (reversing dismissal for failing to accept such allegations).

## ARGUMENT

### I. THE COMPLAINT DOES NOT RELY ON GROUP PLEADING.

Rule 8 only requires "fair notice of the nature and basis … for a claim, and a general indication of the type of litigation involved." *Dowling v. Boeing Co.*, 2023 WL 2645566, at *5 (E.D. Mo. Mar. 27, 2023) (quoting *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014)). Defendants' argument the complaint "makes no effort to allege which Defendant did what" is false. Mem. 8. Monsanto held patents, drafted the CPLA, and signed the agreement with Corteva; Bayer CropScience assumed/administered all and carried out U.S. operations; Channel executed retaliation; and, it was all "managed and controlled by Bayer AG and carried out by it and through the other defendants." Comp. ¶83; *see id.* ¶¶23-24, 44-51, 63-64, 70 (Bayer AG), ¶¶7, 35, 176, 185-86, 207-09, 303 (Monsanto), ¶¶56-57, 70, 91, 368, 545-46, 549 (Crop Science), ¶¶80-81, 107, 112, 225, 376-83, 393, 435-42, 447-52, 501, 677-78 (Channel). That is enough to give fair notice. *Watkins v. Algoa Corr. Facility Mo. Dep't of Corr.*, 2022 WL 452476, at *2 (W.D. Mo. Feb. 14, 2022) (citing *Ash v. Anderson Merch., LLC*, 799 F.3d 957, 961 (8th Cir. 2015) (plaintiff was "not required to determine conclusively which of the three defendant companies" was its employer or describe "corporate structure")).[2] This is especially so where, as

[2] *See Irons v. Neske*, 2021 WL 4191614, at *2 (E.D. Mo. Sept. 15, 2021) (collecting cases; collective allegations sufficient "if the complaint provides the defendants with adequate notice of the claims"); *Downing v. Goldman Phipps PLLC*, 2015 WL 4078198, at *6 (E.D. Mo. July 6, 2015) (same); *Anderson v. Waddle*, 474 F.Supp.2d 1116, 1120 (E.D. Mo. 2007) (collective references to 'the defendants' rather than specifically setting forth the names of each defendant

here, "multiple defendants are members of the same corporate family … and share counsel, [so] … should be able to sort out amongst themselves who is responsible for the alleged [wrongful] behavior." *Kruger v. Lely N. Am., Inc.*, 518 F.Supp.3d 1281, 1293 (D. Minn. 2021); *see also Judah v. Ovsak*, 550 F.Supp.3d 687, 698 (D. Minn. 2021) (denying dismissal: "in the context of the Complaint as a whole" each defendant's role was "reasonably apparent"). And antitrust law treats "the coordinated activity of a parent and its wholly owned subsidiary … as that of a single enterprise[.]" *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984).

*In re Crop Inputs Antitrust Litig.* involved unrelated manufacturers, wholesalers, and retailers allegedly conspiring, not a commonly represented corporate family that knows each entity's role. 172 F.4th 570, 575-78 (8th Cir. 2026); *Kruger*, 518 F.Supp.3d at 1293. And unlike this complaint, *Crop Inputs*, 172 F.4th at 578, inferred agreement from independent competitors' parallel conduct, requiring similar, contemporaneous acts by each defendant; *Copperweld* eliminates that concern among Bayer entities; 467 U.S. at 771. And, as stated, this complaint alleges "what [each] did that is asserted to be wrongful." 172 F.4th at 577 (citation omitted).[3]

Although these allegations are adequate on their own,[4] Plaintiff's further allegations of alter ego, agency, and joint venture preclude dismissal at this stage. Comp. ¶83. Defendants only

---

repeatedly, [but] the defendants herein can ascertain from the allegations in the [] Complaint what is being claimed as a violation of Plaintiffs' rights. No further specificity is required[.]").

[3] The complaint alleges each Defendant's role here while in the only case they cite, the "plaintiff allege[d] only that P&G owns Duracell U.S. Operations, Inc." *Energizer Brands, LLC v. Procter & Gamble Co.*, 2016 WL 2894708, at *2 (E.D. Mo. May 18, 2016 (distinguishing ownership from case where "plaintiff alleged the existence of a scheme in which all defendants participated").

[4] Monsanto and CropScience's participation is clear. Bayer AG participated by directing the conduct, and Channel by engaging in the retaliatory acts. Thus, they are "direct participants" and the "wrong can seemingly be traced to the parent through the conduct of its own personnel and management[.]" *A.O.A. v. Rennert*, 350 F.Supp.3d 818, 845 (E.D. Mo. 2018) (quoting *United States v. Bestfoods*, 524 U.S. 51, 64 (1998)); *see also Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F.Supp.2d 1048, 1069-70 (D. Colo. 2004) (parent corporations

cursorily attack the first—alter ego—ignoring the rest, which is fatal to their motion. The attack itself, if considered, is premature because it is "fact-intensive" *Cass Com. Bank v. Cap. Tech. & Leasing, LLC*, 2015 WL 4775102, at *3 (E.D. Mo. Aug. 13, 2015) (denying summary judgment). And it is based (incorrectly) entirely on Delaware law even though antitrust and RPA claims, including alter-ego liability, is governed by federal common law or by borrowing Missouri law. *See NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 727-28 & n.3 (8th Cir. 2008); Mo. Rev. Stat. § 416.141 (Missouri antirust statute "construed in harmony with … federal antitrust statutes.").[5]

Both Missouri and federal common law permit piercing the corporate veil even without proof of fraud, as Defendants argue Delaware requires. *Greater K.C. Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997); *see also Bruhn's Freezer Meats of Chi., Inc. v. U.S. Dep't of Agric.*, 438 F.2d 1332, 1343 (8th Cir. 1971) (if done "to circumvent a statute"); *Doe 1631 v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 18 (Mo. 2013) (if done to "perpetrate the violation of statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights"). Having failed to analyze the alter-ego allegations under the proper standard, the motion should be denied. Likewise, Defendants motion ignores that a choice-of-law clause applies to the state-law claims. Doc. No. 44-1 at 36-37.[6]

---

directly liable for "independently participating in the antitrust violations of their subsidiaries [if] directing, controlling, and encouraging" it).

[5] Relying on *Guidry v. Seven Trails W.,* LLC, 2014 WL 4386744 (E.D. Mo. Sept. 5, 2014), Defendants analyze alter ego exclusively under Delaware law. Mem. 8-9. *Guidry* did not involve federal claims and the court applied Delaware law because the plaintiffs did not dispute it. *Id.* at *9. Defendants argue Delaware applies because they incorporated there. But that principle has no application here, where the issue does not involve internal corporate affairs such as a fight among shareholders or election of officers. *See A.O.A.*, 350 F.Supp.3d at 835-36 (discussing and rejecting internal-affairs doctrine to alter-ego liability).

[6] Even if the Court accepts Defendants' arguments, it should not dismiss Monsanto and CropScience, whose roles are well pled. If necessary, Plaintiff can amend to make that clear.

## II. THE COMPLAINT PLEADS CLAIMS UNDER THE SHERMAN ACT.

The Court should not deny "discovery that will reveal evidence" supporting the claims when that evidence rests with the Defendants. *Twombly*, 550 U.S. at 556; *see also Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (dismissal of antitrust complaint "should be 'granted sparingly and with caution'" as "proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators"). Latham alleges that Bayer monopolizes NK603 and the corn seed market that depends on it. Even if lawful patents began that monopoly, Bayer unlawfully extended it post-patent by effectively blocking generic competition, which would have lowered prices. Comp. ¶¶8-25, 297-99. The proof is in the market: in years since expiration, prices have gone up and no competitor has emerged. Comp. ¶¶199-200, 266, 298, 345-56.

### A. Patent Law Does Not Bar Antitrust Scrutiny of Defendants' Conduct.

Defendants misstate the complaint. Latham does not allege high post-patent prices are antitrust violations alone. Mem. 9-10. Rather, Bayer uses monopoly power, competitor agreements, de facto exclusivity, tying and bundling, and restrictive licensing conditions to keep generic NK603 and NK603-traited seed out of the post-patent market, permitting high prices. Comp. ¶¶8-25, 297-328, 338-45, 360, 365-433 458, 463-65, 505-30. The Sherman Act prohibits maintaining "monopoly power" via exclusionary conduct rather than through a "superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 1966); *see also U.S. v. Microsoft Corp.*, 253 F.3d 34, 51, 58-59 (D.C. Cir. 2001); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007).

Patent rights do not change that rule. *See Microsoft Corp.*, 253 F.3d at 63-69. "Beyond the limited monopoly which is granted, the arrangements by which the patent is utilized are subject to the general law." *U.S. v. Masonite Corp.*, 316 U.S. 265, 277 (1942) (applying antitrust law). That includes antitrust scrutiny both before and after a patent expires. *F.T.C. v. Actavis, Inc.*, 570 U.S.

136, 147, 158 (2013) (patentee's settlement with competitor during patent term still subject to antitrust scrutiny); *id.* at 161 (Roberts, C.J. dissenting); *Schoenbaum v. E.I. DuPont de Nemours & Co.*, 517 F.Supp.2d 1125, 1143-44 (E.D. Mo. 2007) (denying motion to dismiss §§ 1 and 2 claims challenging Monsanto's seed licensing conduct and noting that while a patentee may unilaterally exact high royalties, an agreement with competitors regarding the price of the patented product states an antitrust claim), vacated in part on other grounds, 2007 WL 3331291. *Schoenbaum* sustained similar claims even though Monsanto's patents were then in force. Its reasoning applies with greater force here, in which the last U.S. patent on NK603 expired years ago. After all, even lawfully acquired monopoly power may not be used "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *U.S. v. Griffith*, 334 U.S. 100, 108 (1948) ("[i]f monopoly power can be used to beget monopoly, the Act becomes a feeble instrument indeed"); *Microsoft*, 253 F.3d at 63 (no categorical antitrust immunity for IP holders).

The Supreme Court has long condemned patent licenses used to fix prices, allocate markets, or suppress competition beyond the patent grant.[7] Here, Bayer exceeded its patent rights via post-expiration restraints and competitor agreements that blocked generic entry. *See Standard Oil*, 283 U.S. at 174 (concerted conduct by patentees "curtailing the manufacture and supply of a [now] unpatented product" violates Sherman Act); *Ethyl Gasoline Corp. v. U.S.*, 309 U.S. 436, 456-57 (1940) ("condition to [a] license" that will "enlarge [patentee's] monopoly" unlawful).

[7] *Standard Oil Co. (Ind.) v. U.S.*, 283 U.S. 163, 169, 174 (1931) ("limited monopolies granted to patent owners do not exempt them from the prohibitions of the Sherman Act" and fixing "royalties is tantamount to the power to fix prices"); *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 400 (1948) (use of patent licensing and royalty provisions to fix prices and restrict distribution of unpatented products violated Sherman Act); *Hartford-Empire Co. v. U.S.*, 323 U.S. 386, 406-07 (1945) (patent cross-licensing arrangements used to allocate fields of manufacture, suppress competition, and maintain prices illegal).

*Actavis,* the Supreme Court's most recent word, supports the claim. *Actavis,* 570 U.S. at 148-49. Even the dissent acknowledged that any "actions [that] go beyond the monopoly powers conferred by the patent … are subject to antitrust scrutiny." *Id.* at 162 (Roberts, C.J., dissenting). Competitor agreements, license restrictions, and retaliation that harms competition *after* the last U.S. patent covering NK603 expired enjoys no protection. *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 573 (2021) (once patent "expired" device enters the "public domain"). And patents on *other* traits are no defense to a monopoly based on NK603. *See, e.g., King Drug Co. of Florence v. SmithKline Beecham Corp.*, 791 F.3d 388, 406 (3d Cir. 2015) (patentee may not "leverage[] some part of its patent power … to cause anticompetitive harm—namely, elimination of the risk of competition").[8] The claims here are clear that Bayer's restraints "exceed its expired patent rights[,]" blocking post-patent competition. Comp. ¶322; *see also id*. ¶¶138, 313, 319.

**B. The Complaint Alleges an Illegal Agreement under the Sherman Act.**

Count 1 alleges a horizontal agreement between competitors—Monsanto/Bayer and Corteva—not a vertical distribution dispute. *See* Comp. ¶¶9, 10, 206-19, 506, 510, 511, 513(c).[9] The agreement itself is not disputed. Despite expiration of its last U.S. patent on NK603, the agreement continued to require Corteva to pay Bayer royalties on NK603-containing seed in the

---

[8] Even courts post-*Actavis* that have upheld patent-licensing agreements do so because the "anticompetitive effects [are not] greater than that authorized by settled law and precedent[.]" *F.T.C. v. Endo Pharms. Inc.*, 82 F.4th 1196, 1204 (D.C. Cir. 2023). Defendants fail to argue the alleged *post-patent* restrictions here are so authorized. Their precedent involve *unexpired* patents.

[9] Defendants' cases involved vertical agreements. *See Double D Spotting*, 136 F.3d at 559 (defendant "not a participant in the unloading services market at the same level as" plaintiff); *Electronics Comms. Corp. v. Toshiba Am. Consumer Products., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (claim "essentially a dispute about the way one product is distributed, a question of intrabrand competition" where distributor challenged termination of its distribution agreement with manufacturer). Even if Corteva used to license NK603 from Bayer, once the patent expired, Bayer could no longer supply a license to Corteva in the U.S. as its own U.S. rights had expired.

U.S. *and* barred Corteva from providing NK603 to ISCs, thereby fixing a minimum price,[10] suppressing generic output, and allocating the ISC channel to Bayer. Comp. ¶¶ 212-19, 301-07, 510-18. These allegations describe a naked horizontal restraint, which is *per se* illegal without inquiry into actual effects on competition. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984).[11] Defendants do not meaningfully argue otherwise, although they blithely challenge the existence of market power as to Count 1. Mem. 19. Even if those arguments had merit (*but infra* §II.C.1), they would not justify dismissal: "market power is not essential to antitrust claims involving naked agreements among competitors." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023).[12]

Labeling a restraint restricting competition after the patent expired a patent license is no defense. *Supra* § II.A. "The owner of a patent cannot extend his statutory grant by contract or agreement." *Masonite*, 316 U.S. at 277; *see Schoenbaum*, 517 F.Supp.2d at 1143 (applying *Masonite* to sustain § 1 claim rejecting patent-grant defense). The U.S. patents expired: so, Corteva did not need a license and Bayer did not have a right to grant anymore. Comp. ¶¶300-06. At that point, the agreement became "horizontal in an economically meaningful way" as, Corteva, a

---

[10] For purposes of applying the per se rule, price fixing includes more than a "direct agreement on the actual prices to be maintained" and includes agreements on the control of supply that are designed to "prevent prices from falling." *Palmer*, 498 U.S. at 48. The Corteva agreement to pay post-patent royalties to Bayer fixed the "minimum, post-patent price of hybrid corn seed containing NK603" (Comp. ¶ 214), which prevented the price from falling below the supra-competitive level set by Bayer. *Id.* ¶¶ 216-219, 511.

[11] Although whether the per-se rule or the rule-of-reason applies is a question of law, "underpinning that purely legal decision are numerous factual questions." *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 733-34 (8th Cir. 2014) (reversing summary judgment because "a reasonable jury could conclude the wholesalers' real agreement involved dividing territory and customers along geographic lines," which would be a "*per se* antitrust violation").

[12] And, in any event, their attack is only focused on the *downstream* market for NK603-traited seed. They concede market power in the *upstream* input market for the NK603 trait, which the Corteva agreement also restrains by restricting Corteva from supplying generic NK603 to ISCs.

source ISCs "might turn to for supply[,]" was precluded "from the market."[13] *Illinois Corp. Travel, Inc. v. Am. Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir. 1989) (Easterbrook, J.).

Agreement to pay continued royalties and allocate markets were not, therefore, ancillary to any lawful patent grant; instead, they only delayed Corteva's generic entry and preserved Bayer's post-patent monopoly. Comp. ¶¶9-10, 213-19, 306, 510-18. Defendants correctly do not argue the restraints were ancillary because, at best, that is a "defense" that Plaintiff need "not anticipate and plead around[.]" *Deslandes*, 81 F.4th at 703-05 (reversing because "the district judge jettisoned the *per se* rule too early"). Nonetheless, even if the "rule of reason" applied, the complaint alleges all that is necessary. Comp. ¶¶290 -310, 513-19. Defendants ignore all. Instead, Defendants rely on cases (*Brulotte* and *Kimble*) involving whether *patent* law renders such terms illegal. Mem. 10-12. But nothing in those cases creates an antitrust defense. *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 460-62 (2015) ("*Brulotte* is a patent rather than an antitrust case."). As explained *infra* § IV, Bayer's post-patent royalty provisions *do* violate *Brulotte* and *Kimble* but Defendants acknowledge those cases do not describe when acts "violate[s] the antitrust laws." Mem. 10. They are certainly no basis for dismissal of the antitrust claims.[14]

Bayer's Monsanto cases involved restrictions *within* the patent term. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1340 (Fed. Cir. 2006); *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1342-43 (Fed. Cir. 2004) (restrictions "not beyond the scope of the patent grant at issue"). Even if they

---

[13] Defendants justify their perpetual restrictions on still-patented traits and germplasm licensed under the CPLA or PVPA and combined with NK603. Mem. 12. That does not apply to Count 1 because the Corteva agreement prevents adding NK603 to "Corteva's own traits." Mem. 13.

[14] Defendants quote language in *Kimble*, 576 U.S. at 460-61, discussing circumstances in which post-patent royalties promote competition under a rule-of-reason analysis. Mem. 11. But *Kimble* acknowledged a "material caveat" to those benefits—the absence of "high barriers to entry," *Kimble*, 576 U.S. at 460, which are pled here. Comp. ¶524. And, as noted, the agreement here is alleged to be unlawful *per se*, while *Kimble* discussed vertical licensing agreements. Plus, the proof is the market: there has not been generic entry despite the post-patent, increasing royalties.

did not, those cases would not be a defense to Bayer "agree[ing] with [its] competitors." *Schoenbaum*, 517 F.Supp.2d at 1137, 1143 (distinguishing *McFarling* and *Scruggs*).

**C. The Complaint Alleges a Section 2 Claim under the Sherman Act.**

Section 2 prohibits willful maintenance of monopoly power through exclusionary conduct. *See Grinnell*, 384 U.S. at 570-71; *Microsoft Corp.*, 253 F.3d at 58 (exclusionary conduct by monopolist unlawful). Exclusionary conduct includes "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way[.]" *Broadcom*, 501 F.3d at 308. Plaintiff alleges an integrated monopoly-maintenance scheme: after patent expiration, Bayer used competitor agreements, licensing restraints, de facto exclusive dealing, tying and bundling, and retaliation to keep generic NK603 out of the market and preserve supra-competitive prices. Comp. ¶¶9-21, 297-328, 338-45, 360, 365-433, 458-65, 523-30. Bayer challenges: (1) market power, (2) whether these acts are exclusionary, and (3) causation.

**1. Plaintiff adequately alleges Relevant Markets and monopoly power.**

A market definition is only relevant to identify market power, which is used to determine if a restraint might adversely affect competition. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014) (the purpose of market definition is "to reveal whether…market power exists"). But allegations of "actual detrimental effects … can obviate the need for an inquiry into market power[.]" *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993) (internal marks and citation omitted). Plaintiff alleges such effects: the patents expired, prices rose, output reduced, and generic entry did not occur. Comp. ¶¶5, 8, 10 117-18, 184, 199-200, 219, 226, 329, 519. Defendants ignore these allegations, but they are "direct evidence" and independently sufficient "to infer that [they have] market power to raise prices and drive out competition." *Eastman Kodak Co. v. Image Tech. Servs.*,

*Inc.*, 504 U.S. 451, 477 (1992); *1-800 Contacts, Inc. v. F.T.C.*, 1 F.4th 102, 118 (2d Cir. 2021) (citing "direct evidence in the form of increased prices"); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (same). Definitions and market share—used to circumstantially prove market power—are thus unnecessary.[15]

Even if required, Plaintiff alleges what is necessary: "geography and product" markets. *Flegel*, 4 F.3d at 689. There are two product markets: "(1) an upstream input market for genetically modified ("GE") corn seed traits that are glyphosate tolerant (NK603 or its close substitutes), for use in commercial hybrid corn seed, and (2) the downstream market for hybrid GE corn seed that include NK603 or its close substitutes ("Relevant Markets")." Comp. ¶ 222. The geographic market is all U.S. corn-producing regions. *Id.* ¶228-31. No attack is made on the definition of product markets or the scope of the upstream market. Mem. 19; *see id.* ¶¶180-83, 224-96, 456, 523. Defendants only deny market power in the downstream market based on the fact their direct sales are below 40%. That ignores their control over a critical input, NK603, which alone plausibly shows monopoly power in both markets. It is a bottleneck input necessary to the downstream product (seed).[16] Comp. ¶180. That omission alone precludes dismissal.

---

[15] *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) ("there are two ways of proving market power" including direct evidence); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1016, 1018 (6th Cir. 1999) (reversing summary judgment despite absence of "high market share" because "plaintiffs' evidence shows direct evidence of a monopoly, that is, actual control over prices or actual exclusion of competitors"); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F.Supp.2d 367, 389 (D. Mass. 2013) (direct proof eliminates need for "circumstantial evidence").

[16] *See MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983) (monopolist's control over a "bottleneck" input "can extend monopoly power from one stage of production to another, and from one market into another."); *Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *14 (N.D. Cal. May 14, 2015) (certifying class based upon "theory of monopoly power [that] is predicated on anti-competitive conduct that affected both [an upstream] chip market and the final flash product market" in which plaintiffs "contend that [defendant] raised its competitors' costs in the upstream market for final flash products by enforcing … [d]isputed [p]atents and extracting royalties from participants in the downstream" market because "chips are

Yet, even if considered, the downstream market (and market power) is also well pled. Market definition "is a deeply fact-intensive inquiry" and "courts hesitate to grant motions to dismiss for failure to plead[.]" *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001); *Double D Spotting.*, 136 F.3d at 560; *Jones v. Varsity Brands, LLC*, 618 F.Supp.3d 725, 754 (W.D. Tenn. 2022), *on reconsideration*, 2023 WL 5662590 (W.D. Tenn. Aug. 31, 2023). Plaintiff alleges a nationwide market because it is highly concentrated; Bayer and other seed manufacturers license, market, and compete nationwide; NK603 seed is only available from one of Bayer's national distribution channels (via agreement with Corteva, Channel, DEKALB, or ISCs); and, neither demand nor royalty rate for NK603 varies by geography. Comp. ¶¶99, 106-110, 228–31, 376. ISCs receive a national license from Bayer, *see* CPLA §§2.20, 2.21, 2.26, f2.34, 3.01, and Plaintiff sold NK603-traited seed across seven Midwest states. Comp. ¶34. The markets, thus, "'correspond to commercial realities' of the industry[,]" are "economically significant," *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962), and cannot be rejected at the pleading stage absent glaring deficiency. *Todd*, 275 F.3d at 199-200; *Double D Spotting*, 136 F.3d at 560.

Defendant's argument a nationwide market is "too broad" also fails because only a too-narrow market creates "the illusion of market power where none may exist," *Home Health Specs., Inc. v. Liberty Health Sys.*, 1994 WL 463406, at *2 (E.D. Pa. Aug. 24, 1994), while there is "no risk" of that "by alleging a" nationwide market, *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at

---

critical"); *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1075 (9th Cir. 2025) ("technological barriers … are anticompetitive [if the] "only purpose is to drive up rivals' costs and cut off access to inputs necessary for competition"); *Le v. Zuffa, LLC*, 216 F.Supp.3d 1154, 1160,1165-67 (D. Nev. 2016) (plaintiff plausibly alleged that market power over input market for elite MMA fighters supported power over output market for MMA events by blocking "actual or potential rivals from accessing inputs"); *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 829 (6th Cir. 2011) (substantial market power "for residential real estate brokerage services and the market for multiple listing services, which is a vital input into the brokerage services market" because "'[b]rokers without full access to an MLS would be …at a significant competitive disadvantage'").

*10 (D. Md. Sept. 16, 2020); *see also Todd*, 275 F.3d at 199; *In re Mushroom Dir. Purch. Antitrust Litig.*, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015); *In re Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *9 n.5 (N.D. Ala. June 28, 2017). Tellingly, then, Defendants case rejects facially narrow markets. *Double D Spotting* rejected a market limited to unloading services at *one* Supervalu warehouse. 136 F.3d at 560. *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005), did not even address the issue but asked if antitrust injury was provable classwide for 100,000 growers on a developed record involving a different GE trait, different pricing practices, and a period beginning in 1996—before NK603 received regulatory approval in 2001. *Compare id*. at 566 with Comp. ¶155. The market facts here are different: a consolidated market, NK603's emergence as the foundational trait, and a nationwide royalty. *Id.* ¶¶6, 8, 152, 230, 232-40.

Lastly, even if market share were necessary, the complaint alleges it. Bayer and Corteva—alleged conspirators—directly sell well over 70% of GE corn seed. Comp. ¶277; *see Grinnell*, 384 U.S. at 571 ("two-thirds" sufficient to infer power); *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1280 n.8 (8th Cir. 1981); *Sezzle, Inc. v. Shopify, Inc.*, 2026 WL 1283922, at *8 (D. Minn. May 11, 2026). Their shares may be combined because they conspired. *See In re Pork Antitrust Litig*., 781 F.Supp.3d 758, 868 (D. Minn. 2025); *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984).[17] Bayer's cited case confirms the point, refusing to combine two company's market share absent "specific allegations of an agreement between" them. *Se. Mo. Hospital v. C.R. Bard, Inc.*, 2008 WL 199567, at *6 (E.D. Mo. Jan. 22, 2008). Plaintiff alleges that agreement *and* Bayer's control over the critical input, which empowers it to set prices across distribution channels.

[17] The complaint also alleges (Comp. ¶¶ 239, 253, 264, 279, 312, 524) relevant factors besides market share, including "a strong consumer preference for the firm's product [and] significant barriers either to the entry of new firms or to increased output by existing firms," which Defendants ignore. *Inline Pkg., LLC v. Graphic Pkg. Int'l, LLC*, 962 F.3d 1015, 1030 (8th Cir. 2020) (quoting *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1232 (8th Cir. 1987)).

Comp. ¶¶213, 226, 266, 291, 523. "[W]hen a product is controlled by one interest, without substitutes available in the market, there is monopoly power." *U.S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956).

**2. Defendants maintain a monopoly using anti-competitive conduct.**

Defendants' other section 2 arguments depend on dismembering the alleged acts. But the alleged conduct must be viewed "as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962); *see also Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1193-94 (8th Cir. 1982) (reversing dismissal where the "district court appears to have viewed the many incidents … as isolated, self-contained actions"); *Nat'l Farmers' Org., Inc. v. Assoc. Milk Producers, Inc.*, 850 F.2d 1286, 1307 (8th Cir. 1988), *am.* 878 F.2d 1118 (8th Cir. 1989). That means without "tightly compartmentalizing the … factual components … and wiping the slate clean after scrutiny of each[.]" *Cont'l Ore*, 370 U.S. at 699. The complaint alleges that, after NK603 entered the public domain, Bayer preserved its monopoly through multiple acts: by locking up Corteva, restricting post-patent breeding, using the PPP to penalize switching and therefore raise costs of potential entrants, and retaliating against Latham when it pursued a generic pathway. That coordinated conduct is monopoly maintenance through exclusion "not competition … on the merits." *Broadcom*, 501 F.3d at 308. At this stage, that is enough because "balancing anticompetitive effects against hypothesized justifications … is not amenable to resolution on the pleadings." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 451 (7th Cir. 2020).

***a) The Corteva agreement is anti-competitive.***

As explained in § II.B, the Corteva agreement neutralized the most likely post-patent competitor, excluding competition other than via the merits. Comp. ¶¶206-17, 527.

**b) *Breeding restrictions raise barriers to competition.***

Licensing restrictions can violate section 2 when the "conduct on balance harms competition and is therefore condemned as exclusionary[.]" *Microsoft*, 253 F.3d at 59-60 (condemning restrictions "protect[ing] Microsoft's operating system monopoly").[18] Bayer uses restrictive licenses to close—or substantially narrow—breeding and supply pathways needed for generic entry. The CPLA, stewardship, and related agreements prohibit ISCs, breeders, dealers, and growers from using NK603-containing seed to develop or commercialize generic NK603 products—even after patent expiration. Comp. ¶¶13-16, 305, 319-27. Those restrictions do not protect any continuing patent right and make generic entry more difficult. *Id*. ¶¶ 319-23.

Hybrid corn must be bred from seed in which NK603 has been inserted. *Id*. ¶¶11, 14-16, 104. By locking up that seed via perpetual restrictions—enforced post-patent, *id*. at ¶¶11, 14-16, 104, 181, 201-03, 313-28—Bayer "decreas[es] competition," which is exclusionary, *Microsoft Corp.*, 253 F.3d at 62 (preventing modification of boot sequence to promote competing internet browser).[19] Bayer blocked those routes while controlling the NK603 input market. *Id*. ¶¶456, 460. Absence—or even delay of—generic entry (*id.* ¶464) confirms the foreclosure. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("[c]onsumer injury results from the delay

---

[18] *See also SanDisk Corp. v. Kingston Tech. Co.*, 2010 WL 11595034, at *8 (W.D. Wis. Nov. 15, 2010) (section 2 claim stated based on patentee's licensing program because patentee was "seeking to maintain its monopoly [in upstream market] and expand monopoly powers in downstream markets by dampening innovation and creating barrier to entry … by raising the cost of doing business in those markets"); *In re Google Play Store Antitrust Litig*., 2024 WL 3302068, at *11 (N.D. Cal. July 3, 2024) (monopolist "suppress[ed] competition by actively impeding" users on its platform from loading competing app stores and by developers' terms of service).

[19] Patent disclosures *should* allow the public to replicate the invention (Mem. 2), but reality is different. *Id*. ¶317 (citing USDA report discussing how patent disclosures in seed traits may "only provide information that the patenting firm would … understand" which "inhibits the public's ability...to replicate it after the patent expires"). And although sample seed must be publicly deposited, finding a viable sample takes "years of searching" after which Bayer retaliates. *Id.* ¶12

[a] dominant firm imposes on smaller rival's growth") (quoting Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 62 (2d ed. 2002)).

Plaintiff is not required to plead around a defense. *Deslandes*, 81 F.4th at 703. Yet Defendants' defenses to the breeding restrictions require ignoring the allegations, unalleged facts, and improper inferences. First, they argue field-of-use restrictions are a proper exercise of their patent rights (Mem. 14) but, as explained, the patents are expired. *Supra* § II.A. A license cannot be used to "control conduct by the licensee not embraced in the patent monopoly." *Ethyl Gasoline*, 309 U.S. at 456–57. Defendants, thus, turn to their trade-secrets, "know how," or trademarks (Mem. 14) but they admit "the same rules" apply so a restriction must fall within the scope of those rights. (Mem. 15) Nowhere is it alleged breeding NK603 requires use of any trade secrets, trademarks, or "know how." To the contrary, the complaint alleges the "restrictions have no legitimate business purpose" and "only exist to make it more difficult for competitors to develop seed containing NK603 after the U.S. patent has expired." Comp. ¶323. Second, Defendants insist the restrictions are justified by other "traits and germplasm [in the seed] whose patent protections had not expired" (Mem. 14) but the only paragraphs Defendants cite merely identify a "stacked" product that Defendants plan, in the future, to remove from the market entirely. Comp. ¶¶22, 454. Nothing suggests every seed with NK603 in circulation contains still-patented traits or germplasm to justify ongoing restrictions; rather, the complaint plainly describes restrictions that exceed all patent rights, *id.* ¶¶318-19, including alleging royalties for NK603 "uncoupled with *any other* patented trait or proprietary germplasm material." *Id.* ¶340 (emphasis added).[20] Third, Defendants' reliance on *Matter of E. I. Dupont De Nemours & Co.*, 96 F.T.C. 653 (1980), is misplaced because

[20] If the Court rejects the existing allegation, Plaintiff respectfully seeks to leave to amend the complaint to expressly allege that there exists seed containing NK603, without *any* unexpired rights attached to it, that could have been used to breed generic products and speed up competition.

the complaint does not accuse them of a "refusal to license [any] technology." *Id.* at 749 n.40. It challenges *affirmative* restrictions that exceed the patent term.

**c) *The PPP raises costs of rivals offering a generic.***

Loyalty programs that result in "failure of generics to enter the market" not "due to competition on the merits" but by raising rivals' costs are anticompetitive. *F.T.C. v. Syngenta Crop Prot. AG*, 711 F.Supp.3d 545, 583 (M.D.N.C. 2024). The PPP did not merely reward loyalty; it penalized switching, creating another barrier to generic entry. Comp. ¶396. Defendants offer two arguments: the program was "voluntary" and it did not foreclose a substantial share of the market. Mem. 16-17. The very case they cite refutes the first argument, confirming section 2 looks to economic reality, not labels: "claims that allege only de facto exclusive dealing may be viable." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058-59 (8th Cir. 2000). Economic coercion by "dominant supplier" that "no [ISC] could afford to lose .. as a supplier" creates de facto exclusive dealing as it makes dealing with rivals irrational. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270, 278, 283 (3d Cir. 2012); *Dentsply Int'l, Inc.*, 399 F.3d at 193-94 (at-will contracts violated section 2). The PPP's retroactive, all-or-nothing thresholds, advance commitments, multi-year benchmarks, and near-exclusive volume requirements across Bayer's *entire* GE corn-trait portfolio make switching irrational. Comp. ¶¶397-405, 425-30. Generics would have to offer alternatives to all Bayer's patented technology to compete. *Id.* ¶¶403-05. *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978) (rebates that required purchase of unpatented products with patented products meant price not "determined by the economic laws of a competitive market").[21]

[21] Bayer's arguments are also contradicted by its dropping the rebate thresholds after Mr. Latham's congressional testimony, *id.* ¶¶417-19, and by committing to the DOJ not to restore

Defendants rely solely on inapposite cases resolved on developed records. *Concord Boat*, 207 F.3d 1039 (review of jury verdict); *S.E. Missouri Hospital*, 642 F.3d 608 (summary judgment). Courts do not, however, weigh allegations at the pleading stage. *See Syngenta*, 711 F.Supp.3d at 583 (denying motion to dismiss claim involving materially identical agricultural loyalty program, noting that foreclosure "turn[s] on a factual dispute ill suited for the pleadings stage") (citation omitted). Moreover, the claims in Defendants' cases failed based on evidence of real *and exercised* freedom to buy elsewhere, *Concord Boat*, 207 F.3d at 1059; *C.R. Bard*, 642 F.3d 615-17, or "scant evidence that firms have difficulty entering." *Concord Boat*, 207 F.3d at 1059. In contrast, ISCs had no "meaningful exit option during or after the contracted period[,]" Comp. ¶462; *id.* ¶¶ *id.* ¶¶212-13, 216, 307-308, 322 (explaining why). Terminating the entire CPLA would mean abandoning all Bayer products—"losing [it] as a supplier [is] not an option" because the product is essential. *ZF Meritor*, 696 F.3d at 278. And Defendants do not even address the allegations of high entry barriers or retaliation. Comp. ¶¶264-267, 316-318, 404, 463-64, 524, 527(c); *see also id*. ¶¶370-95. The PPP, therefore, "exacerbates the already high costs to enter the market," foreclosing "the most efficient channel of distribution." *Syngenta Crop Prot. AG,* 711 F.Supp.3d at 577.[22] That is enough for *de facto* exclusivity.

Second, Defendants' contention there is not sufficient market foreclosure because ISCs "collectively account for 30% of the GE corn seed market" (Mem. 17) fails in the framing because it measures the downstream *seed* market, while the PPP operates in the upstream *trait* market,

---

them. *See supra* p.2. The very existence of a DOJ investigation "bolster[s]" the allegations. *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F.Supp.3d 404, 452 (E.D. Pa. 2018).

[22] Voluntariness is also contrary to the multi-year lock-in effect, *id.* ¶¶431, which creates de facto exclusive dealing. *See Syngenta*, 711 F.Supp.3d at 578-79; *McWane*, 783 F.3d at 833-34 (short-term, voluntary agreement could harm competition); *Dentsply Int'l*, 399 F.3d at 193-94 ("'series of independent sales'" violated antitrust laws because "the economic elements involved … realistically ma[d]e the arrangements … as effective as those in written contracts").

where Bayer's 100% share is unchallenged. Comp. ¶213, 523 Also, Bayer's control of NK603 gives it control over downstream GE hybrid corn seed, and the lack of market penetration confirms foreclosure. *Dentsply*, 399 F.3d at 194. Plus, *Microsoft*—the case Defendants cite—held even share below 40%–50% is enough when they close the most efficient distribution channels and thereby preserve a monopoly. 253 F.3d at 62, 70–71; *id.* at 62 (agreement "prevent[ed distributors] from taking actions that could increase rivals' share"). *See* Comp. ¶¶391, 395, 420, 478.

Plus, Bayer did not just close the ISC channel but locked out Corteva, which, including Bayer and Channel, accounts for nearly the entire market. Comp. ¶¶16, 111-14, 116. Participation in the PPP was "economically mandatory" (*id.* ¶¶402, 458-63), committing the overwhelming majority of each ISC's corn purchases to Bayer and requiring ISCs to maintain or grow Bayer volume above prior-year levels to earn a rebate. *Id*. ¶¶398-400, 413. There was no room for a competing product: because ISCs must price, market, grow, and sell seed before knowing their royalty rate, they cannot rationally risk losing the Bayer rebate to carry a rival's product. *Id.* ¶¶401, 459. Generic rivals—if they existed—could reach ISCs only by discounting enough to offset rebates forfeited across the entire Bayer line, raising the effective marginal cost to irrational levels for an equally efficient entrant. *Id.* ¶404; *see McWane, Inc. v. F.T.C.*, 783 F.3d 814, 832 (11th Cir. 2015). Ignoring the combined effects of Bayer's exclusive agreements is "not how foreclosure is measured." *U.S. v. Google LLC*, 747 F.Supp.3d 1, 156, 163 (D.D.C. 2024). Defendants' fallback—that a rival could build a new distribution channel—ignores entry barriers and raises a fact question, not a pleading defect. *In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 779 F.Supp.3d 624, 647 (M.D.N.C. 2025).

**d) *The complaint adequately alleges illegal bundling.***

Defendants do not challenge Plaintiff's bundling allegations, only tying. A tying arrangement has three elements to be *per se* illegal, none of which Defendants dispute. *E.g.*,

*Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1499 (8th Cir. 1992). Instead, they invent two more: identification of traits besides NK603 as the tied product and definition of a tied-product market. Mem. 17-18. This Circuit requires neither, but, in any event, the allegations are sufficient.[23]

The products are distinct. Comp. ¶¶164, 166-67 (herbicide tolerance and insect resistance are distinct categories serving different agronomic functions). Defendants used its leverage through NK603 to "restrict the availability of other GE traits and increase Bayer's market share in those traits, foreclosing competition from competing seed companies and existing and emergent generic GE seed companies." *Id.* ¶ 183. The tied product is Defendants' insect-resistance traits (*id.* ¶422)—a category USDA reports on at least 87% of U.S. corn acres. *Id.* ¶167. Insect-resistance traits are not an amorphous category. *Id*. ¶422. Defendants name the products themselves—SmartStax and VT2Pro, the trait stacks they say Plaintiff licensed and sold alongside NK603. *See, e.g.*, Mem. 2, 12, 25 (citing Comp. ¶¶22, 454, 654).

In contrast, *Cavalleri v. Hermes Int'l* involved a complaint "bereft of any facts" identifying the tied products, alleging only that purchasers were forced to buy unspecified "other Hermes products" drawn from "a kaleidoscope" of goods from clothes to blankets and furniture. 2025 WL 2662897, at *3 (N.D. Cal. Sept. 17, 2025). Insect resistance is not a kaleidoscope. It is a single, defined trait category that USDA tracks, that Defendants market and license, and that the complaint identifies by name. And because exclusionary conduct is judged on its combined effect rather than

---

[23] Even in the Third Circuit these elements are not required when the defendant has market power because the tying claim is *per se* illegal. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 511 (3d Cir. 1998) ("Per se liability exists where the defendant is found to have appreciable market power in the tying market."); *accord Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1499 (8th Cir. 1992). As noted, market power is alleged.

by "dismembering it and viewing its separate parts," the Court should reject Defendants' motion. *Cont'l Ore Co.*, 370 U.S. at 699; *see supra* § II.C.[24]

**e) *Defendants' retaliatory acts also harmed competition.***

Deterring generic competition by retaliating against potential entrants, like Latham, is also exclusionary. *Microsoft*, 253 F.3d at 77-78. It prevents rivals from gaining a foothold on competitive merit. *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 804 (8th Cir. 1987) ("abrupt withdrawal of credit terms which had been established through the parties' dealings over the course of several years had no legitimate business purpose but made sense only if it was for the express purpose of stifling competition" and use of "financial power … to prevent … a source of competitive [pressure]" is actionable); *Am. President Lines, LLC v. Matson, Inc.*, 633 F.Supp.3d 209, 226 (D.D.C. 2022) ("threats by dominant firms have been held to be exclusionary conduct that violates the Sherman Act"). In *Lorain J. Co. v. United States*, for example, a dominant local newspaper was found to have violated section 2 of the Sherman Act by threatening to discontinue advertising for any customer that also advertised with a competitor. 342 U.S. 143, 152-53 (1951). At minimum, retaliation reinforces the broader exclusionary scheme: Bayer used its market position not simply to win sales, but to suppress ISC-led breeding and generic entry, strengthen barriers created by its licenses and PPP, and signal to other ISCs that attempts to compete would be punished. Comp. ¶¶12, 365-95, 458-65.[25]

---

[24] Defendants devote a footnote to arguing a corn/soybean "tie" would harm competition in soybean seed not corn. Mem. 18 n.17. The allegations describe a bundled-rebate program, not a tie: Defendants conditioned payments "on meeting the thresholds in both corn and soybean sales, effectively bundling Bayer's corn and soybean seed product lines." Comp. ¶406. This "financially penalized [Plaintiff] in *both* their soybean and *corn* business." *Id.* ¶¶408, 410 (emphasis added).

[25] Defendants' argument that the complaint does not allege below-cost pricing is beside the point. Nonetheless, Latham's allegations support a reasonable inference that Channel sold this seed below cost. *See* Comp. ¶¶384, 386-87, 393-94. That is enough for now. *Dodge Data & Analytics*

Defendants ignore the retaliatory aspect and characterize these allegations as a "price squeeze" theory. But it is more: Bayer used monopoly power over NK603, post-expiration licensing restraints, confidential information obtained through the CPLA, and Bayer-controlled seed brands to target and punish a nascent source of generic competition. *Id*. ¶¶365-95, 458-65. That is not a theory rejected in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009).[26] It is exclusionary retaliation and foreclosure as part of a broader monopoly-maintenance scheme. Nor is it a standalone refusal-to-deal claim. Latham does not seek to impose a duty on Bayer to assist a rival or deal on preferred terms. Bayer punished it for even pursuing competition. Comp. ¶¶365-95, 458-65. Section 2 permits scrutiny of such affirmative exclusionary conduct even where no free-standing duty to deal exists. *Microsoft*, 253 F.3d at 64-67; *Broadcom*, 501 F.3d at 308; *McWane*, 783 F.3d at 832. Even a refusal-to-deal claim is actionable when a monopolist terminated a pattern of cooperation that had originated in a competitive market and persisted for years with the intent to prevent competition. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-05 (1985) ("behavior [is] predatory" if it was done "to exclude

*LLC v. iSqFt, Inc.*, 183 F.Supp.3d 855, 867 (S.D. Ohio 2016) ("If a plaintiff were required to actually know a defendant's costs … no predatory pricing case would progress beyond a motion to dismiss."); *id.* (statements of intent, "stolen customer information," and costs significantly below competitors price adequate to state claim; misuse of customer information alone stated section 2 claim). If necessary, Plaintiff requests leave to amend to allege expressly.

[26] Leading antitrust scholars predicted these very facts as harming consumer welfare. *See* Erik N. Hovenkamp & Herbert Hovenkamp, *The Viability of Antitrust Price Squeeze Claims*, 51 Ariz. L. Rev. 273, 288 (2009) ("smaller firm had made a realistic threat to integrate into the dominant firm's upstream market [and] the dominant firm squeezed the smaller firm's margins to the point that it could no longer recover its fixed cost investment"). Professor Hovenkamp's scholarship is routinely relied on by the Supreme Court, including in *Verizon Comms Inc. v. Trinko*, 540 U.S. 398, 411 (2004) and *linkLine*, 555 U.S. at 453. *See also* Scholarship at the Supreme Court (identifying his treatise as most cited scholarship and his book as the 8th most cited scholarship for antitrust cases), avail. at https://nunn.law/scotus?q=antitrust&mode=most_cited (last visited Oct. 15, 2026).

rivals on some basis other than efficiency").[27] The complaint describes an abrupt departure from the parties' long-standing course of dealing, in which Bayer actively undercut its licensee's prices to punish it for exploring generic entry. To do so, Bayer *lost* money to take customers already buying Bayer-traited seed. Comp. ¶384. Its *admitted* goal was to keep generic NK603 off market because generics "take money out of the market." *Id.* ¶373, 386-87. *See Aspen Skiing*, 472 U.S. at 602 (intent is "relevant to … whether the challenged conduct is fairly characterized as 'exclusionary,'[] 'anticompetitive,' . . . or 'predatory'").[28] Defendants sacrificed short-term gains to harm Latham solely to perpetuate their monopoly because entry of a generic would erode prices it charges to others. *U.S. v. Google LLC*, 778 F.Supp.3d 797, 867 (E.D. Va. 2025) (rejecting refusal-to-deal argument on similar grounds); *Simon & Simon, PC v. Align Tech., Inc.*, 533 F.Supp.3d 904, 914-15 (N.D. Cal. 2021) (fact-based balancing of harms and benefits).

### D. Defendants' Proximate-Cause Argument is Meritless.

Defendants argue that proximate cause requires allegations that Plaintiff requested royalty-free NK603 from Corteva and Corteva agreed to supply it. Mem. at 18–19. That argument is frivolous. The pleaded injury is the supracompetitive price Plaintiff paid Bayer—an established antitrust injury. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482 (1982); *accord Blades v. Monsanto Co.*, 400 F.3d 562, 569 (8th Cir. 2005). Neither *Wholesale Grocery* nor *Concord Boat* requires an unsuccessful request for third-party supply. *Cf. Zenith Radio Corp. v. Hazeltine Rsch.*,

---

[27] *Accord Trinko*, 540 U.S. at 409 (distinguishing case involving regulated industry from *Aspen Skiing* where the monopolist elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years); *SanDisk Corp. v. Kingston Tech. Co.*, 2010 WL 11595034, at *6 (W.D. Wis. Nov. 15, 2010) ("There is no reason to think the holdings in *Trinko* and *Linkline* give monopolists free rein over the terms they set whenever they choose to deal with competitors.").

[28] Intent allegations here are unequivocal and therefore dissimilar to vague statements in *Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir. 1989) such as "'we will not be underbid[.]'"

*Inc.*, 395 U.S. 100, 114 n.9 (1969). Entry of Corteva, or any generic, "would have injected pricing pressure on Bayer, resulting in lower costs to Latham and others to produce NK603 corn seed[.]" Comp. ¶ 8; *id*. ¶¶117-18. And Defendants cannot feign ignorance; the complaint clearly alleges Corteva would have engaged "in price competition with Bayer … [and] caused the price of NK603, as an input, to fall across the Relevant Markets toward marginal cost, which in the post-patent world would be at or near zero." *Id*. ¶301.

## III. THE COMPLAINT STATES A ROBINSON-PATMAN ACT CLAIM.

The Robinson-Patman Act (RPA), 15 U.S.C. § 13, makes it unlawful to charge different purchasers a different price for commodities of like grade and quality where the effect may substantially lessen or injure competition. *Conoco Inc. v. Inman Oil Co., Inc.*, 774 F.2d 895, 901 (8th Cir. 1985). The complaint alleges unlawful price discrimination between ISCs and other, favored seed companies. Comp. ¶¶466-82. The only argument Defendants raise is that any price discrimination was for licensing, not commodity sales. Mem. 20-21. But "[a] product that is patented, or that contains patented elements, remains a commodity for purposes of the Robinson–Patman Act[.]" *Innomed Labs, LLC v. ALZA Corp.*, 368 F.3d 148, 161 (2d Cir. 2004). And Plaintiff purchased "both a license and a commodity" the latter being parent seed. Comp. ¶532; *id.* ¶ 469, 471. The complaint alleges the license is "ancillary legal permission tied to the purchase of the commodity" and the seed is "the dominant, and a necessary, part of the transaction" necessary to "grow hybrid corn seed[.]" *Id*. ¶532. And Bayer's discriminatory pricing results in a lower "price for the same Parent Inbred Seed" to other ISCs than Plaintiff. *Id.* ¶ 535. Courts have recognized such claims are proper. *E.g.*, *Monsanto Co. v. Hensel Seed Sols. LLC*, 2020 WL 2085653, at *1-*3 (E.D. Mo. Apr. 30, 2020) (denying dismissal of RPA claim).

Defendants urge use of a "dominant nature test" as applied in *Innomed Labs*, 368 F.3d at 158 (Mem. 21), but that was after trial on a full record.[29] Plaintiff here pled the commodity was dominant. Comp. ¶532. Further, *Innomed Labs* held that test had "no application" to sale of a commodity and a separate royalty-bearing distribution right to a patented product. *Id.* at 152, 159. "[C]ontracts involving both the transfer of a product and the right to distribute that product are, as a matter of law, properly considered commodities contracts." *Id.* at 158. Defendants make no attempt to justify use of the dominant nature test—such as by arguing the license and seed are "fused together." *Id.* at 159. In fact, Bayer continued to charge royalties for parent seed containing NK603 even after its last U.S. patent on NK603 expired—when a license was no longer necessary. Its arguments for dismissal, therefore, fall short.

At worst, the allegations raise fact issues not yet resolvable. *See id.* (affirming jury verdict); *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1215-16 (9th Cir. 1980) (reversing summary judgment); *Ansel Commc'ns, Inc. v. Novell, Inc.*, 1999 WL 33302368, at *3 (N.D. Cal. Mar. 24, 1999) ("factual question which is not suitable for summary adjudication"); *Stutzman Feed Serv., Inc. v. Todd & Sargent, Inc.*, 336 F.Supp.417, 420 (S.D. Iowa 1972) ("[t]he dominant nature

---

[29] Some courts (but not the Eighth Circuit) have distinguished tangible goods from intangible rights in defining commodity under the RPA, but they relied on the definition of "commodities" developed under section 3 of the Clayton Act, which included "goods, wares, merchandise, machinery or supplies." *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1035 (7th Cir. 1989) (citation omitted). Intangible *services* did not fit any of those categories, and the "dominant nature test" arose from contracts that combined services and goods. *Id*. But GE traits and related licenses are inputs (e.g., supplies), which fall within the Clayton Act's definition. Defendants' cases ignore this distinction. *See Kennedy Theater Ticket Serv. v. Ticketron, Inc.*, 342 F.Supp.922, 925 (E.D. Pa. 1972) (admission ticket to theater or amusement park a mere "license" to be admitted to a place of entertainment and therefore not a commodity); *La Salle St. Press, Inc. v. McCormick & Henderson, Inc.*, 293 F.Supp.1004, 1005 (N.D. Ill. 1968) (rejecting argument that the product *created* from exercise of a patent does not make the license a commodity), *aff'd*, 445 F.2d 84, 95 (7th Cir. 1971) (no appeal of dismissal of the RPA claim); *Linzer Prods. Corp. v. Sekar*, 499 F.Supp.2d 540, 556 (S.D.N.Y. 2007) (not addressing whether the license and accompanying machinery were "supplies"). This too is a basis for denial on the RPA claim.

of the contract ordinarily cannot be ascertained without the presentation of evidence" and "a fact question is presented as to … the dominant aspect of the agreement").[30]

## IV. DEFENDANTS ATTACK ON *BRULOTTE* SHOULD BE REJECTED.

Defendants' attacks on the application of *Brulotte v. Thys Co.*, 379 U.S. 29 (1964) fail. Mem. 10-12, 24-25. First, Latham pleads antitrust, contract, good-faith-and-fair-dealing, and unjust-enrichment claims—not patent misuse. Conduct constituting misuse may support affirmative damages under other theories. *B. Braun Medical Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1428 n.5 (Fed. Cir. 1997). So *Brulotte* need not create an independent cause of action; it establishes post-expiration royalties were unlawful causing damages recoverable under the pleaded claims.[31]

Second, *Brulotte* forecloses Defendants' "privilege to use" theory that *any* unused, unexpired patent allows royalties on an expired one. Mem. 25. That license listed twelve patents, only seven of which were incorporated into the machines, and one listed patent remained unexpired. *Brulotte*, 379 U.S. at 30 & n.2. The Court still invalidated post-expiration royalties because "any" attempt to project patent leverage beyond expiration, "whatever the legal device

[30] Defendants' cited cases are inapposite as they involve contracts for pure services or plainly intangible rights uncoupled with a tangible commodity. *See, e.g., KMG Kanal-Muller-Gruppe Int'l GmbH & Co. v. Inliner U.S.A. Inc.*, 1999 WL 1078556, at *3-*4 (S.D. Tex. May 13, 1999) (mere fact that license was used to *produce* a commodity insufficient where "discriminatory pricing" was alleged to be "fee to license a particular technology"); *Tri-State Broad. Co. v. United Press Int'l, Inc.*, 369 F.2d 268, 269 (5th Cir. 1966) (purchaser acquired "the right and privilege of broadcasting" seller's news reports over the radio but only agreed "as far as practicable" to also deliver printed reports).

[31] Defendants' reliance on *Arconic Corp. v. Novelis Inc.*, 670 F.Supp.3d 196, 204 (W.D. Penn. 2023), is misplaced because the complaining party did not even pay royalties so was not seeking disgorgement; the court merely held patent use *itself* does not create a claim for damages. And *Restored Images Consulting, LLC v. Dr. Vinyl & Assocs., Ltd.*, 2016 WL 4036049 (W.D. Mo. July 27, 2016), did not involve patents. *Id.* at *13.

employed," violates patent law. *Id.* at 31-33.[32] Here, Bayer separately priced NK603, imposed the royalty on seed incorporating that trait, and *raised* that trait-specific charge after the last NK603 patent expired. Comp. ¶¶ 152, 191, 196-200; Doc. No. 44-1 at CPLA §§ 2.19, 4.01. *Brulotte* precludes that type of "perpetual" royalty. *Lavery v. Pursuant Health, Inc.*, 126 F.4th 1170, 1175-78 (6th Cir. 2025).[33]

*Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.*, 339 U.S. 827 (1950), is inapposite because no patent there had expired; *Brulotte* expressly refused to extend royalties beyond the patent term. 379 U.S. at 33; *accord Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 137 (1969) (*Automatic Radio* "is not authority for the proposition that patentees have carte blanche ... to condition the grant of patent licenses upon the payment of royalties on unpatented articles."). *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015), reaffirmed *Brulotte*: if an agreement requires royalties for post-expiration use of a patent, "no dice." *Id.* at 459. Its latest-running-patent observation cannot mean that licensing different, still-patented technology permits perpetual royalties on an expired patent; *Brulotte* rejected that result despite an unexpired, unused patent. Nor does the exception for non-patent rights apply: *Kimble* permits

---

[32] One of Defendants' cases summarized *Brulotte* perfectly: the patent owner "was acting *in all respects* as if the patent remained in place." *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1021 (9th Cir. 2007). Defendants did the same: maintaining *and increasing* NK603 royalties and using perpetual breeding and use restrictions. *See also Pitney Bowes, Inc. v. Mestre,* 701 F.2d 1365, 1373 (11th Cir. 1983) (using leverage of patent to project monopoly "beyond the []patent period," including "exclusive rights" renders agreement "unenforceable under *Brulotte*.").

[33] *See, e.g.*, *Bradley Corp. v. Lawler Mfg. Co., Inc.*, 2020 WL 7027875, at *7 (S.D. Ind. Nov. 30, 2020) (royalty could not be collected on products that did not practice unexpired patents); *Boggild v. Kenner Prods., Div. of CPG Prods. Corp.*, 776 F.2d 1315, 1319 (6th Cir. 1985) (*Brulotte* precluded enforcement of license provisions developed in anticipation of patent protection and requiring royalty payments for use, sale, or manufacture of patented item beyond life of patent); *Bayer Cropscience LP v. Corteva, Inc.*, 2025 WL 1503764, at *8 n.114 (Del. Super. Ct. May 5, 2025) ("inclusion of patents unrelated to the royalty obligation does not allow a patent holder to circumnavigate *Brulotte*").

continued charge for trade secrets or know-how only at a reduced amount reflecting the patent's expiration. 576 U.S. at 454. Latham alleges no trade secret or know-how use, the NK603 royalty was for trait only, and that price *increased* post-patent. Comp. ¶¶ 198-200. Finally, *Corteva AgriScience LLC v. Monsanto Co.* (cited Mem. 11), unpublished and non-controlling, involved an entirely different licensing agreement, evaluated on summary judgment, that was a "last-running" agreement because it treated "collectively" NK603 in foreign jurisdictions where patents were unexpired. 2024 WL 4197718, at *1, *6 (Del. Sup. Ct. Sept 16, 2024). The CPLA is limited to the U.S., where NK603 has expired (Doc. No. 44-1, CPLA §2.34), the royalty is paid for U.S. units, and the royalty is an NK603-specific royalty set for each product. Comp. ¶¶152, 191, 196-200.

## V. COUNT 4 STATES A CLAIM FOR BREACH OF CONTRACT.

### A. Latham Identifies a Breach.

A breach may consist of failing to provide something promised or action not permitted via contract terms. *See, e.g.*, *Bell v. Shelter Gen. Ins. Co.*, 701 S.W.3d 614, 618-19 (Mo. 2024) (failure to pay tax and fees as part of comparable value); *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020) (calculating rates using unlisted factors a breach). Here, the CPLA states that Monsanto is providing, and the licensee wants to obtain, Monsanto "proprietary rights," including patents owned by Monsanto. *See* Compl. ¶ 7, 542; Doc. No. 44-1, CPLA §§1.03, 1.04. Monsanto promises to provide "a non-exclusive license of certain proprietary" rights. Doc. No. 44-1 at 1; *see also id.* CPLA §§1.07, 7.01, 6.02. But "Monsanto Rights," as relevant here, is defined as valid and *unexpired* patent claims that "cover a Licensed Product." *Id.* at §§2.26, 3.01. In exchange, licensees agree to pay a royalty. *See* Comp. ¶¶193-95, 542-45; Doc. No. 44-1, CPLA §§2.26, 3.01.[34] Once

[34] *Lucero v. Curators of University of Missouri*, in which a student alleged breach based on university rules, which were not objective, quantifiable promises but only general, "aspirational" policy statements to achieve a positive work and learning atmosphere, 400 S.W.3d 1, 6-7 (Mo.

the last NK603 patent expired, Monsanto was not providing any patent rights on it, yet still took a royalty. *Id*. ¶¶548-50; *see also* Doc. No. 44-1, CPLA §§4.02(c), 8.02 (termination for failure to pay royalties). Nothing in the CPLA permits a royalty for patent claims not conferred. *Id.* ¶548.

**B. The Contract Does Not Permit a Royalty on NK603.**

Defendants appear to assert that a licensee is required to pay royalties on NK603 so long as some Addendum contains patented traits, regardless of whether each Licensed Product contains *any* patented technology. Mem. 22-23 & fn. 19.[35] And, they say Latham could have avoided royalties by terminating the CPLA. All of this ignores contract terms, allegations, and reality.

First, Defendants' argument regarding duration of the CPLA (Mem. 23) has nothing to do with the right to impose a royalty on NK603. Second, Defendants' contract interpretation relies entirely on two definitions (§§2.18, 2.31) and one provision (§4.01) excised from the CPLA. Contracts, however, are "read … as a whole to determine the parties' intent, giving the terms their plain, ordinary, and usual meaning." *Majestic Milling Co., LLC v. River Valley Ag Exch., LLC*, 733 S.W.3d 563, 569-70 (Mo. Ct. App. 2026) (using dictionaries and considering contract's context); *Equity Fin. Res., Inc. v. Overman*, 619 S.W.3d 538, 542 (Mo. App. 2021) (same).

ISCs license "Monsanto Rights," defined as valid and *unexpired* patent claims that cover a Licensed Product. Doc. No. 44-1, CPLA §§2.26, 3.01. The definition of "Licensed Product,"

---

App. 2013), is inapposite; the promise here was not "aspirational" but objective: Defendants agreed to license patent claims in exchange for royalties.

[35] Defendants cite, and attach, a SmartStax Addendum (fn. 19), outside the pleading and inappropriately considered. Moreover, their point is entirely unclear. Contrary to suggestion, addenda are not one giant collective contract but specific to product offered and purchased by a licensee. *See* Doc. No. 44-1, CPLA §§2.18, 2.19 (stating that Licensed Products are those listed on a schedule to "each" Addendum, that such addenda are product specific, separately executed, and "independently terminable" from the CPLA), 4.01(a) (royalties per schedule to "applicable" addendum). If Defendants are urging that they can still charge a royalty on NK603 so long as other patented traits are contained in any product listed in any Addendum, that not only is contrary to law, but the fact that addenda are separate, each from the other.

standing alone (§2.18), is only a descriptor of what products appear on a schedule to each Addendum. The royalty provisions establish that a royalty is paid "per unit" in amount set annually. *Id.* at §§2.31, 4.01.[36] None nullify that the royalty is paid for a right provided by Monsanto. None permit a royalty on an unpatented trait. The ordinary meaning of "royalty" is payment for a right conferred by a patent. *See Carpenters Pension Tr. Fund of Kansas City v. Lankford Enterprises, Inc.*, 570 F.Supp.3d 731, 737 (W.D. Mo. 2021); https://www.merriam-webster.com/dictionary/royalty); *see also Kimble*, 576 U.S. at 451 ("[w]hile a patent lasts," a patentee has exclusive rights that he "may sell or license for royalty payments").[37] A license is permission to use proprietary material. *See* Comp. ¶469.

Any ambiguity is also resolved against the drafter. *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020). And contract interpretation now is "premature [because] the only inquiry is whether the plaintiff has stated a ***cognizable*** claim." *Bell*, 701 S.W.3d at 619 (emphasis original); *see also Heiss Prods., Inc. v. Watlow Elec. Mfg. Co.*, 2026 WL 617328, at *1 (E.D. Mo. Mar. 5, 2026) (declining to address contract-interpretation at the pleadings).

Defendants' argument ISCs can avoid post-patent royalties by terminating the CPLA (Mem. 23) is absurd: a termination option does not excuse a breach. ISCs would have to give up purchasing other products they contracted to license. Comp. ¶342. And termination does not necessarily cut off royalty payments. CPLA §8.03(a). This argument also is meritless for the same reasons discussed below regarding the voluntary payment doctrine.

---

[36] Such amounts are by trait, or more recently, a total indicating the amount attributable to the NK603 trait alone, uncoupled with any patented traits or genetics. Compl. ¶198.

[37] Defendants' own reliance on *Kimble* is off base. *See supra* § IV.

### C. Charging a Royalty after Patent Expiration is Counter to Patent Laws.

Finally, and contrary to Defendants' position, *Brulotte* certainly does say that a patent holder may not impose royalties for use of an invention after the patent has expired and contracts to the contrary are unenforceable. *See* § IV. The CPLA itself provides that the parties "shall comply with all applicable laws and regulations" and that nothing in the CPLA or Addenda "shall be construed so as to require the violation of any law." Doc. No. 44-1, CPLA §10.03. In the event of a conflict between any provision and any law, "the law shall prevail." *Id.* Defendants' argument ignores contract provisions and seeks an interpretation contrary thereto and to law.

## VI. COUNT 5 STATES A CLAIM FOR BREACH OF GOOD FAITH/FAIR DEALING.

Even if Defendants are correct that the contract does not prohibit them from charging post-patent royalties (Mem. 22), good faith and fair dealing does. For reasons stated, the argument that the contract "expressly permits" the challenged action and Bayer "acts in accordance with the express terms" is meritless. Mem. 25-26.[38] And contrary to suggestion, discretion over royalty amount or timing in no way overcomes a duty of good faith and fair dealing. *See* Mem. 26.

"Missouri law implies a covenant of good faith and fair dealing in every contract." *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 369 (Mo. App. 2008) (citation omitted). "[W]here 'a contract confers on one party a discretionary power affecting the rights of the other, a

---

[38] Defendants' cases are inapposite. In *Bishop v. Shelter Mut. Ins. Co.*, for example, an insurance agent alleged wrongful termination. In Missouri, however, an employer may terminate for any or no cause unless it violates a contract term of duration or cause for termination. 129 S.W.3d 500, 503 (Mo. App. 2004). The contract expressly provided for termination at any time upon written notice. *Id.* That, in conjunction with Missouri's at-will doctrine, precluded the claim. *Id.* at 505-06. Defendants' other cases are of like circumstance, not present here. *See State v. Nationwide Life Ins. Co.*, 340 S.W.3d 161, 194 (Mo. App. 2011) (term of agreement expressly defined; no implied duty to renew contract "set to expire by its negotiated terms"); *Park Ridge Assocs. v. U.M.B. Bank*, 613 S.W.3d 456, 462-63, 465 (Mo. App. 2020) (trustee properly pursued foreclosure after default and failure to cure within specified period; claim of oral agreement to negotiate after cure or modify loan precluded by statute; also sale price not inadequate).

duty is imposed to exercise the discretion in good faith and in accordance with fair dealing." *Id*. (citation omitted). Discretion "must not be exercised to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain." *Id*. at 370.[39] And the duty prevents "opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting," *id.* at 370 (citation omitted), and a party "must do nothing destructive of the other party's right to enjoy the fruits of the contract[.]" *Am. Bus. Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1142 (8th Cir. 1986).

ISCs buy NK603-containing parent seed, then invest substantial effort and expense to grow, harvest, process, condition, package, market, and sell the resulting seed. Comp. ¶¶11, 37, 104-05, 111-14, 152-54, 160, 166, 180, 182, 456. Royalties are a significant cost, yet Bayer provides only an estimate before ISCs commit production costs and announces the final rate after much of that investment is sunk. *Id*. ¶¶401, 439, 558-60. With thin margins dependent on PPP and market funding, ISCs cannot readily absorb an increase. *Id*. ¶¶ 388, 401, 435. Bayer knows and exploits that.

After years at the same per-unit price with little or no variance between estimated and final rates, Bayer sharply increased the royalty just before NK603's patent expired and continued raising it thereafter, including above its estimate after ISCs had completed production. *Id*. ¶¶200, 346-47, 349, 354, 356, 438-41, 446, 564, 566-68. Royalties rose from about 42% to 70% of a bag's cost with Bayer adding no value despite assurances otherwise. *Id*. ¶¶100-02, 352, 355, 364, 434, 569.

Bayer views generic competition and ISCs as threats to its monopoly and, knowing off-patent glyphosate depressed herbicide prices, seeks to block generic NK603 entry by weakening

[39] *See also Edoho v. Bd. of Curators of Lincoln Univ.*, 344 S.W.3d 794, 799 (Mo. App. 2011) (same); *Finova Cap. Corp. v. Ream*, 230 S.W.3d 35, 45 (Mo. App. 2007) (same); *Envt'l. Prot., Insp. & Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo. App. 2000) (same).

ISCs. *Id.* ¶¶18, 23-24, 117, 140-41, 329, 345. It raised royalties on an unpatented trait after ISCs locked in production, leaving no realistic alternative, while underpricing ISCs through its own brands to make competition nearly impossible. *Id.* ¶¶21, 437, 442, 447-49, 452-53, 561, 572.

Such conduct violates the duty of good faith and fair dealing, is in bad faith, constitutes an abuse of discretion, and is contrary to law and public policy. *Id.* ¶573.[40] Clearly, economic conditions changed—NK603 went off patent. Defendants engaged in opportunistic behavior, using discretion over royalty amounts and timing to actively harm ISCs for their own anti-competitive purposes. The CPLA does not permit *any* royalty on NK603, much less an increase, after the patent expired. Imposing post-patent royalties evades the spirit of the transaction: a patent license for a royalty. Once a patent expires, however, the trait is in the public domain. *Kimble*, 576 U.S. at 452.

Defendants are wrong that no "expectat[ion]" is identified. Mem. 27. The CPLA promises seed covered by unexpired patent rights, while Bayer's discounts, funding, decade of stable royalties, and estimates tracking final rates confirm that licensees expected a fair return and level playing field. Bayer changed the game solely to destroy the fruits of the contract for Licensees while ensuring it exceeded the gains reasonably expected at the time of contracting.

Defendants' contention that Latham seeks to add terms to the CPLA fails. Mem. 27. The duty is implied in every contract and "need not be added." *Hawthorn Bank & Hawthorn Real Estate, LLC v. F.A.L. Investments, LLC*, 449 S.W.3d 61, 67 (Mo. App. 2014). *Hardee's Food Sys., Inc. v. Hallbeck*, 2011 WL 5307807 (E.D. Mo. Nov. 3, 2011) (Mem. 27) is inapposite because the contract stated expressly that how obligations were enforced as to other franchisees did not affect

[40] *See Bishop*, 129 S.W.3d at 507 (a plaintiff properly pleads breach of good faith and fair dealing when the defendant's action violates public policy or a statute). Defendants' conduct violates a number of statutes and the policies they embody, including but not limited to patent protection granted for 20 years but no longer.

the obligations at hand. *Id.* at *1-2, 4. The CPLA contains no comparable provision. *See, e.g.*, *Monsanto Co. v. Hensel Seed Solutions*, 2019 WL 2173444, at *3 (E.D. Mo. May 20, 2019) (finding that seed dealer stated claim for breach of good faith and fair dealing that Monsanto provided discriminatory discounts to other dealers). Whether a breach occurred is a fact question. *Hawthorn*, 449 S.W.3d at 65. Latham adequately pleaded the claim.[41]

## VII. COUNT 6 IS PROPERLY PLEAD IN THE ALTERNATIVE AND THE VOLUNTARY PAYMENT DOCTRINE DOES NOT SUPPORT DISMISSAL.

### A. Count 6 is Properly Plead in the Alternative.

"[T]he mere existence of a contract does not preclude [p]laintiff from claiming in the alternative that [d]efendant was unjustly enriched." *Fellows v. Am. Campus Communities Servs., Inc.*, 2017 WL 2881121, at *3 (E.D. Mo. July 6, 2017) (rejecting dismissal because review of a motion to dismiss requires "allowing [the complaint its] broadest intendment").[42] Rule 8 expressly allows alternative claims. *See Slaughter v. Bass Pro, Inc.*, 648 F.Supp.3d 1108, 1123 (W.D. Mo. 2023) (collecting cases);[43] *Ervin v. TD Ameritrade, Inc.*, 2020 WL 8367526, at *9 (W.D. Mo. Aug.

[41] Defendants claim no waiver in the "right to vary" actual from estimated amount. Mem. 26 n. 22. The question, however, is not whether such a right exists but whether it was exercised in a manner that breached the duty of good faith and fair dealing. Defendants also ignore allegations that they had no right to impose post-patent royalties on NK603 in the first place. Moreover, the fact that historically, there was little-to-no variance indicates that accurate estimate is possible, and a decade's worth of experience is relevant to expectation and good faith performance. *See, e.g.*, *A.W.G. Farms, Inc. v. Fed. Crop Ins. Corp.*, 757 F.2d 720, 729 (8th Cir. 1985) (course of dealing "must be considered under basic principles of good faith and fairness").

[42] Defendants acknowledge alternative pleading but contend Plaintiff did not plead the absence of a valid contract in the alternative. Mem. 28. Yet, Plaintiff did plead "[a] right to charge royalties for a non-patented trait is not part of the CPLA," and its unjust enrichment claim was plead in the alternative. Comp. ¶576.

[43] *Accord Pork Plus, LLC v. Choice Genetics USA, LLC*, 2021 WL 9667325, at *7 (W.D. Mo. Feb. 22, 2021) (collecting cases); *Cape Dogwood Redevel. v. Glob. Bowling, LLC*, 2019 WL 4279402, at *3-4 (E.D. Mo. Sept. 10, 2019) (collecting cases); *Freeman*, 2020 WL 7041810 at *9; *S&K Leimkuehler, Inc. v. Barcel USA, LLC*, 2018 WL 6004687, at *5 (W.D. Mo. Nov. 15, 2018); *Hays v. Nissan N. Am. Inc.*, 297 F.Supp.3d 958, 963-64 (W.D. Mo. 2017).

28, 2020) (declining to interpret contract at dismissal stage; it "cannot conclude, as a matter of law, that the subject matter for which Plaintiff seeks recovery is addressed in a contract between the parties"); *NTD I, LLC v. Alliant Asset Mgmt. Co., LLC*, 362 F.Supp.3d 664, 681-82 (E.D. Mo. 2019) (declining summary judgment where there were disputed fact questions on contract and unjust-enrichment claims). Defendants argue "the CPLA is silent on" whether post-patent royalties are prohibited. Mem. 22. If Defendants are correct, Plaintiff's contract claim may fail but it may pursue unjust enrichment. That is because if the contract is silent on what is permitted or prohibited,[44] it falls outside the contract and equitable claims are allowed. *See McKay v. WilTel Commc'n Sys., Inc.*, 87 F.3d 970, 976 (8th Cir. 1996) (equitable claim allowed where services outside scope of compensation contract); *Rambo Assocs., Inc. v. S. Tama Cnty. Cmty. Sch. Dist.*, 487 F.3d 1178, 1189 (8th Cir. 2007) (under Iowa law, explaining general rule that if "there is no conflict between the written contract and an implied contract in law," the ordinary rule does not apply); *Boswell v. Panera Bread Co.*, 2016 WL 1392066, *1-2 (E.D. Mo. Apr. 8, 2016) (express contract did not preclude unjust enrichment); *Freeman v. Toyota Motor Sales, USA, Inc.*, 2020 WL 7041810, at *8-9 (E.D. Mo. Nov. 30, 2020) (warranty did not preclude unjust enrichment).[45]

Defendants' contention that retaining NK603 royalties is not unjust improperly seeks a merits ruling. They merely offer their own CPLA interpretation and invoke benefits other than patented GE traits. Mem. 29-30. But Plaintiff alleges that Bayer imposed and increased royalties

[44] Plaintiff also alleges that even if the CPLA requires post-patent royalties, such provisions are unconscionable and preempted by U.S. patent law. Comp. ¶¶ 334, 582, 589-90. In that instance, unjust enrichment can be used to recover monies unjustly paid. *See* REST. (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 31 cmt. A (2011); *see e.g.*, *Lee v. Enter. Leasing Co.-W., LLC*, 30 F.Supp.3d 1002, 1019-1025 (D. Nev. 2014) (citing REST. (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 32 and recognizing that where an otherwise lawful agreement contains an unlawful payment term, the payor may recover the unlawfully collected amount).

[45] *E.g.*, *Sultan v. BAC Home Loans Servicing L.P.*, 2011 WL 1557933, at *4 (W.D. Mo. Apr. 25, 2011); *Petrie v. LeVan*, 799 S.W.2d 632, 634-36 (Mo. App. 1990).

on NK603 *itself* after expiration and without adding value, and compelled payment under threat of termination. Comp. ¶¶102, 198-200. Nor could Latham avoid these royalties "without penalty" by terminating. *Id.* ¶ 342.

**B. Dismissal Based on the Voluntary Payment Doctrine is Improper.**

Defendants' voluntary-payment defense cannot support dismissal because plaintiffs need not anticipate affirmative defenses. *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 943-44 (8th Cir. 2021). Defendants bear the burden of pleading and proving the doctrine. *Damon v. City of Kansas City*, 419 S.W.3d 162, 194 (Mo. App. 2013). Because Latham has not "pleaded [itself] out of court," dismissal is improper. *Weatherly*, 994 F.3d at 944 (citation omitted); *see also Equal Empl'mt Opp. Comm'n v. Miller's Grill, Inc.*, 2026 WL 1132916, at *3 (E.D. Mo. Apr. 27, 2026) (a defendant "cannot render a complaint defective by pleading an affirmative defense").

Importantly, there are *factual* exceptions to the defense—none of which Plaintiff is required to plead to avoid dismissal since it is an affirmative defense. First, the defense does not, as Defendants recognize, apply to "fraud, duress, or a mistake of fact." Mem. 28. Nothing in the complaint alleges the absence of duress. In fact, it alleges the opposite. Comp. ¶¶582-586. Virtually all U.S.-grown corn contains NK603, and Bayer requires a license to buy, produce, or sell it. *Id.* ¶¶ 6-7, 70, 111, 113, 139, 152, 157, 190-91. Licensees have to pay the royalty to avoid termination, cutting off the right to sell not just seed with NK603 but any Bayer trait. *Id.* at ¶¶ 204, 221, 328, 342. For this reason, dismissal is inappropriate. *See Damon*, 419 S.W.3d at 194 (allegations that traffic fine paid under threat of legal action precluded dismissal). And "[n]othing in the [complaint] alleges Plaintiff[] had "full knowledge of all *the facts* in the case," rendering dismissal improper. *Hug v. Am. Traffic Sols., Inc.*, 2014 WL 2611832, at *7 (E.D. Mo. June 11, 2014) (quoting *Huch v. Charter Comms., Inc.*, 290 S.W.3d 721, 726 (Mo. 2009)) (emphasis added).

Second, restitution may be granted even for a "mistake of law if the surrounding facts raise an independent equity, as when the mistake is induced, or is accompanied by inequitable conduct of the other party." *Damon*, 419 S.W.3d at 193 (citation omitted); *see also Handly v. Lyons*, 475 S.W.2d 451, 462-63 (Mo. App. 1971) (same).

Third, the Missouri Supreme Court has refused to apply the defense when doing so would immunize unlawful behavior contrary to public policy. *Eisel v. Midwest BankCentre*, 230 S.W.3d 335, 339-40 (Mo. banc 2007).[46] Here, the complaint alleges a "violation of public policy." Comp. ¶581. Antitrust and patent laws protect free competition for the public good. Expiration of patent protection is embodied in our very Constitution. Comp. ¶137. Extraction of post-patent royalties on NK603 is an "impermissible extension of the patent monopoly beyond the statutory period." *Veltman v. Norton Simon, Inc.*, 425 F.Supp.774, 775 (S.D.N.Y. 1977) (relying on *Brulotte*). Accepting the voluntary payment doctrine here would illogically and inequitably shift the burden of recognizing unlawful behavior onto licensees and contravene law and public policy. This defense is no basis for dismissal.

## VIII. COUNT 7 ALLEGES BREACH OF GOOD FAITH AND FAIR DEALING.

Defendants characterize Count 7 as alleging only "discretionary payments by Defendants, without any consideration from Plaintiff." Mem. at 31. But that describes a bilateral contract. A contract is unilateral when "performance is based on the wish, will, or pleasure of one of the

[46] In *Eisel*, customers paid for document preparation constituting unauthorized practice of law. *Id.* The Court reasoned that unauthorized legal practice is prohibited regardless of "waiver, consent or lack of objection," and that requiring a customer to recognize unauthorized business of law would be "illogical and inequitable." *Id.* at 339-40; *see also Carpenter v. Countrywide Home Loans, Inc.*, 250 S.W.3d 697, 703 (Mo. 2008) (same); *Mitchell v. Resid. Funding Corp.*, 334 S.W.3d 477, 500 (Mo. App. 2010) (rejecting doctrine in case alleging fees prohibited by Second Mortgage Act, finding it "illogical and inequitable" to shift burden of recognizing illegality from lender to borrower). In *Huch*, the Court rejected the doctrine where it would thwart legislative protections under the Missouri Merchandising Practices Act. 290 S.W.3d at 727.

parties." *Ketcherside v. McLane*, 118 S.W.3d 631, 635 (Mo. App. 2003) (citation omitted). There is "no promise in return as consideration." *Id.* at 635. Rather, the contract "arises when the conduct of the parties supports a reasonable inference of a mutual understanding that one party perform and the other party compensate for such performance." *Id.* Thus, "the promisee performs, consideration is supplied." *Cook v. Coldwell Banker*, 967 S.W.2d 654, 657 (Mo. App. 1998); *see also Hankins v. Crain Auto. Holdings, LLC*, 129 F.4th 1088, 1094 (8th Cir. 2025); *Garrity v. A.I. Processors*, 850 S.W.2d 413, 417 (Mo. App. 1993). The offer may not be revoked after substantial performance. *Ketcherside*, 118 S.W.3d at 635; *Cook*, 967 S.W.2d at 657.

The complaint alleges a Bayer-signed PPP writing offering increasing incentive payments based on year-over-year unit sales, with 90% as the top tier. Comp. ¶¶398, 598-99. Latham "performed its end of the bargain" by selling more than 90% of its prior-year volume, but some customers returned purchases due to weather beyond Latham's control. *Id.* ¶¶601-02, 605. Although Bayer's practice, stated by its V.P. of U.S. Seed Licensing, was not to penalize licensees for such returns, Bayer denied Latham the 90% payment. *Id.* ¶¶603-07. Latham thus alleges a unilateral contract accepted by performance and an abuse of discretion that evaded the transaction's spirit and deprived Latham of its expected benefit, violating the duty of good faith and fair dealing. And Bayer's defense that it has discretion over PPP qualification fails (Mem. 31) because good faith and fair dealing exists to prevent abuses of discretion. *Supra*, § VI.

## IX. COUNT 8 ALLEGES BREACH OF CONTRACT REGARDING 2025 MARKET FUNDING.

Defendants' contention Count 8 fails to allege sufficiently definite terms or lacks consideration fails for similar reasons. Mem. 31-32 & n.27. Performance supplies consideration for a unilateral contract. *Cook*, 967 S.W.2d at 657. Plaintiff hired sales staff and targeted Corteva customers in NW Iowa at Scott Shisler and Matthew Brandt's request on March 27, 2025 and

based on its promise of market funding for Plaintiff's "production and sales efforts" there.[47] Comp. ¶613. Before agreeing to target NW Iowa, Plaintiff asked "what the plan is for market funding before going to plant." *Id.* ¶¶ 614-15. Shisler provided specific funding amounts per unit sold. *Id.* ¶616. Plaintiff accepted by email and performance, and then, at its expense, completed production, hired a salesperson, priced seed, and booked most orders. *Id.* ¶617-19, 623. Even if email acceptance did not create a bilateral contract, Plaintiff's performance created a unilateral one. *Becker v. State of Mo., Dept. of Soc. Srvs., Bd. of Prob. & Parole*, 689 F.2d 763, 766 (8th Cir. 1982) (consideration "may consist of a detriment to the promise[e] or a benefit to the promisor"). Bayer was not at liberty to revoke after Plaintiff performed. *Cook*, 967 S.W.2d at 657; *Ketcherside*, 118 S.W.3d at 637 (substantial performance where plaintiff "had everything ready to go").[48]

Certainly, Plaintiff had reasonable basis to understand Bayer would pay if Plaintiff performed: such market-funding agreements were historically honored. Comp. ¶611. Bayer's asserted justification for revoking—Plaintiff's CPLA was terminated "by 2025"—is disingenuous. Mem. 32-33. First, the market-funding contract was separate from the CPLA. Second, it was made *after* Bayer terminated the CPLA. Comp. ¶¶622-23. Even if offering funding was "discretionary" (Mem. 32) Bayer did so, and Plaintiff accepted and performed.[49]

---

[47] Defendants quibble about who made the market funding offer (Mem. at 32), but the complaint alleges that these gentlemen were "Bayer representatives." *Id.* ¶613. And this is not a claim subject to Rule 9 pleading requirements.

[48] *Edmonds Grp., L.L.C. v. Platinum Prot., L.L.C.*, 2011 WL 3444234, at *3 (E.D. Mo. Aug. 8, 2011); *Coffman Indus., Inc. v. Gorman-Taber Co.*, 521 S.W.2d 763, 772 (Mo. App. 1975).

[49] *Clark v. Washington Univ.* (cited Mem. at 32-33) is not "instructive" but easily distinguished: plaintiff's prior employment contract had expired, he became an at-will employee at an agreed upon salary but was made no promise of employment for any duration. 906 S.W.2d 789, 791-93 (Mo. App. 1995). Here, Bayer promised market funding notwithstanding licensee status and after Plaintiff was terminated.

## X. COUNTS 9-11 STATE CLAIMS FOR PROMISSORY ESTOPPEL.

Count 9, alleged in the alternative to Count 8, survives against Defendants' definitiveness argument for all the same reasons as the contract claim. And Defendants fail to concede there is a contract, so the existence of an "adequate remedy at law" is disputed (Mem. 34-35 n. 28) and Rule 8 permits alternative counts. *St. Luke's Hosp. of Kan. City v. Benefit Mgmt. Consultants, Inc.*, 626 S.W.3d 731 (Mo. App. 2021), is not to the contrary. *Id.* at 754 n.17 ("party may ordinarily plead alternative remedies and elect its preferred remedy prior to submission of the case").

Defendants' contention the promises in Counts 10 (2023-24 Riverton funding) and 11 (2023-24 SmartStax funding) are indefinite fail too because Defendants cite no case holding that Plaintiff is required to allege "exact" or closely paraphrase language used by Bayer. Mem. 35-36. "Rule 8 establishes … with unmistakable clarity … that evidence of the claim is not required." *Berk v. Choy*, 607 U.S. 187, 193 (2026) (cleaned up). Only "fair notice" is required, not "[s]pecific facts[.]" *Brown v. Adtalem Glob. Educ., Inc.*, 421 F.Supp.3d 825, 831 (W.D. Mo. 2019) (cleaned up). Bayer and Plaintiff arranged for market funding "every year for approximately 15 years." Comp. ¶ 611. It was Bayer's practice "at all times" not to put the agreement "in writing." *Id.* ¶631. Nonetheless, Plaintiff alleges names, dates, amount of funding promised, and basis on which conferred. *See* Comp. ¶¶640-48, ¶¶ 652-60.[50] Those are definite commitments for specific amounts that Plaintiff was expected to and did rely on. Indeed, Mr. Brandt not only acknowledged the Riverton debt of $73,067.94 (*id.* ¶649), but nearly two months *after the complaint was filed* a Bayer representative emailed Mr. Latham that it had "an outstanding market funding payment

---

[50] *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 437-38, 440 (8th Cir. 2013), involved a loan modification in which plaintiff alleged mere "conflicting promises" and "tentative" discussions. *Freitas v. Wells Fargo Home Mortg., Inc.*, 2011 WL 5524913, at *3 (W.D. Mo. Nov. 14, 2011); *see also Freitas*, 703 F.3d at 440-41.

owed to Latham," and, on July 27, 2026, Latham *received a $73,067.94 check*—all while Bayer's attorneys argue market-funding promises are not binding. See Exhs. 1-2.[51] The "essence of [promissory estoppel] is justifiable reliance causing damage," *Midwest Energy, Inc. v. Orion Food Sys., Inc.*, 14 S.W.3d 154, 159 (Mo. Ct. App. 2000), and estoppel is a fact question, *Savannah Place, Ltd. v. Heidelberg*, 122 S.W.3d 74, 81 (Mo. App. 2003). Defendants' independent attack on the Smartstax funding as a mere "course of performance" (Mem. 36 n.29) is defeated by the allegations that there was offer, performance and justifiable reliance. Comp. ¶¶ 654, 656-660.

Further, market-funding was entirely independent of the CPLA, requiring Plaintiff to target its sales efforts at Bayer's request. Mem. 33-34. Bayer's promise to pay for it did not result in any modifications "of this Agreement" (*i.e.,* the CPLA) which is all the integration clause applies to. Mem. 34 (citing CPLA §10.08(a)). Even Defendants call them "separate contract[s]." Mem. 34 n.28. And unlike their cases, market-funding was not "within the scope of rights and responsibilities established by the" CPLA. *Ramey v. RE/MAX Kansas City*, 2010 WL11508733, at *4 (W.D. Mo. Aug. 24, 2010); *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F.Supp.3d 1002, 1009, 1024 (E.D. Mo. 2018) (no allegation that email "would be construed … as a novation of an essential provision of their [other] Agreement.").

## XI. COUNT 12 STATES A CLAIM FOR NEGLIGENT MISREPRESENTATION REGARDING 2025 MARKET FUNDING.

As recounted above, Bayer promised 2025 market funding *after* it terminated Plaintiff's CPLA. Then, once Plaintiff performed, Bayer refused to pay *because the CPLA was terminated*, despite knowing at the time of the promise that another license had been executed with M.S. Technologies LLC "with whom Bayer knew Latham had a continuing business arrangement."

[51] Despite the payment, the claim is not moot until Bayer pays prejudgment interest required by statute. *See Reliance Ins. Co. in Liquidation v. Chitwood*, 433 F.3d 660, 665 (8th Cir. 2006).

Compl. ¶¶613-19, 626, 634-36, 663. That is classic inducement by misrepresentation: Bayer was at least negligent in expressing an intention to pay if Plaintiff performed. *Shim v. ADT, LLC*, 2020 WL 6703285, at *2 (E.D. Mo. Nov. 13, 2020) ("present intention" is cognizable misrepresentation "if a statement is a representation . . . or concerns matters within the speaker's control" (internal quotations, citation omitted)); *Bailey v. Hawthorn Bank*, 382 S.W.3d 84, 100-01 (Mo. App. 2012) (told that bank would loan money, which it failed to extend, plaintiff need not establish that bank knew of falsity at the time loan commitment made). Defendants' arguments to the contrary all fail.

First, Plaintiff alleged falsity: Shisler represented a "present intention to pay market funding and do so notwithstanding" that Plaintiff's CPLA was terminated and it was now operating under MS Tech's CPLA. Comp. ¶¶633, 665. A promise's meaning, including "truth or falsity[,]" is made based on "existing circumstances[,]" all "background[,]" and "context[.]" *Haberstick v. Gordon A. Gundaker Real Estate Co., Inc.*, 921 S.W.2d 104, 109 (Mo. App. 1996) (internal quotations, citation omitted). A post-change commitment reasonably included that the change in control would not preclude payment. *Id.* ¶665. Bayer never told Plaintiff market funding was conditioned on license status. *Id.* ¶624.[52] But Bayer then claimed it would not pay because of the change—rendering the representation false.[53] If Bayer had exercised reasonable care, it would not have made the representation, knowing Plaintiff would rely on it to perform.

Second, Plaintiff's reliance was not unjustified simply because Plaintiff knew its CPLA had been terminated when the promise was made. Mem. 37. When it promised, Bayer knew that

---

[52] Negligent misrepresentation may arise from omissions as well as representations. *Duncan v. Savannah, LLC*, 637 S.W.3d 633, 641 (Mo. App. 2021); *Lafarge N. Am., Inc. v. Disc. Grp. L.L.C.*, 574 F.3d 973, 981-82 (8th Cir. 2009).

[53] The "if" in paragraph 669 conveys no more than what remains to be proven: if Bayer, in fact, did not pay because of the change of control or if that was pretext for retaliation based on John Latham's Congressional testimony. So, either the stated reason was false or the initial intent to pay was false when made.

too, as Bayer also knew the termination was due to a change of control and that Plaintiff would continue to sell seed through its relationship with MS Technologies. Comp. ¶¶ 37, 623. Plaintiff had no reason to disbelieve Scott Shisler; it had worked with him for years. *Id.* ¶¶630, 632. At best, "[t]he right to rely on a representation is ordinarily a question of fact for the jury." *Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 690 (Mo. App. 1994); *accord Lizama v. Venus Labs., Inc.*, 679 F.Supp.3d 848, 868 (E.D. Mo. 2023).

Finally, Defendants invoke the economic loss doctrine based on two dated district court decisions and dicta in *Dubinsky v. Mermart, LLC*, 595 F.3d 812 (8th Cir. 2010) (Jarvey, J., sitting by designation), even though the circuit did "not reach the issue[,]" *id.* at 819-20. More recently, the Circuit rejected *Dubinsky*, stating "Missouri law … expressly limits this doctrine to warranty and negligence or strict liability claims." *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 774 (8th Cir. 2020). Even more recently, it reversed dismissal of fraudulent and negligent misrepresentation claims based on the doctrine, citing *Vogt*. *See Dunne v. Res. Converting, LLC*, 991 F.3d 931, 943 (8th Cir. 2021). The only Missouri state case Defendants cite *allowed* a misrepresentation claim based on pre-contract misrepresentations inducing plaintiff to act in reliance to his detriment. *O'Neal v. Stifel, Nicolaus & Co.*, 996 S.W.2d 700, 701-02 (Mo. App. 1999). Here, the misrepresentation induced Plaintiff to its detriment. Comp. ¶¶634-35, 667.

## XII. COUNT 13 STATES A CLAIM UNDER MISSOURI'S TRADE SECRET ACT.

### A. Latham's Customer Information and Data is a Trade Secret.

Defendants' contention that Plaintiff's "customer names and contact information" and "sales and product-related data" cannot be trade secrets should be rejected. Mem. 38-40. The complaint alleges much more than the identity of seed dealers, including financial statements and customer and extensive grower point-of-sale (GPOS) information including product, volume and type of purchase. Comp. ¶¶380, 382, 672 678. Defendants miss the point in arguing they "knew

the identity of all Bayer seed dealers" from stewardship agreements. Mem. at 39. The trade secrets alleged include more. And if the information was otherwise readily available, why did the CPLA require Plaintiff to provide it, limit its use, and require Bayer to keep it from its marketing personnel? *Id*. ¶ 675. Bayer seeks an inference it is not entitled to at this stage. Further, no allegation shows Defendants knew, or could readily determine, which growers or dealers *did business with Plaintiff*, including sales and product-related data, absent the information supplied to it by Plaintiff. *See id*. ¶¶674, 678. Yet, Defendants insist Bayer did not need the information "to market to dealers." Mem. at 39. The misappropriation was *not* just marketing: Plaintiff's customers were *targeted*, which required knowledge of who they were. Comp. ¶¶12, 378-80, 384, 418.

Defendants' inapposite cases involved former employees or suppliers with no noncompete who gained information or relationships in the course of their work.[54] Most relied on *Western Blue Print Co. v. Roberts* where a salesperson simply developed "customer contacts." 367 S.W.3d 7, 16, 18 (Mo. 2012). *Western Blue* was not applying the MUTSA but identified "the [employer's] proper means of protection is a non-competition agreement." *Id.* at 18 (citation omitted). In contrast, Bayer was not Plaintiff's employee and Plaintiff did not give Bayer its information to sell Latham product. *See Raycap Holdings LLC v. Ervin*, 2025 WL 1137206, at *10 & n.8 (E.D. Mo. Feb. 5, 2025) (distinguishing *Western Blue* based on lack of non-compete but finding for defendant due to plaintiff's selective enforcement, inapplicable here). Plaintiff was forced to give Bayer its information, and unlike Defendants' cases, the CPLA limited its use. Comp. ¶¶673-75.

[54] *Tension Envelope Corp. v. JBM Envelope Co.*, 876 F.3d 1112, 1115-16 (8th Cir. 2017); *Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 2000 WL 33739340, at *10-11 (E.D. Mo. Dec. 6, 2000); *Inventory Sales, LLC v. Packer Fastener & Supply Inc.*, 2026 WL 40066, at *10 (E.D. Mo. Jan. 6, 2026); *W. Forms, Inc. v. Pickell*, 308 F.3d 930, 932, 934 (8th Cir. 2002).

Customer list, pricing, and marketing information is a trade secret where the owner took steps to keep the information secret. *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 955 (8th Cir. 2023); *Conseco Fin. Servicing Corp. v. N. Am. Mortgage Co.*, 381 F.3d 811, 819 (8th Cir. 2004).[55] Unlike each party in Defendants' cases, Plaintiff did so. Comp. ¶¶673-74. Defendants' ask the Court to disregard the allegations. And *Tension Envelope Corp.*, decided on summary judgment, is inapposite: there, the supplier obtained direct-sale agreements with exactly two of plaintiff's customers, and the "unique requirements" were specifications for envelopes it was already making for plaintiff to resell. 876 F.3d at 1115, 1122. Plaintiff here had over 200 customers and there is no allegation the information Defendants used was readily available. *Inventory Sales* also was decided on summary judgment, with evidence of little effort to maintain confidentiality and plaintiff's admission that purchase information was "readily ascertainable through proper means." 2026 WL 40066, at *9. There is no such evidence or admission here.

**B. Latham Alleges Misappropriation.**

Defendants' contention that there could be no misappropriation "because the CPLA does not limit the use of dealer data" is wrong. Mem. 40. Using information Defendants "knew or had reason to know" was subject to a duty to maintain secrecy or limit use is misappropriation. Mo. Rev. Stat §417.453 (2)(b)c(ii), (iii). It is a fact-intensive inquiry inappropriate at this stage. *See*

[55] *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 957 (8th Cir. 2007) (finding no error in denying JNOV where jury found trade secret pertaining to "pricing information, customer-specific product purchases, quantities of products … and prioritization of its products" which employees under confidentiality agreement misappropriated); *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1015, 1016 (8th Cir. 2001) (upholding findings that Disney misappropriated plaintiff's advertiser list; finding error on causation based on evidence that advertising rates were valuable information usable by competitor to undersell and acquire advertiser); *Enter. Leasing Co. - S. Cent., LLC v. Heller*, 2025 WL 2731542, at *3-4 (N.D. Fla. Sept. 24, 2025) (applying Missouri law; finding non-compete reasonable where information included financial and sales data consistent with Missouri law on trade secrets).

*Cerner Corp. v. Visicu, Inc*., 667 F.Supp.2d 1062, 1077 (W.D. Mo. 2009) ("Whether a trade secret has been misappropriated is a question of fact"; denying summary judgment).

The CPLA has a confidentiality provision that binds Affiliates like Channel. Doc. No. 44-1, CPLA §§9.01(b), 9.02(a), 9.04. The CPLA expressly permits use of "names and addresses of purchasers of Licensed Products" for *only* two purposes: "direct marketing of Licensed Events and/or for direct communications regarding Channeling Programs." *Id.* at §3.09.[56] Neither—understandably—gives Defendants the right to use the information to compete with Plaintiff. Comp. ¶¶674-75. If any use was permitted, the two expressly allowed would be superfluous. And, to the contrary, the provision makes clear that it was intended to prevent the information from being used by "personnel directly involved in the marketing of Corn products under brands used by Monsanto or its Affiliates[.]" CPLA §3.09(c). That is exactly what Defendants did.

Defendants retort that the provision applies to growers, not seed dealers.[57] That ignores the general confidentiality provision and assumes dealers are not also growers, which is outside the pleading. It also assumes Defendants did not give Channel and DEKALB grower information. Comp. ¶¶673 (information included "[c]ustomer" and "dealer" data). These are questions for discovery. *See, e.g., High Sch. Servicos Educacionais, Ltda v. Curators of Univ. of Missouri*, 2020 WL 13517898, at *2 (W.D. Mo. Nov. 6, 2020) (denying motion to dismiss where agreement

---

[56] A "Licensed Event" is the specific genetic event, CPLA §2.16, which is different than a "Licensed Product"—seed containing that event. CPLA §2.18. A "Channeling Program" is a program used to maintain separation of GE seed from other seed. *See* CPLA §2.02.

[57] Any focus on disclosure neglects that the MUTSA prohibits ***use*** of a trade secret without the owner's consent. *See* Mo. Rev. Stat. §417.453(2)(b) (defining misappropriation as "[d]isclosure ***or use*** of a trade secret … without express or implied consent by another person" who, among other things, knew or should have known that knowledge of the trade secret was … [a]cquired under circumstances giving rise to a duty to maintain its secrecy ***or limit its use***") (emphasis added). Latham alleges that its trade secret information was provided to Channel and DEKALB sales representatives "who used that information without Latham's consent." Comp. ¶678-81. Neither the CPLA nor MUTSA permit use of Latham's information in the manner alleged.

protected confidential information, including customer list, operational manual and other information stored on google drive, by prohibiting defendants' use "beyond the scope of the agreement" and plaintiff restricted access to those with credentials). Defendants' final argument relies on more inapposite cases. Mem. 40-41. *See Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 2019 WL 1207866, at *1-2, 4, 7-9 (E.D. Mo. Mar. 14, 2019) (data at issue did not belong to plaintiff but defendant and agreement allowed its use)*; Kreisler Drug Co., Inc. Mo. Cvs Pharm., LLC v. Naber*, 2016 WL 5844145, at *1, 3, 8 (W.D. Mo. Oct. 4, 2016) (on summary judgment, concluding allowing access was common in the industry, sharing of general physician information was permitted, and party consented to its transfer).

## XIII. COUNT 14 STATES A CLAIM FOR TORTIOUS INTERFERENCE.

### A. Latham's Business Relationships were Not Based Solely on the CPLA.

The business expectancy at issue is not based on "a contract alone." Mem. 42. Defendants' cases involved distribution or agency agreements and plaintiffs challenging interference with the customers that arose solely based on those agreements.[58] But where a party develops its own relationships with customers, a defendant can tortiously interfere with them. *E.g., Boyer v. Grandview Manor Care Ctr., Inc.*, 805 S.W.2d 187, 189-90 (Mo. App. 1991) (rejecting argument that "whatever relationship [physician] had with [patient] was created only by [facility's] assignment of [patient] to him" where administrator did not assign physician and family contracted

[58] Both decisions relied on *Cole v. Homier Distrib.* Co., 599 F.3d 856 (8th Cir. 2010), a distributorship case, relying on three Missouri cases. *Id.* at 861. In two, plaintiffs were selling as defendant's agent so customers belonged to defendant, not plaintiff. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 525-26 (Mo. App. 2007); *Jurisprudence Wireless Commc'ns, Inc. v. CyberTel Corp.*, 26 S.W.3d 300, 301 (Mo. App. 2000). The other, *BMK Corp. v. Clayton Corp.*, was also a distributorship. In affirming judgment for plaintiff, the court simply distinguished cases (including *Jurisprudence*) and analyzed facts. 226 S.W.3d 179, 191-92 (Mo. App. 2007).

directly with physician for patient care).[59] Latham is neither mere distributor nor agent and does not allege interference through termination of the CPLA. It sells hybrid seed it produces.

For 75 years, Plaintiff produced, marketed, and sold its seed under its own brand. Comp. ¶¶1, 34-35, 113. Customers were cultivated over years of building its brand and "providing quality products and service to growers and dealers across the country." Comp. ¶¶1, 116 (ISCs serve "an important role" by offering seed and services through regional presence). Some customers had been with Plaintiff "for years." *Id.* ¶377. Latham only purchases inputs from Bayer to seed it then produces. *Id.* ¶111, 115. While important, neither those inputs nor the CPLA "alone" created the business expectancy, so Defendants' authorities do not apply. *See Major Brands, Inc. v. Mast-Jagermeister US, Inc.*, 2019 WL 6050731, at *9-10 (E.D. Mo. Nov. 15, 2019) (relationships with retailers that "are independent" of distribution agreement, "'formed through years of relationship-building and commercial sales,'" and when "[s]ome … pre-dated [plaintiff's] distribution of the Jägermeister Brands" sufficient); *see also Major Cadillac, Inc. v. Gen. Motors Corp.*, 2008 WL 482398, at *3 (W.D. Mo. Feb. 19, 2008) (expectancy properly based on plaintiffs' longstanding customer relationships).[60] And nothing in the complaint alleges Plaintiff lost *only* Bayer-traited seed sales. Mem. 42. Plaintiff sold soybeans too (Comp. ¶1), where Corteva offered popular competing traits. Comp. ¶409. And Bayer targeted and stole soybean sales as well.[61]

---

[59] Extending these cases beyond their context would defeat tortious interference in all situations where there is a contract. An employer's expectation of continued business might be viewed as based on an employee's non-compete, yet interference exists when ex-employee solicits customers away to another company. *E.g.*, *CIBC Bank USA et al. v. Williams*, 669 S.W.3d 298, 310-11 (Mo. App. 2023); *Church Mut. Ins. Co. v. Sands*, 2014 WL 3385208, *6 (W.D. Mo. July 9, 2014).

[60] Also Defendant's argument that "Plaintiff could sell Bayer-traited seed … only because it had a CPLA" ignores Latham sells seed on behalf of MS Tech without a CPLA and Bayer offered it market funding to do so—clearly recognizing the importance of Latham's relationships.

[61] Again, a plaintiff is not required to plead around defenses. If Count 14 is adequately plead, Latham would amend to add allegations that many customers predated the CPLA, were developed independent of it, and that Defendant also interfered with non-Bayer-traited products.

**B. Latham Alleges a Lack of Justification and Wrongful Means.**

Defendants had no legitimate economic purpose in replacing sales by Latham with sales by its direct-sales divisions, at prices that created a "loss of profits." Comp. ¶393. Those customers "were already buying Bayer seed from Latham at a higher royalty to Bayer." Comp. ¶386. Defendants call this "implausible" but cannot address it directly. Instead, Defendants say they merely wanted to "establish[] relationships when … needed to counter Plaintiff's directly competing products." Mem. 43, fn. 34. No *allegation* supports that; Defendants do not get inferences at this stage. Latham's allegations control: Defendants' purpose was to harm Latham and foreclose generic NK603 competition, which was possible only by Bayer's dominant market power. *Id*. ¶¶365, 386-87. That is improper means, not justification for the conduct alleged.

Even when there *is* justification, improper means "destroys any justification the defendant may have had for interfering." *Reyna Hotel Corp. v. Lotus Hosp. Mgmt., LLC*, 714 S.W.3d 423, 436 (Mo. App. 2025) (citation omitted). Improper means includes any conduct independently wrongful including "'threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law.'" *Western Blue,* 367 S.W.3d at 20 (quoting *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. 2006)); *Topper v. Midwest Div., Inc.*, 306 S.W.3d 117, 126 (Mo. App. 2010); *Kerr Const. Paving Co., Inc. v. Khazin*, 961 S.W.2d 75, 80 (Mo. App. 1997). Anti-competitive conduct can constitute improper means. *See Am. Bus. Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1145 (8th Cir. 1986) (evidence suggested "conspiracy violative of public policy and perhaps of state and federal anti-trust laws"); *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310, 315-16 (Mo. 1979) (improper means from anticompetitive agreements and conduct). Latham also asserts predatory and retaliatory conduct, which Defendants do not address. Latham also alleges misappropriation of trade secrets, which can also be improper means. *Lyn-Flex W., Inc. v.*

*Dieckhaus*, 24 S.W.3d 693, 700 (Mo. App. 1999).[62] These alleged improper means and Defendants' purported justification present fact questions not properly resolved here.

## XIV. THE LIMITATION OF LIABILITY DOES NOT BAR COUNTS 13 OR 14.

Defendants' contention that a limitation-of-liability provision in the CPLA bars Count 13 (MUTSA) and Count 14 (tortious interference) fails because the provision only applies to "damages … suffered ***for breach hereof***, whether based on contract or tort[.]" CPLA §7.04 (emphasis added) (capitalization removed). This is interpreted according to plain language. *Ferbet v. Hidden Valley Golf & Ski, Inc.*, 618 S.W.3d 596, 605 (Mo. App. 2020). Any ambiguity is construed against the drafter. *Trimble v. Pracna*, 167 S.W.3d 706, 715 (Mo. 2005). Because the limitation only applies to a "breach *hereof*" it can only apply to a breach of the CPLA. That may extend to "tort" claims for a breach of the CPLA but no further under the plain language. Bayer did not employ broad phrases like "arising from" or "related to" the CPLA.[63] Neither violation of the MUTSA nor tortious interference constitutes or is based on a breach of the CPLA.

Section 7.04 does not apply to the MUTSA claim for other reasons. First, it conflicts with public policy as reflected in the statute. *See Huch*, 290 S.W.3d at 726-27 (rejecting voluntary-payment doctrine as defense to statutory claim); *Lift Truck Lease & Serv., Inc. v. Nissan Forklift*

[62] Defendants' undeveloped preemption footnote (Mem. 44, n.35) ignores that section 417.463 does not displace tort claims "not entirely predicted on misappropriation of trade secrets." *Church*, 2014 WL 3385208, at *7; *LifeScience Techs., LLC v. Mercy Health*, 632 F.Supp.3d 949, 959 (E.D. Mo. 2022). Here, Defendants' use of information it provided was improper even if it does not rise to the level of a trade secret given that the CPLA allows only limited use of a limited category of information, and contractual terms can show lack of justification. *See Envtl. Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.*, 178 S.W.3d 691, 704-05 (Mo. App. 2005) (actions contrary to terms of contract sufficient evidence for jury to conclude diverting payment unjustified).

[63] The CPLA elsewhere restricts any limitation on rights and remedies "with respect to failure … to comply with the terms of this Agreement" to those "expressly stated." It also provides that unless otherwise expressly stated, "the aggrieved Party shall in all events be entitled to seek whatever additional remedies may be available in law or in equity." CPLA §10.12.

*Corp., N. Am.*, 2013 WL 3092115, at *4-5 (E.D. Mo. June 18, 2013) (finding limitation-of-liability provision unenforceable as limiting statutory protections under Missouri Power Equipment Act); *see also Whitney v. Alltel Comms., Inc.*, 173 S.W.3d 300, 310-11 (Mo. App. 2005) (arbitration provision unconscionable where it would frustrate protections of Merchandising Practices Act). Second, the MUTSA expressly provides for recovery of actual loss caused by misappropriation, unjust enrichment, and punitive damages, Mo. Rev. Stat. § 417.457,[64] and the CPLA states that if there is a conflict between a contract provision and the law, "the law shall prevail.". CPLA §10.03. And even if §7.04 applied by its terms (and it does not), Plaintiff alleges the CPLA is unconscionable. Comp. ¶¶188-89, 583-587. Defendants acknowledge limitations-on-liability clauses are only "enforceable as long as they are not unconscionable or against public policy." Mem. 29, 44. Yet, they do not challenge the allegations. Dismissal is therefore improper.

**<u>CONCLUSION</u>**

The motion to dismiss should be denied. If any part is granted, Plaintiff respectfully asks for it to be granted without prejudice and for leave to amend. Given the number of claims, arguments, authorities, and issues, it is difficult to identify all possible amendments within existing page limits. Plaintiff is prepared to act expeditiously.

[64] Damages for unjust enrichment is benefit to the defendant, not loss to the plaintiff, *Pitman v. City of Columbia*, 309 S.W.3d 395, 403 (Mo. App. 2010), which is not specified in §7.04.

Dated: October 16, 2026

Respectfully Submitted,

*/s/ Bradley T. Wilders*

George A. Hanson, 43450(MO)
Bradley T. Wilders, 60444(MO)
Stefon J. David, 72761(MO)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Rd Suite 200
Kansas City, Missouri 64113
816-714-7100 – telephone
hanson@stuevesiegel.com
wilders@stuevesiegel.com
david@stuevesiegel.com

Tracey F. George, 52361(MO)
**DAVIS GEORGE, LLC**
1600 Genessee St., Ste 328
Kansas City, MO 64102
816-569-2629 - telephone
tracey@dgmlawyers.com

Don M. Downing, 30405(MO)
Gretchen Garrison, 33963(MO)
**GRAY RITTER GRAHAM**
701 Market St., Ste. 800
St. Louis, MO 63101
314-241-5620 - telephone
ddowning@grgpc.com
ggarrison@grgpc.com

*Attorneys for Plaintiff and the Proposed Class*